UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ADAM FRANCHI, Individually and on Behalf of All Others Similarly Situated, )<br><br>Plaintiff, )<br><br>vs. )<br><br>SMILEDIRECTCLUB, INC., et al., )<br><br>Defendants. ) | Civil Action No. 3:19-cv-00962<br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensley<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

CONSOLIDATED COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES LAWS

## INTRODUCTION

1.      This is a securities class action brought on behalf of all persons who acquired the Class A common stock of SmileDirectClub, Inc. ("SDC" or the "Company") traceable to a false and misleading registration statement and prospectus (collectively, the "Registration Statement") utilized in connection with SDC's September 12, 2019 initial public offering (the "Class"). This action asserts strict liability claims brought under §§11, 12(a)(2) and 15 of the Securities Act of 1933 (the "1933 Act" or the "Securities Act") against SDC, its board of directors, the private equity firm that controlled SDC, and the investment banks which underwrote SDC's initial public offering. This action arises out of defendants' use of the false and misleading Registration Statement to sell more than $1.3 billion of SDC Class A common stock to Lead Plaintiff and the Class at a price of $23 per share, more than $625 million of which was paid directly to the Individual Defendants in connection with the IPO.

## SUMMARY OF THE ACTION

2.      SDC operates as a teledentistry company. The Company is headquartered in Nashville, Tennessee. SDC manufactures, markets, and sells 3D-printed clear dental aligners to treat malocclusion through its website, as well as through retail stores known as SmileShops. SmileDirectClub stock trades under the ticker symbol "SDC" on the NASDAQ.

3.      In May 2019, defendants filed the Registration Statement with the U.S. Securities and Exchange Commission ("SEC") in connection with the planned sale of SDC common stock. The Registration Statement was then used to sell more than $1.3 billion of Class A common stock in SDC's September 12, 2019 initial public offering ("IPO"). The Registration Statement contained false and misleading statements and omitted material facts necessary to make the statements made therein not false or misleading, including:

- 1 -

(a)      known trends in the Company's revenue, gross profit and Adjusted EBITDA, which at the time of the IPO were substantially declining compared to the historical growth disclosed in the Registration Statement;[1]

(b)      the level of customer dissatisfaction and negative customer experiences related to SDC's treatment plans, as the Registration Statement claimed high levels of member satisfaction would drive future growth, while omitting the fact that: (i) thousands of customers had made complaints about the Company's products and services, some of which involved serious injury; and (ii) SDC was engaged in a hardball litigation campaign designed to suppress SDC customers and medical professionals critical of SDC's products and business practices;

(c)      the actual standard of care SDC provided to its customers - while claiming that SDC provided high quality care at lower costs by streamlining the process and eliminating overhead associated with traditional treatment by an orthodontist, the Registration Statement omitted that SDC had endangered the health of many of its customers by proscribing aligners to customers who were not suitable candidates, and by failing to provide adequate, or any, ongoing dental care and supervision to its customers; and

(d)      the legislative and regulatory risks facing the Company – the Registration Statement, among other things, failed to disclose a long-running investigation by the California Dental Board, which had resulted in raids on the Company's California SmileShops, and the looming impact of California legislation designed to thwart SDC's improper business practices.

4.      By December 17, 2019, SDC's stock had declined to as low as $7.70 per share, a decline of more than 66% below the IPO offering price, inflicting substantial economic harm on

---

[1]     SDC defines Adjusted EBITDA as net profit (or loss) before provision for income tax expense, interest expense, depreciation and amortization, and loss on disposal of property, plant and equipment, adjusted to remove derivative fair value adjustments, loss on extinguishment of debt, foreign currency adjustments, and equity-based compensation.

4852-7379-3205.v1

Lead Plaintiff and the Class who purchased SDC stock pursuant and traceable to the false and misleading Registration Statement.

## JURISDICTION AND VENUE

5. The claims asserted herein arise under and pursuant to §§11, 12 and 15 of the 1933 Act [15 U.S.C. §§77k, 77l(a)(2) and 77o].

6. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §22 of the 1933 Act.

7. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because SDC's headquarters are in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

8. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

9. Lead Plaintiff 1199 SEIU Health Care Employees Pension Fund ("SEIU" or "Lead Plaintiff") acquired the SDC Class A common stock pursuant and traceable to the Registration Statement, as set forth in its certification previously filed with the Court, and has been damaged thereby. ECF No. 33-3.

10. Defendant SDC operates as a teledentistry company. SDC is headquartered in Nashville, Tennessee and its shares are listed and trade on the NASDAQ under the ticker "SDC."

11. Defendant David Katzman is, and was at the time of the IPO, the Chief Executive Officer and Chairman of the Board of SDC. David Katzman is co-founder Jordan Katzman's father and, through his position as the managing partner of Camelot Venture Group ("Camelot"), provided the initial funding for SDC. Through his stock ownership, stock voting agreement, and position as

- 3 -

the managing partner of Camelot, David Katzman controls the business operations of SDC. David Katzman participated in the preparation of, and signed, the Registration Statement. David Katzman, through entities which he controls and of which he is the beneficiary, sold 8,998,951 Units and shares of common stock to the Company for proceeds of more than $198.4 million. In addition, Heather Katzman, David Katzman's spouse, sold 63,699 Units and shares of common stock for additional proceeds of more than $1.39 million.

12. Defendant Kyle Wailes ("Wailes") is, and was at the time of the IPO, the Chief Financial Officer of SDC. Defendant Wailes participated in the preparation of, and signed, the Registration Statement.

13. Defendant Steven Katzman is, and was at the time of the IPO, Chief Operating Officer and a director of SDC. Steven Katzman is co-founder Jordan Katzman's uncle. Through his stock ownership, stock voting agreement, and position as an advisor of defendant Camelot, Steven Katzman controls the business operations of SDC. Steven Katzman participated in the preparation of, and signed, the Registration Statement. Steven Katzman sold 663,595 Units and shares of the common stock to the Company for proceeds of more than $14.5 million. Steven Katzman is also the Trustee for the David B. Katzman 2009 Family Trust, which sold 2,907,335 Units and shares of common stock for proceeds of more than $64 million.

14. Defendant Jordan Katzman is, and was at the time of the IPO, a co-founder of SDC and a member of its Board of Directors. Jordan Katzman participated in the preparation of, and signed, the Registration Statement. Jordan Katzman, through entities which he controls and of which he is the beneficiary, sold 7,141,516 Units and shares of common stock to the Company for proceeds of more than $157 million.

- 4 -

15.     Defendant Alexander Fenkell is, and was at the time of the IPO, a co-founder of SDC and a member of its Board of Directors.  Fenkell participated in the preparation of, and signed, the Registration Statement. Fenkell, through entities which he controls and of which he is the beneficiary, sold 6,521,446 Units and shares of common stock to the Company for proceeds of more than $143.75 million.

16.     Defendant Richard Schnall is, and was at the time of the IPO, a director of SDC and a partner with Clayton, Dublier & Rice ("CD&R").  Schnall participated in the preparation of, and signed, the Registration Statement. CD&R, through its subsidiaries, sold 2,275,857 Units to the Company for proceeds of more than $49 million.

17.     Defendant Susan Greenspon Rammelt is, and was at the time of the IPO, a director of SDC.  Rammelt participated in the preparation of, and signed, the Registration Statement. Rammelt sold 29,964 Units and shares of common stock to the Company for proceeds of more than $650,000.

18.     The defendants referenced above in ¶¶11-17 are referred to herein as the "Individual Defendants." All told collectively through entities they control or of which they are a partner or beneficiary, the Individual Defendants sold more than $625 million worth of Units and common stock to the Company in connection with and as part of the IPO as the Company purchased these Units and common stock with proceeds raised from investors in the IPO.

19.     Defendants J.P. Morgan Securities LLC and Citigroup Global Markets Inc. acted as lead underwriters of the IPO, and participated in the drafting and/or dissemination of the Registration Statement.  Defendants BofA Securities, Inc., UBS Securities LLC, Jefferies LLC, Credit Suisse Securities (USA) LLC, Guggenheim Securities, LLC, Stifel, Nicolaus & Company, Incorporated, William Blair & Company, L.L.C. and Loop Capital Markets LLC each acted as underwriters of the IPO.  Each of the underwriters acted as an underwriter of the IPO, and participated in the drafting

4852-7379-3205.v1

and/or dissemination of the Registration Statement as well as the sale of more than $1.345 billion of SDC common stock to the Class.

20.    The defendants referenced in ¶19 are referred to collectively as the "Underwriter Defendants." The Underwriter Defendants collectively received more than $67 million in payouts for their participation in the IPO.

21.    Defendant Camelot is a private investment group founded and controlled by managing partner and defendant David Katzman. Camelot is the largest shareholder of SDC and the managing member of the entity that controls SDC. As such, Camelot – through its stock ownership, through its control as the managing member of SDC, and through its ability to appoint David Katzman and Steven Katzman as the operating officers of SDC – controls SDC.

22.    Defendant SDC and the Individual Defendants who signed the Registration Statement are strictly liable for the false and misleading statements incorporated into the Registration Statement. Each of the Underwriter Defendants are likewise liable as they acted together as the Underwriting Syndicate which drafted and disseminated the Registration Statement in connection with the IPO. The Underwriter Defendants were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statement.

## DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE IN CONNECTION WITH THE IPO

**The Revenue, Gross Profit and Adjusted EBITDA Growth**
**Trends Portrayed in the Registration Statement Had Halted and**
**Turned Decidedly Negative by the Time of the IPO**

23.    The Registration Statement represented that "Accelerating Growth" was one of SDC's "Strengths" and that revenue, gross profit and Adjusted EBITDA were growing.

- 6 -

24.     These representations were misleading when made as the revenue, gross profit and Adjusted EBITDA growth trends portrayed in the Registration Statement had, in fact, reversed course and turned negative by the time of the IPO.

25.     The decline in SDC's revenue, gross profit and Adjusted EBITDA represented a distinct reversal in the Company's growth trends portrayed in the Registration Statement. These changes in trends – both the termination of SDC's historical positive trends and its new downward trends – were omitted from the Registration Statement. The failure to disclose this adverse information rendered the Registration Statement's representations concerning growth in revenue, gross profit and Adjusted EBITDA for SDC's most recent quarters misleading.

26.     In addition, Regulation S-K Item 303(a)(3)(ii), 303(b) (and Instruction No. 3 to Paragraph 303(a)) ("Item 303") requires companies to:

> *Describe any known trends* or uncertainties *that have had or that the registrant reasonably expects will have a material* favorable or *unfavorable impact on net sales or revenues or income* from continuing operations.

> *                *                *

> *The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results* . . . .

27.     The SEC expressly states that disclosure is mandatory where there is a known trend or uncertainty that is *reasonably likely* to have a material effect on the "registrant's financial condition" or "results of operations."

28.     As of the date of the IPO, SDC's revenue, gross profit and Adjusted EBITDA trends had reversed course from those portrayed in the Registration Statement. The undisclosed reversal in revenue, gross profit and Adjusted EBITDA trends from positive to negative "*cause[d] reported financial information*" contained in the Registration Statement to "*not . . . be . . . indicative of future operating results.*" The Registration Statement was misleading and violated SEC disclosure

rules in that it presented positive trends of increasing revenue, gross profit and Adjusted EBITDA, while omitting that these trends had reversed course by the time of the IPO.

29.     As shown in the chart below, the Registration Statement presented impressive quarterly growth in Adjusted EBITDA, reporting a trend in which EBITDA had increased from negative $12.7 million in the fourth quarter of 2018 ("4Q18") to negative $3.9 million in the first quarter of 2019 ("1Q19") to positive $6.2 million in the second quarter of 2019 ("2Q19") (the last period reported in the Registration Statement).



The above trend was misleading as, by the date of the IPO, SDC's Adjusted EBITDA trend had halted and had commenced a downward trend dramatically different from that portrayed in the Registration Statement.

- 8 -



The Adjusted EBITDA growth portrayed in the Registration Statement was misleading as Adjusted EBITDA growth, one of the most important metrics measuring the Company's performance, was neither positive nor growing, but rather was in a state of decline at the time of the IPO. Thus, both the representation that SDC was experiencing "accelerating growth" and the Company's reported growth in Adjusted EBITDA contained in the Registration Statement were misleading and not indicative of SDC's current, let alone future, performance.

30.     Similarly, as shown in the chart below, the Registration Statement presented impressive quarterly gross profit growth, a trend in which gross profit was increasing by nearly 80% from $90.8 million in 4Q18 to $161.1 million in 2Q19 (the last period reported in the Registration Statement).

4852-7379-3205.v1



The gross profit reported in the Registration Statement was misleading as, ***by the date of the IPO, SDC's gross profit trend had halted and had commenced a downward trend dramatically different from that portrayed in the Registration Statement***.

4852-7379-3205.v1

Case 3:19-cv-00962   Document 71   Filed 02/21/20   Page 11 of 31 PageID #: 694



31.     The Registration Statement stated that SDC's revenue had grown rapidly to over $423.2 million in 2018 from $146.0 million in 2017, a ***growth rate of 190%***, and that revenue for the six months ended June 30, 2019 had increased an additional 113% over the same period in 2018. Likewise, the tables in the Registration Statement showed that SDC's revenue had grown sequentially each quarter since the fourth quarter of 2017 ("4Q17").[2]  This strong revenue growth rate portrayed in the Registration Statement was misleading, and not indicative of SDC's current revenue performance at the time of the IPO.

---

[2]     The Registration Statement similarly reported continuous growth in gross profit from 4Q17 through 2Q19.

32.     The positive trends highlighted in the Registration Statement had reversed by the IPO, and SDC's revenue, gross profit and Adjusted EBITDA were all declining in the third quarter of 2019 ("3Q19"), which information was omitted from the Registration Statement.  This omission rendered the Registration Statement's portrayal of SDC's operating performance as well as its statement regarding "accelerating growth" false and misleading and violated Item 303.  Because the Registration Statement omitted any disclosure of the known reversal in SDC's revenue, gross profit and Adjusted EBITDA trends, the claim of "accelerating growth" and the reported positive growth for the most recent periods contained in the Registration Statement were both false and misleading and not indicative of, nor consistent with, SDC's current or future operating results.

33.     SDC closely tracked its revenue, gross profit and Adjusted EBITDA in connection with its ongoing operations and in connection with the IPO. Each of the defendants was aware of or should have known at the time of the IPO of the dramatic reversal in SDC's operating trends as pled herein.  In addition, the decline in Adjusted EBITDA referenced above was, in part, the result of increased marketing and selling expense ($17.8 million), which were within defendants' knowledge and/or control, and the doubling of legal expenses that were incurred as a result of the issues described in ¶¶36-40 *infra*.  SDC's increased marketing, selling and legal expenses had already been incurred and/or were budgeted to be incurred at the time of the IPO.

**False and Misleading Statements and Omissions**
**Regarding Customer Satisfaction**

34.     The Registration Statement stated that "positive member experience," was SDC's number one strength and emphasized that SDC was, at the time of the IPO,  experiencing "Accelerating Growth" in its business.

35.     Stating that "member satisfaction" was an "important criteria that will enable us to maintain our position as the leading direct-to-consumer clear aligner provider," and that SDC's

"primary focus is on delivering an exceptional member experience," the Registration Statement assured investors that SDC customers were "highly satisfied," touting the Company's "Smile Guarantee" as a "testament to our confidence in the quality and efficacy of our product." The Registration Statement further stated:

- "Our primary focus is on delivering an exceptional customer ('member') experience . . . . As a testament to our confidence in the quality and efficacy of our product, we offer a Smile Guarantee, which provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied."

- SDC's high "average rating of 4.9 out of 5 from over 100,000 member reviews on our website" emphasizing that "our members are *highly satisfied*."

- "Our offering provides a *highly positive member experience* delivered by our vertically integrated model, which enables us to address critical problems around cost, convenience, and access to care."

- "[W]e deliver a *quality service* at a fraction of the cost [of] traditional orthodontic solutions."

36.     The statements made in ¶¶34-35 above rendered the Registration Statement false and misleading.  The true facts were:

(a)     That the Registration Statement failed to disclose that thousands of SDC customers were neither "highly satisfied" nor had "highly positive experiences" with SDC's products and services, as many customers were having *serious medical problems caused by the use of SDC molds and aligners*, received missing or misshapen aligners, and were experiencing difficulties in obtaining refunds. The Better Business Bureau ("BBB") alone registered more than 1,800 complaints against SDC, even though BBB had expressly discouraged customers from submitting complaints to BBB before first contacting SDC directly.  In fact, the level of SDC customer complaints was so extraordinary, BBB noted that "[d]ue to the volume of complaints filed against this business, BBB only publishes the details for 50% of the total complaints filed";

- 13 -

(b)     That SDC's primary focus in 2019 was not on delivering an exceptional member experience, but rather on signing up as many customers as possible, without regard to whether those customers were appropriate candidates for SDC's treatment plan.  For example, in order to avoid being disciplined or fired, employees in the Company's retail stores, or SmileShops, were expected to meet daily sales conversion rates of 73% without regard to whether such customers use of SDC's aligners were medically appropriate.  The conversion rates were monitored real-time by SDC management and employees were specifically trained and instructed to consummate sales regardless of whether SDC's treatment was medically appropriate or safe for the customer;

(c)     That while SDC dentists were ostensibly required to approve treatment plans for prospective customers, such plans were, as a matter of course, approved instantly without meaningful review by SDC dentists.  In rare cases where treatment plans were not approved by the reviewing dentist, SDC employees were instructed to resubmit rejected treatment plans to another SDC dentist until the plan was approved in order to close the sale;

(d)     That SDC went to extreme lengths to avoid public disclosure of complaints and critiques.  For example: (i) On April 6, 2018, the website Lifehacker published a blog article entitled, "You Could Fuck Up Your Mouth With SmileDirectClub," which discussed potential safety problems associated with so-called at-home orthodontists services such as SDC.  Days later, SDC sued Lifehacker in Davidson County Chancery Court, falsely contending that the article was untruthful and defamatory.  In light of the baselessness of its contentions, SDC later voluntarily dismissed the case; and (ii) On March 28, 2018, SDC filed a defamation case in federal court in this District against a former customer who had appeared on a local television news station complaining that his aligners "'didn't move [his] teeth,'" and that he felt "'ripped off,'" *without even mentioning SDC once*;

- 14 -

4852-7379-3205.v1

Case 3:19-cv-00962   Document 71   Filed 02/21/20   Page 15 of 31 PageID #: 698

(e) That SDC directed its employees to ignore or rebuff SDC customers when they tried to obtain refunds, or to have the customer obtain new impressions made for additional aligners which would delay treatment beyond the deadline for obtaining a refund. For those customers who were able to successfully obtain a refund, SDC hid criticism of its products and services by requiring customers to sign non-disclosure agreements ("NDA") and remove negative reviews from the internet and social media as well as refrain from sharing their experiences with SDC or report problems to state dental boards. On January 21, 2020, the *New York Times* published an excerpt from one of SDC's NDAs, which stated that the consumer "will not make, publish, or communicate any statements or opinions that would disparage, create a negative impression of, or in any way be harmful to the business or business reputation of SDC"';

(f) Asserting that it was attempting to protect its ability to provide innovative treatment methods to underserved communities from purportedly hostile dental associations, SDC was engaged in a programmatic campaign of threats and intimidation in order to avoid revelations of the truth about SDC's over-prescription of aligners and poor quality service. SDC regularly sent cease-and-desist letters and sued dentists and orthodontists who critiqued the Company's products, including in YouTube videos. SDC's hardball litigation campaign went so far as to even sue the Michigan affiliate of the American Dental Association over four paragraphs that the nonprofit published about the Company in its monthly journal. The SDC litigation campaign was designed to keep from public view legitimate criticism regarding the Company's products, and stifle additional criticism; and

(g) That SDC had been the subject of numerous complaints to the California Dental Board, and those complaints had resulted in an investigation and in raids on the Company's California SmileShop stores commencing in late 2017.

- 15 -

**False and Misleading Statements and Omissions**
**Regarding SDC's Standard of Care**

37.     The Registration Statement asserted that SDC's "cutting-edge teledentistry technology and vertically integrated" platform "remov[es] the overhead cost of in-person doctor visits [by] managing the entire member experience" which "allow[s] doctors in [their] network to focus on what matters most: providing convenient access to excellent clinical care." Specifically, defendants emphasized that SDC provided "professional-level service" and that "trained technicians" create customer treatment plans. Moreover, the Company asserted that:

> Our member journey starts with two convenient options: a member books an appointment to take a free, in-person 3D oral image at any of our 300 retail stores . . . or orders an easy-to-use doctor prescribed impression kit online, which we mail directly to their door. Using this image or impression, we create a draft custom treatment plan that demonstrates how the member's teeth will move during treatment. Next, via SmileCheck, a state licensed doctor within our network reviews and approves the member's clinical information and treatment plan. If the member is a good candidate for clear aligners and decides to purchase, the treating doctor prescribes custom-made clear aligners . . . . SmileCheck is also used by the treating doctor to monitor the member's progress and enables seamless communication with the member over the course of treatment.

38.     The statements made in ¶37 above rendered the Registration Statement false and misleading. The true facts were:

(a)     That SDC's teledentistry model placed its customers at risk of serious injury by removing the basic level of care provided by traditional orthodontic treatment plans;

(b)     That SDC did not ensure customers were good candidates for, and could safely use, SDC's treatment by reviewing dental x-rays and conducting dental exams. Instead, SDC required customers to self-certify their own dental health, and made no effort to verify such certifications;

(c)     That SmileShops employed sales assistants to handle consultations, which required untrained employees to complete highly specialized tasks such as taking pictures of a

- 16 -

customer's teeth as well as complete a 3D scan of a patient's mouth without meaningful oversight from a licensed dentist, notwithstanding the fact that, as reported by NBC Nightly News on February 13, 2020, moving teeth without in-person supervision can lead to permanent, significant harm, including bone loss, disease and loss of teeth. As a result, according to NBC, "nine members of Congress . . . asked the Food and Drug Administration and the Federal Trade Commission to Investigate SmileDirectClub 'to ensure that it is not misleading consumers or causing patient harm'";

(d)     During 2Q19 and 3Q19, SDC customers were fast-tracked and approved for aligners despite the fact that they were not qualified candidates. Instead, smile plans were created and forwarded to a SDC dentist who instantaneously approved the plan based solely on a photo of the customer's mouth and a scan or impression of their teeth, but without the necessary information to determine if SDC aligners were safe and appropriate for such customer's use. In the rare instances in which a smile plan was rejected, SDC employees were directed to resubmit the plan to other SDC dentists until it was approved. Once approved, SDC's customers did not receive dental treatment by licensed treating dentists, but rather followed treatment plans created by a team of dental technicians, not licensed dentists;

(e)     That the SDC commission system overseen by the Individual Defendants mandated sales conversion rates which encouraged poor quality care. During 2Q19 and 3Q19 leading up to the IPO, defendants required sales personnel to meet the Company's mandated sales conversion rate of 73% or risk being terminated. If a sales employee met the 73% conversion rate, they would receive $5 for every approved smile plan sold and if the employee reached a conversion rate of 75% or more they would receive $10 in commission. The high pressure sales tactics and compensation structures imposed by SDC prioritized profits above patient care, leading sales personnel to sell aligners to unqualified candidates;

- 17 -

(f)     That SDC was engaged in the unlicensed practice of dentistry in California;

(g)     That SDC and its Lead Dentist Jeffrey Sulitzer had opened SDC's SmileShops in California in 2017 and 2018 under false pretense, as Sulitzer applied to operate dental offices in California stating that he controlled the offices and assumed liability for services offered to patients in other offices when in fact the SmileShops he opened were controlled by SDC, which wasn't licensed to practice dentistry in California; and

(h)     That SDC's treating dentists had no meaningful contact with SDC customers. If customers had issues with their aligners, they were not allowed to speak to or see a licensed SDC dentist, but instead were directed to speak with hygienists to resolve their issues. The only involvement of a licensed dentist prior to a customer receiving aligners was a superficial review of a photo and scan or impression of a customer's teeth where the SDC dentist was paid $50.00 if the dentist approved the plan and $0 if the dentist did not.

**False and Misleading Statements and Omissions**
**Regarding Regulatory and Legislative Risk**

39.     The Registration Statement advised investors that regulatory and legal challenges *could* have a negative impact on the Company's business in the future:

> Adverse changes in, or interpretations of, laws, rules, and regulations governing remote healthcare and the practice of dentistry ***could have a material adverse effect on our business.***

> Our current business model is dependent, in part, on current laws, rules, and regulations governing remote healthcare and the practice of dentistry. If changes in laws, rules, regulations, or their interpretations are inconsistent with our current business model, we would need to adapt our business model accordingly, and our operations in certain jurisdictions may be disrupted, which could have a material adverse effect on our business, financial condition, and result of operations.

> *         *         *

> Our business ***could be adversely affected*** by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states.

- 18 -

A number of dental and orthodontic professionals believe that clear aligners are appropriate for only a limited percentage of their patients. National and state dental associations have issued statements discouraging use of orthodontics using a teledentistry platform. Increased market acceptance of our remote clear aligner treatment may depend, in part, upon the recommendations of dental and orthodontic professionals and associations, as well as other factors including effectiveness, safety, ease of use, reliability, aesthetics, and price compared to competing products.

Furthermore, our ability to conduct business in each state is dependent, in part, upon that particular state's treatment of remote healthcare and that . . . each of which is subject to changing political, regulatory, and other influences. There is a risk that state authorities may find that our contractual relationships with our doctors violate laws and regulations prohibiting the corporate practice of dentistry, which generally bar the practice of dentistry by entities. Two state dental boards have established new rules or interpreted existing rules in a manner that purports to limit or restrict our ability to conduct our business as currently conducted. The Georgia Board of Dentistry passed a new rule that requires a licensed dentist to be present when 3D oral images are taken by a dental assistant, and the Board of Dental Examiners of Alabama has interpreted existing rules to require "direct supervision" (meaning the dentist must be physically present somewhere in the building) for the taking of digital oral images. In both Georgia and Alabama, we have filed lawsuits in Federal court against the dental boards and their individual members, alleging, among other things, violations of the Sherman Act, and we will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model. In addition, a national orthodontic association has met with various dental boards across the country in an effort to advocate for new rules and regulations that could have the effect of interfering with our business model. Although, none of these efforts have resulted in rules and regulations being passed to date, it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business. If adverse regulations are adopted or any such claims are successful, and we were unable to adapt our business model accordingly, our operations in such states would be disrupted, which could have a material adverse effect on our business, financial condition, and results of operations. In addition, a national dental association recently filed a citizen petition with FDA alleging that our manufacturing is in violation of "prescription only" requirements. Although FDA denied the petitioners' request to initiate enforcement action, the petition continues to be circulated by that national dental association and other third parties.

40. The statements in ¶39 above rendered the Registration Statement false and misleading. The true facts were:

(a) That at the time of the IPO, dozens of claims or complaints had been filed by state chapters of the American Dental Association ("ADA"), American Association of Orthodontics

- 19 -

("AAO"), and other similar trade organizations challenging SDC's practice of providing so-called teledentistry without professional oversight by a licensed dentist. The ADA's complaint asserted that SDC was "placing the public at risk by knowingly evading the 'by prescription only' restriction that the FDA has placed on plastic teeth aligners," and "utterly fail[ing] to meet the standard of care for a comprehensive oral examination." SDC falsely denied these allegations, calling them "spurious" and "misleading";

(b)     That, as revealed in an October 2019 lawsuit, Defendants were aware that SDC had been under investigation by the Dental Board of California since 2017 for engaging in the unlicensed practice of dentistry;

(c)     That, as alleged in a November 2019 accusation before the Dental Board of California filed by the Attorney General of California, SDC and Sulitzer were in violation of numerous provisions of applicable California law by, among other things: (i) using advertising tending to deceive and mislead the public; (ii) performing or allowing to be performed treatments on patients that were not his patients of record; (iii) performing the unlicensed practice of dentistry; (iv) permitting clearly excessive treatment, incompetent treatment, grossly negligent treatment, repeated negligent acts, and/or unnecessary treatment; and (v) operating an unregistered mobile dental unit; and

(d)     That pending legislation would soon be passed by the California legislature which required teledentistry platforms to provide each customer with the treating dentist's name, license number and the dental board contact information and that the legislation was designed to curb SDC's improper and unlawful business practices, and which SDC was aware, would, when passed, have a materially adverse impact on SDC's operations in one of its largest markets. The legislation mandated the review of a patient's most recent radiographs (*i.e.*, x-rays) prior to

beginning orthodontic treatment as well as requiring that the teledentistry provider conduct a full patient examination prior to the enactment of a treatment plan. It also prohibited providers such as SDC from preventing disgruntled customers from making reports to the Dental Board of California even if the patient signed an NDA, thereby eliminating SDC's then existing practice of using NDAs to prevent the disclosure of negative information about its treatment practices.

## CLASS ACTION ALLEGATIONS

41.     Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who acquired shares of SDC Class A common stock pursuant or traceable to the Company's false and misleading Registration Statement (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

42.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through discovery, Lead Plaintiff believes that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SDC or its transfer agent and may be notified of the pendency of this action electronically, by mail, and using the form of notice similar to that customarily used in securities class actions. SDC has more than 100 million shares of stock outstanding.

43.     Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

- 21 -

44.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

45.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the Registration Statement was false or misleading;

(b)     whether the federal securities laws were violated by defendants' acts as alleged herein; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

46.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violations of Section 11 of the 1933 Act
### (Against All Defendants Except Camelot)

47.     Lead Plaintiff repeats and realleges each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

48.     Lead Plaintiff acquired SDC Class  A common stock pursuant and/or traceable to the Registration Statement.

49.     The Registration Statement contained untrue statements of material fact and omitted material facts necessary to make the statements made therein not false or misleading.

4852-7379-3205.v1

50.     SDC is the registrant for the IPO.  As issuer of the Class A common stock, SDC is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions in the Registration Statement.

51.     The Individual Defendants were responsible for the contents and dissemination of the Registration Statement.  The Individual Defendants did not make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

52.     The Underwriter Defendants underwrote the IPO.  The Underwriter Defendants did not make a reasonable investigation or possess reasonable grounds to believe that the statements contained in the Registration Statement were not false or misleading, and did not omit material facts necessary to make statements made therein not false or misleading.

53.     By reason of the conduct herein alleged, each defendant violated §11 of the 1933 Act.

54.     Lead Plaintiff and the Class sustained damage as a result of the violations alleged herein.

55.     At the time of their purchases of SDC Class A common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to SDC's IPO.  Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Lead Plaintiff filed this complaint.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action was commenced.

4852-7379-3205.v1

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### (Against All Defendants Except Camelot)

56.     Lead Plaintiff repeats and realleges each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

57.     The Registration Statement and the Prospectus incorporated therein contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above.  The defendants owed Lead Plaintiff and the other members of the Class who purchased shares of SDC Class A common stock pursuant to the Registration Statement and the Prospectus incorporated therein a duty to conduct  a reasonable and diligent investigation in connection with the IPO to ensure that the statements made in the  Registration Statement and Prospectus were true and did not omit to state a material fact required to be stated in order to make the statements made therein not false or misleading.

58.     The defendants named herein, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Registration Statement and the Prospectus incorporated therein as set forth above.

59.     Each of the defendants named herein participated in the sale of SDC common stock for their own personal financial gain by means of the Registration Statement and the Prospectus incorporated therein.

60.     Lead Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement and the Prospectus incorporated therein at the time Lead Plaintiff acquired the Company's shares.

61.     By reason of the conduct alleged herein, defendants violated §12(a)(2) of the Securities Act.  As a direct and proximate result of such violations, Lead Plaintiff and the other

members of the Class who purchased SDC Class A common stock from one of the Underwriter Defendants pursuant to the Registration Statement and the Prospectus incorporated therein sustained substantial damages in connection with their purchase of SDC common stock. Accordingly, Lead Plaintiff and the other members of the Class who hold such common stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares to the defendants sued herein. Class members who have sold their shares of common stock seek damages to the extent permitted by law.

## COUNT III

### Violations of Section 15 of the 1933 Act
### (Against the Individual Defendants and Camelot)

62. Lead Plaintiff repeats and realleges each and every allegation contained above, except any allegation construed to allege fraud or intentional misconduct.

63. Each of the Individual Defendants and Camelot was a control person of SDC by virtue of his or her position as an owner, director and/or senior officer of SDC. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of SDC. As detailed in ¶21, Camelot is SDC's largest shareholder and the managing member of the limited liability corporation that controlled SDC at the time of the IPO. Camelot possessed control over SDC and the Individual Defendants.

64. Each of the Individual Defendants and Camelot was a culpable participant in the violations of §11 and 12(a)(2) of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process, which allowed the IPO to be completed.

- 25 -

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.      Awarding rescission or a rescissory measure of damages; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: February 21, 2020

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
CHRISTOPHER M. WOOD, #032977


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
SCOTT H. SAHAM
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
scotts@rgrdlaw.com

Lead Counsel for Lead Plaintiff

4852-7379-3205.v1

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on February 21, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: CWood@rgrdlaw.com

# Mailing Information for a Case 3:19-cv-00962 Franch v. SmileDirectClub, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Wade B. Cowan**
  wcowan@dhhrplc.com

- **James M. Ficaro**
  jmf@weiserlawfirm.com

- **Andrew J. Finn**
  finna@sullcrom.com

- **Inbar R. Gal**
  gali@sullcrom.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **Michael C. Griffin**
  michael.griffin@skadden.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Lewis S. Kahn**
  Lewis.Kahn@ksfcounsel.com

- **Jay B. Kasner**
  jay.kasner@skadden.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **MICHAEL J MORSE**
  PKNASHLAW@AOL.COM

- **Richard A. Maniskas**
  rmaniskas@sbtklaw.com

- **E. Powell Miller**
  epm@millerlawpc.com

- **Scott D. Musoff**
  scott.musoff@skadden.com

- **Danielle S. Myers**
  danim@rgrdlaw.com

- **Sharon L. Nelles**
  nelless@sullcrom.com

- **Christopher Nelson**
  cln@weiserlawfirm.com

- **Melinda A. Nicholson**
  Melinda.Nicholson@ksfcounsel.com

- **Michael J. Palestina**
  Michael.Palestina@ksfcounsel.com

- **Ira M. Press**
  ipress@kmllp.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com

- **John Tate Spragens**
  john@spragenslaw.com

- **Tara L. Swafford**
  tara@swaffordlawfirm.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,creis@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)