UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

ADAM FRANCHI, Individually and on
Behalf of All Others Similarly Situated,   :   Consolidated Case No. 19-cv-962

  :

                        Plaintiff,   :   Judge Eli J. Richardson

         vs.   :

  :   Magistrate Judge Jeffrey S. Frensley

SMILEDIRECTCLUB, INC., et al.,   :

  :

           Defendants.   :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................. ii

PRELIMINARY STATEMENT ......................................................................................................... 1

STATEMENT OF FACTS ................................................................................................................. 5

      A.      SmileDirectClub Pioneers Teledentistry and
              Disrupts the Traditional Orthodontic Industry ......................................................... 5

      B.      The Offering Documents Disclose the Risks of Legal
              and Regulatory Challenges by Organized Dentistry ................................................ 6

      C.      SmileDirectClub's Stock Drops Significantly on the Day of the IPO ..................... 8

      D.      After the IPO, SmileDirectClub Continues to Face Attacks from
              Organized Dentistry, as the Offering Documents Warned Might Happen .............. 9

      E.      SmileDirectClub Announces Its Q3 2019
              Results, Which Exceeded Market Expectations ..................................................... 10

      F.      Duplicative Securities Lawsuits Are Filed Against SmileDirectClub
              in State and Federal Courts in Tennessee, Michigan and New York ................... 11

ARGUMENT .................................................................................................................................... 12

I.      THIS ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL
      TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION ...................... 12

      A.      The Offering Documents Did Not Fail To Disclose
              Known Trends About SmileDirectClub's Revenue,
              Gross Profits or Adjusted EBITDA ....................................................................... 13

      B.      The Offering Documents Did Not Misrepresent
              SmileDirectClub's Member Satisfaction ............................................................... 17

      C.      The Offering Documents Did Not Misrepresent
              SmileDirectClub's Standard of Care ..................................................................... 19

      D.      The Offering Documents Disclosed the
              Company's Legal and Regulatory Risks ................................................................ 21

II.     THIS ACTION SHOULD BE DISMISSED FOR LACK OF CAUSATION ................. 25

CONCLUSION ................................................................................................................................. 25

# TABLE OF AUTHORITIES

## CASES

*Abuhamdan v. Blyth, Inc.*,
 9 F. Supp. 3d 175 (D. Conn. 2014) ..................................................................................15

*In re Allscripts, Inc. Securities Litigation*,
 No. 00 C 6796, 2001 WL 743411 (E.D. Ill. June 29, 2001) ..............................................18

*Azzolini v. Corts Trust II for Provident Financial Trust I*,
 No. 103CV1003, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) .....................................25

*Bassett v. National Collegiate Athletic Association*,
 528 F.3d 426, 430 (6th Cir. 2008) .......................................................................................4

*Bell Atlantic Corp. v. Twombly*,
 550 U.S. 544 (2007) ...........................................................................................................12

*Bondali v. Yum! Brands, Inc.*,
 620 F. App'x 483 (6th Cir. 2015) ...........................................................................20, 22, 23

*In re Burlington Coat Factory Securities Litigation*,
 114 F.3d 1410 (3d Cir. 1997) .............................................................................................14

*Chan v. New Oriental Education & Technology Group Inc.*,
 Civ. No. 16-9279, 2019 WL 2865452 (D.N.J. July 3, 2019) ............................................16

*City of St. Clair Shores Police & Fire Retirement System v. Nationstar Mortgage
 Holdings Inc.*, No. 15-61170-CIV-DIMITROULEAS,
 2016 WL 4705718 (S.D. Fla. June 21, 2016) ....................................................................14

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
 752 F.3d 173 (2d Cir. 2014) ...............................................................................................22

*Curry v. Yelp Inc.*,
 No. 14-cv-03547-JST, 2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875
 F.3d 1219 (9th Cir. 2017) ...................................................................................................18

*DeMaria v. Andersen*,
 318 F.3d 170 (2d Cir. 2003) ...........................................................................................3, 14

*Dura Pharmaceuticals, Inc. v. Broudo*,
 544 U.S. 336 (2005) .........................................................................................................2, 25

*In re Ford Motor Co. Securities Litigation*,
 381 F.3d 563 (6th Cir. 2004) ..............................................................................................17

Case 3:19-cv-00962   Document 73   Filed 03/23/20   Page 3 of 32 PageID #: 720

*Gallagher v. Abbott Labs.*,
269 F.3d 806 (7th Cir. 2001) ...............................................................................................16

*Gart v. Electroscope, Inc.*,
24 F. Supp. 2d 969 (D. Minn. 1998)......................................................................................14

*IBEW Local No. 58 Annuity Fund v. EveryWare Global, Inc.*,
849 F.3d 325 (6th Cir. 2017) .........................................................................................24, 25

*Indiana State District Council of Laborers & HOD Carriers Pension & Welfare Fund v.
Omnicare, Inc.*,
719 F.3d 498 (6th Cir. 2013) ...............................................................................................12

*Iron Worker Local Union No. 405 Annuity Fund v. Dollar General Corp.*,
No. 3:17 CV 63, 2018 WL 10152459 (M.D. Tenn. Mar. 8, 2018)...............................22, 23

*J & R Marketing, SEP v. General Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) .................................................................................15, 18, 23

*In re Lions Gate Entertainment Corp. Securities Litigation*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ......................................................................................22

*In re N2K Securities Litigation*,
82 F. Supp. 2d 204 (S.D.N.Y. 2000), *aff'd*, 202 F.3d 81 (2d Cir. 2000)...........................14

*In re Netflix, Inc. Securities Litigation*,
No. C04-2978 FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ................................18

*Nurlybayev v. ZTO Express (Cayman) Inc.*,
No. 17 Civ. 6130, 2019 WL 3219451 (S.D.N.Y. July 17, 2019) .....................................23

*Oxford Asset Management, Ltd. v. Jaharis*,
297 F.3d 1182 (11th Cir. 2002) ...........................................................................................15

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x. 617 (2d Cir. 2009)...............22

*Romine v. Acxiom Corp.*,
296 F.3d 701 (8th Cir. 2002) ...............................................................................................19

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ...............................................................................................18

*Scott v. General Motors Co.*,
46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015)....................19

*In re Sofamor Danek Group, Inc.*,
123 F.3d 394 (6th Cir. 1997) ...............................................................................................22

Case 3:19-cv-00962   Document 73   Filed 03/23/20   Page 4 of 32 PageID #: 721

*Stadnick v. Vivint Solar, Inc.*,
    861 F.3d 31 (2d Cir. 2017)..................................................................................3, 14, 23

*In re State St. Bank & Trust Co. Fixed Income Funds Investment Litigation*,
    774 F. Supp. 2d 584 (S.D.N.Y. 2011)................................................................................25

*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019)................................................................................15

*Tuchman v. DSC Communications Corp.*,
    14 F.3d 1061 (5th Cir. 1994) ...........................................................................................20

*In re Turkcell Iletisim Hizmetler, A.S. Securities Litigation*,
    202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001)..............................................................................15

**STATUTES**

15 U.S.C. § 77k................................................................................................................13, 25

15 U.S.C. § 77*l*...................................................................................................................13

15 U.S.C. § 77*o*..................................................................................................................13

**REGULATIONS**

17 C.F.R. § 229.303(a)(3)(ii) ...............................................................................................15

Case 3:19-cv-00962   Document 73   Filed 03/23/20   Page 5 of 32 PageID #: 722

Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Complaint (ECF No. 71) ("Compl.") with prejudice in its entirety for failure to state a claim under Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

Plaintiffs attempt to manufacture a shareholder class action under the federal securities laws based on nothing more than the disappointing early stock performance of Defendant SmileDirectClub, Inc. ("SmileDirectClub" or the "Company") following its initial public offering (the "IPO"). But Plaintiffs' buyer's remorse is not actionable under the securities laws.

Founded in 2014, SmileDirectClub is an oral care company based in Nashville, which provides dental support organization services with a pioneering direct-to-consumer medtech platform for transforming smiles. Its revolutionary teledentistry platform has democratized access to care by enabling dentists and orthodontists to provide patients with clear aligner therapy at a fraction of the historical cost and enabling remote access to state-licensed dentists and orthodontists. This innovative approach aims to solve the critical problems of cost, convenience and access to care that plague traditional orthodontic treatment and provides access to such treatments to many who were unable to afford traditional treatment. Unsurprisingly, SmileDirectClub's disruptive (and rapidly growing) business has sparked fierce opposition from organized dentistry bent on preserving its longstanding, highly profitable monopoly on beautiful smiles. All of this was disclosed in the Company's detailed registration statement and prospectus (the "Offering Documents") for the IPO, which Plaintiffs now challenge.

Unlike a typical securities class action, this case does not arise from a financial restatement, regulatory enforcement action, any corporate scandal or for that matter any new information. Instead, Plaintiffs seek to recover alleged market losses that occurred immediately after the IPO. On SmileDirectClub's first day of public trading, its stock closed down 27.5%

from the IPO price.  Pricing of an IPO is an art and not a science.  Simply because, in hindsight, the IPO ended up being priced higher than the market valued it does not mean the Offering Documents were false or misleading.  The securities laws are not meant "to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause."  *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).

SmileDirectClub's stock price continued to decline in the weeks after the IPO based not on the revelation of any misrepresentation in the Offering Documents, but on a series of new developments, such as a meritless lawsuit (the "*Ciccio* action") brought by three orthodontists and a consumer attacking SmileDirectClub's business model (whose claims in turn were based on sham petitioning by the American Dental Association ("ADA") to the Federal Trade Commission ("FTC") and Food and Drug Administration ("FDA") that resulted in no action or investigation by either agency) and new teledentistry regulations enacted in California (which had no effect on SmileDirectClub's business model).

Although these were the exact types of risks investors were warned of in the Offering Documents, Plaintiffs now claim these same risks were misrepresented or concealed in violation of Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act").  Specifically, Plaintiffs challenge four categories alleged misstatements or omissions: (i) trends in the Company's revenue, gross profit and Adjusted EBITDA; (ii) the level of customer satisfaction; (iii) the standard of care SmileDirectClub provided to its members; and (iv) the legislative and regulatory risks facing the Company.  Each of these claims fails as a matter of law because Plaintiffs do not allege any facts showing that the Offering Documents contained a material misstatement or omitted material information they were required to disclose.

*First*, Plaintiffs fail to allege any known undisclosed trend in the Company's revenue, gross profit and Adjusted EBITDA at the time of the IPO.  (*See infra* § I.A.)  They essentially fault the Offering Documents for not including the Company's financial results for the quarter ending September 30, 2019 ("Q3 2019"), but that quarter was still in progress at the time of the IPO on September 12, 2019.  Courts have repeatedly held that companies have no duty to disclose interim financial results[1], and the Offering Documents expressly warned that the Company had never made a profit and its performance and earnings might fluctuate.

*Second*, Plaintiffs do not allege any actionable misstatement or omission about member satisfaction. (*See infra* § I.B.)  For example, Plaintiffs contend the Company's statements that customers were "highly satisfied" or had "highly positive experiences" were false or misleading because some of SmileDirectClub's members (less than 0.02%) made complaints to the Better Business Bureau.  Tellingly, Plaintiffs do not allege what portion of those complaints were about treatment issues and cannot dispute that all but a miniscule fraction were about billing and administrative issues.  In any event, the fact that some members allegedly experienced issues does not render the disclosure of other members' positive experiences false or misleading.

*Third*, Plaintiffs do not allege any actionable misstatement or omission about the standard of care SmileDirectClub provided to its members.  (*See infra* § I.C.)  Indeed, Plaintiffs' core complaints are not directed at the Offering Documents at all, but rather at Plaintiffs' view of SmileDirectClub's fully disclosed business model, which view is apparently based on the *Ciccio* action and/or the ADA's sham petitioning.  But whatever Plaintiffs think of the merits of SmileDirectClub's business, it was accurately described in the Offering Documents.  Plaintiffs'

---

[1]     *See, e.g.*, *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (no duty to include interim financial results); *DeMaria v. Andersen*, 318 F.3d 170, 181 (2d Cir. 2003) (same).

3

subjective disagreement with the Company's disruptive business strategy or the efficacy of its aligners does not state a claim under the disclosure-based Securities Act.

*Finally*, the Offering Documents extensively disclosed the legislative and regulatory risks facing the Company.  (*See infra* § I.D.)  For example, the Offering Documents warned that various state dental boards were targeting the Company's business and that "[a]lthough[] none of these efforts have resulted in rules and regulations being passed to date, it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business."  (Ex. B, Prospectus, at 38.[2])  That disclosure was not false or misleading ***at the time*** because California ***subsequently*** enacted new teledentistry regulations one month after the IPO.  Regardless, Plaintiffs also fail to allege any facts showing the new rules were expected to have a material impact on the Company (and indeed they have not).

Separately, in addition to failing to allege any misstatement or actionable omission, all of Plaintiffs' claims also should be dismissed because any purported loss they suffered was caused by normal market activity and external post-IPO developments, not by any corrective disclosure or the materialization of some undisclosed risk.  While negative causation is an affirmative defense under the Securities Act, courts have dismissed claims based on negative causation where, as here, it is apparent from the face of the complaint.  (*See infra* § II.)

---

[2]  Exhibits cited herein are attached to the accompanying Declaration of Elizabeth Gonser, dated March 23, 2020.  "When a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."  *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

<u>**STATEMENT OF FACTS**</u>

**A.** **SmileDirectClub Pioneers Teledentistry and**
**<u>Disrupts the Traditional Orthodontic Industry</u>**

The traditional orthodontic model typically costs $5,000–$8,000 or more, requires a series of time-consuming office visits during limited hours and is available in less than 40% of the counties in the U.S. alone. (Ex. B, Prospectus, at 1.[3]) SmileDirectClub uses cutting-edge teledentistry technology and a vertically integrated model to democratize access to a more affordable, convenient and accessible solution for a straighter smile:

> We offer professional-level service and high-quality clear aligners at a cost of $1,895, up to 60% less than traditional orthodontic solutions. We achieve this cost savings while maintaining high quality by removing the overhead cost of in-person doctor visits and managing the entire member experience, all the way from marketing to aligner manufacturing, fulfillment, treatment by a member's doctor, and monitoring through completion of their treatment, which is supported by our proprietary teledentistry platform ("SmileCheck"). These efficiencies enable us to pass the cost savings directly to the members and allow doctors in our network to focus on what matters most: providing convenient access to excellent clinical care.

(*Id.* at 2; *see also* Compl. ¶ 37.)

The Offering Documents describe a typical "member journey":

> Our member journey starts with two convenient options: a member books an appointment to take a free, in-person 3D oral image at any of our over 300 retail stores ("SmileShops") . . . or orders an easy-to-use doctor prescribed impression kit online, which we mail directly to their door. Using the image or impression, we create a draft custom treatment plan that demonstrates how the member's teeth will move during treatment. Next, via SmileCheck, a state licensed doctor within our network reviews and approves the member's clinical information and treatment plan. If the member is a good candidate for clear aligners and decides to purchase, the treating doctor prescribes custom-made clear aligners, which we then manufacture and ship directly to the member. . . . SmileCheck is also used by the treating doctor to monitor the member's progress and enables seamless communication with the member over the course of treatment.

---

[3]     When referring to the Offering Documents, this brief cites to the prospectus as representative. As relevant to this Action, the registration statement (Ex. A) and prospectus contain materially identical disclosures.

(Ex. B, Prospectus, at 4; *see also id.* at 103-05; Compl. ¶ 37.)

As of the IPO, and as disclosed in the Offering Documents, SmileDirectClub had helped more than 700,000 members.  (Ex. B, Prospectus, at 2.)  In 2018, the Company's revenue increased 190% year-over-year to $423.2 million.  (*Id.*)  In the first six months of 2019, revenue was already up 113% from the first half of 2018, totaling $373.5 million.  (*Id.*)

**B.      The Offering Documents Disclose the Risks of Legal
and Regulatory Challenges by Organized Dentistry**

Threatened by SmileDirectClub's innovative value proposition and rapid growth, the ADA, American Association of Orthodontics and other similar trade organizations have challenged SmileDirectClub's pioneering business model.  (*See* Compl. ¶ 40(a).)  The Offering Documents expressly and repeatedly warn investors about this risk:

> *Our business could be adversely affected by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states.*
>
> A number of dental and orthodontic professionals believe that clear aligners are appropriate for only a limited percentage of their patients. ***National and state dental associations have issued statements discouraging use of orthodontics using a teledentistry platform***. Increased market acceptance of our remote clear aligner treatment may depend, in part, upon the recommendations of dental and orthodontic professionals and associations, as well as other factors including effectiveness, safety, ease of use, reliability, aesthetics, and price compared to competing products.
>
> Furthermore, our ability to conduct business in each state is dependent, in part, upon that particular state's treatment of remote healthcare and that state dental board's regulation of the practice of dentistry, each of which is subject to changing political, regulatory, and other influences. There is a risk that state authorities may find that our contractual relationships with our doctors violate laws and regulations prohibiting the corporate practice of dentistry, which generally bar the practice of dentistry by entities. . . . ***If adverse regulations are adopted or any such claims are successful, and we were unable to adapt our business model accordingly, our operations in such states would be disrupted, which could have a material adverse effect on our business, financial condition, and results of operations***.

(Ex. B, Prospectus, at 37-38 (second and third emphases added); Compl. ¶ 39.)

The Offering Documents also disclose specific ***then-existing*** regulatory challenges in various states:

> We periodically receive communications from state and federal regulatory and similar agencies inquiring about the nature of our business activities, licensing of professionals providing services, and similar matters. Such matters are routinely concluded with no financial or operational impact on us. Currently there are no actions with any agency that are expected to have a material adverse effect on our business, results of operations, and financial condition.

(Ex. B, Prospectus, at 128.)

Additionally, the Offering Documents describe active lawsuits that SmileDirectClub had brought against state dental boards in Georgia and Alabama at the time of the IPO:

> Two state dental boards have established new rules or interpreted existing rules in a manner that purports to limit or restrict our ability to conduct our business as currently conducted. The Georgia Board of Dentistry passed a new rule that requires a licensed dentist to be present when 3D oral images are taken by a dental assistant, and the Board of Dental Examiners of Alabama has interpreted existing rules to require "direct supervision" (meaning the dentist must be physically present somewhere in the building) for the taking of digital oral images. ***In both Georgia and Alabama, we have filed lawsuits in Federal court against the dental boards and their individual members alleging, among other things, violations of the Sherman Act, and we will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model***.

(Ex. B, Prospectus, at 38 (emphasis added); *see also id.* at 123-24, 128.)

Similarly, the Offering Documents also describe a then-ongoing lawsuit filed against SmileDirectClub by the New Jersey Dental Association (*id.* at 124), in which the court recently granted summary judgment in SmileDirectClub's favor and dismissed the action. (Ex. I, Order at 8 ¶ 27, *Galkin v. SmileDirectClub, LLC*, No. Mid-C-19-19 (Sup. Ct. N.J. Chancery Div. Middlesex Cnty. Mar. 6, 2020) ("The actions taken by SDC, either directly or through its subsidiaries, do not constitute the practice of dentistry.").)

The Offering Documents further disclose that "a national dental association recently filed a citizen petition with FDA alleging that [SmileDirectClub's] manufacturing is in violation of

7

'prescription only' requirements" and caution that "[a]lthough ***FDA denied the petitioners'***

***request to initiate enforcement action***, the petition continues to be circulated by that national

dental association and other third parties."  (*Id.* at 38 (emphasis added).)

Importantly, the Offering Documents make clear that these challenges were likely to

continue and could result in new rules or regulations that could adversely affect

SmileDirectClub's business:

> In addition, a national orthodontic association has met with various dental boards
> across the country in an effort to advocate for new rules and regulations that could
> have the effect of interfering with our business model. Although, none of these
> efforts have resulted in rules and regulations being passed to date, it is possible that
> the rules and regulations governing the practice of dentistry and orthodontics in one
> or more states may change or be interpreted in a manner unfavorable to our
> business.

(*Id.* at 38; *see also id.* at 26, 124; Compl. ¶ 39.)

Finally, the Offering Documents warn that SmileDirectClub "could be the target of

claims relating to false, misleading, deceptive, or otherwise noncompliant advertising or

marketing practices," which "could also result in litigation, fines, penalties, and adverse publicity

that could cause reputational harm and loss of member trust, which could have an adverse effect

on our business."  (Ex. B, Prospectus, at 46.)

C.      **SmileDirectClub's Stock Drops Significantly on the Day of the IPO**

On September 12, 2019, SmileDirectClub completed its IPO, issuing shares at $23.00

each.  (Compl. ¶ 1.)  By the end of the first trading day, however, the share price closed down

27.5% at $16.67 per share.  (Ex. E, Stock Prices, at 1.)  Plaintiffs do not allege the drop was

caused by any corrective disclosure or other revelation about the Company that was not disclosed

in the Offering Documents.

8

**D.      After the IPO, SmileDirectClub Continues to Face Attacks from
Organized Dentistry, as the Offering Documents Warned Might Happen**

On September 24, 2019 (tellingly, just two days before the first of the shareholder

lawsuits was filed), three orthodontists and a single consumer filed a putative class action in this

District captioned *Ciccio v. SmileDirectClub, LLC*, No. 19-cv-845 (M.D. Tenn.) (Trauger, J.),

asserting claims for false advertising, unfair and deceptive trade practice and fraud—just as the

Offering Documents had warned could happen.  (Ex. G, *Ciccio* Complaint.)  The *Ciccio*

complaint, despite not being brought by investors, claimed that the Offering Documents

contained misstatements and omitted that the Company was allegedly experiencing legal

challenges in several states for purportedly operating as a dental practice without a license.  (*Id.*)[4]

A few weeks later, on October 14, 2019, California enacted new rules for teledentistry,

which did not go into effect until January 1, 2020.  (Compl. ¶¶ 3(d), 40(d).)  Among other things,

these rules—which were tacked onto the California Dental Board's sunset bill—require a

licensed dentist to review the patient's most recent x-rays or other bone imaging suitable for

orthodontia before prescribing teeth aligners and prohibit non-disclosure agreements that would

prevent consumers from submitting complaints to the Dental Board.  (*Id.* ¶ 40(d).)  While

California Governor Gavin Newsom felt constrained to sign the bill to ensure the Dental Board

could continue to operate, he issued a stern rebuke regarding the new teledentistry regulations.

(Ex. J, Signing Statement for CA Assembly Bill 1519.)  Although this new law was intended to

attack teledentistry, it did not have any material impact on SmileDirectClub's operations in

California.  Nevertheless, the Company's share price fell approximately 13% to $9.70 on the

heels of posts by short sellers about the new rules.  (Ex. E, Stock Prices, at 1.)

---

[4]      The consumer claims in the *Ciccio* action have since been dismissed.  The Company's
motion to dismiss the orthodontist claims remains pending.

9

Two days later, on October 16, 2019, SmileDirectClub and its Chief Clinical Officer, Dr. Jeffrey Sulitzer, D.M.D., filed a lawsuit captioned *Sulitzer v. Tippins*, No. 19-cv-8902 (C.D. Cal.), against the California Dental Board based on the overly aggressive tactics of one of the board's investigators.  (Compl. ¶¶ 3(d), 40(b); Ex. H, *Sulitzer* Complaint.[5])  This was consistent with the Offering Documents' disclosure that the Company "will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model."  (Ex. B, Prospectus, at 38.)  Nevertheless, the next day, the Company's stock price fell 5.90% to $9.41 per share.  (Ex. E, Stock Prices, at 1.)

### E.    SmileDirectClub Announces Its Q3 2019 Results, Which Exceeded Market Expectations

On November 12, 2019—eight weeks after the IPO—SmileDirectClub announced its Q3 2019 results, for the quarter ended September 30, 2019, during which the IPO occurred.  (Ex. C, Q3 2019 Press Release, at 1; *see also* Compl. ¶¶ 29-31 (relying on Q3 2019 results).)  Overall, the results were positive.  For example, total revenue was $180.2 million, a 50.6% year-over-year increase, and aligner shipments were 106,070, a 46.5% year-over-year increase.  (Ex. C, Q3 2019 Press Release, at 1.)  The Company's Q3 2019 revenue beat market expectations by approximately $15 million or almost 10%.  (Ex. D, Q3 2019 Transcript, at 1.)  On the accompanying earnings call, Chief Financial Officer ("CFO") Kyle Wailes noted that "September was the highest revenue month in the history of SmileDirectClub."  (*Id.* at 7.)  Chief Executive Officer ("CEO") David Katzman stated that the Company's "core business metrics are trending positively" and highlighted that "adjusted EBITDA came in ahead of management's

---

[5]    There, Dr. Sulitzer asserts claims in his capacity as an individual and as owner of a California professional corporation that contracts with SmileDirectClub LLC for dental support organization services.

expectations at negative $45 million, reflecting continued investments that we believe will position us favorably to capture the long-term market opportunity." (*Id.* at 5.)

Notwithstanding this positive performance, the Company also reported a net loss of $387.6 million. (Ex. C, Q3 2019 Press Release, at 1.) This was largely due to one-time IPO-related expenses of approximately $330 million, as the Offering Documents had disclose and Mr. Wailes reiterated on the Q3 earnings call:

> General and administrative expenses were $390 million in Q3 compared to $30 million in the prior year period. G&A expenses in the current year period include a one-time charge of $324 million related to equity based compensation and $6 million of other one-time IPO specific costs during the third quarter. As we mentioned [in] our [Offering Documents], we expected to have a one-time charge in third quarter as a result of compensation expense related to the IPO.

(Ex. D, Q3 2019 Transcript, at 8.) Indeed, the Offering Documents warned investors that the Company "expect[ed] to incur a material one-time compensation expense, in the quarter of this offering in connection with the payment of cash bonus amounts and issuance of shares of Class A common stock[.]" (Ex. B, Prospectus, at 88.) Excluding this one-time expense, the Company's net loss was only $57.6 million, which was consistent with the Company's history of net losses "since inception"—as the Offering Documents also disclosed. (*See id.* at 25-26 (disclosing net losses for 2017 through the first half of 2019, and cautioning "[i]t is possible that we will not achieve profitability or that, even if we do achieve profitability, we may not maintain or increase profitability in the future").)

F. **Duplicative Securities Lawsuits Are Filed Against SmileDirectClub in State and Federal Courts in Tennessee, Michigan and New York**

Based on these post-IPO developments, various putative shareholders began filing duplicative securities actions in state and federal courts just two weeks after the IPO. Six duplicative actions were filed in state courts in New York, Michigan and Tennessee. The New York plaintiff agreed to a stay pending resolution of any motions to dismiss in this and the other

11

actions.  On February 26, 2020, the Michigan action was dismissed in its entirety.  The four Tennessee state court actions were consolidated, and Defendants moved to stay that action in favor of this one or to dismiss it entirely for failure to state a claim.  Briefing on that motion will be complete on April 10, 2020.

All federal cases were consolidated here.  On February 21, 2020, Plaintiffs filed the Consolidated Complaint against the Company, certain of its officers and/or directors, the investment banking firms that acted as underwriters for its IPO and Camelot Venture Group ("Camelot"), a private investment group that invests primarily in direct-to-consumer brands.  (Compl. ¶¶ 11-21.)  Plaintiffs assert claims under Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of all purchasers of SmileDirectClub's Class A common stock issued pursuant and/or traceable to the Offering Documents.  (*Id.* ¶ 1.)  As demonstrated below, the Consolidated Complaint should be dismissed with prejudice in its entirety.

## ARGUMENT

### I.  THIS ACTION SHOULD BE DISMISSED BECAUSE PLAINTIFFS FAIL TO ALLEGE ANY ACTIONABLE MISSTATEMENT OR OMISSION

To survive dismissal under Rule 12(b)(6), "the plaintiff [must] provide 'enough facts to state a claim to relief that is plausible on its face.'"  *Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 719 F.3d 498, 502 (6th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), *vacated on other grounds sub nom. Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175 (2015). "[A]lthough § 11 claims [of the Securities Act] do not require pleading of scienter, Rule 9(b) pleading standards still apply to § 11 claims that sound in fraud," as Plaintiffs' claims here do. *Id.* (applying Rule 9(b) to Section 11 claims).  "Complaints subject to Rule 9(b) must plead 'with particularity the circumstances constituting fraud or mistake.'"  *Id.* (quoting Fed. R. Civ. P. 9(b)).

12

To state a claim under Section 11, Plaintiffs must allege facts demonstrating that "part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Stating a claim under Section 12(a)(2) requires the same showing for a Prospectus. *See* 15 U.S.C. § 77*l*(a)(2). Section 15 provides for liability of persons who "control" any person liable under Section 11 or 12. *See* 15 U.S.C. § 77*o*(a). In other words, for any of Plaintiffs' claims to survive dismissal, they must allege facts showing a material misstatement or actionable omission in the Offering Documents. As explained below, each of Plaintiffs' four attempts to do so fails as a matter of law.

**A.      The Offering Documents Did Not Fail To Disclose Known Trends
About SmileDirectClub's Revenue, Gross Profits or Adjusted EBITDA**

Plaintiffs' primary theory is that the Offering Documents were misleading because they purportedly failed to disclose "known trends in the Company's revenue, gross profit and Adjusted EBITDA, which at the time of the IPO were substantially declining compared to the historical growth disclosed in the [Offering Documents]." (Compl. ¶ 3(a); *see also id.* ¶¶ 23-33.) Plaintiffs do not contend that any of the historical data disclosed in the Offering Documents was false. Plaintiffs also do not allege that the Company failed to disclose any purported trend in its underlying business or in the competitive environment. Rather, Plaintiffs claim that the Offering Documents should have disclosed that revenue, gross profit and Adjusted EBITDA for the quarter in progress at the time of the IPO (Q3 2019) would be lower than the previous quarter (Q2 2019). This theory fails for multiple reasons.

As a threshold matter, a company has no duty to disclose interim financial results in connection with an IPO, particularly where, as here, the "registration statement contained ample warnings and disclosures that explained shareholder revenue and earning fluctuations," including

13

that the company "anticipated its substantial operating losses to continue." *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017).[6]  Here, the Offering Documents warned that "[o]ur operating results have fluctuated in the past and we expect our future quarterly and annual operating results to fluctuate as we focus on increasing demand for our products."  (Ex. B, Prospectus, at 25.)  The Offering Documents specifically cautioned investors that the Company has "incurred net operating losses since inception" and might "not achieve profitability . . . in the future."  (*Id.* at 25-26.)  They also disclosed a trend of increasing sales and marketing expenses and cautioned that the Company "expect[s] to continue to invest heavily in sales and marketing[.]"  (*Id.* at 84, 88-89.)  In light of these disclosures and risk warnings, no reasonable investor could have been misled into thinking the Company's revenue, gross profit and Adjusted EBITDA would necessarily continue to increase.  *See DeMaria v. Andersen*, 318 F.3d 170, 181-82 (2d Cir. 2003) ("[C]autionary statements and the specific, prominent disclosures . . . [of prior losses] do not paint an unrealistically optimistic picture . . . but instead 'bespeak caution' . . . . [and] would not have misled a reasonable investor . . . .").[7]

---

[6]  *See also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997) ("Equally well settled is the principle that an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in progress."); *City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mortg. Holdings Inc.*, No. 15-61170-CIV, 2016 WL 4705718, at *8 (S.D. Fla. June 21, 2016) ("Nationstar had no duty to disclose its financial results ahead of time.").

[7]  *See also In re N2K Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 2000) (omission in April 15 IPO materials of increased losses for quarter ended March 31 not actionable where company warned it "intends to increase substantially its operating expenses . . . to fund increased sales and marketing" and "expects to continue to incur significant losses"), *aff'd*, 202 F.3d 81 (2d Cir. 2000); *Gart v. Electroscope, Inc.*, 24 F. Supp. 2d 969, 974 (D. Minn. 1998) (no duty to disclose results for quarter ending three days after IPO).

14

To the extent Plaintiffs claim that Item 303 of SEC Regulation S-K required disclosure of the actual interim financial data, it did not.  Item 303 requires disclosure only of "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).  First, Plaintiffs do not identify any purported trend or uncertainty. Instead, they incorrectly claim—contrary to Item 303's plain text—that SmileDirectClub was obligated to disclose the financial results themselves.  *See In re Turkcell Iletisim Hizmetler A.S. Sec. Litig.*, 202 F. Supp. 2d 8, 13 (S.D.N.Y. 2001) (Item 303 did not require disclosure of decrease in operating income).

Second, in any event, courts have repeatedly held that the "alleged effects on a single quarter's revenues do not constitute 'trends' under Item 303."  *Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019) (Item 303 did not require disclosure in Q1 and Q2 financials of shift in sales from Q3 to Q2 and other factors that affected Q3 growth); *see also Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1191 (11th Cir. 2002) ("It may be that a particular pattern is, for example, of such short duration that it will not support any conclusions about the registrant's business environment."); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 206 (D. Conn. 2014) ("[A] two-month decline in sales . . . is not a 'trend' that must be disclosed.").

Third, even if a single quarter of financial results could constitute a trend (and it does not), Plaintiffs also fail to allege facts showing Defendants ***knew*** at the time of the IPO that revenue, Adjusted EBITDA and gross profits would be lower in Q3 2019 than in Q2 2019.  The Sixth Circuit has made clear that Item 303 applies only to information that is actually known, not merely knowable.  *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008)

15

("While Section 11 does not require any additional knowledge, that does not change the fact that the duty of disclosure arising from Item 303 does require knowledge."). Thus, Plaintiffs' conclusory assertion that "[e]ach of the defendants was aware of *or should have known* at the time of the IPO of the dramatic reversal in SDC's operating trends," (Compl. ¶ 33 (emphasis added)), fails even at the pleading stage. *See Chan v. New Oriental Educ. & Tech. Grp. Inc.*, Civ. No. 16-9279, 2019 WL 2865452, at \*12 (D.N.J. July 3, 2019) (allegations "that management 'must have known' amount to a 'concession' that '[plaintiffs] have no facts to say that management did know'"). Adjusted EBITDA and Gross Profit are complex accounting calculations. (*See, e.g.*, Ex. B, Prospectus, at 23-24 (explaining Adjusted EBITDA calculation).) Plaintiffs do not allege any facts showing the Company had completed its quarterly analysis of this information by the time of the IPO *when the quarter was still in progress*. Again, Plaintiffs' conclusory assertion that "SDC closely tracked its revenue, gross profit and Adjusted EBITDA in connection with its ongoing operations and in connection with the IPO," (Compl. ¶ 33), is insufficient even under Rule 8. Plaintiffs fail to allege, for example, when in Q3 the supposed "trend" turned negative, when the Company compiled and calculated that information, and who specifically knew of such calculations. Indeed, as Company executives later noted on the Q3 earnings call (and the Complaint does not dispute), September was the highest revenue month in Company history. (Ex. D, Q3 2019 Transcript, at 1.)

Thus, Plaintiffs fail to allege the Company had a duty to disclose its Q3 2019 results any sooner than it did. *See Gallagher v. Abbott Labs.*, 269 F.3d 806, 808 (7th Cir. 2001) ("Much of plaintiffs' argument reads as if firms have an absolute duty to disclose all information material to stock prices as soon as news comes into their possession. Yet that is not the way the securities laws work. We do not have a system of continuous disclosure.").

16

**B.    The Offering Documents Did Not Misrepresent
        SmileDirectClub's Member Satisfaction**

Next, Plaintiffs claim that the Offering Documents misrepresented customer satisfaction

with SmileDirectClub's products and services.  (Compl. ¶¶ 3(b), 34-36.)  Specifically, they

challenge the following statements in Offering Documents:

- "Our primary focus is on delivering an exceptional customer ('member') experience . . . . As a testament to our confidence in the quality and efficacy of our product, we offer a Smile Guarantee, which provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied."

- SmileDirectClub's high "average rating of 4.9 out of 5 from over 100,000 member reviews on our website" emphasizing that "our members are *highly satisfied.*"

- "Our offering provides a *highly positive member experience* delivered by our vertically integrated model, which enables us to address critical problems around cost, convenience, and access to care."

- "[W]e deliver a *quality service* at a fraction of the cost [of] traditional orthodontic solutions."

(Compl. ¶ 35 (emphasis in Complaint); *see also* Ex. B, Prospectus, at 2.)

As an initial matter, to the extent Plaintiffs challenge the Company's statements that it is

focused on delivering an exceptional customer experience and is confident in the quality and

efficacy of its product, those statements are plainly inactionable puffery.  *See In re Ford Motor*

*Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (statements that Ford makes "quality a top

priority" and wants its "customers to feel safe and secure in their vehicles at all times" were

"mere corporate puffery," which is inactionable, notwithstanding subsequent product recall).

The challenged statements also are not false or misleading because certain members

allegedly experienced issues or complications with their clear aligner therapy.  (*See* Compl. ¶

36.)   Plaintiffs note that certain members have submitted complaints to the Better Business

Bureau ("BBB") (*id*. ¶ 36(a)), but "Plaintiffs must show more than the mere existence of a few

17

customer complaints per year to adequately plead that Defendants'. . . [statements] were false or misleading." *Curry v. Yelp Inc.*, No. 14-cv-03547-JST, 2015 WL 7454137, at *7 (N.D. Cal. Nov. 24, 2015) (noting plaintiffs "failed to direct the Court to any case holding that customer complaints alleging circumstances that are contrary to defendant's representations independently suffice to establish the falsity of those representations"), *aff'd*, 875 F.3d 1219 (9th Cir. 2017). The BBB complaints amount to less than one quarter of one percent of SmileDirectClub's members, and Plaintiffs ignore that overall the Company currently has an A+ rating from BBB and customer reviews on the BBB average four out of five stars. (Ex. F, BBB Profile, at 1.) Even more fundamentally, the Offering Documents do not claim 100% member satisfaction, and the alleged dissatisfaction of some members does not render disclosures about the high satisfaction of others false or misleading. *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements."); *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (existence of customer complaints insufficient to allege Company suffered from a "failing business model" and "was aware that its service was much worse than represented").

To the extent Plaintiffs complain that certain members agree to confidentiality provisions as part of a general release when refunds are issued outside of the Company's refund policy and argue that the Company had a duty to disclose member complaints, that too fails as a matter of law. (*See* Compl. ¶ 36.) It is axiomatic that "[t]here is no general duty on the part of a company to provide the public with all material information." *J & R Mktg.*, 549 F.3d at 397 (citation omitted). As courts have recognized, a duty to disclose declines in customer satisfaction "would not comport with the way the business world works." *In re Allscripts, Inc. Sec. Litig.*, No. 00 C

18

6796, 2001 WL 743411, at *6 (N.D. Ill. June 29, 2001). The federal securities laws do not require "corporate officials [to] present an overly gloomy or cautious picture of current performance and future prospects." *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015); *see also Romine v. Acxiom Corp.*, 296 F.3d 701, 708 (8th Cir. 2002) ("[A] company has no duty to disparage its own competitive positions in the market where it has provided accurate hard data from which analysts and investors can draw their own conclusions about the company's conditions and the value of its stock." (internal quotation marks and citation omitted)).

Finally, the Company's disclosure of member satisfaction also was not false or misleading because the Company has used litigation to protect its rights against baseless attempts to disparage its business. (*See* Compl. ¶ 36(f)-(g).) The Offering Documents expressly disclosed the Company's disputes with the ADA and state dental boards and made clear that the Company "will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model." (Ex. B, Prospectus, at 38.) If anything, the dissatisfaction of SmileDirectClub's *competitors* only reflects the satisfaction of its members.

**C.     The Offering Documents Did Not Misrepresent SmileDirectClub's Standard of Care**

Third, Plaintiffs contend that the Offering Documents misrepresented SmileDirectClub's "actual standard of care SDC provided to its customers" by allegedly "omitt[ing] that SDC had endangered the health of many of its customers by proscribing aligners to customers who were not suitable candidates, and by failing to provide adequate, or any, ongoing dental care and supervision to its customers." (Compl. ¶ 3(c); *see generally id.* ¶¶ 37-38.) Specifically, Plaintiffs challenge the Offering Documents' description of a typical "member journey." (Compl. ¶ 37; *see also* Ex. B, Prospectus, at 4.)

19

But again, Plaintiffs do not allege any facts showing the Offering Documents' description was false or omitted material information it was required to disclose.  Instead, Plaintiffs merely complain about what they perceive as shortcomings in the disclosed business model.  For example, they chastise the Company for "require[ing] customers to self-certify their own dental health," instead of the Company conducting x-rays.  (Compl. ¶ 38(b).)  Similarly, they complain that SmileShop employees, rather than dentists, take the 3-D image of members' teeth, which are then reviewed and approved by the treating dentist along with the proposed treatment plan.  (*Id.* ¶ 38(c)-(d).)  Regardless of what Plaintiffs think about the merits of teledentistry and SmileDirectClub's business, they were accurately disclosed in the Offering Documents.  As the Sixth Circuit has held, "[t]o the extent the plaintiffs take issue with the efficiency or effectiveness of [defendant's business], the plaintiffs raise a claim of corporate mismanagement, not investor deception."  *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (description of protocols as "'strict' . . . is not 'disproven' just because [company] could have strengthened its standards and protocols").  In other words, Plaintiffs' subjective disagreement with the Company's business strategy does not state a claim for a disclosure-based securities violation.  *See Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994) (affirming dismissal of securities claims where "plaintiffs' allegations . . . are nothing more than conclusory disparaging characterizations of [defendant's] products and market position").[8]

---

[8]  To the extent Plaintiffs complain that members were referred to "hygienists" regarding issues with their aligners, the Offering Documents disclosed that SmileDirectClub has "a dedicated team of approximately 600 customer care team members in Nashville and Costa Rica, including general customer care team members, an advanced customer care team to address more complex questions, and a clinical customer care team of certified dental professionals available to answer clinical questions."  (Ex. B, Prospectus, at 116.)

20

**D.** **The Offering Documents Disclosed the Company's Legal and Regulatory Risks**

Finally, Plaintiffs claim that the Offering Documents misled investors about "the legislative and regulatory risks facing the Company," including by allegedly "fail[ing] to disclose a long-running investigation by the California Dental Board, which had resulted in raids on the Company's California SmileShops, and the looming impact of California legislation designed to thwart SDC's improper business practices." (Compl. ¶ 3(d); *see generally id.* ¶¶ 39-40.) This claim is plainly foreclosed by the Offering Documents, which repeatedly disclosed, in detail, the legal and regulatory risks that SmileDirectClub faces.

For example, the Offering Documents expressly warned that "[o]ur business could be adversely affected by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states." (Ex. B, Prospectus, at 37.) The Offering Documents detail regulations passed or misinterpreted in Georgia and Alabama at the urging of those states' dental boards and SmileDirectClub's related pending lawsuits against those boards for their anticompetitive conduct. (*Id.* at 38, 123-24, 128.) The Offering Documents also disclose the sham petition that the ADA submitted to the FDA urging the FDA to initiate enforcement action against SmileDirectClub, which the FDA rejected. (*Id.* at 38.) And, perhaps most importantly, the Offering Documents warned that these attacks were likely to continue and could result in new rules or regulations that could adversely affect SmileDirectClub's business:

> [A] national orthodontic association has met with various dental boards across the country in an effort to advocate for new rules and regulations that could have the effect of interfering with our business model. Although, none of these efforts have resulted in rules and regulations being passed to date, it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business.

(*Id.*; *see also id.* at 26, 124.)

21

These extensive, company-specific risk disclosures preclude Plaintiffs' claims.  *See Bondali*, 620 F. App'x at 491 ("[C]autionary statements are 'not actionable to the extent plaintiffs contend defendants should have disclosed risk factors 'are' affecting financial results rather than 'may' affect financial results.'" (citation omitted)); *Iron Worker Local Union No. 405 Annuity Fund v. Dollar Gen. Corp.*, No. 3:17 CV 63, 2018 WL 10152459, at *12 (M.D. Tenn. Mar. 8, 2018) (dismissing securities fraud claims where defendant made "the very disclosure Plaintiffs contend was missing and therefore made the statement misleading").

Plaintiffs' only issue with the Company's legal and regulatory disclosures is that they did not include an allegedly ongoing investigation by the California Dental Board and proposed regulations that were being considered by the California legislature at the time of the IPO. (Compl. ¶ 40(b)-(d).)  But "[b]efore liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure."  *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997).  "The securities laws do not require clairvoyance in the preparation of offering documents."  *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).  And "a government investigation, without more, does not trigger a generalized duty to disclose" under the securities laws.  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("'[D]isclosure is not a rite of confession,' and companies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" (citations omitted)).

In any event, the Offering Documents disclosed that the Company had received "communications from state and federal regulatory and similar agencies inquiring about the nature of our business activities," and that "[s]ome state dentistry boards have established new

22

rules or interpreted existing rules in a manner that limits or restricts our ability to conduct our business as currently conducted in other states." (Ex. B, Prospectus, at 128.) They also warned that "various dental boards across the country" were "advocate[ing] for new rules and regulations" and "it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business." (*Id.* at 38; *see also id.* at 26, 124.) Nothing more was required. *See J & R Mktg.*, 549 F.3d at 394 (It "is surely not the law" that if a company says "anything" about a topic, it "must disclose all 'material, non-public, adverse information' about that general topic."); *Stadnick*, 861 F.3d at 39 (rejecting securities claim based on alleged omission of regulatory changes where company's "registration statement included ample warning that its business could be affected by evolving regulatory regimes").

Moreover, Plaintiffs do not allege that the California Dental Board's investigation has had or is reasonably expected to have any impact—much less a material impact—on SmileDirectClub's business. Indeed, Plaintiffs do not allege that SmileDirectClub has been subject to any fines, penalties or other enforcement action resulting from the investigation (because it has not been). Likewise, Plaintiffs do not allege that SmileDirectClub reasonably expected the new California regulations, which were merely a proposal at the time of the IPO, to have a material impact on its business. Without such allegations, Plaintiffs cannot establish any duty to disclose. *See Iron Worker Local Union No. 405 Annuity Fund*, 2018 WL 10152459, at *12 (no duty to disclose effect of regulatory change absent factual allegations showing defendants "could or should have predicted" the impact); *see also Bondali*, 620 F. App'x at 491 (no duty to disclose where "plaintiffs have not alleged facts suggesting the issues . . . were so severe that they would have resulted in financial loss"); *Nurlybayev v. ZTO Express (Cayman)*

23

*Inc.*, No. 17 Civ. 6130-LTS-SN, 2019 WL 3219451, at *5 (S.D.N.Y. July 17, 2019) (no duty to disclose that, prior to IPO, company decreased fees on a service that was its "primary source of revenue in the quarter immediately preceding its IPO" in part because the complaint failed to allege the "effect on [defendant's] profitability").

Finally, Plaintiffs suggest that SmileDirectClub should have disclosed that it is engaged in the unlicensed practice of dentistry (Compl. ¶ 40), but they do not allege any facts that would show the Company was engaged in such a practice. To the extent state dental boards had made similar claims at the time of the IPO, the Offering Documents disclosed that. For example, the Offering Documents describe a lawsuit against the Company by the New Jersey Dental Association claiming the Company engages in the illegal corporate practice of dentistry. (Ex. B, Prospectus, at 124.) On March 6, 2020, the New Jersey court completely rejected the Dental Association's claims and granted summary judgment for SmileDirectClub, holding:

> The evidentiary record does not support a finding that SDC is engaging in the corporate practice of dentistry by providing non-clinical administrative support services, including its teledentistry platform, to Smile of NJ or the Smile of NJ Doctors. The actions taken by SDC, either directly or through its subsidiaries, do not constitute the practice of dentistry. The treatment of patients is directed and controlled by licensed New Jersey dentists or orthodontists[.]

Order at 8 ¶ 27, *Galkin v. SmileDirectClub, LLC*, No. Mid-C-19-19 (Sup. Ct. N.J. Chancery Div. Middlesex Cnty. Mar. 6, 2020) (submitted herewith as Ex. I). Thus, Plaintiffs' accusation that SmileDirectClub is engaged in the unlicensed practice of dentistry has been expressly rejected, and the Company had no duty to describe its business in the false manner Plaintiffs urge.

Because each of Plaintiffs' four theories of alleged misstatements fails as a matter of law, the Consolidated Complaint should be dismissed with prejudice in its entirety. *See IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325, 328 (6th Cir. 2017) ("Plaintiffs

have failed to state a violation of § 11 or § 12(a)(2) of the Securities Act because they have not pleaded plausibly that those documents contained material misrepresentations . . . .").

## II.     THIS ACTION SHOULD BE DISMISSED FOR LACK OF CAUSATION

Separate from Plaintiffs' failure to allege any actionable misstatement or omission, their claims independently fail for lack of causation.  The securities laws do not "provide investors with broad insurance against market losses"; rather, they "protect [investors] against those economic losses that misrepresentations actually cause."  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005).  Accordingly, the Securities Act provides an affirmative defense that bars recovery for losses that are not attributable to the alleged misrepresentation or omission in the offering documents.  *See* 15 U.S.C. § 77k(e).  Even at the pleading stage, dismissal is warranted "[i]f it is apparent on the face of the complaint [that] the decline in share value is not related to any material misstatement and/or omission."  *Azzolini v. Corts Tr. II for Provident Fin. Tr. I*, No. 103CV1003, 2005 WL 3448053, at *5 (E.D. Tenn. Dec. 14, 2005) (dismissing Securities Act claims based on negative causation); *see also In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588, 595 (S.D.N.Y. 2011) (same).

Here, the Company's stock price fell 27.5% on its first day of trading and then continued to decline following various post-IPO events, such as the new California regulations and the *Ciccio* lawsuit.  None of these events revealed any misstatement or undisclosed risk in the Offering Documents.  Thus, Plaintiffs' claims should be dismissed for negative causation.[9]

## <u>CONCLUSION</u>

For these reasons, the Consolidated Complaint should be dismissed with prejudice.

---

[9]     Because Plaintiffs fail to allege a primary violation under Section 11 or 12, their claims for control person liability necessarily fail as well.  *See IBEW Local No. 58 Annuity Fund,* 849 F.3d 325 at 328.

<span style="display:block; text-align:center;">25</span>

Dated: Nashville, TN
      March 23, 2020

Respectfully submitted,

/s/ Steven A. Riley
Steven A. Riley (TN #6258)
Elizabeth O. Gonser (TN #26329)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737
sriley@rwjplc.com
egonser@rwjplc.com

*Counsel for All Defendants*

/s/ Scott D. Musoff
Jay B. Kasner (*pro hac vice*)
Scott D. Musoff (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 735-2000

*Counsel for Defendants SmileDirectClub,
Inc., David Katzman, Kyle Wailes, Steven
Katzman, Jordan Katzman, Alexander
Fenkell, Susan Greenspon Rammelt, Richard
Schnall and Camelot Venture Group*

/s/ Andrew J. Finn
Sharon L. Nelles (*pro hac vice*)
Andrew J. Finn (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-400
Facsimile: (917) 558-3588

*Counsel for Defendants J.P. Morgan
Securities LLC, Citigroup Global Markets
Inc., BofA Securities, Inc., Jefferies LLC, UBS
Securities LLC, Credit Suisse Securities
(USA) LLC, Guggenheim Securities, LLC,
Stifel, Nicolaus & Company, Incorporated,
William Blair & Company, L.L.C. and Loop
Capital Markets LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 23, 2020 a true and correct copy of the foregoing document was served via the Court's electronic filing system on:

Christopher M. Wood
Robbins Geller Rudman & Dowd, LLP
414 Union Street, Suite 900
Nashville, TN 37219
cwood@rgrdlaw.com

Darren J. Robbins
Danielle S. Myers
Michael Albert
Robbins Geller Rudman & Dowd, LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
darrenr@rgrdlaw.com
dmyers@rgrdlaw.com
malbert@rgrdlaw.com

/s/ Steven A. Riley