UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ADAM FRANCHI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SMILEDIRECTCLUB, INC., et al.,<br><br>Defendants. | Civil Action No. 3:19-cv-00962<br>**(Consolidated)**<br><br>CLASS ACTION<br><br>Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensley |

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS .....................................................................................2

    A.    At the IPO, SDC Was Not Experiencing "Accelerating Growth"..........................2

    B.    SDC Misrepresented Customer Satisfaction...........................................................5

    C.    SDC's Teledentistry Platform Did Not Provide High Quality Care.......................6

    D.    SDC Did Not Warn Investors of Regulatory and Legal Challenges that
        Had Materialized by the Time of the IPO................................................................7

III.  ARGUMENT..........................................................................................................8

    A.    The Complaint Alleges Actionable Misstatements and Omissions.........................9

        1.    The Registration Statement Falsely Stated that Growth Was
               Accelerating at the Time of the IPO ...........................................................10

        2.    Defendants Violated SEC Item 303............................................................12

               a.    Knowledge Is Not an Element of a 1933 Act Claim, and the
                    Requirements of SEC Item 303 Are Satisfied ...............................14

               b.    The Misrepresented and Omitted Facts Were Material .................15

        3.    The Registration Statement Misrepresented the Standard of Care
               SDC Provided and Its Customers' Satisfaction .........................................16

               a.    The Registration Statement Contained Untrue Statements
                    Concerning the Standard of Care SDC Provided to Its
                    Customers ......................................................................................17

               b.    The Registration Statement Contained Untrue Statements
                    Concerning Member Satisfaction ..................................................18

               c.    Defendants' Risk Disclosures Were Misleading ...........................20

    B.    Defendants Have Failed to Prove a Lack of Loss Causation.................................24

IV.   CONCLUSION.....................................................................................................25

Cases\4810-8356-5754.v1-4/22/20

**CASES**

*Azzolini v. Corts Tr. II for Provident Fin. Tr. I*,
2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) ...................................................................24

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ...................................................................................................8, 16

*Bondali v. Yum! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ....................................................................................18, 21

*Chevalier v. Estate of Barnhart*,
803 F.3d 789 (6th Cir. 2015) .................................................................................................21

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ....................................................................................12, 16, 20

*City of St. Clair Shores Police & Fire Ret. Sys. v.*
*Nationstar Mortg. Holdings Inc.*,
2016 WL 4705718 (S.D. Fla. June 21, 2016) ........................................................................13

*Curran v. Freshpet, Inc.*,
2018 WL 394878 (D.N.J. Jan. 12, 2018) ...............................................................................15

*Curry v. Yelp Inc.*,
2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*,
875 F.3d 1219 (9th Cir. 2017) ................................................................................................19

*Fed. Housing Fin. Agency for Fed. Nat'l Mortg. Ass'n v.*
*Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017), *cert. denied*,
*Noruma Sec. Int'l, Inc. v. Fed. Housing Agency*,
___ U.S. ___, 138 S. Ct. 2679 (2018) .....................................................................................8

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ..............................................................18, 20

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ......................................................10, 17, 18, 20

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) (*en banc*) ....................................................................... *passim*

Cases\4810-8356-5754.v1-4/22/20

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)........................................................................................1, 8, 14

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)...................................................................11

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)................................................................................13

*In re Convergent Techs. Sec. Litig.*,
948 F.2d 507 (9th Cir. 1991),
*as amended on denial of reh'g* (Dec. 6, 1991)........................................................11

*In re Direct Gen. Corp. Sec. Litig.*,
398 F. Supp. 2d 888 (M.D. Tenn. 2005)...................................................10, 15, 16

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ........................................21, 22, 24

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)...............................................................13, 20

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2014)....................................................................9

*In re Ford Motor Co. Sec. Litig.*,
381 F.3d 563 (6th Cir. 2004) ...........................................................................19, 20

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
791 F.3d 90 (D.C. Cir. 2015) .................................................................................21

*In re NationsMart Corp. Sec. Litig.*,
130 F.3d 309 (8th Cir. 1997) ...................................................................................9

*In re Netflix, Inc. Sec. Litig.*,
2005 WL 1562858 (N.D. Cal. June 28, 2005) .................................................19, 20

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016).......................................................13

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000)..................................................................9

*In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*,
166 F. Supp. 3d 948 (W.D. Tenn. 2014)....................................................................24

*In re Sirrom Capital Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999)..................................................................9, 10

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)...................................................................................11

*In re WRT Energy Sec. Litig.*,
2005 WL 2088406 (S.D.N.Y. Aug. 30, 2005).........................................................24

*Ind. State Dist. Council of Laborers & Hot Rod Carriers
Pension & Welfare Fund v. Omnicare, Inc.*,
583 F.3d (6th Cir. 2009) .....................................................................................9, 24

*Iron Worker Local Union No. 405 Annuity Fund v.
Dollar Gen. Corp.*,
2018 WL 10152459 (M.D. Tenn. Mar. 8, 2018) .......................................................8

*J & R Mktg., SEP v. Gen. Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) .............................................................................20, 23

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011).........................................................................12, 13, 14

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
238 F.3d 363 (5th Cir. 2001) ...................................................................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011).......................................................................................11, 13, 16

*Milman v. Box Hill Sys. Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999).......................................................................13

*Norfolk Cty Ret. Sys. v. Cmty. Health Sys., Inc.*,
2016 WL 4098584 (M.D. Tenn. June 16, 2016),
*rev'd on other grounds*, 877 F.3d 687
(6th Cir. 2017)...................................................................................17, 18, 21

*Omnicare, Inc. v.
Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015)...............................................................................................10, 20

Cases\4810-8356-5754.v1-4/22/20

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012)........................................................................................12

*Pinter v. Dahl*,
486 U.S. 622 (1988).......................................................................................................8

*Sanderson v. HCA-The Healthcare Co.*,
447 F.3d 873 (6th Cir. 2006) .......................................................................................9

*Schuh v. HCA Holdings, Inc.*,
947 F. Supp. 2d 882 (M.D. Tenn. 2013)..............................................................8, 12, 14, 24

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018) .......................................................................15

*Siracusano v. Matrixx Initiatives, Inc.*,
585 F.3d 1167 (9th Cir. 2009),
*aff'd*, 563 U.S. 27 (2011) ...........................................................................................21

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)....................................................................................................15

*Tuchman v. DSC Commc'ns Corp.*,
14 F.3d 1061 (5th Cir. 1994) ......................................................................................18

*Universal Health Servs., Inc. v. United States*,
___ U.S. ___, 136 S. Ct. 1989 (2016).........................................................................11

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019)................................................................20, 21

*Winslow v. BancorpSouth, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011).........................................................22

*Zwick Partners, LP v. Quorum Health Corp.*,
2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)..........................................................22

Cases\4810-8356-5754.v1-4/22/20

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §11.................................................................................................................1
  §12(a)(2) ........................................................................................................1
  §15.................................................................................................................1
  §77............................................................................................................ *passim*
  §78...............................................................................................................13

Federal Rules of Civil Procedure
  Rule 8 ............................................................................................................1
  Rule 9(b) ...........................................................................................8, 9, 19, 20
  Rule 12(b)(6)..................................................................................................8

17 C.F.R.
  §229.303.......................................................................................................12
  §229.303(a)(3)(ii)..........................................................................................12

**LEGISLATIVE HISTORY**

Private Securities Litigation Reform Act of 1995
  Pub. L. No. 104-67, 109 Stat. 737 (1995)...........................................19, 20

Cases\4810-8356-5754.v1-4/22/20

## I. INTRODUCTION

This case is not about whether SDC was a pioneer in its industry. It is about whether the Registration Statement used by defendants to sell $1.3 billion in common stock to investors misrepresented or omitted material facts about SDC's business.[1] The answer to this question is yes. Lead Plaintiff has adequately pled violations of §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act"), and defendants are strictly liable as a result thereof.

The Complaint clearly and succinctly pleads each material misstatement and omission and why it is untrue, easily satisfying the pleading requirements of Rule 8 of the Federal Rules of Civil Procedure (the "Rules") as a plaintiff "need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381-82 (1983).

First, the Complaint alleges that the Registration Statement misrepresented that SDC's "strength" was due to its purported "accelerating growth" when, in fact, SDC's three key business metrics (revenue, gross profit and Adjusted EBITDA) were actually ***declining***.

Second, the Registration Statement claimed SDC's high level of customer satisfaction would drive future growth, while omitting that: (i) thousands of SDC customers had lodged complaints about the Company's products and services, including many involving serious injury; (ii) SDC had deployed a hardball litigation campaign designed to suppress statements and disclosures from SDC customers and medical professionals critical of SDC's products and business practices; (iii) SDC was being investigated in California for the illegal practice of

---

[1] All capitalized terms in this opposition that are not otherwise defined herein have the same meaning as set forth in the Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 71) (the "Complaint"). All "¶_" or "¶¶_" citations herein are to the Complaint. Additionally, all emphasis is added and citations are omitted unless otherwise noted.

- 1 -

dentistry without a license; and (iv) the California Senate had passed legislation which would thwart SDC's improper business practices.

Third, while claiming SDC provided high quality care at lower cost by streamlining the orthodontic process and eliminating overhead associated with traditional treatment by an orthodontist, the Registration Statement omitted that SDC had endangered the health of many of its customers by prescribing aligners to customers who were not suitable candidates and by failing to provide adequate, or any, ongoing dental care and supervision to its customers.

Lead Plaintiff has adequately alleged that defendants used a Registration Statement that was false and misleading to raise more than $1.3 billion via the IPO, more than $625 million of which was immediately transferred to the Individual Defendants' accounts. Lead Plaintiff also adequately alleges that the members of the class, on the other hand, suffered significant harm as the SDC common stock they purchased in connection with the IPO declined by over 66%. Defendants' motion should be denied.

## II. STATEMENT OF FACTS

SDC operates as a teledentistry company headquartered in Nashville, Tennessee. The Company manufactures, markets and sells 3D-printed clear dental aligners to treat malocclusion. In May 2019, defendants filed the Registration Statement with the SEC in connection with the planned sale of SDC Class A common stock. On September 12, 2019, defendants completed SDC's IPO. The Registration Statement contained untrue statements of material fact regarding SDC's then-existing operations and omitted other material facts necessary to make the statements made therein not false or misleading.

### A. At the IPO, SDC Was Not Experiencing "Accelerating Growth"

The Registration Statement falsely represented that one of SDC's "Strengths" was its "Accelerating Growth," portraying SDC's revenue, gross profit and Adjusted EBITDA as

- 2 -

growing. ¶23. In fact, SDC's revenue, gross profit and Adjusted EBITDA were not growing at all, but had reversed course and were declining by the time of the IPO. ¶24. The decline in SDC's most important financial metrics represented a distinct reversal in the Company's growth trends portrayed in the Registration Statement. These trend changes– both the termination of SDC's historical positive trends and its new downward trends – were omitted from the Registration Statement. ¶25. The undisclosed reversal in SDC's revenue, gross profit and Adjusted EBITDA trends from positive to negative "***cause[d] reported financial information***" in the Registration Statement to "***not . . . be . . . indicative of future operating results***," as at the time of the IPO, SDC's growth was no longer accelerating as represented in the Registration Statement. ¶28.

The Registration Statement presented impressive quarterly growth in Adjusted EBITDA, reporting a trend in which Adjusted EBITDA had increased from negative $12.7 million in 4Q18 to negative $3.9 million in 1Q19 to ***positive*** $6.2 million in 2Q19 (the last period reported in the Registration Statement) as shown in the left chart below:



The Registration Statement, however, failed to disclose that by the date of the IPO, SDC's Adjusted EBITDA growth trend had halted and had commenced a downward trend materially different from the one portrayed, as illustrated in the right chart above. Thus, SDC's representation that it was experiencing "accelerating growth" and the Company's reported growth in Adjusted

- 3 -

Cases\4810-8356-5754.v1-4/22/20

EBITDA as portrayed in the Registration Statement were misleading and were ***not*** indicative of SDC's current, let alone future, performance. ¶29. Similarly, as shown in the left chart below, the Registration Statement presented impressive quarterly gross profit growth, with gross profit increasing by nearly 80% from $90.8 million in 4Q18 to $161.1 million in 2Q19 (the last period reported in the Registration Statement).

 

The gross profit reported in the Registration Statement was likewise misleading as, by the date of the IPO, SDC's gross profit trend had halted and had commenced a downward trend materially different from that portrayed in the Registration Statement, as illustrated in the right chart above. ¶30.

The Registration Statement further represented that SDC's revenue had grown sequentially each quarter since 4Q17, reaching over $423.2 million in 2018 from $146.0 million in 2017, and that SDC's revenue for the six months ended June 30, 2019 had increased an additional 113% over the same period in 2018.[2] This revenue growth rate portrayed in the Registration Statement was misleading and not indicative of SDC's revenue performance at the time of the IPO. ¶31.

---

[2]  The Registration Statement similarly reported continuous growth in gross profit from 4Q17 through 2Q19.

- 4 -

Because the Registration Statement omitted any disclosure of the known reversal in SDC's revenue, gross profit and Adjusted EBITDA trends, the claim of "accelerating growth" and the reported positive growth for the most recent periods contained in the Registration Statement was false and/or misleading and was neither indicative of, nor consistent with, SDC's current or future operating results.  ¶32.

The dramatic declines in SDC's most important financial metrics were known to the Individual Defendants as ***SDC closely tracked its revenue, gross profit and Adjusted EBITDA in connection with its ongoing operations and in connection with the IPO***.  ¶33.  The decline in Adjusted EBITDA referenced above was, in part, the result of increased marketing and selling expense ($17.8 million) and the doubling of legal expenses that ***had already been incurred*** prior to the IPO as a result of the problems with SDC's business, of which defendants were aware.  *Id.*

## B.    SDC Misrepresented Customer Satisfaction

The Registration Statement stated that SDC's number one strength was "positive member experience."  ¶34.  Indeed, because SDC's business model was predicated on customers purportedly ***not*** being satisfied with traditional orthodontics, the Company emphasized that its "primary focus is on delivering an exceptional member experience" and that "member satisfaction" was fundamental to "maintain[ing] our position as the leading direct-to-consumer clear aligner provider." ¶35.  Defendants even sought to quantify member satisfaction, stating in the Registration Statement that SDC had an "average rating of 4.9 out of 5 from over 100,000 member reviews on our website" and that the Company's "Smile Guarantee" was a "testament to our confidence in the quality and efficacy of our product."  *Id.*

In fact, ***thousands of SDC customers*** were neither "highly satisfied" nor had "highly positive experiences" with SDC's products and services. ¶36(a). Rather, SDC molds and aligners were causing serious health problems for thousands of customers who received missing or

- 5 -

misshapen aligners and were seeking (and experiencing difficulties in obtaining) refunds. *Id.* For example, the BBB alone registered more than *1,800 complaints* against SDC, notwithstanding the fact that the BBB had expressly discouraged customers from even submitting complaints to BBB before first contacting SDC directly. *Id.* Members were dissatisfied because, contrary to defendants' statements in the Registration Statement, SDC's primary focus was on signing up as many customers as possible to report increased revenue and financial trends in advance of the IPO. ¶36(b)-(c). As a result, SDC sold aligners to customers who were not appropriate candidates for SDC's treatment, pressured sales associates to close sales irrespective of a customer's suitability and approved treatment plans without meaningful review from dentists. *Id.* In addition, SDC took drastic steps to reduce or eliminate criticism, including by employing aggressive litigation against journalists, customers and an affiliate of the American Dental Association (the "ADA"), and requiring that customers sign NDA's in order to receive refunds. ¶36(d)-(f). Indeed, complaints against SDC to the California Dental Board led to an investigation and raids on the Company's California stores beginning in late 2017, none of which was disclosed in the Registration Statement. ¶36(g).

### C. SDC's Teledentistry Platform Did Not Provide High Quality Care

The Registration Statement claimed that SDC's teledentistry platform allowed it to provide "*excellent clinical care*" and "*professional-level service*." ¶37. For example, according to the Registration Statement, "*trained technicians*" created customer treatment plans, and the Company's "SmileCheck" program allowed a "*treating doctor* to monitor [the] member's progress and enable[d] *seamless communication* with the member over the course of treatment." *Id.*

In truth, SDC's teledentistry model was endangering the health of many of its customers by prescribing aligners to unsuitable candidates. ¶3(c). The Registration Statement failed to disclose that SDC doctors were not reviewing dental x-rays or conducting dental exams prior to

- 6 -

prescribing aligners to customers – instead, customers were required to self-certify their own dental health. ¶38(b). Nor did the Registration Statement inform investors that the Company was engaged in the unlicensed practice of dentistry and that SDC's treating dentists had no meaningful contact with customers. ¶38(f), (h). In fact, sales assistants handled customers, completing 3D scans of a patient's mouth, and customers were directed to speak to hygienists instead of a licensed dentist to resolve issues with their aligners. ¶38(c), (h).

### D. SDC Did Not Warn Investors of Regulatory and Legal Challenges that Had Materialized by the Time of the IPO

The Registration Statement advised investors that regulatory and legal challenges ***could have a material adverse effect on our business***. The purported "risk warnings" were themselves false and misleading as, by the time of the IPO, the regulatory and legislative risks that SDC warned of ***had already*** manifested. For example, the Registration Statement omitted that dozens of complaints had been filed by state chapters of the ADA, the American Association of Orthodontics and similar organizations. ¶40(a). The Registration Statement similarly omitted the fact that SDC was under investigation by the Dental Board of California for engaging in the unlicensed practice of dentistry. ¶40(b). The Registration Statement conspicuously omitted entirely, legislation passed by the California Senate, which required fundamental changes in SDC's business model in one of SDC's largest markets. ¶40(d). Critically, the legislation expressly requires teledentistry platforms to provide each customer with the treating dentist's name, license number and dental board contact; mandates reviews of a patient's most recent radiographs prior to beginning orthodontic treatment; and requires teledentistry providers to conduct a full patient examination prior to the enactment of the plan – requirements not implemented by SDC. *Id.*

- 7 -

## III. ARGUMENT

The "chief innovation" of the 1933 Act "was to replace the traditional buyer-beware or *caveat emptor* rule of contract with an affirmative duty on sellers to disclose all material information fully and fairly prior to public offerings of securities. That change marked a paradigm shift in the securities markets." *Fed. Housing Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 96 (2d Cir. 2017), *cert. denied, Noruma Sec. Int'l, Inc. v. Fed. Housing Agency*, ___ U.S. ___, 138 S. Ct. 2679 (2018). The Supreme Court has repeatedly emphasized that the 1933 Act's purpose of promoting "full and fair disclosure" is effectuated by means of strict liability, "even for innocent misstatements." *Pinter v. Dahl*, 486 U.S. 622, 646 (1988); *Basic Inc. v. Levinson*, 485 U.S. 224, 234 (1988); *Huddleston,* 459 U.S. at 380-82.

The elements of a §11 claim are minimal: "If a plaintiff purchased a security issued pursuant to a Registration Statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Id.* "'Neither scienter, reliance, nor loss causation is an element of §11 or §12(a)(2) claims.'" *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 886 (M.D. Tenn. 2013). As the U.S. Supreme Court has made abundantly clear, 1933 Act "[l]iability . . . is virtually absolute, even for innocent misstatements," as the 1933 Act "places a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 382; *Schuh*, 947 F.2d at 886.[3]

Defendants incorrectly contend that Lead Plaintiff's 1933 Act claims should be subject to Rule 9(b) pleading standards. Memorandum of Law in Support of Defendants' Motion to Dismiss (ECF No. 73) ("Defs' Mem.") at 1. A §11 claim is only subject to Rule 9(b) if it "sounds in fraud."

---

[3]   Despite the well-developed body of decisional authority penned by the Judges of this Court addressing Rule 12(b)(6) motions in securities actions, defendants cite but a single opinion by a visiting judge which did ***not*** involve §11 claims, *Iron Worker Local Union No. 405 Annuity Fund v. Dollar Gen. Corp.*, 2018 WL 10152459 (M.D. Tenn. Mar. 8, 2018). This is particularly noteworthy in light of defense counsel's familiarity with the relevant law from the Middle District.

- 8 -

*Ind. State Dist. Council of Laborers & Hot Rod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d at 935, 942 (6th Cir. 2009) ("*Omnicare I*"); *Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238 F.3d 363, 369 (5th Cir. 2001) (claims that do not sound in fraud "cannot be dismissed for failure to satisfy Rule 9(b)"); *see also In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) ("Rule 9(b) does not apply . . . because proof of fraud or mistake is not a prerequisite to establishing liability under §11.").

Where §11 claims are premised on allegations independent of fraud, the claims do not "sound in fraud." *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) (Rule 9(b) pleading standard inapplicable where "[p]laintiffs speak in terms of defendants' failure to make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true"); *accord In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 688 (M.D. Tenn. 2000). Lead Plaintiff's 1933 Act claims are grounded not in fraud, but rather in defendants' failure to exercise reasonable care to ensure that the Registration Statement was accurate. ¶¶51-52, 57-58. In addition, the Complaint expressly disclaims allegations of fraud. ¶¶47, 56, 62. Such disclaimers preclude the application of Rule 9(b)'s heightened pleading standards.[4] *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602, 602 n.19 (N.D. Ohio 2014); *Prison Realty*, 117 F. Supp. 2d at 688-89.

### A. The Complaint Alleges Actionable Misstatements and Omissions

Section 11 "creates two ways to hold issuers liable for the contents of a Registration Statement – one focusing on what the statement says and the other on what it leaves out."

---

[4] Even if Rule 9(b) did apply, dismissal would not be warranted because here the Complaint alleges the Registration Statement's false and misleading statements with particularity. ¶¶23-40. *Sanderson v. HCA-The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) ("'Rule 9(b) requires that the plaintiff specify the "who, what, when, where, and how"'").

- 9 -

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 179 (2015) ("*Omnicare II*"). The Complaint here adequately alleges both.

### 1. The Registration Statement Falsely Stated that Growth Was Accelerating at the Time of the IPO

A company cannot project "financial well-being . . . while knowingly omitting material facts that would have tempered their optimism." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 544 (6th Cir. 2001) (*en banc*). Otherwise, a company could, as defendants have done here, "offer a patchwork of honesty and omission. This proposition is untenable, however, both as a matter of policy and precedent." *Id.* at 560-61. *See also Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *13 (M.D. Tenn. Dec. 18, 2017) (holding that "where a defendant initially had no obligation to disclose facts on a particular subject, but he chooses voluntarily to address the subject in relation to a securities transaction, he 'assume[s] a duty to speak fully and truthfully on th[e] subject[]'").[5]

Here, the Registration Statement misrepresented that "Accelerating Growth" was one of SDC's "Strengths" and that SDC's revenue, gross profit and Adjusted EBITDA were growing dramatically. ¶23. These representations were untrue as the Registration Statement omitted that SDC's growth was not accelerating. Rather, SDC's revenue, gross profit and Adjusted EBITDA growth trends portrayed therein had reversed course and turned negative by the time of the IPO. The decline in SDC's revenue, gross profit and Adjusted EBITDA represented a distinct reversal in the Company's growth trends portrayed in the Registration Statement. The failure to disclose this adverse information rendered the Registration Statement's claims of "accelerating growth"

---

[5]   This court has long recognized that "[w]hether and when [d]efendants had a duty to disclose the adverse information . . . must be determined by the trier of fact . . . who must determine the factual circumstances under which these alleged false statements and omissions were made." *In re Direct Gen. Corp. Sec. Litig.*; s*ee also Sirrom*, 84 F. Supp. 2d at 944.

Cases\4810-8356-5754.v1-4/22/20

false and the accelerating revenue, gross profit and Adjusted EBITDA growth trends portrayed therein misleading.  ¶¶23-33.

Defendants insist that there is no 1933 Act violation because the Registration Statement provided accurate historical information.  Defs' Mem. at 13.  This argument misses the mark.  Defendants' contention not only fails to reckon with the applicable case law cited above; it also ignores the fact that by the date of the IPO, approximately 10 of the 12 weeks of 3Q19 had already transpired, rendering the half-truths in the Registration Statement materially misleading.  Even in fraud cases where the pleading standard is higher, "representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, ___ U.S. ___, 136 S. Ct. 1989, 2000 (2016) (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44, (2011)).[6]  Defendants' insistence simply ignores the well-established "rule against half-truths, or statements that are misleading by omission."  *In re Vivendi, S.A. Sec. Litig*., 838 F.3d 223, 240 (2d Cir. 2016).

Although the Registration Statement characterized SDC's "accelerating growth" as a "strength," portraying dramatic increases in revenue, Adjusted EBITDA and gross profit, the Registration Statement failed to disclose that at the time of the IPO, SDC was experiencing Adjusted EBITDA, gross profit and revenue declines that rendered the assertions of ***accelerating growth*** materially misleading.  While defendants argue that they had no duty to disclose this information, the Registration Statement boasted about SDC's positive growth, and once defendants

---

[6]  *Accord In re Bristol Myers Squibb Co. Sec. Litig*., 586 F. Supp. 2d 148, 160 (S.D.N.Y. 2008) ("even an entirely truthful statement may provide a basis for liability if material omissions related to the content of the statement make it . . . materially misleading"); *In re Convergent Techs. Sec. Litig.*, 948 F.2d 507, 512 (9th Cir. 1991), *as amended on denial of reh'g* (Dec. 6, 1991) (Accurate statements "'can become, through their context and manner of presentation, devices which mislead investors. . . .  [T]he disclosure required by the securities laws is measured not by literal truth, but by the ability of the material to accurately inform rather than mislead prospective buyers.'").

- 11 -

spoke, they had a duty to speak truthfully and completely.  *Helwig*, 251 F.3d at 561.  "'Corporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decision making.'"  *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 673 (6th Cir. 2005).  Yet, here they were not.

### 2. Defendants Violated SEC Item 303

The change in trends from the growth represented in the Registration Statement to the dramatic declines in Adjusted EBITDA, revenue and gross profit at the time of the IPO were all known negative trends or uncertainties that existed at the time of the IPO.  Defendants had a duty to disclose these material changes in trends or uncertainties under Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303, which requires companies to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations."  17 C.F.R. §229.303(a)(3)(ii); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012).  Because SDC's prior reported results were not indicative of future operations, Item 303 required disclosure of the change in trend from positive to negative in Adjusted EBITDA, revenue and gross profit.  *Id.*

In attempting to sidestep the mandatory disclosure requirements of Item 303, and the applicable Circuit Court authority referenced above, defendants argue that they were not required to disclose SDC's change in revenue, Adjusted EBITDA and gross profit trends that were occurring at the time of the IPO because the quarter had yet to be completed.  Defs' Mem. at 3, 13.  Defendants are wrong.  Judge Sharp specifically rejected this timeworn argument in *Schuh*, recognizing that "what may not constitute a trend in one industry may signal a trend in another," rejecting the argument that, as a matter of law, "'a two month period of time does not establish a "trend" for purposes of the disclosures required by Item 303.'"  *Schuh,* 947 F. Supp. 2d at 891-92;

- 12 -

*see also Matrixx*, 563 U.S. at 39-40 (explaining that the problem with "bright-line" and "categorical" rules is that they "would 'artificially exclude . . . information [that] would otherwise be considered significant to the trading decision of a reasonable investor'"). Other District Courts are in accord, rejecting the "no duty to disclose interim financial results" argument. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 513 (S.D.N.Y. 2013) (defendants had a duty to disclose a material negative impact to revenues that occurred **ten days prior** to the initial public offering); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (requiring disclosure of a known declining sales trend caused by a loss of key customers during the same quarter of company's IPO).[7]

Further, defendants' assertion that no disclosure of SDC's "financial results themselves" was required (Defs' Mem. at 15), ignores entirely the clear mandate of Item 303, which requires an issuer to disclose the full extent to which adverse trends were expected to affect their business, as well as related "uncertainties." *See In re Ply Gem Holdings, Inc. Sec. Litig.*, 2016 WL 5339541, at \*6 (S.D.N.Y. Sept. 23, 2016) (finding a violation of Item 303 where defendant's "disclosures fail[ed] to provide clarity on the extent of the expected effect" of a known trend); *Litwin*, 634 F.3d at 718-19 (defendant must disclose "whether, and to what extent, the particular known trend, event, or uncertainty might have been reasonably expected to materially affect [defendant's business]"). The dramatic declines here in Adjusted EBITDA, gross profit and revenue occurred prior to the IPO and triggered Item 303's disclosure requirements.

---

[7]   *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997), and *City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718 (S.D. Fla. June 21, 2016), are inapposite. *See* Defs' Mem. at 14 n.6. *Burlington* was a Securities Exchange Act of 1934 ("1934 Act") securities fraud case where plaintiffs expressly did not raise Item 303 claims on appeal. 114 F.3d at 1419 n.7. And in *Nationstar*, the court held that the defendant had **already warned** that it was being negatively impacted by the allegedly undisclosed impact of declining interest rates. 2016 WL 4705718, at \*8. No similar facts exist here.

- 13 -

### a. Knowledge Is Not an Element of a 1933 Act Claim, and the Requirements of SEC Item 303 Are Satisfied

Defendants' assertion that knowledge has not been adequately alleged is unavailing. Defs' Mem. at 15. First, "'*scienter* [is not] an element of §11 or §12(a)(2) claims.'" *Schuh*, 947 F. Supp. 2d at 886. As the U.S. Supreme Court made clear decades ago, 1933 Act "[l]iability . . . is virtually absolute, even for *innocent* misstatements." *Huddleston*, 459 U.S. at 382. Defendants are liable for *innocent or negligent* material misstatements or omissions, including those alleged in ¶23 – that the Registration Statement falsely or misleadingly represented that *accelerating growth* was a *strength* – as no knowledge requirement exists for these claims. *Id.*

Second, with respect to Lead Plaintiff's distinct Item 303 claim, the Complaint alleges that the change in trend was *known*, as *SDC closely tracked* its revenue, gross profit and Adjusted EBITDA in connection with its ongoing operations and in connection with the IPO. ¶33. Nothing more is required. Defendants seemingly argue that alleging defendants' awareness of the trend is insufficient. Yet, a 1933 Act claim is adequately pled where a plaintiff alleges "that there was a downward trend of which [defendants] had knowledge. The details can be fleshed out later." *Schuh*, 947 F. Supp. 2d at 891.

Defendants appear to contend that SDC does not even track its own key business metrics – the very same metrics hyped in the Registration Statement. Any contention about defendants' lack of awareness is particularly misplaced here, where the decline in Adjusted EBITDA was, in part, the result of increased marketing, selling and legal expenses that had already been incurred at the time of the IPO as a result of the serious problems alleged in the complaint. *Compare* ¶¶33, 36(a) (SDC had received thousands of complaints prior to the IPO), ¶36(d)-(f) (prior to the IPO, SDC filed lawsuits and vigorously pursued NDAs against customers who made their complaints public), *and* ¶40 (detailing dental board investigations of SDC prior to the IPO), *with Litwin*, 634

- 14 -

F.3d at 716 (finding Item 303 claim sufficiently pled where "[p]laintiffs allege that the downward trend in the real estate market was already known and existing at the time of the IPO, and that the trend or uncertainty in the market was reasonably likely to have a material impact on Blackstone's financial condition").  At a bare minimum, these allegations (and defendants' response) raise a factual question for the jury.  *See Shah v. Zimmer Biomet Holdings, Inc*., 348 F. Supp. 3d 821, 839-40 (N.D. Ind. 2018) (requiring disclosure where issues were known and "it [was] not a stretch to think" future issues were "inevitable"); *Curran v. Freshpet, Inc*., 2018 WL 394878, at \*6, \*8 (D.N.J. Jan. 12, 2018) (holding that defendants violated Item 303 where they "were aware of the manufacturing and retailer issues that would impede [the company's] ability to expand" such that "the inclusion of these facts would have presented a materially different outlook for the company's growth to a reasonable investor").

### b.      The Misrepresented and Omitted Facts Were Material

The change in trends in the Company's three key financial metrics, Adjusted EBITDA, revenue and gross profit, from growth to significant declines was material and required disclosure in the Registration Statement.  The Supreme Court and the Sixth Circuit (sitting *en banc*) have both held that "the issue of materiality is a mixed question of law and fact [and] [c]ourts generally reserve such questions for the trier of fact."  *Helwig*, 251 F.3d at 563 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 896 (M.D. Tenn. 2005) ("whether the information withheld was material . . . [m]ust be determined by the trier of fact").  Thus, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so ***obviously unimportant*** to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'"  *Helwig*, 251 F.3d at 563.

- 15 -

Defendants' arguments regarding materiality (Defs' Mem. at 13-16) are premature and meritless. Information is material under the federal securities laws if a "'reasonable investor' would have considered [it] significant" in making investment decisions. *Basic*, 485 U.S. at 232. Here, it is impossible to credibly contend that a reasonable investor would not have found it significant that SDC's three core business metrics (revenue, gross profit and Adjusted EBITDA) were no longer growing (as represented in the Registration Statement) but rather were suffering dramatic declines at the time of the IPO. For example, Adjusted EBITDA *plummeted by over $50 million* from the Registration Statement's last reported positive growth of $6.2 million to a decline of $45.2 million. Likewise, gross profit was no longer growing by 80%, it too was in a state of decline. Defendants cannot credibly contend that the omitted information is "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Bridgestone*, 399 F.3d at 681. Accordingly, materiality "*must* be determined by the trier of fact." *Direct General*, 398 F. Supp. 2d at 896; *see also Matrixx*, 563 U.S. at 47 (rejecting argument that *complaints* about the company's product could be deemed immaterial as a matter of law as "it is substantially likely that a reasonable investor would have viewed this information "'as having significantly altered the "total" mix of information made available"'").

### 3. The Registration Statement Misrepresented the Standard of Care SDC Provided and Its Customers' Satisfaction

Using clear aligners to treat malocclusion is not new or innovative, similar therapies have been offered by many different companies and dental practitioners for years. Nevertheless, SDC claimed that its business model was unique because it was a "direct-to-consumer clear aligner provider," which provided "professional level service," with unparalleled customer satisfaction in an industry plagued with high costs and high levels of customer dissatisfaction. ¶¶34-35, 37.

- 16 -

Having chosen to speak about SDC's quality and customer satisfaction, it is beyond dispute that defendants had a "'duty to speak fully and truthfully on th[e] subject[].'"  *Grae*, 2017 WL 6442145, at *13; *Norfolk Cty Ret. Sys. v. Cmty. Health Sys., Inc.*, 2016 WL 4098584, at *12 (M.D. Tenn. June 16, 2016), *rev'd on other grounds*, 877 F.3d 687 (6th Cir. 2017) ("once [defendants] 'put the topic of the cause of [their] financial success at issue,' they were 'obligated to disclose information concerning the source of the success'").

### a. The Registration Statement Contained Untrue Statements Concerning the Standard of Care SDC Provided to Its Customers

The Registration Statement contained untrue statements of material fact and omitted material facts about the standard of care SDC provided.  ¶38(a)-(h).  The Registration Statement stated that SDC's teledentistry platform provided its customers with "***excellent clinical care***" and "***professional-level service***."  ¶37.  Unbeknownst to investors and the public, SDC's teledentistry model could not provide the standard of care necessary to move a customer's teeth safely, as there was not sufficient interaction with a licensed dentist to ensure the safe and effective orthodontic treatment being promised.  ¶¶3(c), 38.  In fact, SDC customers were virtually always instantaneously approved for aligners, and interacted with sales assistants who worked on commission and were required to meet Company-mandated sales metrics.  ¶38(c)-(e).  The lack of interaction with dentists, combined with high pressure sales tactics, resulted in poor care.  *Id.*

While the Registration Statement emphasized that "trained technicians" created customer treatment plans (¶37), it was sales assistants who handled initial customer consultations – completing highly specialized tasks without meaningful oversight from a licensed dentist.  *Compare* ¶37, *with* ¶38(c).  Likewise, the Registration Statement stated that its "SmileCheck" program allowed customers to have "***seamless communication***" with their "***treating doctor***" through the course of their treatment.  ¶37.  In truth, SDC's treating dentists had no meaningful

- 17 -

contact with SDC customers – their only involvement being a superficial review of a photo or impression of a customer's teeth.  ¶38(h).  Indeed, if customers had issues, they were directed to speak with hygienists rather than to speak with a licensed dentist.  *Id.*

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 WL 1335803, at *49 (M.D. Tenn. Mar. 31, 2011), is on point.  There, under the PSLRA's more stringent fraud pleading standards, Judge Haynes found that statements such as "PSI 'provide[s] higher care than our competitors,' 'the most intensive level of care,' 'highly coordinated treatment,' mechanisms to identify and counsel problems, 'optimizing staff ratios,' and 'regular site visits'" were hard facts adequately alleged to be materially misleading.  *See also Grae*, 2017 WL 6442145, at *8 (upholding statements under §10(b), including statements regarding "'provid[ing] quality corrections services, [and] offer[ing] a compelling value'").[8]

### b.    The Registration Statement Contained Untrue Statements Concerning Member Satisfaction

The Registration Statement claimed that SDC's business model was unique because of its unparalleled customer satisfaction in an industry with high levels of customer dissatisfaction.  ¶¶34-35.  Customer satisfaction was so important to SDC that the Company claimed "positive member experience" was its number one strength and that SDC's "primary focus is on delivering an exceptional member experience."  *Id.*  Defendants asserted that SDC had an "average rating of

---

[8]    *Bondali v. Yum! Brands*, *Inc.,* 620 F. App'x 483 (6th Cir. 2015), and *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994), are inapposite.  *See* Defs' Mem. at 20.  *Bondali* held that an aspirational statement in defendant's code of conduct about "a strict food safety testing program" was not misleading merely because it could have been strengthened.  620 F. App'x at 487.  *Tuchman* held that "conclusory disparaging characterizations of [a defendant's] products and market position" were insufficient to plead scienter, which is not an element of the 1933 Act claims brought here.  14 F.3d at 1070.  Neither case suggests statements that misled shareholders about a company's most important product or service are not actionable.

- 18 -

"4.9 out of 5 from over 100,000 member reviews on our website" and that the Company's "Smile Guarantee" was a "testament to our confidence in the quality and efficacy of our product." *Id.*

In fact, thousands of SDC customers were neither "highly satisfied" nor had "highly positive experiences." Rather, customers were dissatisfied because, contrary to defendants' statements in the Registration Statement, SDC's primary focus was on signing up as many customers as possible to enable SDC to report strong results and growth in advance of the IPO. ¶36(b)-(c). As a result, SDC sold aligners to customers who were not appropriate candidates, pressured sales associates to close sales irrespective of a customer's suitability and approved treatment plans without meaningful review from dentists. *Id.* In addition, SDC took drastic steps to reduce or eliminate criticism, including by employing aggressive litigation against journalists, customers and an affiliate of the ADA and by requiring that customers sign NDAs in order to receive refunds. ¶36(d)-(h). Indeed, complaints against SDC to the California Dental Board led to an investigation and raids on the Company's California stores beginning in late 2017, none of which was disclosed in the Registration Statement. ¶36(g).

Relying almost exclusively on out-of-circuit authority, defendants contend that they had no duty to disclose negative member experiences.[9] Defs' Mem. at 17-19. But having chosen to

---

[9] *Curry v. Yelp Inc.*, 2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875 F.3d 1219 (9th Cir. 2017), was a securities fraud case where, as with *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563 (6th Cir. 2004), and *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858 (N.D. Cal. June 28, 2005), and unlike here, plaintiffs were required to meet the heightened pleading standard of the PSLRA and Rule 9(b) in order to plead falsity with particularity. The Court merely held that "when compared to the tens of millions of reviews hosted by Yelp, a dozen relevant but unsubstantiated and divergent consumer complaints over at least five years does not establish a pattern of conduct sufficient to indicate that Defendants' statements were false." *Curry*, 2015 WL 7454137, at *7. Here, the Complaint pleads much more, including complaints by customers that mirror precisely the warnings SDC sought to suppress from medical professionals regarding the dangers of harm inherent in its business model. ¶36.

- 19 -

speak about how essential customer satisfaction was to SDC's business model, defendants have a "'duty to speak fully and truthfully on th[e] subject[].'" *Grae*, 2017 WL 6442145, at *13.

The Judges of this Court have repeatedly found falsity adequately alleged under similar circumstances, even under the heightened pleading standards of the PSLRA and Rule 9(b). *Garden City*, 2011 WL 1335803, at *45; *Grae*, 2017 WL 6442145, at *13.[10] Defendants' reliance on *Ford*, 381 F.3d at 571, is inapposite. Defs' Mem. at 17. There, the court noted that "loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available," were immaterial. *Ford*, 381 F.3d at 571; *see also Netflix*, 2005 WL 1562858, at *7 ("vague and amorphous statements do not give rise to liability for securities fraud"). Here however, defendants' emphasized customer satisfaction as a critical component of SDC's business, and because SDC's product was not unique, "delivering an exceptional member experience" was the underpinning of its entire business model. *See* ¶35.

### c.     Defendants' Risk Disclosures Were Misleading

SDC's so-called risk disclosures were misleading as they warned investors that legal and regulatory risks "***may*** impact its business when that risk ha[d] ***already*** materialized." *Facebook*, 986 F. Supp. 2d at 516. Cautionary language provides no protection to someone "'""who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'""" *Weiner v. Tivity Health, Inc.*, 365 F.

---

[10]    *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 397 (6th Cir. 2008), quoted *Bridgestone*, 399 F.3d at 669, for the proposition that "'[t]here is no general duty on the part of a company to provide the public with all material information.'" Defs' Mem. at 18. But *Bridgestone* confirms that a "duty to affirmatively disclose 'may arise' [after] . . . 'an inaccurate, incomplete or misleading prior disclosure.'" *Bridgestone*, 399 F.3d at 669. As recently as 2015, the Supreme Court reiterated the common-sense notion that half-truths are actionable. *See Omnicare II*, 575 U.S. at 193 ("[defendants'] view would punch a hole in the statute for half-truths").

- 20 -

Supp. 3d 900, 911 (M.D. Tenn. 2019) (quoting *In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102-03 (D.C. Cir. 2015); *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167 (9th Cir. 2009), *aff'd*, 563 U.S. 27 (2011).

For example, the Registration Statement advised investors that with regard to future regulations or legal risks – "[o]ur business *could be adversely affected* by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states." ¶39. In truth, by the time of the IPO, dozens of complaints *had already been filed* by state chapters of the ADA and other similar trade organizations challenging SDC's practice of teledentistry as it "utterly fail[ed] to meet the standard of care for a comprehensive oral examination." ¶40(a). Additionally, the Registration Statement failed to disclose that SDC was *already* under investigation by the Dental Board of California for engaging in the unlicensed practice of dentistry. ¶40(b). These purported "risk disclosures" were misleading as they did not alert investors to legal risks that *had already occurred*.[11] *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *16 (M.D. Tenn. Nov. 19, 2019) (cautions about "'the risk of changes in volume, payor mix and third-party reimbursement rate[]' only meaningful to the extent that such changes have not already occurred").

Furthermore, though the Registration Statement mentioned the potential adverse effects that *could* occur as a result of changes in regulations governing teledentistry, that risk had already

---

[11] Defendants rely on *Bondali*, 620 F. App'x 483, to argue that Sixth Circuit law precludes Lead Plaintiff's claims. Defs' Mem. at 22. However, *Bondali* is not only at odds with the Sixth Circuit's *en banc* decision in *Helwig*, it is unpublished and therefore not binding precedent nor binding authority. *Tivity*, 365 F. Supp. 3d at 910-911; *see also Chevalier v. Estate of Barnhart*, 803 F.3d 789, 796 n.4 (6th Cir. 2015) (observing that unpublished decisions are "binding on only the parties"). Moreover, two separate District Court opinions have emphasized *Bondali*'s holding that "'there may be circumstances under which [such] a risk disclosure might support Section 10(b) liability'" and upheld misleading risk disclosures. *Weiner*, 365 F. Supp. 3d at 910; *Norfolk Cty.*, 2016 WL 4098584, at *13-*14.

- 21 -

begun to materialize. By the time of the IPO, legislation in California designed specifically to curtail SDC's practices had already ***unanimously*** passed the California Senate. *See* ¶40(d). Specifically, the legislation required teledentistry platforms to provide each customer with the treating dentist's name and contact information, mandated the review of a patient's most recent radiographs prior to beginning orthodontic treatment, and required the teledentistry provider to conduct a full patient examination prior to beginning a treatment plan. *Id.* The legislation also prohibited SDC or anyone else from preventing dissatisfied customers from making reports to the Dental Board of California, thereby eliminating SDC's then-existing practice of using NDAs to silence critics. *Id.* As the purported risk disclosures only "portended the future, but did not alert investors about the conditions that then existed," SDC's risk disclosures were "meaningless." *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at \*16 (M.D. Tenn. Apr. 26, 2011); *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at \*7 (M.D. Tenn. Apr. 19, 2018).

Defendants disingenuously assert Lead Plaintiff has not alleged that the California regulations would have a material impact on SDC's business. Defs' Mem. at 23. Not so. Lead Plaintiff has pled both that the pending regulations were not properly disclosed in the Registration Statement, and that the new legislation in one of SDC's largest markets would fundamentally and materially alter SDC's business model. ¶40(d). It is beyond dispute that the legislation would change the way SDC did business in California; as discussed *supra*, the legislation mandated the implementation of several new facets that would run contrary to the manner in which SDC was running its teledentistry model. *Id.* Nor can defendants evade liability by arguing that their omissions are not actionable because they successfully rushed the IPO out the door ***before*** the California law was enacted. Defs' Mem. at 23. In *Helwig*, the full Sixth Circuit rejected the argument that because the legislation was merely proposed at the time, such an omission could not

- 22 -

be actionable. 251 F.3d at 556, 559.[12] Rather, the Court reaffirmed that "a party who discloses material facts in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects.'" *Helwig*, 251 F.3d at 561.

Defendants chose to make statements regarding the ***potential*** for regulatory and legal risks pertaining to its business model, including references to risks it faced due to rulemaking in specific states, Georgia and Alabama, which would "limit or restrict our ability to conduct our business as currently conducted." ¶39. However, the Registration Statement inexplicably failed to disclose the far more restrictive legislation in California, one of SDC's largest markets. ¶40(d). *Helwig* expressly rejects such selective disclosures, finding that a company may not "choose which contingencies to expose and which to conceal. On any subject falling short of reasonable certainty, then, a company could offer a patchwork of honesty and omission. This proposition is untenable . . . ." 251 F.3d at 560-61. Defendants' own authority is in accord. *See J & R Mktg.*, 549 F.3d at 394 ("A company has to disclose additional information only when what it has disclosed would be rendered misleading without that additional information.").

Relying on materials outside of the pleadings, defendants proffer their own narrative and facts regarding a lawsuit against the Company by the New Jersey Dental Association, placing an alternative spin on the Complaint's allegations. *See* Defs' Mem. at 24. Defendants are well aware their proffer of a counter-narrative is not appropriate at this stage of the case. "The point is not that one account of events is right and one is wrong – that determination awaits further findings.

---

[12] In *Helwig*, the Sixth Circuit upheld claims that the defendants had failed to disclose the potential impact of pending legislation in statements beginning on February 10, 1997 (and continuing until October 21, 1997) in spite of the fact that the legislation in question was not passed by Congress until June 1997. 251 F.3d at 545-46. Here, the California legislation had already unanimously passed the California Senate by the time of the IPO, and final approval was all but assured. *See* ¶¶3(d), 40(d); Defs' Mem. at 9.

Cases\4810-8356-5754.v1-4/22/20

The point is that plaintiffs are entitled to prove their case." *Helwig*, 251 F.3d at 565. "[T]he meaningfulness of the cautionary statement cannot be determined without a determination of the facts . . . . The Court cannot make such a factual determination on a motion to dismiss." *Envision*, 2019 WL 6168254, at \*16.

## B. Defendants Have Failed to Prove a Lack of Loss Causation

Loss causation is an affirmative defense, not an element of a §11 claim. *Envision*, 2019 WL 6168254, at \*27; *Schuh*, 947 F. Supp. 2d at 886. Because a defendant is required to "prove" that ***none*** of the depreciation in a stock's trading price is attributable to a misrepresentation or omission, it is "unsuitable for adjudication on a motion to dismiss." *In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014).

Defendants' own authority demonstrates that their two-sentence assertion regarding the cause of SDC's post-IPO stock price declines is inadequate. Defs' Mem. at 25. In *Azzolini v. Corts Tr. II for Provident Fin. Tr. I*, 2005 WL 3448053, at \*5 (E.D. Tenn. Dec. 14, 2005), the court granted defendants' motion for judgment on the pleadings as it was "apparent on the face of the complaint the decline in share value is not related to any material misstatement and/or omission." The complaint itself alleged that the misstatements were revealed to be false "two years before [p]laintiffs claim they suffered any losses." *Id.* at \*6. The same is not true here.

Defendants do not even attempt to carry their burden of proof regarding how the more than 66% decline in the price of SDC stock (¶4) was entirely attributable to factors other than the alleged misrepresentations and omissions. Instead, they attempt to flip the pleading requirements on their head by contending that Lead Plaintiff "do[es] not allege" that the 27% stock price decline that occurred on the first date of trading was a "corrective disclosure." Defs' Mem. at 8. Lead Plaintiff has no obligation to do so. *In re WRT Energy Sec. Litig.*, 2005 WL 2088406, at \*1 (S.D.N.Y. Aug. 30, 2005); *Omnicare I*, 583 F.3d at 947. It is defendants who have the burden of establishing this

- 24 -

affirmative defense – something they utterly fail to so much as attempt to do.  Defendants likewise fail to address any of the stock price declines that occurred after the first day of trading.  Their failure to address either of these issues mandates a rejection of their causation argument.

## IV.     CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss should be denied.

DATED:  April 22, 2020

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
SCOTT H. SAHAM
TING H. LIU
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
scotts@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 25 -

# Mailing Information for a Case 3:19-cv-00962 Franch v. SmileDirectClub, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receiv



- **Michael Albert**
  malbert@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Wade B. Cowan**
  wcowan@dhhrplc.com

- **James M. Ficaro**
  jmf@weiserlawfirm.com

- **Andrew J. Finn**
  finna@sullcrom.com

- **Inbar R. Gal**
  gali@sullcrom.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **Michael C. Griffin**
  michael.griffin@skadden.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Lewis S. Kahn**
  Lewis.Kahn@ksfcounsel.com

- **Jay B. Kasner**
  jay.kasner@skadden.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **MICHAEL J MORSE**
  PKNASHLAW@AOL.COM

- **Richard A. Maniskas**
  rmaniskas@sbtklaw.com

Case 3:19-cv-00962   Document 75   Filed 04/22/20   Page 33 of 34 PageID #: 1439

- **E. Powell Miller**
  epm@millerlawpc.com

- **Scott D. Musoff**
  scott.musoff@skadden.com

- **Danielle S. Myers**
  danim@rgrdlaw.com

- **Sharon L. Nelles**
  nelless@sullcrom.com

- **Christopher Nelson**
  cln@weiserlawfirm.com

- **Melinda A. Nicholson**
  Melinda.Nicholson@ksfcounsel.com

- **Michael J. Palestina**
  Michael.Palestina@ksfcounsel.com

- **Ira M. Press**
  ipress@kmllp.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com

- **John Tate Spragens**
  john@spragenslaw.com

- **Tara L. Swafford**
  tara@swaffordlawfirm.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,creis@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)