UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ADAM FRANCHI, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> SMILEDIRECTCLUB, INC., et al., <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

Civil Action No. 3:19-cv-00962
**(Consolidated)**

<u>CLASS ACTION</u>

Judge Eli J. Richardson
Magistrate Judge Jeffery S. Frensley

AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE
FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

SUMMARY OF THE ACTION ...........................................................................................1

BACKGROUND ...................................................................................................................1

JURISDICTION AND VENUE ...........................................................................................5

class action allegations ........................................................................................................6

SECURITIES ACT CLAIMS................................................................................................7

    A.    The Securities Act Parties ....................................................................................7

        1.    Securities Act Plaintiff.............................................................................7

        2.    Securities Act Defendants.........................................................................7

            a.    SDC Defendants...........................................................................7

            b.    Underwriter Defendants...................................................................10

            c.    Camelot .........................................................................................11

    B.    Detailed Allegations.............................................................................................11

    C.    False and Misleading Statements and Omissions Made in Connection with the IPO....................................................................................13

        1.    The Revenue, Gross Profit and Adjusted EBITDA Growth Trends in the Registration Statement Had Turned Decidedly Negative by the Time of the IPO.................................13

        2.    False and Misleading Statements and Omissions Regarding Customer Satisfaction .................................................................19

        3.    False and Misleading Statements and Omissions Regarding SDC's Standard of Care......................................................................23

        4.    False and Misleading Statements and Omissions Regarding Regulatory and Legislative Risk..........................................................25

    D.    Causes of Action.................................................................................................29

COUNT I ..............................................................................................................................29

- i -

Violations of Section 11 of the Securities Act (Against Securities Act Defendants Except Camelot)...................................................................................29

COUNT II ...........................................................................................................30

Violation of Section 12(a)(2) of the Securities Act (Against Securities Act Defendants Except Camelot) ................................................................30

COUNT III ..........................................................................................................32

Violations of Section 15 of the 1933 Act (Against the Individual Securities Act Defendants and Camelot)................................................................32

EXCHANGE ACT CLAIMS ...............................................................................33

      A.     The Exchange Act Parties ..............................................................33

            1.     Exchange Act Plaintiffs .................................................33

            2.     Exchange Act Defendants...............................................33

      B.     False and Misleading Statements and Omissions of Material Fact ..........34

      C.     Additional Scienter Allegations................................................35

            1.     Revenue, Gross Profit and Adjusted EBITDA Were Central to the Company's Operations, Closely Tracked by Senior Management and Negatively Impacted by Exchange Act Defendants' Own Affirmative Conduct.........................................35

            2.     As Evidenced by SDC's Own Lawsuit, the Exchange Act Defendants Were Aware of an Ongoing 2-Year Investigation into the Company and Sulitzer, SDC's Chief Clinical Officer ...........................................................36

            3.     SDC Was Actively and Aggressively Lobbying Against California Legislation that Was Expected to Have a Profound Adverse Impact on the Company's Operations ............37

            4.     SDC Received Over 1,000 Complaints Filed with the Better Business Bureau and Deliberately Manipulated the Appearance of Positive Reviews by Executing and Enforcing Non-Disclosure Agreements with Injured Customers ..............................................................38

5.   The Exchange Act Defendants Implemented an Aggressive
     Sales Culture Monitoring Customer Conversion Rates on
     an Hourly, Daily and Weekly Basis ................................................40

6.   SDC's Insiders Sold Nearly 30 Million Shares and Units in
     Connection with and as Part of the IPO at Inflated Prices
     Allowing Them to Pocket $630 Million .......................................41

D.   Loss Causation/Economic Loss ....................................................44

E.   Application of Presumption of Reliance ........................................57

F.   Causes of Action ............................................................................58

COUNT IV ..................................................................................................................58

Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 (Against
     SDC and the Individual Exchange Act Defendants) ......................58

COUNT V ....................................................................................................................60

Violations of Section 20(a) of the Exchange Act (Against the Individual
     Exchange Act Defendants) ............................................................60

PRAYER FOR RELIEF ..............................................................................................61

JURY DEMAND ..........................................................................................................62

4826-6892-0280.v2

Case 3:19-cv-00962   Document 85   Filed 03/30/21   Page 4 of 72 PageID #: 1561

# INTRODUCTION

1. 1199 SEIU Health Care Employees Pension Fund (the "Pension Fund" or "Lead Plaintiff") and Bucks County Employees Retirement System (the "Retirement System") (collectively, "Plaintiffs"), by and through their undersigned counsel, bring this action against defendants based upon the investigation of counsel, which included, without limitation, the review and analysis of: (a) public filings made with the United States Securities and Exchange Commission ("SEC"); (b) releases and other publications disseminated by defendants; and (c) securities analyst reports, news articles, media reports, websites and other information concerning defendants and other related non-parties. Plaintiffs believe that substantial additional evidentiary support will likely exist for the allegations set forth herein after a reasonable opportunity for discovery.

# SUMMARY OF THE ACTION

2. This securities class action is brought on behalf of purchasers of SmileDirectClub, Inc. ("SDC" or the "Company") common stock between September 12, 2019 and March 12, 2020, inclusive (the "Class" and the "Class Period"), seeking to pursue remedies under §§11, 12(a)(2) and 15 of the Securities Act of 1933 ("1933 Act" or "Securities Act"), and §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act" or "Exchange Act") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

# BACKGROUND

3. SDC was founded in 2014 and operates as a direct-to-consumer teledentistry company that markets, manufactures and sells 3D-printed clear dental aligners to treat malocclusion. SDC seeks to offer consumers clear dental aligners more affordably and more conveniently than traditional brick and mortar orthodontists via its proprietary remote teledentistry platform.

4. On September 12, 2019, defendants completed SDC's initial public offering ("IPO"), raising more than $1.3 billion via the sale of 58.5 million shares at $23 per share pursuant to a

- 1 -

Registration Statement (defined herein) that contained untrue statements of material fact and omitted other material facts necessary to make the statements made therein not false or misleading.

5.     The Registration Statement contained untrue representations about the Company's financial metrics and growth.  For example the Registration Statement represented that one of SDC's "Strengths" was its "Accelerating Growth," portraying the Company's revenue, gross profit and Adjusted EBITDA as growing.  In fact, at the time of the IPO, these metrics were no longer growing as represented in the Registration Statement, but rather had reversed course and were declining.  The fact that SDC's most important financial metrics were declining at the time of the IPO represented a distinct reversal in the Company's growth trends prior thereto.  The omission from the Registration Statement of these trend changes – both the termination of SDC's historical positive trends and its new downward trends – "cause[d] reported financial information" in the Registration Statement to "not . . . be . . . indicative of future operating results."

6.     The dramatic declines in SDC's most important financial metrics were available to and known by the defendants as SDC closely tracked its revenue, gross profit and Adjusted EBITDA in connection with both its ongoing operations and in preparation for the IPO.  Notably, the decline in Adjusted EBITDA referenced above was, in part, the result of increased marketing and selling expense ($17.8 million) and the doubling of legal expenses that had already been incurred prior to the IPO as a result of pending investigations, litigation with dental associations and customers, and lobbying against pending legislation, of which defendants were aware.

7.     Because SDC's business model was predicated on customers purportedly not being satisfied with traditional orthodontics, the Company emphasized that its "primary focus is on delivering an exceptional member experience" and that "member satisfaction" was fundamental to "maintain[ing] our position as the leading direct-to-consumer clear aligner provider."  Asserting that

- 2 -

SDC's number one strength was "positive member experience," defendants even quantified member satisfaction, stating in the Registration Statement that SDC had an "average rating of 4.9 out of 5 from over 100,000 member reviews on our website" and that the Company's "Smile Guarantee" was a "testament to our confidence in the quality and efficacy of our product."

8. These statements were false and/or misleading as they omitted material facts including that thousands of SDC customers were neither "highly satisfied" nor had "highly positive experiences" with SDC's products and services. Rather, SDC molds and aligners were causing serious health problems for thousands of customers who received missing or misshapen aligners and were seeking (and experiencing difficulties in obtaining) refunds. For example, the Better Business Bureau ("BBB") alone registered more than 1,000 complaints against SDC. Customers were dissatisfied because, contrary to defendants' statements in the Registration Statement, SDC's primary focus was on signing up as many customers as possible to report favorable revenue and financial trends in advance of the IPO. As a result, SDC sold aligners to customers who were not appropriate candidates for SDC's treatment, pressured sales associates to close sales irrespective of a customer's suitability and approved treatment plans without meaningful review from dentists.

9. In addition, SDC took drastic steps to subvert revelations about existing adverse developments, including by employing aggressive litigation against journalists, customers and an affiliate of the American Dental Association (the "ADA"), and requiring that customers agree to keep all adverse facts out of the public realm by signing Non-Disclosure Agreements ("NDAs") in order to receive refunds. Indeed, repeated complaints against SDC to the Dental Board of California had led to an investigation and raids on the Company's California stores beginning in late 2017, all of which were omitted from the Registration Statement.

4826-6892-0280.v2

10.     The Registration Statement further stated that through its teledentistry platform SDC provided "excellent clinical care" and "professional-level service," as its "trained technicians" created customer treatment plans and the Company's SmileCheck program allowed a "treating doctor to monitor [the] member's progress and enable[d] seamless communication with the member over the course of treatment."

11.     In truth, SDC's teledentistry model was endangering the health of its customers by prescribing aligners to unsuitable candidates and failing to disclose that: (i) SDC doctors were not reviewing dental x-rays or conducting dental exams prior to prescribing aligners to customers – instead, customers were required to self-certify their own dental health; and (ii) the Company was engaged in the unlicensed practice of dentistry with SDC's treating dentists having no meaningful contact with customers and sales assistants handling customers and completing 3D scans of a patient's mouth.  In fact, customers were directed to speak to hygienists instead of a licensed dentist to resolve issues with their aligners.

12.     While the Registration Statement advised investors that regulatory and legal challenges **could have** a material adverse effect on our business, these purported "risk warnings" were themselves misleading as, by the time of the IPO, the regulatory and legislative risks that SDC warned of had already manifested.[1]  For example, the Registration Statement omitted that dozens of complaints had been filed by state chapters of the American Association of Orthodontics ("AAO") and similar organizations around the country.  The Registration Statement similarly omitted that SDC was under investigation by the Dental Board of California for engaging in the unlicensed practice of dentistry.  The Registration Statement conspicuously omitted entirely, legislation passed by the California Senate, which required fundamental changes in SDC's business model in

---

[1]     All citations are omitted and emphasis added unless otherwise indicated.

California – one of SDC's largest markets. Critically, the legislation expressly required teledentistry platforms to provide each customer with the treating dentist's name, license number and dental board contact; mandates reviews of a patient's most recent radiographs prior to beginning orthodontic treatment; and requires teledentistry providers to conduct a full patient examination prior to the enactment of the plan – requirements not implemented by SDC.

13.     A series of disclosures that took place between September 24, 2019 and March 12, 2020, brought to light the truth about the Company's business model and its declining results. SDC's stock price declined immediately and significantly after each partial disclosure. By March 12, 2020, SDC's stock had declined to $5.30 per share, 77% below the $23 IPO price and the price at which defendants had sold more than $625 million of their own SDC stock.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under §§11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§77k, 77l(a)(2) and 77o), and §§10(b), 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder.

15.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, §22 of the 1933 Act (15 U.S.C. §77v) and §27 of the Exchange Act (15 U.S.C. §78aa).

16.     Venue is properly laid in this District pursuant to §22 of the Securities Act, §27 of the Exchange Act and 28 U.S.C. §1391(b) and (c). The acts and conduct complained of herein occurred in substantial part in this District.

17.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NASDAQ stock market (the "NASDAQ").

## CLASS ACTION ALLEGATIONS

18. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class consisting of purchasers of SDC common stock during the Class Period. Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SDC shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by SDC, its transfer agent or securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

20. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

21. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

22. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- 6 -

(a)     whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)     whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of SDC;

(c)     whether the price of SDC common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

23.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SECURITIES ACT CLAIMS

**A.     The Securities Act Parties**

**1.     Securities Act Plaintiff**

24.     Lead Plaintiff 1199 SEIU Health Care Employees Pension Fund is a multi-employer Taft-Hartley defined benefit plan providing benefits to working and retired healthcare industry workers and their families in New York City and surrounding areas.  The Pension Fund purchased or otherwise acquired SDC common stock pursuant and traceable to the Registration Statement, as set forth in its certification previously filed with the Court, and has been damaged thereby.  ECF No. 33-3.

**2.     Securities Act Defendants**

**a.     SDC Defendants**

25. Defendant SDC operates as a teledentistry company. SDC is headquartered in Nashville, Tennessee. Its shares are listed and trade on the NASDAQ under the ticker symbol "SDC." The defendants sold $1.3 billion of Class A common stock in SDC's September 12, 2019 IPO via a registration statement and prospectus (collectively, the "Registration Statement") filed with the SEC and as amended declared effective on or about September 11, 2019.

26. Defendant David Katzman is, and was at the time of the IPO, the Chief Executive Officer and Chairman of the Board of SDC. David Katzman is co-founder Jordan Katzman's father and, through his position as managing partner of defendant Camelot Venture Group ("Camelot"), provided the initial funding for SDC. Through his stock ownership, stock voting agreement and position as the managing partner of Camelot, David Katzman controlled the business operations of SDC. David Katzman signed the Registration Statement and participated in its preparation and dissemination. In connection with the IPO, and using entities he controlled and of which he is the beneficiary, David Katzman sold 8,998,951 Units and shares of common stock to the Company for proceeds of more than $198.4 million. In addition, Heather Katzman, David Katzman's spouse, likewise sold 63,699 Units and shares of common stock for additional proceeds of more than $1.39 million. Throughout the Class Period, David Katzman acted and/or made the statements detailed herein in his capacity as an officer and/or director of SDC.

27. Defendant Kyle Wailes ("Wailes") is, and was all relevant times, the Chief Financial Officer of SDC. Defendant Wailes signed the Registration Statement and participated in its preparation and dissemination. Throughout the Class Period, Wailes acted and/or made the statements detailed herein in his capacity as an officer of SDC.

28. Defendant Steven Katzman is, and was at all relevant times, Chief Operating Officer and a director of SDC. Steven Katzman is co-founder Jordan Katzman's uncle. Through his stock

- 8 -

ownership, stock voting agreement and position as an advisor to Camelot, Steven Katzman controlled SDC. Steven Katzman signed the Registration Statement and participated in its preparation and dissemination. Steven Katzman sold 663,595 Units and shares of the common stock to the Company for proceeds of more than $14.5 million. Steven Katzman is also the trustee for the David B. Katzman 2009 Family Trust, which sold 2,907,335 Units and shares of common stock for proceeds of more than $64 million. Throughout the Class Period, Steven Katzman acted and/or made the statements detailed herein in his capacity as an officer and/or director of SDC.

29. Defendant Jordan Katzman is, and was at all relevant times a co-founder of SDC and a member of its Board of Directors. Jordan Katzman signed the Registration Statement and participated in its preparation and dissemination. Jordan Katzman, through entities which he controls and of which he is the beneficiary, sold 7,141,516 Units and shares of common stock to the Company for proceeds of more than $157 million. Throughout the Class Period, Jordan Katzman acted and/or made the statements detailed herein in his capacity as a director of SDC.

30. Defendant Alexander Fenkell ("Fenkell") is, and was at all relevant times, a co-founder of SDC and a member of its Board of Directors. Fenkell signed the Registration Statement and participated in its preparation and dissemination. Fenkell, through entities which he controls and of which he is the beneficiary, sold 6,521,446 Units and shares of common stock to the Company for proceeds of more than $143.75 million. Throughout the Class Period, Fenkell acted and/or made the statements detailed herein in his capacity as a director of SDC.

31. Defendant Richard Schnall ("Schnall") is, and was at all relevant times, a director of SDC and a partner of Clayton, Dublier & Rice ("CD&R"). Schnall signed the Registration Statement and participated in its preparation and dissemination. CD&R, through its subsidiaries, sold 2,275,857 Units to the Company for proceeds of more than $49 million.

32.     Defendant Susan Greenspon Rammelt ("Rammelt") is, and was at all relevant times, a director of SDC. Rammelt signed the Registration Statement and participated in its preparation and dissemination. Rammelt sold 29,964 Units and shares of common stock to the Company for proceeds of more than $650,000.

33.     The defendants referenced above in ¶¶26-32 are referred to herein as the "Individual Securities Act Defendants." All told, collectively through entities they controlled or of which they were a partner or beneficiary, the Individual Securities Act Defendants sold more than $625 million worth of Units and common stock to the Company in connection with and as part of the IPO as the Company purchased these same Units and common stock using proceeds raised from investors in the IPO.

### b.     Underwriter Defendants

34.     Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., BofA Securities Inc., UBS Securities LLC, Jefferies LLC, Credit Suisse Securities (USA) LLC, Guggenheim Securities, LLC, Stifel, Nicolaus & Company, Incorporated, William Blair & Company, L.L.C. and Loop Capital Markets LLC acted as underwriters of the IPO and participated in the drafting and dissemination of the Registration Statement as well as the sale of more than $1.345 billion of SDC common stock to the Class.

35.     The defendants referenced in ¶34 are referred to collectively as the "Underwriter Defendants." The Underwriter Defendants acted together as an underwriting syndicate and drafted and disseminated the Registration Statement in connection with the IPO. The Underwriter Defendants were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statement used in connection with the IPO. The Underwriter Defendants collectively received more than $67 million for their participation in the IPO.

- 10 -

### c.  Camelot

36.  Defendant Camelot is a private investment group founded and controlled by its managing partner defendant David Katzman.  Camelot is the largest shareholder of SDC and the managing member of the entity that controls SDC.  As such, Camelot – through its stock ownership, through its control as the managing member of SDC and through its ability to appoint David Katzman and Steven Katzman as the operating officers of SDC – controlled SDC.

37.  Defendants SDC, David Katzman, Wailes, Steven Katzman, Jordan Katzman, Fenkell, Schnall and Rammelt, together with the Underwriter Defendants and defendant Camelot are collectively referred to as the "Securities Act Defendants."

### B.  Detailed Allegations

38.  SDC is a teledentistry company that holds itself out as the "industry pioneer as the first direct-to-consumer medtech platform for transforming smiles" through the use of clear aligner therapy to treat malocclusion.  SDC claims to have disrupted the traditional orthodontic model by offering at-home aligner therapy that achieved cost savings by removing the overhead cost of in-person doctor visits while purportedly maintaining the same standard of care required of traditional brick & mortar orthodontist offices.

39.  The Company manufactures, markets and sells clear dental aligner treatments through its website.  In an effort to encourage prospective customers to seek treatment from SDC, the Company's website provides first-hand reviews from other members.  According to the Company, at the time of the IPO, it had an "average rating of 4.9 out of 5 from over 100,000 member reviews on our website" signaling that "[SDC's] members are highly satisfied."

40.  A consumer interested in SDC's aligner therapy can seek treatment through one of two ways: (1) visiting a SmileShop to take an in-person 3D oral image of his or her smile; or (2) ordering an impression kit online, which the customer uses to take his or her own dental impression

at home, purportedly pursuant to the prescription of a licensed doctor. Once complete, the impression or image is used by the Company's non-dentist technicians to create a draft treatment plan containing clinical protocols for how the customer's teeth will move during treatment. According to the Company, that treatment plan along with the member's dental and health history, is then sent to a state licensed doctor in the SDC affiliated network, and within 48 hours, the treatment plan is approved (or rejected).

41.     As of the date of IPO, SDC operated with a network of 300 SmileShops. According to the Company, it performs "treatment monitoring by a member's doctor through completion of [the customer's] treatment."

42.     In May 2019, defendants filed the Registration Statement with the SEC in connection with the planned sale of SDC common stock. The Registration Statement was then used to sell more than $1.3 billion of Class A common stock in SDC's September 12, 2019 IPO. The Registration Statement contained untrue statements of material fact and omitted material facts necessary to make the statements made therein not false or misleading, including:

(a)     known trends in the Company's revenue, gross profit and Adjusted EBITDA, which at the time of the IPO were declining as compared to the historical growth disclosed in the Registration Statement;[2]

(b)     the level of customer dissatisfaction and negative customer experiences related to SDC's treatment plans, as the Registration Statement claimed high levels of member satisfaction would drive future growth, while omitting the fact that: (i) more than a thousand customers had made complaints about the Company's products and services, many of which

---

[2]     SDC defines Adjusted EBITDA as net profit (or loss) before provision for income tax expense, interest expense, depreciation and amortization, and loss on disposal of property, plant and equipment, adjusted to remove derivative fair value adjustments, loss on extinguishment of debt, foreign currency adjustments and equity-based compensation.

- 12 -

involved serious injury; and (ii) SDC was engaged in a litigation campaign designed to suppress public disclosure of critical comments made by SDC customers and medical professionals concerning SDC's products and business practices;

(c) the actual standard of care SDC provided to its customers – while claiming that SDC provided high quality care at lower costs by streamlining the process and eliminating overhead associated with traditional treatment by an orthodontist, the Registration Statement omitted that SDC had endangered the health of many of its customers by prescribing aligners to customers who were not suitable candidates, and by failing to provide adequate, or any, ongoing dental care and supervision to its customers; and

(d) the legislative and regulatory risks facing the Company – the Registration Statement, among other things, failed to disclose a long-running investigation by the Dental Board of California, which had resulted in multiple raids on the Company's California Smile Shops, and the looming impact of California legislation designed to thwart SDC's improper business practices.

43. By March 12, 2020, SDC's stock had declined to as low as $5.30 per share, a decline of more than 77% below the IPO offering price, inflicting substantial economic harm on Lead Plaintiff and the Class, who purchased SDC common stock pursuant and traceable to the Registration Statement.

### C. False and Misleading Statements and Omissions Made in Connection with the IPO

#### 1. The Revenue, Gross Profit and Adjusted EBITDA Growth Trends in the Registration Statement Had Turned Decidedly Negative by the Time of the IPO

44. The Registration Statement represented that "Accelerating Growth" was one of SDC's "Strengths" and that the Company's revenue, gross profit and Adjusted EBITDA were growing.

- 13 -

45.     These representations were misleading as SDC's revenue, gross profit and Adjusted EBITDA growth trends portrayed in the Registration Statement had, in fact, reversed course and turned negative by the time of the IPO.

46.     The decline in SDC's revenue, gross profit and Adjusted EBITDA represented a distinct reversal in the Company's growth trends portrayed in the Registration Statement. These trend changes – both the termination of SDC's historical positive trends and its new downward trends – were omitted from the Registration Statement. The failure to disclose this adverse information rendered the Registration Statement's representations concerning growth in revenue, gross profit and Adjusted EBITDA for SDC's most recent quarters misleading.

47.     In addition, Regulation S-K Item 303(a)(3)(ii), 303(b) (and Instruction No. 3 to Paragraph 303(a)) ("Item 303") requires companies to:

> **Describe any known trends** or uncertainties **that have had or that the registrant reasonably expects will have a material** favorable or **unfavorable impact on net sales or revenues or income** from continuing operations.

> \*     \*     \*

> **The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results** . . . .

48.     The SEC expressly mandates disclosure of a known trend or uncertainty that is **reasonably likely** to have a material effect on the "registrant's financial condition" or "results of operations."

49.     As of the date of the IPO, SDC's revenue, gross profit and Adjusted EBITDA trends had reversed course from the trends portrayed in the Registration Statement. The undisclosed reversal in revenue, gross profit and Adjusted EBITDA trends from positive to negative "**cause[d] reported financial information**" contained in the Registration Statement to "**not . . . be . . . indicative of future operating results.**" Rather, the Registration Statement was misleading and

- 14 -

violated SEC disclosure rules in that it presented positive trends of increasing revenue, gross profit and Adjusted EBITDA, while omitting that these trends had reversed course by the time of the IPO.

50.     As shown in the chart below, the Registration Statement presented impressive quarterly growth in Adjusted EBITDA, reporting a trend in which EBITDA had increased from negative $12.7 million in the fourth quarter of 2018 ("4Q18") to negative $3.9 million in the first quarter of 2019 ("1Q19") to positive $6.2 million in the second quarter of 2019 ("2Q19") – the last period reported in the Registration Statement.



The Adjusted EBITDA reported in the Registration Statement was misleading as, by the date of the IPO, SDC's Adjusted EBITDA trend had halted and had commenced a downward trend dramatically different from that portrayed in the Registration Statement.

- 15 -



The Adjusted EBITDA growth trend portrayed in the Registration Statement was likewise misleading. SDC's Adjusted EBITDA, one of the most important metrics measuring the Company's performance, was neither positive nor growing, but rather was in a state of decline at the time of the IPO. Thus, both the representation that SDC was experiencing "accelerating growth" and the Company's reported growth in Adjusted EBITDA contained in the Registration Statement were misleading and were not indicative of SDC's current, let alone future, performance.

51.     Similarly, as shown in the chart below, the Registration Statement presented impressive quarterly gross profit growth, a trend in which gross profit was increasing by nearly 80% from $90.8 million in 4Q18 to $161.1 million in 2Q19 – the last period reported in the Registration Statement.

- 16 -



The gross profit reported in the Registration Statement was misleading as, by the date of the IPO, SDC's gross profit trend had halted and had commenced a downward trend dramatically different from that portrayed in the Registration Statement.

4826-6892-0280.v2



52.     The Registration Statement stated that SDC's revenue had grown rapidly to over $423.2 million in 2018 from $146.0 million in 2017, a ***growth rate of 190%***, and that revenue for the six months ended June 30, 2019 had increased an additional 113% over the same period in 2018. Likewise, the tables in the Registration Statement showed that SDC's revenue had grown sequentially each quarter since the fourth quarter of 2017 ("4Q17").[3]  This strong revenue growth rate portrayed in the Registration Statement was misleading and at the time of the IPO and was not indicative of SDC's current revenue performance.

---

[3]     The Registration Statement similarly reported continuous growth in gross profit from 4Q17 through 2Q19.

4826-6892-0280.v2

53.     The positive trends highlighted in the Registration Statement had reversed by the IPO. SDC's revenue, gross profit and Adjusted EBITDA were all declining by the third quarter of 2019 ("3Q19"), which information was omitted from the Registration Statement.  This omission rendered the Registration Statement's portrayal of SDC's operating performance as well as its statement regarding "accelerating growth" false and misleading and violated Item 303.   Because the Registration Statement omitted any disclosure of the known reversal in SDC's revenue, gross profit and Adjusted EBITDA trends, the Registration Statement's claim of "accelerating growth" and reported positive growth for the most recent periods contained therein were both false and misleading and not indicative of, nor consistent with, SDC's current or expected operating results.

54.     Each of the defendants was aware of the dramatic reversal in SDC's operating trends as pled herein, as at the time of the IPO, SDC closely tracked its revenue, gross profit and Adjusted EBITDA in connection with its ongoing operations and in connection with the IPO.  In addition, the decline in Adjusted EBITDA referenced above was, in part, the result of increased marketing and selling expense ($17.8 million), and the doubling of legal expenses that were incurred as a result of the issues described in ¶¶57-62 *infra,* which were known to defendants David Katzman and Wailes.  SDC's increased marketing, selling and legal expenses had already been incurred and/or were budgeted to be incurred as of the date of the IPO.

## 2.     False and Misleading Statements and Omissions Regarding Customer Satisfaction

55.     The Registration Statement stated that "positive member experience" was SDC's number one strength and emphasized that SDC was, at the time of the IPO, experiencing "Accelerating Growth" in its business.

56.     Stating that "member satisfaction" was an "important criteria that will enable us to maintain our position as the leading direct-to-consumer clear aligner provider," and that SDC's

- 19 -

"primary focus is on delivering an exceptional member experience," the Registration Statement assured investors that SDC customers were "highly satisfied," touting the Company's "Smile Guarantee" as a "testament to our confidence in the quality and efficacy of our product." The Registration Statement further stated:

- "Our primary focus is on delivering an exceptional customer ('member') experience . . . . As a testament to our confidence in the quality and efficacy of our product, we offer a Smile Guarantee, which provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied."

- "Throughout our member journey, *we are singularly focused on delivering an exceptional member experience*. We manage every member touchpoint and communication, enabling us to continually refine and optimize the member experience."

- SDC's high "average rating of 4.9 out of 5 from over 100,000 member reviews on our website" emphasizing that "our members are *highly satisfied*."

- "Our offering provides a *highly positive member experience* delivered by our vertically integrated model, which enables us to address critical problems around cost, convenience, and access to care."

- "[W]e deliver a *quality service* at a fraction of the cost [of] traditional orthodontic solutions."

57.     The statements made in ¶¶55-56 above rendered the Registration Statement false and/or misleading. The true facts were:

(a)     That thousands of SDC customers were neither "highly satisfied" nor had "highly positive experiences" with SDC's products and services, as many customers were having *serious medical problems caused by the use of SDC molds and aligners*, received missing or misshapen aligners and were experiencing difficulties in obtaining refunds. The BBB alone registered more than 1000 complaints by the date of the IPO against SDC, even though the BBB had expressly discouraged customers from submitting complaints to the BBB before first contacting SDC directly. In fact, the level of SDC customer complaints was so extraordinary, the BBB noted

- 20 -

that "[d]ue to the volume of complaints filed against this business, BBB only publishes the details for 50% of the total complaints filed";

(b)     That SDC's primary focus in 2019 was not on delivering an exceptional member experience, but rather was on signing up as many customers as possible, without regard to whether those customers were appropriate candidates for SDC's treatment plan.  In order to avoid being disciplined or fired, employees in the Company's retail stores, or Smile Shops, were expected to meet daily sales conversion rates of 73% without regard to whether such customers' use of SDC's aligners were medically appropriate.  The conversion rates were monitored real-time by SDC management and employees were specifically trained and instructed to consummate sales without regard as to whether SDC's treatment was medically appropriate or safe for the customer;

(c)     That while SDC dentists were ostensibly required to approve treatment plans for prospective customers, such plans were approved instantly as a matter of course, without meaningful review by SDC dentists.  In rare cases where treatment plans were not approved by the reviewing dentist, in order to close the sale SDC employees were instructed to resubmit rejected treatment plans to another SDC dentist until the plan was approved;

(d)     That SDC went to extreme lengths to avoid public disclosure of complaints and critiques.  For example on April 6, 2018, the website Lifehacker published a blog article entitled, "You Could F__k Up Your Mouth With SmileDirectClub," which discussed potential safety problems associated with so-called at-home orthodontists services such as SDC.  Days later, SDC sued Lifehacker in Davidson County Chancery Court, falsely contending that the article was untruthful and defamatory.  In light of the baselessness of its contentions, SDC later voluntarily dismissed the case; and on March 28, 2018, SDC filed a defamation case in federal court in this District against a former customer who had appeared on a local television news station complaining

- 21 -

that his aligners "'didn't move [his] teeth,'" and that he felt "'ripped off,'" ***without even mentioning SDC once***;

(e)     That SDC directed its employees to ignore or rebuff SDC customers when they tried to obtain refunds, or to have the customer obtain new impressions made for additional aligners which would delay treatment beyond the deadline for obtaining a refund.  For those customers who were able to successfully obtain a refund, SDC avoided public disclosure of criticism of its products and services by requiring customers to execute NDAs and remove negative reviews from the internet and social media as well as refrain from sharing their experiences with SDC or report problems to state dental boards.  On January 21, 2020, the *New York Times* published an excerpt from one of SDC's NDAs, which stated that the consumer "will not make, publish, or communicate any statements or opinions that would disparage, create a negative impression of, or in any way be harmful to the business or business reputation of SDC";

(f)     Asserting that it was attempting to protect its ability to provide innovative treatment methods to underserved communities from purportedly hostile dental associations, SDC was engaged in a programmatic campaign of threats and intimidation in order to avoid revelation of the truth about SDC's over-prescription of aligners and poor quality service.  SDC regularly sent cease-and-desist letters and sued dentists and orthodontists who critiqued the Company's products, including in YouTube videos.  SDC's hardball litigation campaign went so far as to even sue the Michigan affiliate of the ADA over four paragraphs that the nonprofit published about the Company in its monthly journal.  The SDC litigation campaign kept from public view truthful criticism regarding the Company's products, and stifle any critic of the Company; and

4826-6892-0280.v2

(g)     That SDC had been the subject of numerous complaints to the Dental Board of California, and those complaints had resulted in an investigation and in raids on the Company's California SmileShop stores commencing in late 2017.

### 3.     False and Misleading Statements and Omissions Regarding SDC's Standard of Care

58.     The Registration Statement asserted that SDC's "cutting-edge teledentistry technology and vertically integrated" platform "remov[es] the overhead cost of in-person doctor visits [by] managing the entire member experience" which "allow[s] doctors in [their] network to focus on what matters most: providing convenient access to excellent clinical care."  Specifically, defendants emphasized that SDC provided "professional-level service" and that "trained technicians" create customer treatment plans.  Moreover, the Company asserted that:

> Our member journey starts with two convenient options: a member books an APPOINTMENT to take a free, in-person 3D oral image at any of our 300 retail stores . . . or orders an easy-to-use doctor prescribed impression kit online, which we mail directly to their door.  Using this image or impression, we create a draft custom treatment plan that demonstrates how the member's teeth will move during treatment.  Next, via SmileCheck, a state licensed doctor within our network reviews and approves the member's clinical information and treatment plan.  If the member is a good candidate for clear aligners and decides to purchase, the treating doctor prescribes custom-made clear aligners . . . SmileCheck is also used by the treating doctor to monitor the member's progress and enables seamless communication with the member over the course of treatment.

59.     The statements made in ¶58 above rendered the Registration Statement false and misleading.  The true facts were:

(a)     That SDC's teledentistry model placed its customers at risk of serious injury by removing the basic level of care provided by traditional orthodontic treatment plans;

(b)     That SDC did not ensure customers were good candidates for, and could safely use, SDC's treatment by reviewing dental x-rays and conducting dental exams.  Instead, SDC

- 23 -

required customers to self-certify their own dental health, and made no effort to verify such certifications;

(c)     That Smile Shops employed sales assistants to handle **consultations**, which required untrained employees to complete highly specialized tasks such as taking pictures of a customer's teeth as well as complete a 3D scan of a patient's mouth without meaningful oversight from a licensed dentist, notwithstanding the fact that, as later reported by *NBC Nightly News* on February 13, 2020, moving teeth without in-person supervision can lead to permanent, significant harm, including bone loss, disease and loss of teeth. As a result, according to NBC, "nine members of Congress . . . asked the Food and Drug Administration and the Federal Trade Commission to Investigate SmileDirectClub 'to ensure that it is not misleading consumers or causing patient harm'";

(d)     During 2Q19 and 3Q19, SDC customers were fast-tracked and approved for aligners despite the fact that they were not qualified candidates. Instead, smile plans were created and forwarded to a SDC dentist who instantaneously approved the plan based solely on a photo of the customer's mouth and a scan or impression of their teeth, but without the necessary information to determine if SDC aligners were safe and appropriate for such customer's use. In the rare instances in which a smile plans were rejected, SDC employees were directed to resubmit the plan to other SDC dentists until it was approved. Once approved, SDC's customers did not receive dental treatment by licensed treating dentists, but rather followed treatment plans created by a team of dental technicians, not licensed dentists;

(e)     That the SDC commission system overseen by the Individual Securities Act Defendants mandated sales conversion rates which encouraged poor quality care. During 2Q19 and 3Q19 leading up to the IPO, defendants required sales personnel to meet the Company's mandated sales conversion rate of 73% or risk being terminated. If a sales employee met the 73% conversion

- 24 -

rate, they would receive $5 for every approved smile plan sold and if the employee reached a conversion rate of 75% or more they would receive $10 in commission. The high pressure sales tactics and compensation structures imposed by SDC prioritized profits above patient care, leading sales personnel to sell aligners to unqualified candidates;

(f)     That SDC was engaged in the unlicensed practice of dentistry in California;

(g)     That SDC and its Lead Dentist Jeffrey Sulitzer ("Sulitzer") had opened SDC's Smile Shops in California in 2017 and 2018 under false pretense, as Sulitzer applied to operate dental offices in California stating that he controlled the offices and assumed liability for services offered to patients in other offices when in fact the Smile Shops he opened were controlled by SDC, which wasn't licensed to practice dentistry in California; and

(h)     That SDC's treating dentists had no meaningful contact with SDC customers. If customers had issues with their aligners, they were not allowed to speak to or see a licensed SDC dentist, but instead were directed to speak with hygienists to resolve their issues. The only involvement of a licensed dentist prior to a customer receiving aligners was a superficial review of a photo and scan or impression of a customer's teeth where the SDC dentist was paid $50 if the dentist approved the plan and $0 if the dentist did not.

### 4.     False and Misleading Statements and Omissions Regarding Regulatory and Legislative Risk

60.     The Registration Statement advised investors that regulatory and legal challenges *could* have a negative impact on the Company's business in the future:

> Adverse changes in, or interpretations of, laws, rules, and regulations governing remote healthcare and the practice of dentistry *could have a material adverse effect on our business.*
>
> Our current business model is dependent, in part, on current laws, rules, and regulations governing remote healthcare and the practice of dentistry. If changes in laws, rules, regulations, or their interpretations are inconsistent with our current business model, we would need to adapt our business model accordingly, and our

- 25 -

operations in certain jurisdictions may be disrupted, which could have a material adverse effect on our business, financial condition, and result of operations.

*  *  *

Our business ***could be adversely affected*** by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states.

A number of dental and orthodontic professionals believe that clear aligners are appropriate for only a limited percentage of their patients. National and state dental associations have issued statements discouraging use of orthodontics using a teledentistry platform. Increased market acceptance of our remote clear aligner treatment may depend, in part, upon the recommendations of dental and orthodontic professionals and associations, as well as other factors including effectiveness, safety, ease of use, reliability, aesthetics, and price compared to competing products.

Furthermore, our ability to conduct business in each state is dependent, in part, upon that particular state's treatment of remote healthcare and that . . . each of which is subject to changing political, regulatory, and other influences. There is a risk that state authorities may find that our contractual relationships with our doctors violate laws and regulations prohibiting the corporate practice of dentistry, which generally bar the practice of dentistry by entities. Two state dental boards have established new rules or interpreted existing rules in a manner that purports to limit or restrict our ability to conduct our business as currently conducted. The Georgia Board of Dentistry passed a new rule that requires a licensed dentist to be present when 3D oral images are taken by a dental assistant, and the Board of Dental Examiners of Alabama has interpreted existing rules to require "direct supervision" (meaning the dentist must be physically present somewhere in the building) for the taking of digital oral images. In both Georgia and Alabama, we have filed lawsuits in Federal court against the dental boards and their individual members, alleging, among other things, violations of the Sherman Act, and we will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model. In addition, a national orthodontic association has met with various dental boards across the country in an effort to advocate for new rules and regulations that could have the effect of interfering with our business model. Although, none of these efforts have resulted in rules and regulations being passed to date, it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business. If adverse regulations are adopted or any such claims are successful, and we were unable to adapt our business model accordingly, our operations in such states would be disrupted, which could have a material adverse effect on our business, financial condition, and results of operations. In addition, a national dental association recently filed a citizen petition with FDA alleging that our manufacturing is in violation of "prescription only" requirements. Although FDA denied the petitioners' request to initiate enforcement action, the petition continues to be circulated by that national dental association and other third parties.

- 26 -

*   *   *

*Recently, legislation has been introduced in a handful of states specifically supporting and promoting teledentistry and telehealth, including but not limited to requiring insurance companies to pay for such services. We continually monitor these proposed laws and other legal and regulatory developments to understand their potential impact on our operations.*

61. The Registration Statement also represented that:

> We periodically receive communications from state and federal regulatory and similar agencies inquiring about the nature of our business activities, licensing of professionals providing services, and similar matters. Such matters are routinely concluded with no financial or operational impact on us. ***Currently there are no actions with any agency that are expected to have a material adverse effect on our business, results of operations, and financial condition***.

62. The statements in ¶¶60-61 above rendered the Registration Statement false and misleading. The true facts at the time of the IPO were:

(a) That dozens of claims or complaints had been filed by state chapters of the ADA, the AAO and other similar trade organizations challenging SDC's practice of providing so-called teledentistry without professional oversight by a licensed dentist. The ADA's complaint asserted that SDC was "placing the public at risk by knowingly evading the 'by prescription only' restriction that the FDA has placed on plastic teeth aligners," and "fail[ing] to meet the standard of care for a comprehensive oral examination." SDC falsely denied these allegations, calling them "spurious" and "misleading";

(b) That SDC had been under investigation by the Dental Board of California since 2017 for engaging in the unlicensed practice of dentistry;

(c) That SDC's Smile Shops in California had been subject to multiple raids;

(d) That, as alleged in a November 2019 filing by the Attorney General of California before the Dental Board of California, SDC and Sulitzer were in violation of numerous provisions of applicable California law by, among other things: (i) using advertising tending to

- 27 -

deceive and mislead the public; (ii) performing, or allowing to be performed, treatments on patients that were not Sulitzer's patients of record; (iii) performing the unlicensed practice of dentistry; (iv) permitting clearly excessive treatment, incompetent treatment, grossly negligent treatment, repeated negligent acts and/or unnecessary treatment; and (v) operating an unregistered mobile dental unit; and

(e)     That pending legislation that had already been passed by both houses of the California legislature, which required teledentistry platforms to provide each customer with the treating dentist's name, license number and the dental board contact information, and that the legislation was designed to curb SDC's improper and unlawful business practices, and which SDC was aware, would, when signed into law, have a materially adverse impact on SDC's operations in one of its largest markets. The legislation mandated the review of a patient's most recent radiographs (*i.e.*, x-rays) prior to beginning orthodontic treatment by the treating dentist, as well as requiring that the teledentistry provider conduct a full patient examination prior to the enactment of a treatment plan. It also prohibited providers such as SDC from preventing disgruntled customers from making reports to the Dental Board of California even if the patient signed an NDA, thereby eliminating SDC's then existing practice of using NDAs to prevent the disclosure of negative information about its treatment practices.

63.     SDC's stock traded at $5.30 per share on March 12, 2020, a decline of more than 77% below the IPO offering price, inflicting substantial economic harm on Lead Plaintiff and the Class who purchased SDC common stock pursuant and traceable to the Registration Statement.

**D.  Causes of Action**

## COUNT I

### Violations of Section 11 of the Securities Act
### (Against Securities Act Defendants Except Camelot)

64.     Lead Plaintiff incorporates ¶¶18-63 as though fully set forth herein.  With respect to this Count, Lead Plaintiff also excludes allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

65.     By reason of the conduct herein alleged, each defendant named in this Count violated §11 of the 1933 Act.

66.     For all the reasons set forth above in ¶¶44-62, the Registration Statement contained untrue statements of material fact and omitted material facts necessary to make the statements made therein not false or misleading.

67.     On September 12, 2019, SDC conducted its IPO pursuant to SEC Form S-1 which SDC filed with the SEC on May 3, 2019, and after several amendments, was declared effective on or about September 11, 2019.

68.     Lead Plaintiff purchased SDC Class A common stock traceable to the Registration Statement.

69.     SDC is the registrant for the IPO.  As issuer of the Class A common stock, SDC is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions in the Registration Statement.

70.     In the exercise of reasonable care, each of the defendants named herein, should have known of the misstatements and omissions contained in the Registration Statement as set forth above at ¶¶44-62.

71.     Each of the Individual Securities Act Defendants signed the Registration Statement. None of the Individual Securities Act Defendants conducted a reasonable investigation or possessed reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

72.     The Underwriter Defendants served as underwriters of the IPO.  The Underwriter Defendants did not conduct a reasonable investigation or possess reasonable grounds to believe that the Registration Statement did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

73.     Lead Plaintiff and members of the Class sustained damage as a result of the violations alleged herein.

74.     Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time this action was commenced.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time this action was commenced.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### (Against Securities Act Defendants Except Camelot)

75.     Lead Plaintiff incorporates ¶¶18-63 as though fully set forth herein.  Lead Plaintiff also excludes allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

76.     By reason of the conduct alleged herein, Securities Act Defendants except Camelot violated §12(a)(2) of the Securities Act.  The Registration Statement and the Prospectus incorporated

- 30 -

therein contained untrue statements of material fact, and omitted material facts necessary to make the statements made therein not misleading as detailed above at ¶¶44-62.

77.     The defendants named herein owed Lead Plaintiff and the other members of the Class who purchased shares of SDC Class A common stock pursuant to the Prospectus a duty to conduct a reasonable and diligent investigation in connection with the IPO to ensure that the statements made therein did not contain untrue statements of material fact or omit material facts necessary to make the statements made therein not false or misleading.

78.     In the exercise of reasonable care, the defendants named herein, should have known of the misstatements and omissions contained in the Prospectus as set forth above at ¶¶44-62.

79.     Each of the defendants named herein participated in the sale of SDC common stock for their own personal financial gain by means of the Registration Statement and the Prospectus incorporated therein.

80.     Lead Plaintiff did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Registration Statement and the Prospectus incorporated therein at the time it acquired the Company's shares.

81.     By reason of the conduct alleged herein, Securities Act Defendants except Camelot violated §12(a)(2) of the Securities Act.  As a direct and proximate result of the violations alleged herein, Lead Plaintiff and the other members of the Class who purchased SDC Class A common stock from one of the Underwriter Defendants pursuant to the Registration Statement and the Prospectus incorporated therein sustained substantial damages in connection therewith.

82.     Lead Plaintiff and the other members of the Class who hold such common stock have the right to rescind and recover the consideration paid for their shares, and hereby tender their shares

4826-6892-0280.v2

to the defendants sued herein. Class members who have sold their shares of common stock seek damages to the extent permitted by law.

## COUNT III

### Violations of Section 15 of the 1933 Act
### (Against the Individual Securities Act Defendants and Camelot)

83.     Lead Plaintiff incorporates ¶¶18-63 as though fully set forth herein. Lead Plaintiff also excludes allegations that could be construed as alleging fraud or intentional misconduct, as this Count is based solely on claims of strict liability and/or negligence.

84.     By reason of the conduct alleged herein, the Individual Securities Act Defendants violated §15 of the Securities Act. Each of the Individual Securities Act Defendants and Camelot was a control person of SDC by virtue of his or her position as an owner, director and/or senior officer of SDC. The Individual Securities Act Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or were major shareholders of SDC. As detailed in ¶36, Camelot is SDC's largest shareholder and the managing member of the limited liability corporation that controlled SDC at the time of the IPO. Camelot possessed control over SDC and the Individual Securities Act Defendants.

85.     Each of the Individual Securities Act Defendants and Camelot was a participant in the violations of §11 and 12(a)(2) of the 1933 Act alleged in the Counts above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process by which the IPO was completed.

- 32 -

## EXCHANGE ACT CLAIMS

### A.     The Exchange Act Parties

#### 1.     Exchange Act Plaintiffs

86.     Lead Plaintiff 1199 SEIU Health Care Employees Pension Fund is a multi-employer Taft-Hartley defined benefit plan providing benefits to working and retired healthcare industry workers and their families in New York City and surrounding areas.  The Pension Fund purchased SDC common stock during the Class Period.

87.     Plaintiff Bucks County Employees Retirement System is a single-employer retirement system established January 1, 1942, serving public employees and retirees of Bucks County, Pennsylvania.  The Retirement System is administered by the County and offers pension, retirement plans and various other benefits to its participants.  The Retirement System purchased or otherwise acquired SDC common stock during the Class Period.  *See* Certification attached hereto.

#### 2.     Exchange Act Defendants

88.     Defendant SDC is a teledentistry company headquartered in Nashville.  SDC's common stock is traded on the NASDAQ stock exchange under the ticker symbol "SDC."  As of February 29, 2020, the Company had more than 103.5 million shares of Class A common stock issued and outstanding.

89.     Defendant David Katzman is, and was at all relevant times, the Chief Executive Officer and Chairman of the Board of SDC.  In this role, defendant David Katzman acted on SDC's behalf and/or made the statements detailed herein in his capacity as an officer of SDC.

90.     Defendant Wailes is, and was all relevant times, the Chief Financial Officer of SDC. Throughout the Class Period, Wailes acted on SDC's behalf and/or made the statements detailed herein in his capacity as an officer of SDC.

- 33 -

91.     Defendants David Katzman and Wailes may be referred to as "Individual Exchange Act Defendants."  SDC together with defendants David Katzman and Wailes are the "Exchange Act Defendants."

**B.     False and Misleading Statements and Omissions of Material Fact**

92.     Plaintiffs incorporate by reference all of the allegations contained above in ¶¶1-46, 49-63, as each of the statements and omissions that rendered the Registration Statement false and misleading also give rise to liability under the Exchange Act against the Exchange Act Defendants. Each of the statements and omissions described above were knowingly or recklessly false when made by the Exchange Act Defendants and caused damages to members of the Class when the truth was belatedly disclosed as detailed below.

93.     At the time of the IPO, the Company was already experiencing a drastic decline in its revenue, gross profits and Adjusted EBITDA metrics.  The Company was also then-currently the subject of an ongoing investigation by the Dental Board of California into SDC's operations in California, and actively and aggressively lobbying against proposed legislation that would have the effect of negatively impacting the Company's operations.  SDC had also received over 1,000 complaints and was actively suppressing complaining consumers from publicly disclosing their negative experiences with the Company.  As a result, the Registration Statement's representations as detailed above were false and/or misleading for the reasons detailed in ¶¶1-46, 49-63.

94.     The true state of the Company's affairs came to light through a series of revelations, culminating in the Company's March 12, 2020 complete overhaul of its "customer experience" in a purported effort to provide more safety and transparency into the Company's core services.  By March 12, 2020, SDC's stock had declined to $5.30 per share, a decline of 77% below the $23 IPO offering price exactly six months prior, inflicting substantial harm on Plaintiffs and the Class who purchased SDC common stock at inflated prices throughout the Class Period.

95.     Plaintiffs incorporate by reference ¶¶1-46, 49-63, which detail the misrepresentations and omissions of material fact contained in the Registration Statement that form the basis of Lead Plaintiff's Securities Act Claims.   As detailed in this Exchange Act Section each of the misrepresentations and omissions contained in the Registration Statement were knowingly or recklessly false and misleading when made for the additional reasons alleged herein.

### C.     Additional Scienter Allegations

#### 1.     Revenue, Gross Profit and Adjusted EBITDA Were Central to the Company's Operations, Closely Tracked by Senior Management and Negatively Impacted by Exchange Act Defendants' Own Affirmative Conduct

96.     SDC, David Katzman and Wailes closely tracked SDC's revenue, gross profit and Adjusted EBITDA in connection with SDC's ongoing operations and in connection with the IPO as these metrics were among the key metrics monitored by the Company.   These metrics were highlighted in the Registration Statement precisely because Adjusted EBITDA, revenue and gross profit were, according to the defendants, "among the measures ***used by [SDC's] management team to evaluate [SDC's] operating performance and make day-to-day operating decisions.***"

97.     In addition, defendants SDC, David Katzman and Wailes, were aware of the decline in Adjusted EBITDA referenced above as it was, in part, the result of increased marketing and selling expense ($17.8 million in 3Q19), which was within their knowledge and/or control, and the doubling of legal expenses were incurred as a result of their own affirmative conduct.   As a self-proclaimed "disruptor" in the industry, SDC had: (a) launched aggressive lobbying attacks to thwart legislation, including its aggressive (albeit unsuccessful) attempt at blocking California AB 1519 bill in the days and months leading up to the IPO; and (b) pursued aggressive affirmative litigation against customers and dental agencies to conceal the truth about those customers and dental agencies' assertions – thereby incurring substantial legal expenses through its own actions, and

resulting in a negative impact on the Company's bottom line. SDC's increased marketing, selling and legal expenses had already been incurred and/or were budgeted to be incurred at the time of the IPO.

98. In addition to daily monitoring of the Company's financial metrics, the Exchange Act Defendants were also aware, based on their "continual[] monitor[ing] [of] proposed laws and other legal and regulatory developments" that pending legislation would impact SDC's operations, including negatively impacting the Company's most important performance metrics, revenue, gross profit and Adjusted EBITDA.

99. Based on Individual Exchange Act Defendants' day-to-day involvement in the day-to-day operations of the Company, they were also aware of the negative impact the Company's manufacturing inefficiencies would have on both growth and customer experience.

### 2. As Evidenced by SDC's Own Lawsuit, the Exchange Act Defendants Were Aware of an Ongoing 2-Year Investigation into the Company and Sulitzer, SDC's Chief Clinical Officer

100. As was publicly revealed by SDC's *own* lawsuit against the Dental Board of California in October 2019 (the "October Lawsuit"), the Exchange Act Defendants were aware that, beginning as early as 2017 and continuing into 2018, the Dental Board of California had initiated an investigation into the Company's and its Chief Clinical Officer's practices.

101. The October Lawsuit and related filings revealed that not only was the Company subject to an ongoing investigation beginning as early as two years prior to the IPO, but that the Company and certain of its Smile Shops in California had been "raided" by the Dental Board of California. In addition, the Company's chief dentist, Sulitzer, was being investigated by the Dental Board of California as early as April 13, 2017 and throughout 2018, which culminated in formal disciplinary proceedings being brought against Sulitzer. Related filings revealed that *as late as July 2019, just two months prior to the IPO*, one of SDC's mobile SmileShops, *i.e.*, a SmileBus,

- 36 -

operated by SDC's chief dentist, was raided by the Dental Board of California as part of its ongoing investigation. In response to the July 2019 raid, the Exchange Act Defendants had SDC direct its lawyers to send a letter to the Executive Director of the Dental Board of California.

102. The Dental Board of California's motion to dismiss the October Lawsuit highlighted the ongoing disciplinary proceedings against SDC's Chief Clinical Officer based upon the investigations prior to the IPO:

> On November 12, 2019, ***following a two-year Dental Board of California (the "Board") investigation***, Board Executive Director Fischer made before the Board a formal accusation against Dr. Sulitzer, ***to have his license to practice dentistry in California revoked or suspended, because Dr. Sulitzer violated eight separate provisions of California's Dental Practice Acts*** (Cal. Bus. Prof. Code § 1600 et seq.) and related laws. . . . That administrative disciplinary matter is presently ongoing before the Board.

### 3. SDC Was Actively and Aggressively Lobbying Against California Legislation that Was Expected to Have a Profound Adverse Impact on the Company's Operations

103. In their roles, the Exchange Act Defendants stated in the Registration Statement: "We continually monitor . . . proposed laws and other legal and regulatory developments to understand their potential impact on our operations." Regularly referring to SDC as a "disruptor" in the teledentistry industry, Exchange Act Defendants regularly fought proposed laws that they believed would negatively impact the Company's operations.

104. Exchange Act Defendants took affirmative steps to register as an opponent to California bill AB 1519, which was pending at the time of the IPO. California AB 1519 had been introduced in the California Assembly in February 2019, and referred to the Committee on Business & Professions the following month. The bill was passed by the California Assembly on May 23, 2019, and ordered to the California Senate the same day. The bill was referred to the California Senate Committee on Business, Professions and Economic Development in June 2019 and then to the Senate Appropriations Committee in July 2019. The California Senate unanimously approved

- 37 -

the bill prior to the IPO, at which point, final approval was all but assured. According to public reports, SDC was a registered opponent of the bill *prior to the IPO*.

105. Exchange Act Defendants were aware that the pending legislation would cause additional "hurdles and costs" to consumers in SDC's largest market. Indeed, later reports confirmed that the Company was aggressively and actively lobbying against the bill. An October 15, 2019 *Market Watch* article titled, "SmileDirectClub stock slides 13% as California Gov. Newsom signs law to change 'teledentistry' rules," reported that, according to an ADA spokesman, "'SmileDirect and other direct-to-consumer orthodontic companies waged an aggressive lobbying campaign through August and into September [2019],'" calling it "'a complete and total mischaracterization by SmileDirectClub to say the policy changes in AB 1519 were "last minute," . . . [i]n fact, they were amended into the bill on July 3[, 2019].'"

### 4. SDC Received Over 1,000 Complaints Filed with the Better Business Bureau and Deliberately Manipulated the Appearance of Positive Reviews by Executing and Enforcing Non-Disclosure Agreements with Injured Customers

106. As described above (*see*, ¶¶55-56), the Company was "singularly focused" on its "positive member experience." As evidence of positive experiences, the Company emphasized glowing product reviews in the Registration Statement and throughout the Class Period.

107. By the time of the IPO, the Company had already received over 1,000 complaints through the BBB, many of which were clinical in nature, describing broken and loose teeth and misaligned bites, for example. The Company has acknowledged it is aware of, and is obligated to respond to, every complaint lodged by the BBB.

108. The reviews posted on the Company's website and elsewhere told a story of satisfied consumers, concealing negative feedback by individuals who sought a refund through the Company's "Smile Guarantee." Although concealed from investors, the Company was using its so-

- 38 -

called "Smile Guarantee" to ensure that negative reviews and disparaging remarks were kept from the public's eye through the use of NDAs that came to light following an investigative report by *The New York Times*.

109.    As was revealed in a January 21, 2020 *New York Times* article titled: "This Company Says It Will Fix Your Smile.  It May Shush You if It Doesn't," SDC worked to conceal information about customer dissatisfaction.  According to *The New York Times*, "[s]even people who ordered teeth aligners from the company described . . . how the products did not fix their teeth; four said the aligners had created new problems that required traditional dentistry to correct."

110.    The *New York Times* revealed that while some customers sought refunds from failed or dangerous product use, in an effort to silence disgruntled customers, the Exchange Act Defendants required those customers to execute NDAs with confidentiality provisions and enforced those agreements.  The NDAs, which were drafted by SDC, "prohibited the customers from telling anyone about the refund and required them to delete negative social media comments and reviews." In addition to requiring that harmed customers delete negative reviews and critical remarks about the Company, the NDAs also prohibited customers from reporting problems to their state dental boards, and required that any such complaints be withdrawn, which directly contradicted California's AB 1519 bill (*see, e.g.*, ¶¶57, 62, 131):

4826-6892-0280.v2

"Releasor shall not post on social media any information or reviews regarding the Transaction or the terms or existence of this General Release, and shall take all steps necessary to delete or eliminate any such postings made prior to the date of this General Release. Without limiting any of the foregoing, Releasor further covenants and agrees that he/she will not make, publish, or communicate any statements or opinions that would disparage, create a negative impression of, or in any way be harmful to the business or business reputation of SDC or its affiliates or their respective employees, officers, directors, products, or services . Releasor covenants and agrees that he/she has not filed any complaint with any local, state or federal agency or regulator (each, a "Complaint" and collectively, the "Complaints"), or, in the event that Releasor has filed any Complaint(s) prior to executing this Release, Releasor hereby agrees to withdraw any and all outstanding Complaints upon receipt of the Payment. Releasor further agrees that he/she will not file any future Complaints."

111.    The NDAs were a deliberate attempt by the Exchange Act Defendants to conceal adverse information from investors, and were designed to and had the effect of concealing the sheer number of dissatisfied customers.

### 5.    The Exchange Act Defendants Implemented an Aggressive Sales Culture Monitoring Customer Conversion Rates on an Hourly, Daily and Weekly Basis

112.    SDC's upper management monitored customer conversion rates on an hourly, daily, weekly and monthly basis through SDC's software programs, including SmileCheck, to ensure strict conversion rate mandates at SmileShops were met.  Failure to meet compulsory daily conversion rates of 73% meant employees were subject to termination from the Company.  SDC also directed and implemented a compensation system that was designed to, and did, encourage SDC dentists to approve every plan they received encouraging the treatment of customers rejected by competitors such as Invisalign and traditional orthodontists.  SDC's compensation and incentive plans were designed to, and did, encourage SmileShop employees and dentists to make sales at any cost, even if the treatment was not medically appropriate or suitable for the customer.  SDC's high pressure sales

- 40 -

tactics and compensation structures implemented and enforced by upper management and monitored in real-time incentivized employees to make a sale at any cost – prioritizing short-term profits above patient care – or risk being fired, placing its customers at risk of serious injury.

 **6. SDC's Insiders Sold Nearly 30 Million Shares and Units in Connection with and as Part of the IPO at Inflated Prices Allowing Them to Pocket $630 Million**

 113. The wrongful course of business alleged herein was designed to allow, and did allow, SDC insiders to sell substantial amounts of their SDC shares and Units at artificially inflated prices using proceeds from the IPO before the truth about the Exchange Act Defendants' fraudulent practices were revealed to the market.  While investors paid an inflated $23 per share in the Company's IPO, SDC's insiders, including the Individual Exchange Act Defendants and their affiliates, pocketed more than $630 million by selling Units and common stock back to the Company in connection with and as part of the IPO.  The Company purchased these Units and common stock with proceeds raised from investors in the IPO.

 114. Armed with knowledge that: (1) "accelerating growth" was not a strength, as revenue, gross profit and Adjusted EBITDA were not growing as highlighted in the Registration Statement but were in fact declining as a result of SDC's own affirmative conduct; (2) the Company and its Chief Clinical Officer Sulitzer were being actively investigated, and had been investigated for a two-year period before and at the time of the IPO by various regulatory agencies; (3) SDC's "positive member experience" was predicated on the execution of NDAs with disgruntled consumers which concealed negative reviews from the public sphere, and did not reflect the over 1,000 negative complaints received by the BBB at the time of the IPO, which the Company was obligated to, and did, respond to directly; and (4) the Company's sales tactics and mandated conversion rates encouraged obtaining sales at the risk of harming potential customers, David Katzman, together with SDC insiders Steven Katzman, Jordan Katzman, Fenkell, Schnall and Rammelt sold shares and

- 41 -

Units back to the Company at inflated prices, profiting enormously while in possession of the adverse information concealed from investors as alleged herein.

115.     In total, the Company, using IPO-investor proceeds, purchased over $630 million worth of shares and Units from David Katzman, and other SDC insiders and their affiliates.  While investors were buying shares in the Company through the IPO, these insiders, with the benefit of material adverse information not known to investors, were actively divesting themselves of shares of the Company as indicated in the chart below:

| Name | Number of LLC Units and Shares of Class A Common Stock sold to the Company | Aggregate Proceeds Received |
|---|---|---|
| David Katzman | 8,998,951 | $198,411,369 |
| Heather Katzman | 63,699 | $1,391,801 |
| Jordan Katzman | 7,141,516 | $157,462,872 |
| Alexander Fenkell | 6,521,446 | $143,790,803 |
| Steven Katzman | 663,595 | $14,500,839 |
| David B. Katzman 2009 Family Trust | 2,907,335 | $66,868,698 |
| Susan Greenspon Rammelt | 29,964 | $654,713 |
| CD&R SDC Holdings, Inc. | 2,275,857 | $49,727,475 |
| **Total** | **28,602,363** | **$632,808,570** |

116.     SDC insider and founder David Katzman, through entities which he controls and of which he is the beneficiary, sold 8,998,951 Units and shares of common stock to the Company for proceeds of more than ***$198.4 million***.  David Katzman's spouse, Heather Katzman, sold 63,699 Units and shares of common stock for additional proceeds of more than ***$1.39 million***.[4]

---

[4]     The total proceeds for Heather Katzman's sale of 63,699 Units to the Company was not disclosed in the Registration Statement.  The proceeds identified herein are based on a conservative estimated value of $21.85 per share/Unit, which are the proceeds the Company received from each Class A common stock share purchased in the IPO, after expenses.

4826-6892-0280.v2

117.     At that same time, Steven Katzman sold 663,595 Units of his personal SDC shares to the Company for proceeds of more than ***$14.5 million***.

118.     Jordan Katzman, through entities which he controls and of which he is the beneficiary, sold 7,141,516 Units and shares of SDC common stock to the Company for proceeds of more than ***$157.4 million***.  Additionally, the David B. Katzman 2009 Family Trust, of which Steven Katzman is a Trustee, and the descendants of David Katzman, including Jordan Katzman, are the primary beneficiaries, sold 2,907,335 Units back to the Company for proceeds of more than ***$66.8 million***.

119.     Co-founder Fenkell, through entities which he controls and of which he is the beneficiary, sold 6,521,446 Units and shares of common stock to the Company for proceeds of ***$143.8 million***.

120.     CD&R, a company that director Schnall is a partner of, through its subsidiaries, sold 2,275,857 Units to the Company for proceeds of more than ***$49.7 million***.  Meanwhile, Rammelt, also a director of SDC at the time of the IPO, sold 29,964 Units and shares of common stock to the Company for proceeds of more than ***$654,000***.

121.     Wailes entered into an incentive bonus agreement with the Company under which he was entitled to a payment of approximately $18.9 million, 60% of which ($11.3 million) vested immediately upon completion of the IPO.  The remaining bonus will vest on a monthly basis over the two-year period immediately following the IPO.[5]

122.     As the market value of SDC's common stock declined by 77% during the Class Period, these Individual Exchange Act Defendants and their affiliates profited by ***over $480 million*** via their one day selling spree.

---

[5]     In total, the Company paid $332.9 million in closing bonuses, and an additional $71.4 million in retention bonuses in connection with the IPO.

- 43 -

### D. Loss Causation/Economic Loss

123. During the Class Period, as detailed herein, the Exchange Act Defendants engaged in a scheme and wrongful course of business that artificially inflated the price of SDC common stock by making false and misleading statements and/or omitting material information concerning SDC's business practices, member experience, regulatory environment and financial results. By artificially inflating and manipulating SDC's stock price, the Exchange Act Defendants deceived Plaintiffs and the Class and caused them losses when the truth was revealed. As the Exchange Act Defendants' prior misrepresentations and fraudulent conduct reached the market through a series of disclosures, it caused SDC's stock price to fall precipitously as the prior artificial inflation came out of the stock price. As a result of their purchases of SDC common stock during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

124. On September 24, 2019, a group of dentists, orthodontists and consumers filed a class action lawsuit against SDC, David Katzman, Steven Katzman and Camelot in federal court in the Middle District of Tennessee, alleging that the Company's business model constitutes multiple violations of state and federal law. The complaint disputed that "a treating doctor monitors a member's progress," stating that "SmileDirect members do not even know the identity of the dentists who are involved in their case (to the extent that they are involved)" and that "no patient-doctor relationship is ever actually established." The complaint alleged that the Company was currently subject to litigation for the unlicensed practice of dentistry in several states.

125. On September 24, 2019, following the filing of the complaint, SDC's share price fell nearly 9%. SDC's stock price continued to decline over the next two trading days by over 17%, to close at $12.94 per share on September 26, 2019. During this same period, the S&P 500 Index saw a slight increase.

4826-6892-0280.v2

126.    On October 4, 2019, just three weeks after the IPO, Hindenburg Research issued a public report detailing what it called "a complex, dangerous medical process," based on an investigation into SDC during the course of which Hindenburg Research "spoke with multiple former employees, competitors, and customers, [reviewed] the company's SEC filings and numerous court filings, visited one of the company's 'Smile Shop' locations in New York City, and corresponded with dentists and orthodontists." In its October 4, 2019 report, Hindenburg Research revealed the Company was riddled with "'Do it Yourself' dental horror stories, allegations of practicing medicine without licenses, dental emergencies in the company's 'Smile Shops' and lawsuits – all of which we believe will help put the world – and the public markets – on notice about SDC's questionable approach."

127.    The Hindenburg Research report revealed that SDC's practices resulted in over 1,000 BBB complaints in just five years as a Company, and that major medical organizations like the ADA and the AAO had alleged through complaints with the FTC, FDA and at least 36 state boards, that SDC put patients in danger and is practicing medicine illegally. According to the report, instead of offering comprehensive pre-screening by a licensed dentist, SDC was sending 75 to 100 cases to one orthodontist's phone, per day, to "crank out" case decisions.

128.    The Company swiftly responded to the Hindenburg Research report, issuing a public statement on October 4, 2019 titled: "Organized Dentistry's Anti-Competitive Legal Actions." In the statement, SDC dismissed allegations in the Hindenburg Research report and those recently brought by the ADA, calling them "nothing more than the latest in a stream of unevidenced and misleading attempts by dental trade organizations, certain of their members and others motivated to thwart legitimate competition," referring to "a history of untruths promoted by organized dentistry," and calling the ADA's complaints "misleading and untrue." What the October 4, 2019 statement ***did***

- 45 -

confirm is that of the complaints filed by the AAO against the Company in 36 states, at least 19 remained active. In the October 4, 2019 statement, SDC also admitted that it had "1,216 complaints received over a 5-year period," and that the Company reviews and "responds to every BBB complaint in accordance with the BBB's guidelines."

129. Following the damning Hindenburg Research report and SDC's October 4, 2019 statement, SDC's stock dropped over 8% to close the trading day, October 7, 2019. Following the October 4, 2019 statement, media outlets referred to the IPO as the "worst debut in 12 years for a US firm," causing SDC's stock to decline even further, dropping 23% in the two trading days following the October 4, 2019 revelations.

130. In a series of publications between October 9 and October 10, 2019, the ADA denied that its FDA petition had been "shut down" and "dismissed," telling the market that "[a]ll substantive issues raised by the ADA's citizen petition remain fully before the FDA at this time." The ADA's responses also highlighted the Company's purported violations of the FTC act, again drawing attention to SDC's business practices. At closing on October 10, 2019, SDC's stock was trading at $10.24 per share, ***down over 30% from its closing price on October 4, 2019***. During the same period, the S&P 500 Index remained nearly unchanged.

131. As expected, on October 13, 2019 – just 31 days after the IPO – California's Governor signed into law California bill AB 1519, which directly targeted direct-to-consumer orthodontics treatments, imposing additional hurdles in the treatment of malocclusion outside a traditional orthodontist office. AB 1519 mandated the review of a patient's most recent radiographs (*i.e.*, x-rays) prior to beginning orthodontic treatment and required that the teledentistry provider conduct a full patient examination prior to the enactment of a treatment plan. It also prohibited providers such as SDC from preventing disgruntled customers from making reports to the Dental

- 46 -

Board of California even if the patient signed an NDA, which was in direct odds with the Company's use of NDAs to silence harmed consumers (*see, e.g.*, ¶¶57, 62, 108-111, 114). The legislation was designed to curb SDC's improper and unlawful business practices and required teledentistry platforms to provide each customer with the treating dentist's name, license number and the dental board contact information.

132. On October 14, 2019, in an attempt to allay investors' fears, the Company announced that "[n]othing in AB1519 requires SmileDirectClub to cease or modify its operations," yet claimed the bill would "create unnecessary **hurdles and costs** to Californians."

133. The same day, CNBC called SDC the "worst Unicorn IPO of 2019," as investors responded negatively to SDC's announcement that the newly signed law would result in increased costs and hurdles for the Company, which by its own admission had "tens of thousands of customers in California." Following this news, SDC's share price declined 13% on October 14, 2019.

134. In an October 14, 2019 report, a Guggenheim Securities LLC analyst touched on investors' concerns following the signing of the new law, reporting that investors were focused on the Company's 3Q19 regulatory environment.

> The more significant concern, in our view, is the ongoing regulatory discussion exacerbated today by the signing of AB 1519 in CA. ***The new legislation warrants attention from investors as it has the potential to cause necessitated changes to the current business model***. While the bill contains several stipulations, the most important one in our mind is the requirement for a "dentist to review diagnostic digital or conventional radiographs for orthodontia prior to the initial diagnosis and correction of malpositions of human teeth or the initial use of orthodontic appliances.
>
> \*       \*       \*
>
> ***[W]ith the weakness of the shares accelerating, some investors became incrementally concerned on the fundamentals – specifically the competitive landscape and the regulatory landscape. The news on AB 1519 adds to the list of concerns for investors to monitor and adds to the rhetoric of uncertainty around the shares***.

- 47 -

135.     Following the signing of California AB 1519 bill into law on Sunday October 13, 2019 and the Company's October 14, 2019 statement, SDC common stock declined nearly 13% on October 14, 2019.  The same day, the S&P 500 Index was flat.

136.     On October 16, 2019, SDC and its Chief Clinical Officer Sulitzer filed the October Lawsuit against the Dental Board of California.  In the October Lawsuit, SDC *revealed to investors for the first time*, that beginning in late 2017 and throughout 2018, the Dental Board of California launched simultaneous, statewide coordinated raids of the Company's SmileShops in the state. Despite the raids *occurring as early as two years prior to the IPO*, the raids and the pending investigations were concealed from investors and not disclosed in the Registration Statement.

137.     In a series of tweets on October 17, 2019, Hindenburg Research highlighted the Company's admission that it was subject to state-wide raids:

4826-6892-0280.v2



138.    The Hindenburg Research tweets alerted the market about the previously undisclosed

investigation:



Hindenburg Research
@HindenburgRes

Replying to @HindenburgRes

No information about these raids was contained in the company's S-1 filing as part of its IPO process.

The company knew of these raids and that an investigation that had taken place in the largest state in the U.S., and investors did not. $SDC

> 73. The SMILESHOP store employees who witnessed the raids were frightened and intimidated by the Board's enforcement teams undertaking the raids. The teams subjected employees to aggressive behavior, including
>
> 24
> FIRST AMENDED COMPLAINT
> CASE NO. 2:19-CV-08902
>
> Case 2:19-cv-08902  Document 1  Filed 10/16/19  Page 25 of 53  Page ID #:25
>
> unreasonable demands for information and documents, as well as *threats* of initiating an "investigation" of SmileDirect by the Board—contradicting Tippins' prior claims of an existing investigation.
>
> 74. Consumers at the SMILESHOP stores were likewise intimidated, and some of the consumers fled the stores, on information and belief, as a result of the Board raids. As a result, the raids seriously harmed SmileDirect's business, revenue, goodwill, employee relations, and reputation in the marketplace.

10:37 AM · Oct 17, 2019 · Twitter Web App

139.    Following the news of the October Lawsuit and undisclosed investigations, the Company's stock price fell nearly 9% in two days, to close at $9.41 per share on October 17, 2019. During the same period, the S&P 500 Index remained flat.

140.    On Saturday, October 19, 2019, *Market Watch* published an article titled: "SmileDirectClub stock falls anew after company files suit against California Dental Board," stating: "Startup claims harassment for raids and an investigation, but neither action was disclosed in its IPO documents."  The *Market Watch* article highlighted that according to the lawsuit, "Joseph Tippins, investigator in the enforcement unit of the Dental Board, told the company in 2017 that the Dental Board had an active investigation of SmileDirect's operations," the article continued, "[t]he

- 50 -

company, however, which went public in September, ***did not make any disclosures regarding raids or investigations in its IPO documents***." The next trading day, SDC's stock continued to slide, closing at $9.13 per share, a decline of more than 11%. During the same period, the S&P 500 Index remained unchanged.

141. On November 12, 2019 the Company issued its 3Q19 earnings release and convened the 3Q19 earnings conference call after-market hours. The earnings releases revealed declining growth in Adjusted EBITDA, gross profit and revenue and a "significant increase" in legal expenses resulting from the "regulatory climate" in which SDC operates. Calling SDC a "disruptor" in the industry, defendant David Katzman explained during the November 12, 2019 earnings call that SDC's legal expenses had doubled quarter-over-quarter, driven in part by the Company's aggressive, but failed, lobbying attempts throughout August and September 2019 to forestall California's AB 1519 bill, which was pending at the time of the IPO, together with costs associated with investigations and litigation related to preventing public disclosure of consumer complaints and dental regulatory complaints. The increases in marketing and selling expense and the doubling of legal expenses contributed to the decline in the Company's gross profits and Adjusted EBITDA.

142. On November 13, 2019, in direct response to the Company's disappointing 3Q19 earnings announcement revealing sharp declines in important performance metrics – Adjusted EBITDA, revenue and gross profit – the Company's stock price declined, closing down over 20% on November 13, 2019. The same day, the S&P 500 Index saw a slight increase.

143. On November 13, 2019, A *Dow Jones Institutional News* story claimed "SmileDirectClub shareholders have had their teeth kicked in," and that SDC had "encountered nothing but trouble in its short history as a public company," while *Market Watch* quoted: "One

- 51 -

bank, Citigroup, [is] lowering its EBITDA estimate and saying the quarterly report added *'more fuel for bears than bulls*.'"

144. On February 13, 2020, *NBC Nightly News* broadcasted an investigative report highlighting consumer concerns following an undercover investigation.[6] The report revealed harmful consequences – such as a cross-bite and strained neck muscles resulting in migraines – likely caused by SDC's aligners, and that SDC had over 1,800 complaints filed with the BBB, with dozens relating to treatment results. The *NBC Nightly News* segment highlighted that nine members of the U.S. House of Representatives urged the FDA and FTC to take action to investigate the Company's practices.[7] The Company's Smile Guides revealed to hidden cameras that seeing a dentist prior to treatment "[is] not mandatory," and that "anything can go wrong" in using the Company's at-home dental impression kits. The *NBC Nightly News* segment also highlighted the Company's confidentiality provisions in the NDAs SDC required prior to issuing refunds to harmed customers.

---

[6] *SmileDirectClub promises easy teeth straightening. Some patients report painful problems*, NBC News (Feb. 13, 2020), https://www.nbcnews.com/nightly-news/video/smiledirectclub-promises-easy-teeth-straightening-some-patients-report-painful-problems-78711877966.

[7] The letter to the FDA and FTC, which was attached to a January 28, 2020 AAO press release, highlighted the congressional concern regarding SDC, "especially when we see more than 1,350 'Customer Complaints' on the Better Business Bureau's website for the company, as well as press reports highlighting significant issues with the business model and product." The letter also provided:

> As health care providers, we know that orthodontic treatment, if performed without the proper diagnosis and supervision by a dentist or orthodontist, could lead to potentially irreversible damage such as changed bites, gum damage, and tooth loss. For patients who experience some of these negative outcomes, they may require additional and costly treatment from dentists and orthodontists to try to correct the damage.

Given the concerns, the Congressmen urged the FDA and the FTC to investigate "the practices of SmileDirectClub to ensure that it is not misleading consumers or causing patient harm."

- 52 -

145. On February 14, 2020, SDC issued a public statement seeking to allay investors' fears surrounding the safety and efficacy of the Company's aligners, claiming that the *NBC Nightly News* piece from the previous evening "misrepresents SmileDirectClub and the quality of care provided by the over 250 state-licensed dentists and orthodontists across the country who use our platform to treat their patients." Despite the Company's assurances, investors responded negatively to the revelations of the *NBC Nightly News* segment, causing SDC's shares to sharply decline – down 16% in one trading day. The same day, the S&P 500 Index saw a slight increase.

146. On February 19, 2020, *Reuters* published an article titled: "Exclusive: SmileDirectClub's top dentist risks losing license in California crackdown," highlighting the Dental Board of California's two-year investigation and disciplinary process surrounding SDC's Chief Clinical Officer Sulitzer. According to the article: "A Reuters review found nearly 60 complaints about SmileDirectClub's aligners to the U.S. Food and Drug Administration from clinicians or customers, some alleging negative outcomes including loose or lost teeth, jaw pain, bite misalignments, and the need for costly follow-up treatment."

147. Also on February 19, 2020, the Company issued a statement, supporting its Chief Clinical Officer Sulitzer and claiming that the Dental Board of California's accusation was nothing more than "baseless claims . . . [that] were filed in direct retaliation to SmileDirectClub's efforts to address the Board's prior wrongful conduct in failing to stop its investigator from threatening and intimidating customers and employees at SmileShops in California."

148. Despite the Company's attempt at reassurance, SDC's stock fell following the revelation regarding the investigation of SDC's Chief Clinical Officer Sulitzer by the Dental Board of California, declining over 5% on February 19, 2020. The same day, the S&P 500 Index saw an increase of .05%. SDC's stock continued to fall an additional 2% the following day. ***All told, the***

- 53 -

*Company's stock dropped over 21% in the trading days from February 14, 2019 to February 20, 2019, as the market absorbed the negative press surrounding the NBC Nightly News segment and Dental Board of California's investigation and disciplinary proceedings against the Company and its Chief Dentist Sulitzer*.  During the same period, the S&P 500 Index remained level.

149.    After market hours on February 25, 2020, the Company announced a continued decline in Adjusted EBITDA.  During the Company's fourth quarter of 2019 ("4Q19") earnings conference call, David Katzman revealed that the Company experienced an Adjusted EBITDA shortfall of *negative $60 million*, caused by increased legal expenses, and "most notably [by] inefficiencies in [SDC's] manufacturing operations," and "continued elevated legal and lobbying expenses."  According to Wailes, SDC's inefficiencies drove "poor customer experience issues."  The Company was simply unable to deliver the "rapid growth" and "accelerated growth" it claimed and highlighted in the IPO just five months prior, resulting in increased costs and declining customer experiences.

150.    On February 26, 2020, the trading day following the Company's 4Q19 disclosures, SDC common stock plummeted over 29%.  The same day, the S&P 500 Index declined less than half of 1%.

151.    Just after the market opened on March 12, 2020, SDC announced it was unveiling "[n]ew efforts and protocol . . . to ensure company provides the best experience to every club member."  According to the Company, the announced updates to its customer experience "ensure greater transparency of its procedures for its club members and provide effective training for its team members."  Following a "thorough review of its customer experience," the Company implemented the following "improvements," to ensure "safe, affordable access to care":

>   **Pre-Screening Requirements**: SmileDirectClub is adjusting its customer
>   consent form to ensure customers understand the need to verify that they have visited

- 54 -

a dentist within six months of starting treatment with SmileDirectClub and have not reported any pain or other clinical concerns specific to their oral health. A prior visit to a dentist is an important part of any good oral health program, and has always been a requirement to begin treatment with SmileDirectClub.

**SmileShop Training**: SmileShop team members have received additional training to ensure consistent, clear and effective communication with customers regarding teledentistry and SmileDirectClub's consent form. Although many of SmileDirectClub's SmileGuides are dental assistants and hygienists, when they are in the Smile Shops they are not engaged in that capacity, do not practice dentistry and are not able to answer clinical questions about clear aligner therapy or treatment plans. SmileGuides provide general information about SmileDirectClub and its teledentistry platform and the SmilePay program, as well as gather patient information for subsequent review, assessment and diagnosis by one of the more than 250 dentists and orthodontists in the affiliated doctor network. Should customers wish to speak to a dentist or orthodontist in the network, SmileGuides may provide information on how to do so. This training is being rolled out across all shops, and is a mandatory part of the onboarding process for all new SmileShop team members.

**Communication with Treatment Team and Doctors**: Since its founding, every SmileDirectClub customer's treatment is prescribed and overseen by a dentist or orthodontist licensed to practice in the state of the customer. Each customer will receive the name and contact information of their treating dentist or orthodontist, upon the approval of the treatment plan, making staying connected throughout treatment simple. In addition, SmileDirectClub will provide a dedicated email and phone number for any customer who wishes to speak with an affiliated dentist or orthodontist prior to starting their smile journey.

152. The March 12, 2020 announcement made clear that customers would ***now*** be pre-screened to verify they had seen a dentist within six months; that the Company's employees would ***now*** receive training in SDC's teledentistry platform and be unable to provide clinical questions about clear aligner therapy; and that customer's would ***now*** "receive the name and contact information of their treating dentist or orthodontist, upon the approval of the treatment plan." As referenced above, these standard procedures were already required by state laws.

153. Following the Company's March 12, 2020 announcement overhauling the rules the market already believed to be applied to the Company's "customer experience," SDC common stock saw a decline of over 18%. The same day, the S&P 500 index saw half that decline.

- 55 -

154. The declines in the price of SDC common stock as pled herein were a direct result of the nature, extent and impact of the Exchange Act Defendants' prior false and misleading statements and omissions being revealed to investors and the market. As the following chart reveals, SDC's peer index and the S&P 500 Index both performed better than SDC following the Company's Class Period disclosures, demonstrating that the timing and magnitude of the price declines of SDC common stock negates any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific factors unrelated to defendants' wrongful conduct.

155. All told, the Company's stock price fell 77% during the Class Period, from an all-time high at the IPO of $23 per share, down to $5.30 per share following the Company's March 12, 2020 disclosure:



156. The economic loss suffered by Plaintiffs and other members of the Class was a direct result of the Exchange Act Defendants' wrongful conduct, which resulted in the subsequent decline

- 56 -

in the value of those securities when Exchange Act Defendants' prior false and misleading statements and omissions were revealed.

### E.    Application of Presumption of Reliance

157.    The IPO occurred on September 12, 2019.  Exchange Act Defendants failed to disclose the material information omitted from the Registration Statement until the truth was disclosed, in a series of partial disclosures, between September 24, 2019 and March 12, 2020.  These disclosures detailed above in ¶¶123-153 caused SDC's stock price to decline as the information was processed by the market and incorporated into SDC's stock price.  As detailed below, Plaintiffs and the Class are entitled to the fraud on the market presumption of reliance.  A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Plaintiffs' claims are based, in significant part, on defendants' material omissions.  Because this action involves defendants' failure to disclose material adverse information regarding SDC's business, operations and risks, affirmative proof of reliance is not a prerequisite to recovery, as the facts withheld are ones that a reasonable investor might have considered important in making investment decisions.

158.    At all relevant times, the market for SDC common stock was an efficient market for the following reasons, among others:

(a)    SDC common stock met the requirements for listing, and was listed, actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)    As a regulated issuer, SDC filed periodic public reports with the SEC and the NASDAQ;

(c)    SDC regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on the national

- 57 -

circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     SDC was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace; and

(e)     SDC's stock price reacted in response to new, material information about SDC's business.

159.    As a result of the foregoing, the market for SDC common stock promptly digested current information regarding SDC from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of SDC common stock during the Class Period suffered similar injury through their purchase of SDC common stock at artificially inflated prices and a presumption of reliance applies.

**F.     Causes of Action**

## COUNT IV

**Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
(Against SDC and the Individual Exchange Act Defendants)**

160.    This count is brought against SDC and the Individual Exchange Act Defendants.

161.    Plaintiffs incorporate the allegations above in ¶¶1-46, 49-159.

162.    During the Class Period, each of the defendants named in this count disseminated or approved the statements as specified above in ¶¶44-46, 49-56, 58, 60-61, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

- 58 -

163. The defendants named in this count violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of SDC common stock during the Class Period.

164. Exchange Act Defendants, individually and together, directly and indirectly, by the use, means of instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about SDC's business, operations and financial condition as specified herein.

165. Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

166. As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of SDC common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which the Company's common stock traded and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class

Period), Plaintiffs and the other Class members purchased or otherwise acquired SDC common stock during the Class Period at artificially high prices and were harmed thereby.

167.    Plaintiffs and the Class, in reliance on the integrity of the market, paid artificially inflated prices for SDC common stock, and suffered losses when the relevant truth was revealed. Plaintiffs and the Class would not have purchased SDC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

168.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their Class Period transactions in SDC common stock.

169.    By reason of the foregoing, the Exchange Act Defendants named in this count have violated §10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT V

### Violations of Section 20(a) of the Exchange Act
### (Against the Individual Exchange Act Defendants)

170.    Plaintiffs incorporate the allegations in ¶¶1-46, 49-159, above.

171.    This count is brought against the Individual Exchange Act Defendants.

172.    The Individual Exchange Act Defendants were each control persons of SDC during the Class Period by virtue of their positions as directors and/or senior officers of SDC.

173.    Each of the defendants named in this count acted as controlling persons of SDC within the meaning of §20(a) of the Exchange Act.  By virtue of their high-level positions as officers and/or directors of SDC, their ownership and contractual rights, participation in and awareness of the Company's operations and knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control, and

- 60 -

did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

174.     In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transaction and business practices giving rise to the securities violations as alleged in Count IV, and exercised that power.

175.     As a direct and proximate result of these defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases and acquisitions of the Company's common stock during the Class Period when the relevant truth was revealed.

176.     By reason of the foregoing, the defendants named in this count violated §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a class action properly maintained pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B.     Declaring that the Securities Act Defendants are liable pursuant to the Securities Act;

C.     Declaring that the Exchange Act Defendants are liable pursuant to the Exchange Act;

D.     Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants jointly and generally for all damages sustained as a result of defendants' wrongdoing in an amount to be proven at trial, together with interest thereon;

E.     Awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees, and other costs and disbursements;

4826-6892-0280.v2

F.      Awarding rescission or a rescissory measure of damages; and

G.      Awarding Plaintiffs and other members of the Class injunctive and other equitable relief, including rescission, as appropriate, in addition to any other relief that is just and proper under the circumstances.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury.

DATED: March 30, 2021                    ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         DARREN J. ROBBINS
                                         SCOTT H. SAHAM
                                         ASHLEY M. KELLY
                                         TING H. LIU


                                              s/ DARREN J. ROBBINS
                                              DARREN J. ROBBINS

                                         655 West Broadway, Suite 1900
                                         San Diego, CA  92101
                                         Telephone:  619/231-1058
                                         619/231-7423 (fax)
                                         darrenr@rgrdlaw.com
                                         scotts@rgrdlaw.com
                                         akelly@rgrdlaw.com
                                         tliu@rgrdlaw.com

                                         ROBBINS GELLER RUDMAN
                                          & DOWD LLP
                                         CHRISTOPHER M. WOOD, #032977
                                         414 Union Street, Suite 900
                                         Nashville, TN  37219
                                         Telephone:  615/244-2203
                                         615/252-3798 (fax)
                                         cwood@rgrdlaw.com

                                         Lead Counsel for Lead Plaintiff

- 62 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on March 30, 2021, I authorized the electronic

filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send

notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I

hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the

non-CM/ECF participants indicated on the attached Manual Notice List.

s/ DARREN J. ROBBINS
DARREN J. ROBBINS

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: DarrenR@rgrdlaw.com

4826-6892-0280.v2

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM ("Plaintiff") declares:

1. Plaintiff has reviewed a complaint and authorized the filing of a complaint on its behalf.

2. Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3. Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4. Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5. (a) Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:
None.

(b) Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:
*Pelletier v. Endo International plc, et al.*, No. 2:17-cv-05144 (E.D. Pa.)

(c) Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws within the three-year period prior to the date of this Certification:
*In re Newell Brands, Inc. Sec. Litig.*, No. 2:18-cv-10878 (D.N.J.)
*Melucci v. Corcept Therapeutics Incorporated, et al.*, No. 5:19-cv-01372 (N.D. Cal.)
*Nikolov v. Livent Corporation, et al.*, No. 2:19-cv-02218 (E.D. Pa.)
*In re Merit Medical Systems, Inc. Sec. Litig.*, No. 8:19-cv-02326 (C.D. Cal.)

SMILEDIRECTCLUB

6.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this  4th  day of February, 2021.

BUCKS COUNTY EMPLOYEES
RETIREMENT SYSTEM

By: _____
     Diane Marseglia,
     Retirement Board Chair

- 2 -

SMILEDIRECTCLUB

## SCHEDULE A

### SECURITIES TRANSACTIONS

Stock

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 10/24/2019 | 798 | $10.43 |
| 10/24/2019 | 5,508 | $10.34 |
| 10/28/2019 | 3,084 | $11.73 |
| 10/30/2019 | 2,780 | $11.70 |
| 01/16/2020 | 1,170 | $13.42 |
| 01/17/2020 | 1,630 | $12.90 |

| Date Sold | Amount of Shares Sold | Price |
|---|---|---|
| 12/12/2019 | 3,113 | $7.91 |
| 02/14/2020 | 5,642 | $14.17 |
| 02/26/2020 | 2,930 | $8.40 |
| 02/26/2020 | 3,285 | $8.15 |

Prices listed are rounded up to two decimal places.

# Mailing Information for a Case 3:19-cv-00962 Franch v. SmileDirectClub, Inc. et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Wade B. Cowan**
  wcowan@dhhrplc.com

- **James M. Ficaro**
  jmf@weiserlawfirm.com

- **Andrew J. Finn**
  finna@sullcrom.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **Michael C. Griffin**
  michael.griffin@skadden.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Lewis S. Kahn**
  Lewis.Kahn@ksfcounsel.com

- **Jay B. Kasner**
  jay.kasner@skadden.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Ting H. Liu**
  tliu@rgrdlaw.com

- **MICHAEL J MORSE**
  PKNASHLAW@AOL.COM

- **Richard A. Maniskas**
  rmaniskas@sbtklaw.com

- **E. Powell Miller**
  epm@millerlawpc.com

- **Scott D. Musoff**
  scott.musoff@skadden.com

- **Danielle S. Myers**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Sharon L. Nelles**
  nelless@sullcrom.com

- **Christopher Nelson**
  cln@weiserlawfirm.com

- **Melinda A. Nicholson**
  Melinda.Nicholson@ksfcounsel.com

- **Michael J. Palestina**
  Michael.Palestina@ksfcounsel.com

- **Ira M. Press**
  ipress@kmllp.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com

- **John Tate Spragens**
  john@spragenslaw.com,stacia@spragenslaw.com,spragenslaw@ecf.courtdrive.com

- **Tara L. Swafford**
  tara@swaffordlawfirm.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,creis@rgrdlaw.com,AKellyRGRD@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)