UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| ADAM FRANCHI, Individually and on Behalf of All Others Similarly Situated, | : |
| | : Consolidated Case No. 19-cv-962 |
| | : |
| Plaintiff, | : Judge Eli J. Richardson |
| vs. | : |
| | : Magistrate Judge Jeffery S. Frensley |
| SMILEDIRECTCLUB, INC., et al., | : |
| | : |
| Defendants. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
JOINT MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ i

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS ......................................................................................................... 4

    A.    SDC Pioneers Teledentistry and Disrupts the Traditional Orthodontic Industry .... 4

    B.    The Offering Documents Disclose the Risks Posed by Ongoing
           Legal and Regulatory Challenges to SDC's Business Model .................................. 5

    C.    SmileDirectClub's Stock Drops Significantly on the Day of the IPO .................... 6

    D.    After the IPO, SDC Continues to Face Legal and Regulatory
           Challenges, as the Offering Documents Warned Might Happen ........................... 7

    E.    SDC Announces Its Third Quarter 2019 Results ...................................................... 9

    F.    The Company's Stock Price Drops Amid Negative
           News Unrelated to the IPO or the Offering Documents ....................................... 10

    G.    The Related Tennessee State Court Action .............................................................. 11

ARGUMENT .............................................................................................................................. 12

I.     ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT
      ALLEGE ANY MISREPRESENTATION OR ACTIONABLE OMISSION ................. 13

    A.    The Offering Documents Did Not Fail To Disclose Known Trends
           About SDC's Revenue, Gross Profits or Adjusted EBITDA ................................ 13

    B.    The Offering Documents Did Not Misrepresent SDC's Member Satisfaction ..... 16

    C.    The Offering Documents Did Not Misrepresent Any Standard of Care ............... 18

    D.    The Offering Documents Disclosed SDC's Legal and Regulatory Risks ............. 19

II.    ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEIR ALLEGED
      LOSSES WERE NOT CAUSED BY THE OFFERING DOCUMENTS ........................ 21

III.   THE EXCHANGE ACT CLAIMS ALSO FAIL
      BECAUSE PLAINTIFFS DO NOT ALLEGE SCIENTER ........................................... 23

CONCLUSION........................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abuhamdan v. Blyth, Inc.*,
  9 F. Supp. 3d 175 (D. Conn. 2014) ...................................................................................16

*In re Allscripts, Inc. Securities Litigation*,
  No. 00 C 6796, 2001 WL 743411 (N.D. Ill. June 29, 2001) ...........................................17

*Arfa v. Mecox Lane Ltd.*,
  No. 10-CV-9053, 2012 WL 697155 (S.D.N.Y. Mar. 5, 2012), *aff'd*, 504 F. App'x
  14 (2d Cir. 2012) ...............................................................................................................14

*Azzolini v. Corts Trust II for Provident Financial Trust I*,
  No. 103-CV-1003, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) ..................................22

*Bailey v. Esperion Therapeutics, Inc.*,
  No. 18-11438, 2019 WL 3296235 (E.D. Mich. Feb. 19, 2019) ........................................25

*Bondali v. Yum! Brands, Inc.*,
  620 F. App'x 483 (6th Cir. 2015) ..........................................................................12, 19, 21

*In re Burlington Coat Factory Securities Litigation*,
  114 F.3d 1410 (3d Cir. 1997) ............................................................................................13

*In re Centerline Holding Co. Securities Litigation*,
  380 F. App'x 91 (2d Cir. 2010) .........................................................................................24

*Chan v. New Oriental Education & Technology Group Inc.*,
  Civ. No. 16-9279, 2019 WL 2865452 (D.N.J. July 3, 2019) ............................................15

*City of Bristol Pension Fund v. Vertex Pharmaceuticals Inc.*,
  12 F. Supp. 3d 225 (D. Mass. 2014) .................................................................................23

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*,
  752 F.3d 173 (2d Cir. 2014) ..............................................................................................20

*City of St. Clair Shores Police & Fire Retirement System v. Nationstar Mortgage
  Holdings Inc.*,
  No. 15-61170-Civ, 2016 WL 4705718 (S.D. Fla. June 21, 2016) ....................................14

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003) ..............................................................................................14

ii

*Doshi v. General Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ................................................................................23

*In re Dr. Reddy's Laboratory Ltd. Securities Litigation*,
No. 3:17-CV-6436, 2019 WL 1299673 (D.N.J. Mar. 21, 2019) .......................................24

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)..........................................................................................1, 22, 23

*In re Envision Healthcare Corp. Securities Litigation*,
No. 3:17-cv-01112, 2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019)...............................13

*In re EveryWare Global, Inc. Securities Litigation*,
175 F. Supp. 3d 837 (S.D. Ohio 2016), *aff'd sub nom. IBEW Local No. 58 Annuity Fund v. EveryWare Global., Inc.,* 849 F.3d 325 (6th Cir. 2017) .......................................12

*In re Ford Motor Co. Securities Litigation*,
381 F.3d 563 (6th Cir. 2004) ................................................................................17

*Galkin v. SmileDirectClub, LLC*,
No. Mid-C-19-19 (Sup. Ct. N.J. Chancery Div. Middlesex Cnty. Mar. 6, 2020)..............18

*In re Greenlane Holdings, Inc. Securities Litigation*,
No. 19-81259-CIV, 2021 WL 53188 (S.D. Fla. Jan. 6, 2021)...........................................21

*IBEW Local No. 58 Annuity Fund v. EveryWare Global, Inc.*,
849 F.3d 325 (6th Cir. 2017) ................................................................................25

*Indiana Public Retirement System v. AAC Holdings, Inc.*,
No. 3:19-cv-00407, 2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021) ................................12

*Indiana State District Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ................................................................................23

*Indiana State District Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*,
719 F.3d 498 (6th Cir. 2013), *vacated sub nom. Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund,* 575 U.S. 175 (2015) ...................12

*Iron Worker Local Union No. 405 Annuity Fund v. Dollar General Corp.*,
No. 3:17-CV-63, 2018 WL 10152459 (M.D. Tenn. Mar. 8, 2018) ..................................20

*J & R Marketing, SEP v. General Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) ................................................................................14

*In re KBC Asset Management N.V.*,
572 F. App'x 356 (6th Cir. 2014) ...........................................................................22

*In re Lions Gate Entertainment Corp. Securities Litigation*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016)..................................................................................20

*Lubbers v. Flagstar Bancorp, Inc.*,
162 F. Supp. 3d 571 (E.D. Mich. 2016)...........................................................................21

*Martin v. GNC Holdings, Inc.*,
No. 15-CV-01522, 2017 WL 3974002 (W.D. Pa. Sept. 8, 2017), *aff'd,* 757 F.
App'x 151 (3d Cir. 2018) ................................................................................................22

*Miller v. Champion Enterprises Inc.*,
346 F.3d 660 (6th Cir. 2003) ..........................................................................................20

*In re Netflix, Inc. Securities Litigation*,
No. C04-2978 FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ................................17

*In re Omnicom Group, Inc. Securities Litigation*,
597 F.3d 501 (2d Cir. 2010)............................................................................................22

*Pittman v. Unum Group*,
No. 18-CV-128-DCLC, 2020 WL 2846929 (E.D. Tenn. June 1, 2020)............................17

*Richman v. Goldman Sachs Group, Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)..............................................................................20

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ..........................................................................................17

*Santa Fe Industries, Inc. v. Green*,
430 U.S. 462 (1977)........................................................................................................18

*Sapssov v. Health Management Associates, Inc.*,
22 F. Supp. 3d 1210 (M.D. Fla. 2014), *aff'd*, 608 F. App'x 855 (11th Cir. 2015)............22

*Schuh v. HCA Holdings, Inc.*,
947 F. Supp. 2d 882 (M.D. Tenn. 2013)...........................................................................15

Order, *In re SmileDirectClub, Inc. Securities Litigation*,
No. 19-1169-IV (Ch. Ct. Davidson Cnty. June 4, 2020) ..................................................11

Order on Class Certification, *In re SmileDirectClub, Inc. Securities Litigation*,
No. 19-1169-IV (Ch. Ct. Davidson Cnty. Apr. 28, 2021) .................................................11

*In re Sofamor Danek Group, Inc.*,
123 F.3d 394 (6th Cir. 1997) ..........................................................................................20

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017)..............................................................................................14

iv

*Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*,
    412 F. Supp. 3d 353 (S.D.N.Y. 2019), *aff'd sub nom. Cavalier Fundamental
    Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020) ...................15, 16

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007).................................................................................................23, 24

*Tuchman v. DSC Communications Corp.*,
    14 F.3d 1061 (5th Cir. 1994) ...........................................................................................19

*In re Velti PLC Securities Litigation*,
    No. 13-CV-03889, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015) ......................................23

*Webb v. Nashville Area Habitat for Humanity, Inc.*,
    346 S.W.3d 422 (Tenn. 2011)...........................................................................................11

*Willard v. UP Fintech Holding Ltd.*,
    No. 19-CV-10326, 2021 WL 1026571 (S.D.N.Y. Mar. 17, 2021) .....................................16

*Wozniak v. Align Technology, Inc.*,
    850 F. Supp. 2d 1029 (N.D. Cal. 2012) ............................................................................24

## STATUTES

15 U.S.C. § 77k(a) ...............................................................................................................12

15 U.S.C. § 77k(e) ...............................................................................................................22

15 U.S.C. § 77l(a)(2)............................................................................................................12

15 U.S.C. § 78u-4(b)(1) .......................................................................................................12

15 U.S.C. § 78u-4(b)(2) .........................................................................................................1

Defendants respectfully submit this memorandum of law in support of their joint motion to dismiss the Amended Consolidated Complaint (ECF No. 85) ("AC") with prejudice under Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and 15 U.S.C. § 78u-4(b)(2).

## PRELIMINARY STATEMENT

Plaintiffs' Amended Consolidated Complaint adds a claim for intentional securities fraud that is based on the same conclusory allegations as their prior claims and fails as a matter of law for the same reasons (and more). Seizing on nothing more than a decline in the stock price of Defendant SmileDirectClub, Inc. ("SDC" or the "Company"), negative news stories and purportedly disappointing earnings in the months following its initial public offering ("IPO"), Plaintiffs improperly try to use the federal securities laws to recover their ordinary market losses. But the securities laws do not "provide investors with broad insurance against market losses"; they protect only "against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Plaintiffs fail to sufficiently allege any actionable misstatement or omission, any causal connection between their purported losses and SDC's disclosures, and any particularized facts supporting the requisite strong inference of scienter for their new fraud-based claims.

Like Plaintiffs' last complaint, the Amended Consolidated Complaint contends that SDC's registration statement and prospectus for its IPO (together, the "Offering Documents") were misleading because they allegedly: (i) did not predict a supposed declining trend in the Company's revenue, gross profit and Adjusted EBITDA for the yet-to-be-completed third quarter of 2019; (ii) referenced "positive member experience[s]" and customer satisfaction as strengths of the Company despite complaints from a miniscule fraction of customers; (iii) misrepresented what Plaintiffs call the "standard of care" SDC allegedly provides to its members; and (iv) should have highlighted a particular dental board investigation and proposed

legislation in California in the extensive legal and regulatory risk disclosures.  As demonstrated herein, Plaintiffs' allegations fail to state a claim under the Securities Act of 1933 ("Securities Act") or Securities Exchange Act of 1934 ("Exchange Act") for multiple independent reasons and the Amended Consolidated Complaint should be dismissed with prejudice in its entirety.

*First*, all of Plaintiffs' claims fail because they do not allege any misstatement or actionable omission.  The Offering Documents accurately disclosed the Company's historical financial results and expressly warned that future results may vary, including specifically that third quarter growth tended to be lower than in other quarters.  SDC had no duty to predict its financial results for the third quarter of 2019 that was *still in progress* when the IPO occurred. (*See infra* § I.A.)  Moreover, the Offering Documents' positive statements about customer satisfaction are quintessential puffery that cannot form the basis of a federal securities law claim, and Plaintiffs fail to identify any contemporaneous information that could render those statements materially misleading.  (*See infra* § I.B.)  Plaintiffs' claim that the Company misrepresented some unspecified "standard of care" misconstrues the Offering Documents and SDC's business.  As the Offering Documents explained, the Company does not provide any clinical care; rather, it provides a suite of non-clinical administrative support services, including a telehealth platform, to state-licensed dentists and orthodontists to enable *them* to provide remote orthodontic care to patients.  (*See infra* § I.C.)  Finally, the Offering Documents extensively disclosed, with specific examples, the Company's ongoing legal and regulatory challenges and the risks they posed.  SDC had no duty to disclose every legal and regulatory action, nor did the absence of such an itemization render anything in the Offering Documents materially misleading.  (*See infra* § I.D.)

*Second*, all of Plaintiffs' claims also fail because their alleged losses were not caused by any purported misrepresentation in the Offering Documents. SDC's stock price fell immediately upon going public and Plaintiffs do not identify *any* revelation about the Company—much less any revelation that the Offering Documents were materially false or misleading—that supposedly caused that decline. And while the price fell further after various post-IPO events, those events too did not reveal any misrepresentation in the Offering Documents. Moreover, the timing of Plaintiffs' trades alone precludes their claims. Lead Plaintiff 1199 SEIU Health Care Employees Pension Fund ("SEIU") sold all of its SDC shares before any purported corrective disclosure and new named plaintiff Bucks County Employees Retirement System ("Bucks County") did not buy any SDC shares until *after* most of the post-IPO events that Plaintiffs claim were purported corrective disclosures. For example, when new teledentistry regulations were enacted in California and the California dental board's investigation of SDC became public, neither SEIU nor Bucks County held *any* SDC shares. Thus, neither could have suffered any conceivable loss in connection with those events. (*See infra* § II.)

*Third*, Plaintiffs' fraud-based claims under the Exchange Act separately fail because Plaintiffs do not allege particularized facts supporting the requisite cogent and compelling inference of scienter. Plaintiffs allege no direct evidence that the two individual Exchange Act Defendants—SDC's CEO David Katzman and CFO Kyle Wailes—intended to defraud investors. Instead, Plaintiffs simply allege that Mr. Katzman and Mr. Wailes must have known certain information that was not specifically disclosed in the Offering Documents, such as the years-old California dental board investigation (that had not resulted in any enforcement action) and negative reviews on the Better Business Bureau website. But without more—including a duty to disclose such information—these allegations provide no support for an inference of

3

scienter.  Plaintiffs also point to SDC's buyback of certain pre-IPO interests held by Mr. Katzman and others and to the bonus Mr. Wailes received upon completion of the IPO (both of which were disclosed in the Offering Documents).  But Plaintiffs do not allege that the terms of the buyback or Mr. Wailes' bonus were at all affected by what was or was not disclosed in the Offering Documents.  Thus, these too provide no support for inferring scienter.  (*See infra* § III.)

## STATEMENT OF FACTS

**A.     SDC Pioneers Teledentistry and Disrupts the Traditional Orthodontic Industry**

Traditional orthodontic treatment typically costs $5,000–$8,000 or more, requires a series of time-consuming doctor office visits during limited hours and is available in less than 40% of the counties in the U.S.  (Ex. B, Prospectus, at 1.[1])  SDC uses innovative teledentistry technology and a vertically integrated model to connect patients to licensed dentists and orthodontists, democratizing access through a more affordable, convenient and accessible solution for a straighter smile.  (*Id.*)  SDC does not provide medical care to patients.  The Offering Documents made this clear, stating that SDC is "engaged by [its] network of doctors to provide a suite of *non-clinical administrative support services*, including access to and use of SmileCheck."  (*Id.* at ii (emphasis added).)  The Offering Documents make clear that the providers, not SDC, are the ones who provide clinical care to patients:

> Our network of doctors are licensed to practice dentistry in their respective state and are engaged as employees or independent contractors of various professional corporations. These PCs are owned by independent doctors and are registered to engage in business in their respective states. It is through these PCs that the clinical services for clear aligner therapy are rendered to our members.

(*Id.* at 124 (emphasis added).)

---

[1]     As relevant here, disclosures in the registration statement (Ex. A) and prospectus are materially identical.

Nothing in the Offering Documents purported to describe or promise some "standard of care" as Plaintiffs incorrectly claim. Instead the Offering Documents describe a typical "member journey," again expressly explaining that the treating doctor, not SDC, approves the member's treatment plan, prescribes their custom aligners and monitors their progress:

> Our member journey starts with two convenient options: a member books an appointment to take a free, in-person 3D oral image at any of our over 300 retail stores ("SmileShops") . . . or orders an easy-to-use doctor prescribed impression kit online, which we mail directly to their door. Using the image or impression, we create a draft custom treatment plan that demonstrates how the member's teeth will move during treatment. Next, via SmileCheck, a state licensed doctor within our network reviews and approves the member's clinical information and treatment plan. If the member is a good candidate for clear aligners and decides to purchase, the treating doctor prescribes custom-made clear aligners, which we then manufacture and ship directly to the member. . . . SmileCheck is also used by the treating doctor to monitor the member's progress and enables seamless communication with the member over the course of treatment.

(*Id.* at 4 (emphases added); *see also id*. at 103-05; AC ¶ 58.)

**B.      The Offering Documents Disclose the Risks Posed by Ongoing Legal and Regulatory Challenges to SDC's Business Model**

Unsurprisingly, SDC's disruptive model has sparked opposition from the traditional dental industry. The American Dental Association ("ADA"), the American Association of Orthodontics ("AAO") and other similar trade organizations have lobbied state and federal regulators against SDC's business model and discouraged use of SDC's platform. (*See* AC ¶ 62(a).) The Offering Documents expressly warn investors about this risk:

> ***Our business could be adversely affected by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states.***
>
> A number of dental and orthodontic professionals believe that clear aligners are appropriate for only a limited percentage of their patients. National and state dental associations have issued statements discouraging use of orthodontics using a teledentistry platform. Increased market acceptance of our remote clear aligner treatment may depend, in part, upon the recommendations of dental and orthodontic professionals and associations, as well as other factors including effectiveness,

5

> safety, ease of use, reliability, aesthetics, and price compared to competing products.
>
> Furthermore, <u>our ability to conduct business in each state is dependent, in part, upon that particular state's treatment of remote healthcare and that state dental board's regulation of the practice of dentistry, each of which is subject to changing political, regulatory, and other influences. There is a risk that state authorities may find that our contractual relationships with our doctors violate laws and regulations prohibiting the corporate practice of dentistry,</u> which generally bar the practice of dentistry by entities. . . .

(Ex. B, Prospectus, at 37-38 (underlined emphases added).)

The Offering Documents also disclose specific then-existing legal and regulatory challenges, including ongoing lawsuits SDC brought against the state dental boards of Georgia and Alabama for enacting anticompetitive regulations (*id.* at 38, 123-24, 128); a lawsuit filed against SDC by the New Jersey Dental Association claiming SDC engaged in the unauthorized practice of dentistry (*id.* at 124); and a petition filed with the FDA by a national dental association (*id.* at 38). The Offering Documents further warn that SDC "periodically receive[s] communications from state and federal regulatory and similar agencies inquiring about the nature of [its] business activities, licensing of professionals providing services, and similar matters" which are "routinely concluded with no financial or operational impact." (*Id.* at 128.) Importantly, the Offering Documents make clear that these legal challenges are likely to continue and "it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business." (*Id.* at 38.)

## C. SmileDirectClub's Stock Drops Significantly on the Day of the IPO

SDC completed its IPO on September 12, 2019, issuing shares at $23.00 each. (AC ¶ 4.) By the end of the first trading day, however, the share price closed down 27.5% at $16.67 per share. (Ex. C, Stock Prices, at 1.) Plaintiffs do not contend any alleged misrepresentation or

6

omission in the Offering Documents was revealed that day.  Pricing an IPO is not a science and some stocks decrease in price following their IPO while others increase.

**D.      After the IPO, SDC Continues to Face Legal and Regulatory Challenges, as the Offering Documents Warned Might Happen**

On September 24, 2019, a putative class action asserting claims for false advertising and other deceptive practices was filed against SDC.  (AC ¶ 124; Ex. D, Complaint, *Ciccio v. SmileDirectClub, LLC*, No. 19-cv-845 (M.D. Tenn.) (Trauger, J.).)  The Offering Documents had warned of this exact risk: "we could be the target of claims relating to false, misleading, deceptive, or otherwise noncompliant advertising or marketing practices," which "could also result in litigation . . . and adverse publicity that could cause reputational harm and loss of member trust, which could have an adverse effect on our business."  (Ex. B, Prospectus, at 46.)

Over the next three days, SEIU, which would later be appointed Lead Plaintiff here, sold all of its SDC shares.  (ECF No. 33-3 at 2.)  At the same time, other shareholders seized on the allegations in the *Ciccio* complaint and began filing securities class actions against SDC, its officers and directors, and the banks that served as underwriters for its IPO.  The first federal action, which was transferred and later consolidated here, was filed on October 2, 2019.

On October 4, 2019, a short seller called Hindenburg Research published a report based entirely on publicly available information and largely parroting the allegations in the *Ciccio* action, which was intended to further drive down the price of SDC's stock.  (AC ¶ 127.)  Among other things, Hindenburg pointed to publicly available information on the Better Business Bureau's website indicating that SDC had received approximately 1,200 negative reviews over a five-year period.  (*Id.* ¶ 128.)  Hindenburg did not mention that this represents less than one fifth of one percent of SDC's more than 700,000 members over the same time period.  (*See* Ex. B,

7

Prospectus, at 2.)  Neither SEIU nor Bucks County claims to have held any SDC stock at the time of the Hindenburg report.

On October 13, 2019, California enacted Assembly Bill 1519, a sunset bill for the state dental board, which also included new teledentistry regulations.  (AC ¶131.)  Among other things, these rules require a licensed dentist to review the patient's most recent x-rays or other equivalent bone imaging before prescribing aligners and prohibit non-disclosure agreements that would prevent consumers from submitting complaints to the dental board.  (*Id.*)  Governor Gavin Newsom criticized the new regulations, stating that "sunset bills are not the appropriate vehicle for policy changes that lack broad stakeholder input."  (Ex. F, Signing Statement for AB 1519, at 1.)  SDC issued a press release the next day stating that "[n]othing in AB1519 requires SmileDirectClub to cease or modify its operations."  (Ex. G, SDC Press Release, Statement on California Assembly Bill 1519, at 1; AC ¶ 132.)  SDC's CEO confirmed that the new regulations have "no impact on the business, as we stated[,] presently or anticipated" and that the Company is "in compliance with all regulatory laws across California, as well as the United States."  (Ex. H, Q3 2019 Transcript, at 11.)  Plaintiffs allege no particularized facts to the contrary. Additionally, neither SEIU nor Bucks County claims to have held any SDC stock when AB 1519 was enacted.

Unrelated to AB 1519, on October 16, 2019, SDC and its Chief Clinical Officer, Dr. Jeffrey Sulitzer, D.M.D., sued the Dental Board of California for antitrust and due process violations.  (AC ¶¶ 100-102; Ex. I, Complaint, *Sulitzer v. Tippins*, No. 2:19-cv-8902 (C.D. Cal.).[2])  This action was consistent with the Offering Documents' disclosure that the Company

---

[2]  There, Dr. Sulitzer asserts claims in his capacity as an individual and as owner of a California professional corporation that contracts with SmileDirectClub LLC for dental support organization services.

8

"will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model." (Ex. B, Prospectus, at 38.) Among other things, the *Sulitzer* complaint details dental board investigators intimidating employees at SDC stores (SmileShops) in Oakland and Hollywood on May 31, 2018 and at a mobile SmileBus on July 1, 2019. (*See* Ex. I, *Sulitzer* Complaint, ¶¶ 72-78, 82-87; *see also* AC ¶ 136.) Again, notwithstanding SDC's allegations in the *Sulitzer* complaint, Plaintiffs allege no facts showing that the Dental Board's actions at the time of the IPO had, or were expected to have, any material impact on the Company. Neither SEIU nor Bucks County claims to have held any SDC stock when the *Sulitzer* action was filed.

After all of this, Bucks County decided to invest in SDC for the first time. Specifically, between October 24, 2019 and October 30, 2019, Bucks County purchased 12,150 SDC shares at an average price of $11.05 per share—less than 50% of the IPO price. (*See* AC at Schedule A.)[3]

**E.     SDC Announces Its Third Quarter 2019 Results**

On November 12, 2019—eight weeks after the IPO—SDC announced its results for the third quarter ended September 30, 2019, during which the IPO occurred. (Ex. J, Q3 2019 Press Release, at 1; *see also* AC ¶¶ 53-54 (relying on Q3 2019 results).) The Offering Documents had warned that SDC "expect[s] [its] future quarterly . . . operating results to fluctuate," "ha[s] a history of net losses," and "may not achieve or maintain profitability in the future." (Ex. B, Prospectus, at 25.) SDC also specifically warned that "the third quarter has historically tended to have less growth relative to other quarters." (*Id.* at 118.) While Q3 2019 revenue and gross profit were down slightly compared to the prior quarter, both had increased more than 50% year-over-year. (Ex. J, Q3 2019 Press Release, at 4.) Indeed, revenue beat market expectations by

---

[3]     Bucks County did not seek to be, and has not been, appointed a lead plaintiff by this Court to pursue any claims on behalf of a putative class under the Exchange Act.

approximately $15 million, or almost 10%. (Ex. H, Q3 2019 Transcript, at 1.) On the accompanying earnings call, SDC's CEO stated that the Company's "core business metrics are trending positively" and highlighted that "adjusted EBITDA came in ahead of management's expectations at negative $45 million, reflecting continued investments that we believe will position us favorably to capture the long-term market opportunity." (*Id*. at 5.)

Notwithstanding this positive performance, the Company also reported a net loss of $387.6 million. (Ex. J, Q3 2019 Press Release, at 1.) This was largely due to one-time IPO-related expenses of approximately $330 million, as SDC's CFO reiterated on the earnings call. (Ex. H, Q3 2019 Transcript, at 8.) The Offering Documents disclosed that the Company "expects to incur a material one-time compensation expense, in the quarter of this offering in connection with the payment of cash bonus amounts and issuance of shares of Class A common stock[.]" (Ex. B, Prospectus, at 88.) Despite the revenue beat and other positive indicators, the market reacted negatively overall, sending SDC's stock price down 20% on the day after the earnings release, closing at $8.83 per share. (Ex. C, Stock Prices, at 2.)

**F.      The Company's Stock Price Drops Amid Negative
          News Unrelated to the IPO or the Offering Documents**

SDC's stock price fell another 21% between February 14, 2020 and February 20, 2020, following a critical segment on NBC Nightly News and another article about SDC's dispute with the Dental Board of California. (AC ¶ 148.) Bucks County sold approximately half of its SDC shares on February 14, 2020. (*See* AC at Schedule A.) On February 21, 2020, SEIU (but not Bucks County) filed the Consolidated Complaint. (ECF No. 71.)

On February 25, 2020, SDC announced disappointing fourth quarter results. (AC ¶ 149.) The next day, SDC's stock dropped another 29%. (*Id.* ¶ 150.) Bucks County sold all of its remaining SDC shares that day. (*See* AC at Schedule A.)

10

On March 12, 2020, SDC announced certain "updates to its customer experience to ensure greater transparency of its procedures for its club members and provide effective training for its team members." (Ex. K, SDC Press Release, at 1; AC ¶ 151.) Among other things, these updates improved clarity regarding pre-screening requirements, increased training for SmileShop employees and further facilitated communication with treating doctors. (*Id.*) Neither SEIU nor Bucks County claims to have held any SDC stock at the time of this announcement.

## G. The Related Tennessee State Court Action

On June 4, 2020, Chancellor Russell T. Perkins denied Defendants' motion to stay or dismiss the related state court action, which asserts substantially the same Securities Act claims asserted here. Order, *In re SmileDirectClub, Inc. Sec. Litig.*, No. 19-1169-IV (Ch. Ct. Davidson Cnty. June 4, 2020) ("State Ct. Order"). In just two paragraphs and "in deference" to Tennessee's liberal notice pleading standard—which does not require even plausible factual allegations, *Webb v. Nashville Area Habitat for Humanity, Inc.*, 346 S.W.3d 422, 428-36 (Tenn. 2011), much less compliance with the rigorous pleading standards of the PSLRA—the court concluded that "[m]any of the parties' arguments turn[] on characterizations along a 'how much is enough' continuum of what was disclosed" and the court "was not convinced that Plaintiff's Consolidated Complaint is legally insufficient." State Ct. Order at 8. Defendants were denied leave to take an interlocutory appeal. On April 28, 2021, Chancellor Perkins granted the state court plaintiffs' motion for class certification and certified a class of all purchasers of SDC stock issued pursuant and/or traceable to the Offering Documents—the same class Plaintiffs here seek to represent. Order on Class Certification, *In re SmileDirectClub, Inc. Sec. Litig.*, No. 19-1169-IV (Ch. Ct. Davidson Cnty. Apr. 28, 2021). Defendants are appealing that ruling.

11

## ARGUMENT

Because Plaintiffs' Securities Act and Exchange Act claims are based on the same allegations (*see* AC ¶ 92), both sound in fraud and must be pled with particularity under Rule 9(b) and the Private Securities Litigation Reform Act. *See Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare Inc.*, 719 F.3d 498, 502 (6th Cir. 2013) ("[A]lthough § 11 claims do not require pleading of scienter, Rule 9(b) pleading standards still apply to § 11 claims that sound in fraud."), *vacated on other grounds*, 575 U.S. 175 (2015); *see also Bondali v. Yum! Brands, Inc.,* 620 F. App'x 483, 488–89 (6th Cir. 2015). Thus, Plaintiffs must "specify each statement alleged to have been misleading" and plead facts demonstrating "the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).[4]

To state a claim under Section 11 of the Securities Act, Plaintiffs must allege facts demonstrating that "the registration statement, when [it] became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Stating a claim under Section 12(a)(2) requires the same showing, among other elements, for a prospectus. *Id.* § 77l(a)(2). To state a claim under Section 10(b) of the Exchange Act, Plaintiffs must allege: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, No. 3:19-cv-407, 2021 WL 1316705, at *3 (M.D. Tenn. Apr. 8, 2021).

---

[4] In any event, Plaintiffs' Securities Act claims fail even under Rule 8, which would require at a minimum "the plaintiff provide 'enough facts to state a claim to relief that is plausible on its face.'" *Omnicare*, 719 F.3d at 502 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also In re EveryWare Glob., Inc. Sec. Litig.,* 175 F. Supp. 3d 837, 870 (S.D. Ohio 2016) (dismissing Section 11 and Section 12(a)(2) claims under Rule 8), *aff'd sub nom. IBEW Loc. No. 58 Annuity Fund v. EveryWare Glob., Inc.,* 849 F.3d 325 (6th Cir. 2017).

**I.  ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEY DO NOT ALLEGE ANY MISREPRESENTATION OR ACTIONABLE OMISSION**

**A.  The Offering Documents Did Not Fail To Disclose Known Trends About SDC's Revenue, Gross Profits or Adjusted EBITDA**

Plaintiffs contend the Offering Documents misrepresented "that 'Accelerating Growth' was one of SDC's 'Strengths' and that the Company's revenue, gross profit and Adjusted EBITDA were growing" because revenue, gross profit and Adjusted EBITDA for Q3 2019, which was still in progress at the time of the IPO, ended up being lower than in Q2 2019.  (AC ¶¶ 44-45.)  As a threshold matter, Plaintiffs fail to allege any statement actually made in the Offering Documents was false or misleading when made.  Plaintiffs refer exclusively to a single graphic that simply lists "accelerating growth" among SDC's "key strengths."  (Ex. B, Prospectus, at 8.)  Plaintiffs do not dispute that SDC's business had, in fact, grown rapidly in the five years since its founding.  No reasonable investor could interpret this graphic—which does not reference any particular metric or time period—as a guarantee that revenue, gross profit and Adjusted EBITDA would increase in the ongoing third quarter.  Nor do the Offering Documents state anywhere else that those three metrics would continue to increase.  It is "well settled . . . that an accurate report of past successes does not contain an implicit representation that the trend is going to continue, and hence does not, in and of itself, obligate the company to update the public as to the state of the quarter in progress."  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997); *accord In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-1112, 2019 WL 6168254, at *9 (M.D. Tenn. Nov. 19, 2019) ("[Accurate] reports of historical income and EBITDA growth are not themselves actionable statements.").

In addition, far from presenting an overly optimistic picture of Q3 2019 prospects, the Offering Documents bespeak caution.  They specifically warn that "the third quarter has historically tended to have *less growth relative to other quarters*."  (Ex. B, Prospectus, at 118

(emphasis added).)  They also caution that SDC's "operating results have fluctuated in the past" and the Company expects "future quarterly and annual operating results to fluctuate as [it] focus[es] on increasing demand for [its] products."  (*Id.* at 25.)  Consistent with that focus, the Company cautioned that it "expect[s] to continue to invest heavily in sales and marketing."  (*Id.* at 84, 88-89.)  In light of these "ample warnings and disclosures that explained shareholder revenue and earning fluctuations," SDC had no duty to disclose any additional information, including necessarily incomplete financial data for the quarter in progress.  *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017); *see also DeMaria v. Andersen*, 318 F.3d 170, 181 (2d Cir. 2003) (no duty to include interim financials where offering materials disclosed history of losses and warned such losses were expected to continue).[5]

Contrary to Plaintiffs suggestion, Item 303 of Regulation S-K did not require any additional disclosure.  (*See* AC ¶¶ 47-49.)  Item 303 requires disclosure of "trends" that are "both (1) known to management and (2) 'reasonably likely to have material effects on the registrant's financial condition or results of operations.'"  *Stadnick*, 861 F.3d at 39 (citation omitted).  The Sixth Circuit has made clear that Item 303 applies only to a trend that is actually known to relevant management.  *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 392 (6th Cir. 2008).  Plaintiffs do not allege any facts showing any Defendant actually knew, at the time of the IPO, of any declining trend in SDC's revenue, gross profit and Adjusted EBITDA.  Instead, they offer a single conclusory assertion that Defendants must have known that these metrics would decline because "SDC closely tracked its revenue, gross profit and Adjusted EBITDA in

---

[5]  *See also City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mortg. Holdings Inc.*, No. 15-61170-CIV, 2016 WL 4705718, at *8 (S.D. Fla. June 21, 2016) ("no duty to disclose . . . financial results ahead of time"); *Arfa v. Mecox Lane Ltd.,* No. 10-CV-9053, 2012 WL 697155, at *9 n.1 (S.D.N.Y. Mar. 5, 2012) ("Defendants were [not] obligated to disclose the results of a quarter in progress."), *aff'd*, 504 F. App'x 14 (2d Cir. 2012).

14

connection with its ongoing operations and in connection with the IPO." (AC ¶ 54.) But allegations "that management 'must have known' amount to a 'concession' that '[plaintiffs] have no facts to say that management did know.'" *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, Civ. No. 16-9279, 2019 WL 2865452, at \*12 (D.N.J. July 3, 2019). Even taken at face value, Plaintiffs' assertion fails to address when in the ongoing third quarter the supposed "trend" turned negative, when the Company compiled and calculated that information, and who specifically knew that.[6]

Even with the benefit of hindsight, there was no declining "trend" to disclose. Revenue and gross profit *increased* by 50.54% and 65.83%, respectively, in Q3 2019 compared to Q3 2018. (*See* Ex. J, Q3 2019 Press Release, at 4.) In fact, as highlighted on the third quarter earnings call, SDC hit an all-time high for monthly revenue in September 2019 (the month of the IPO and the last month of the quarter). (Ex. H, Q3 2019 Transcript, at 7.) Plaintiffs ignore these increases and cite only the sequential decrease from the prior quarter, but the relevant comparison is year-over-year, not quarter-to-quarter. *See Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 888 (M.D. Tenn. 2013) (dismissing claim that positive revenue trend disclosed in registration statement "had abruptly halted" and turned downward because "there was no downward trend . . . compared to the same quarter in 2010"). Companies have no duty to try to predict earnings fluctuations from one quarter to the next. *See Steamfitters Local 449 Pension Plan v. Skechers U.S.A., Inc.*, 412 F. Supp. 3d 353, 368 (S.D.N.Y. 2019) ("[The] alleged effects

---

[6] Moreover, these complex metrics depend on a wide variety of data and accounting judgments. For example, SDC defines Adjusted EBITDA, a non-GAAP metric, as "net loss before provision for income tax expense, interest expense, depreciation and amortization, and loss on disposal of property, plant and equipment, adjusted to remove derivative fair value adjustments, loss on extinguishment of debt, foreign currency adjustments, and equity-based compensation." (Ex. B, Prospectus, at 23.) Plaintiffs allege no facts showing it is even possible to track such a metric in real time, let alone that SDC actually did so.

15

on a single quarter's revenues do not constitute 'trends' under Item 303."), *aff'd sub nom Cavalier Fundamental Growth Fund v. Skechers U.S.A., Inc.*, 826 F. App'x 111 (2d Cir. 2020); *Abuhamdan v. Blyth, Inc.*, 9 F. Supp. 3d 175, 206 (D. Conn. 2014) ("[A] two-month decline in sales . . . is not a 'trend' that must be disclosed."). Indeed, revenue and gross profit *increased* in the quarter after the IPO (Q4 2019), both year-over-year *and* quarter-to-quarter, which further confirms there was no "trend" of declining revenue and gross profit as of the IPO that should have been disclosed. (*See* Ex. L, Q4 2019 Press Release, at 3.)[7]

In any event, on its face, Item 303 requires only disclosure of trends or uncertainties that could impact financial results, not disclosure of the financial results themselves. (*See* AC ¶ 47 (quoting Item 303).) Plaintiffs do not allege any cause for the decline in revenue and gross profit in the third quarter compared to the prior quarter. *See Willard v. UP Fintech Holding Ltd.*, No. 19-CV-10326 (JMF), 2021 WL 1026571, at *6 (S.D.N.Y. Mar. 17, 2021) (no violation of Item 303 where plaintiffs "conspicuously fail to allege the existence of any causal event or moment in time that the declines allegedly began"). And while Plaintiffs claim the decrease in Adjusted EBITDA was due in part to some unquantified increase in marketing, selling and legal expenses (AC ¶ 54), the Offering Documents *do disclose* that such expenses were increasing. (Ex. B, Prospectus, at 84, 88-89.)

### B. The Offering Documents Did Not Misrepresent SDC's Member Satisfaction

Plaintiffs also allege that the Offering Documents misrepresented that "member satisfaction" was an "important criteria that will enable [SDC] to maintain [its] position as the leading direct-to-consumer clear aligner provider," that SDC's "primary focus is on delivering an

---

[7] The third quarter decline in Adjusted EBITDA was neither a continuation nor reversal of any trend. While Plaintiffs arbitrarily cut off their Adjusted EBITDA chart at Q4 2018 (AC ¶ 51) to make it appear as if there was a consistent trend that halted, Adjusted EBITDA had actually fluctuated dramatically since Q1 2017. (Ex. B, Prospectus, at 90.)

16

exceptional member experience," and that SDC customers were "highly satisfied."  (AC ¶¶ 56-57.)  As an initial matter, these statements are inactionable puffery.  *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (statements that Ford makes "quality a top priority" and wants its "customers to feel safe and secure in their vehicles at all times" were "mere corporate puffery," which was inactionable, notwithstanding subsequent product recall); *Pittman v. Unum Grp.*, No. 18-CV-128, 2020 WL 2846929, at *14 (E.D. Tenn. June 1, 2020) ("Liability does not attach to mere corporate puffery or statements of corporate optimism.").

While Plaintiffs point to certain (public) negative reviews, the Offering Documents do not claim 100% customer satisfaction, and the alleged dissatisfaction of some customers (like any business has) does not render disclosures about the high satisfaction of others false or misleading.  *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people.  That they exist does not make a lie out of any of the alleged false statements."); *In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (existence of customer complaints insufficient to allege company had a "failing business model" and "was aware that its service was much worse than represented"); *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *6 (N.D. Ill. June 29, 2001) (requiring disclosure of declines in customer satisfaction "would not comport with the way the business world works.").[8]

Plaintiffs also complain that certain members had to agree to confidentiality provisions as part of a general release and refund, and that the Company has threatened and commenced

---

[8]    Moreover, Plaintiffs continue to ignore that (i) the approximately 1,200 BBB complaints that Plaintiffs' cite amount to less than one fifth of one percent of the 750,000 SDC customers at the time (Ex. E, SDC Press Release, at 2); (ii) only 47 of those complaints concern clinical issues (*id.*); (iii) overall customer reviews on the BBB average 3.99 out of 5 stars (Ex. M, BBB Profile, at 1); and (iv) the BBB gives SDC an A+ rating (*id.*).

17

litigation to protect its rights against baseless attempts to disparage its business.  Plaintiffs' subjective disagreement with the Company's business judgment on these matters is not a basis for a securities claim.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 474-76 (1977) (securities laws do not create a right of action for corporate mismanagement).  Regardless, the alleged practices do not contradict anything in the Offering Documents, nor do Plaintiffs assert any affirmative duty to disclose such information.  Moreover, the Offering Documents do disclose the Company's disputes with the ADA and state dental boards and make clear that the Company "will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model."  (Ex. B, Prospectus, at 38.)[9]

### C.       The Offering Documents Did Not Misrepresent Any Standard of Care

Plaintiffs further contend that the Offering Documents misrepresent "the actual standard of care SDC provided to its customers" by "omit[ing] that SDC had endangered the health of many of its customers by prescribing aligners to customers who were not suitable candidates, and by failing to provide adequate, or any, ongoing dental care and supervision to its customers."  (AC ¶ 42(c); *see also* AC ¶ 59.)  As a threshold matter, SDC does not provide clinical care.  Rather, as the Offering Documents repeatedly explain, a member's treating doctor—not SDC— is responsible for all clinical care, including approving the member's treatment plan, prescribing their custom aligners and monitoring their progress.  (Ex. B, Prospectus, at 4, 103-05, 124.)[10]

---

[9]    And the confidentiality agreements that Plaintiffs reference were entered into only in connection with refunds issued outside the Company's standard refund policy.

[10]   To the extent Plaintiffs suggest SDC "was engaged in the unlicensed practice of dentistry" (*see, e.g.*, AC ¶ 11), there is no factual or legal basis for that assertion.  Indeed, SDC litigated this exact issue against the New Jersey Dental Association (as disclosed in the Offering Documents (Ex. B, Prospectus, at 124)), and the court granted summary judgment in favor of SDC, holding "[t]he actions taken by SDC, either directly or through its subsidiaries, do not constitute the practice of dentistry."  *Galkin v. SmileDirectClub, LLC*, No. Mid-C-19-19 (Sup. Ct. N.J. Chancery Div. Middlesex Cnty. Mar. 6, 2020).

18

In any event, "[t]o the extent the plaintiffs take issue with the efficiency or effectiveness of [defendant's business], the plaintiffs raise a claim of corporate mismanagement, not investor deception." *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) (description of protocols as "'strict' . . . is not 'disproven' just because [company] could have strengthened its standards and protocols"). Regardless of what Plaintiffs think about the merits of teledentistry and SDC's business, they were accurately disclosed in the Offering Documents. Plaintiffs' subjective disagreement with the Company's business strategy does not state a claim for a disclosure-based securities violation. *See Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061, 1070 (5th Cir. 1994) (affirming dismissal where "plaintiffs' allegations . . . are nothing more than conclusory disparaging characterizations of [defendant's] products and market position").[11]

### D. The Offering Documents Disclosed SDC's Legal and Regulatory Risks

Finally, contrary to Plaintiffs' claim, the Offering Documents did not misrepresent the legal and regulatory risks that SDC faces. The Company prominently warned that its "business could be adversely affected by ongoing professional and legal challenges to [its] business model or by new state actions restricting [its] ability to provide our products and services in certain states." (Ex. B, Prospectus, at 37.) The Offering Documents cite examples of active litigation with dental boards and associations in Georgia, Alabama and New Jersey. (*Id.* at 38, 123-24, 128.) They also disclose a petition submitted to the FDA urging it to initiate enforcement action

---

[11] Plaintiffs' disparagement of SDC's business is also incorrect. The National Advertising Division ("NAD"), an independent adjudicative body that evaluates the truth and transparency of national advertising, recently rejected virtually identical claims made by the American Association of Orthodontists ("AAO") based on many of the same sources Plaintiffs cite here. (Ex. N, NAD Decision.) Following an adversarial proceeding, NAD concluded "the evidence in the record–i.e., the BBB consumer complaints, the investigative reports [including the NBC Nightly News report and the Hindenburg short seller report], as well as the Wexler Study – did not reliably support the message that [SDC's] [direct-to-consumer] teledentistry platform is risky or the message that medical professionals are not involved throughout [SDC's] treatment process." (*Id.* at 18.)

19

against SDC, which the FDA rejected.  (*Id.* at 38.)  And, importantly, the Offering Documents warn that the traditional dental industry's attacks on the Company were ongoing and could result in new actions or regulations that could adversely affect the business.  (*Id.* at 38, 128.)  These extensive disclosures preclude any claim that SDC misrepresented its legal and regulatory risks. *See Iron Worker Local Union No. 405 Annuity Fund v. Dollar Gen. Corp.*, No. 3:17-CV-63, 2018 WL 10152459, at \*12 (M.D. Tenn. Mar. 8, 2018) (dismissing where defendant made "the very disclosure Plaintiffs contend was missing").

Ultimately, Plaintiffs' only complaint is that the Offering Documents did not specifically highlight an investigation by the California dental board and proposed teledentistry regulations in California.  (*See* AC ¶¶ 42(d), 62.)  But SDC was "not required to detail every facet or extent of [its legal and regulatory risk] to have adequately disclosed the nature of the risk."  *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 678 (6th Cir. 2003).  "Before liability for non-disclosure can attach, [SDC] must have violated an affirmative duty of disclosure."  *In re Sofamor Danek Grp., Inc.,* 123 F.3d 394, 400 (6th Cir. 1997).  "[A] government investigation, without more, does not trigger a generalized duty to disclose."  *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016); *see also City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 184 (2d Cir. 2014) ("[C]ompanies do not have a duty 'to disclose uncharged, unadjudicated wrongdoing.'" (citation omitted)); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 272-75 (S.D.N.Y. 2012) (no duty to disclose Wells Notice from SEC).

Plaintiffs allege the California dental board investigation had been ongoing for two years as of the IPO (AC ¶ 62(b)), yet they do not allege the board had taken, or was expected to take, any adverse action against SDC that had materially impacted the Company or was anticipated to at the time of the IPO.  Similarly, Plaintiffs do not cite any general duty to disclose proposed

20

legislation and, while they allege what the proposed regulations would require (*id.* ¶ 62(e)), they do not allege any facts that would show that these changes were expected to have a material impact on SDC's business. To the contrary, Plaintiffs cite—and do not dispute—the Company's announcement the day after the legislation was enacted (a month *after* the IPO) that "[n]othing in AB1519 requires SmileDirectClub to cease or modify its operations [in California]." (*Id.* ¶ 132.)[12]

Absent specific factual allegations (and there are none here) showing the investigation and proposed regulations had or were expected to have a material effect on SDC's business, Plaintiffs' claims based on non-disclosure of that information fail. *See Bondali*, 620 F. App'x at 491 (no duty to disclose where "plaintiffs have not alleged facts suggesting the issues . . . were so severe that they would have resulted in financial loss"); *In re Greenlane Holdings, Inc. Sec. Litig.*, No. 19-81259-CIV, 2021 WL 53188, at *8 (S.D. Fla. Jan. 6, 2021) (no duty to disclose proposed regulations on e-cigarettes where offering documents "warned investors about the deleterious effects of profit-stripping regulations, predicted that future regulations were likely, and cautioned that more such unfavorable changes in the regulatory landscape could adversely affect its profitability"); *Lubbers v. Flagstar Bancorp, Inc.*, 162 F. Supp. 3d 571, 579 (E.D. Mich. 2016) (rejecting, as "semantic quibbling," plaintiffs' claim that defendant failed to disclose an investigation by the Consumer Financial Protection Bureau where defendant disclosed that it was subject to government investigations "from time to time").

## II. ALL OF PLAINTIFFS' CLAIMS FAIL BECAUSE THEIR ALLEGED LOSSES WERE NOT CAUSED BY THE OFFERING DOCUMENTS

All of Plaintiffs' claims independently fail for lack of causation. The securities laws protect investors only "against those economic losses that misrepresentations actually cause."

---

[12] Indeed, the Company's 2020 Annual Report, filed more than a year after the new regulations went into effect, confirms that they have "not had any material impact on our operations." (Ex. O, 2020 10-K, at 14.) Plaintiffs do not contend this statement was false.

*Dura Pharm.*, 544 U.S. at 345. Plaintiffs must plead facts establishing loss causation as an element of their Exchange Act claims. *Id.* at 338. Similarly, "[i]f it is apparent on the face of the complaint [that] the decline in share value is not related to any material misstatement and/or omission," then the Securities Act claims should be dismissed based on the affirmative defense of negative causation. *Azzolini v. Corts Tr. II for Provident Fin. Tr. I*, No. 103CV1003, 2005 WL 3448053, at \*5 (E.D. Tenn. Dec. 14, 2005); *see also* 15 U.S.C. § 77k(e).

Lead Plaintiff SEIU sold all of its SDC shares before any corrective disclosure and thus has no recoverable losses. Specifically, SEIU claims to have sold all of its SDC shares between September 25, 2019 and September 27, 2019. (ECF No. 33-3 at 2.) The only purported "corrective" disclosure at that time was the *Ciccio* lawsuit filed on September 24, 2019. (AC ¶¶ 124-25.) But "allegations of unproven misconduct" in a third party's civil complaint "[are] not a corrective disclosure." *Martin v. GNC Holdings, Inc.*, No. 15-CV-01522, 2017 WL 3974002, at \*18 (W.D. Pa. Sept. 8, 2017), *aff'd,* 757 F. App'x 151 (3d Cir. 2018); *see also Sapssov v. Health Mgmt. Assocs., Inc.*, 22 F. Supp. 3d 1210, 1231 (M.D. Fla. 2014) ("The filing of a civil complaint [in another case] certainly does not establish that the defendant committed or is liable for the conduct alleged."), *aff'd,* 608 F. App'x 855 (11th Cir. 2015). In any event, the *Ciccio* complaint merely regurgitates accusations by the ADA, AAO and others that had long been public. (*Compare* Ex. D, *Ciccio* Complaint, *with* Exs. P-W, Pre-IPO Articles.) It is well settled that a "negative characterization of already-public information" does not constitute a corrective disclosure. *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010); *see also In re KBC Asset Mgmt. N.V.*, 572 F. App'x 356, 360 (6th Cir. 2014) ("The problem with [plaintiff's] theory is that . . . the alleged corrective disclosures [] were old news."). Thus, any losses SEIU may have incurred when it sold its SDC shares (just two and a half weeks after the IPO) could

22

not have been caused by the revelation of any misrepresentation in the Offering Documents. *See Ind. State Dist. Council of Laborers & HOD Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) ("[A] plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market.").[13]

Plaintiff Bucks County has the inverse problem: it did not purchase any SDC shares until October 24, 2019, *after* the *Ciccio* action, the short-seller report, the enactment of the California legislation and the *Sulitzer* action detailing the California dental board's investigation.  (AC ¶¶ 124-40 & Schedule A.)  Thus, to the extent any of these events constitute a corrective disclosure, Bucks County cannot bring any claims based on them.  *City of Bristol Pension Fund v. Vertex Pharms. Inc.*, 12 F. Supp. 3d 225, 229 (D. Mass. 2014) ("Plaintiff . . . cannot establish that the misrepresentation caused it any loss" where defendant "corrected th[e] statement on May 29, and plaintiff did not purchase any shares until May 30"); *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, No. 3:17-CV-6436, 2019 WL 1299673, at *13 (D.N.J. Mar. 21, 2019) (similar).

## III. THE EXCHANGE ACT CLAIMS ALSO FAIL BECAUSE PLAINTIFFS DO NOT ALLEGE SCIENTER

Plaintiffs' Exchange Act claims also independently fail because Plaintiffs do not allege particularized facts giving rise to the requisite strong inference of scienter.  "In the securities-fraud context, scienter includes a 'knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness.'"  *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (citation omitted).  The PSLRA requires Plaintiffs to allege "with particularity facts giving rise to a strong inference that the defendant acted with [scienter]."  *Tellabs, Inc. v. Makor Issues &*

---

[13] SEIU also cannot bring any claims based on events after it sold its SDC shares (AC ¶¶ 126-53).  *Dura Pharm.*, 544 U.S. at 342 ("[I]f . . . the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss."); *see, e.g.*, *In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *29 (N.D. Cal. Oct. 1, 2015) (dismissing where plaintiff sold before any corrective disclosures).

23

*Rights, Ltd.*, 551 U.S. 308, 314 (2007). The inference must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* at 314.

Plaintiffs do not allege any direct evidence that the two individual Exchange Act defendants—SDC's CEO David Katzman and CFO Kyle Wailes—intended to defraud investors. Instead, Plaintiffs allege that Mr. Katzman and Mr. Wailes must have known about certain information that was not specifically disclosed, such as the California investigation and proposed regulations and the negative BBB reviews. (*See* AC ¶¶ 96-112.) But Plaintiffs have to show that Defendants knew that the Offering Documents were false or misleading, not merely that they were aware of certain information that was not included in the Offering Documents. Without more—including a duty to disclose such information—these allegations provide no support for an inference of scienter. *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d Cir. 2010) ("[W]here liability is premised upon alleged material omissions, if the complaint 'does not present facts indicating a clear duty to disclose . . . plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness.'" (citation omitted)).

Plaintiffs also point to SDC's buyback of certain pre-IPO interests held by Mr. Katzman and others and to the bonus Mr. Wailes received upon completion of the IPO (both of which were disclosed in the Offering Documents). (*See* AC ¶¶ 113-22.) But Plaintiffs do not allege that the terms of the buyback or Mr. Wailes' bonus were affected in any way by what was or was not disclosed in the Offering Documents. Moreover, sales by parties who are not Exchange Act defendants (*see* AC ¶¶ 117-20) are irrelevant. *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1045 (N.D. Cal. 2012) (sales by "insiders not named as defendants" are "irrelevant").

Furthermore, Plaintiffs' motive argument makes no sense. Mr. Wailes did not sell, but *received* 259,665 shares of SDC stock in connection with the IPO. (Ex. B, Prospectus, at 150.)

24

And, although Mr. Katzman sold a small fraction of his interest in SDC in connection with the IPO, he retained more than 90% of his stake. *See Bailey v. Esperion Therapeutics, Inc.,* No. 18-11438, 2019 WL 3296235, at \*4 (E.D. Mich. Feb. 19, 2019) (inference of scienter is weak where defendant sold only a small fraction of shares). As significant SDC shareholders, Mr. Katzman and Mr. Wailes are among those who have suffered the most from the stock's decline. This further undermines any inference of scienter. *See In re EveryWare Glob.*, *Inc. Sec. Litig.*, 175 F. Supp. 3d at 858 (S.D. Ohio 2016) ("Defendants had a greater motive to see [the company] succeed, and they ultimately lost millions more than they received in the Secondary Offering.").

Finally, Plaintiffs' entire theory of fraud is incoherent. The information that Plaintiffs claim the Offering Documents omit either was already public—such as the proposed California legislation and the BBB complaints—or would be public imminently—such as SDC's Q3 2019 results. Plaintiffs offer no cogent explanation for why Mr. Katzman and Mr. Wailes would try to conceal this information. For example, if they truly were trying to hide the California dental board's investigation in hopes of defrauding investors, why disclose it in great detail in the *Sulitzer* complaint just one month after the IPO? Considering all of Plaintiffs' allegations holistically, the far more compelling inference is that the Offering Documents reflect a good faith effort to disclose all required information and present a candid picture of the Company's business, strengths and risks—particularly amid an ongoing barrage of attacks from special interest groups and an ever-evolving regulatory landscape.

**CONCLUSION**

For these reasons, all of Plaintiffs' claims should be dismissed with prejudice.[14]

---

[14]  Because Plaintiffs fail to state any primary violation, their claims for control person liability likewise fail. *See IBEW Local No. 58 Annuity Fund*, 849 F.3d at 328.

Respectfully submitted,

/s/ Steven A. Riley
Steven A. Riley (TN #6258)
Elizabeth O. Gonser (TN #26329)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737
sriley@rwjplc.com
egonser@rwjplc.com

/s/ Scott D. Musoff *w/permission*
Jay B. Kasner (*pro hac vice*)
Scott D. Musoff (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
Telephone: (212) 735-3000
Facsimile: (917) 735-2000

*Counsel for Defendants SmileDirectClub,
Inc., David Katzman, Kyle Wailes, Steven
Katzman, Jordan Katzman, Alexander
Fenkell, Susan Greenspon Rammelt, Richard
Schnall and Camelot Venture Group*

/s/ Christopher E. Thorsen *w/permission*
John S. Hicks (TN# 10478)
Christopher E. Thorsen (TN# 21049)
Baker, Donelson, Bearman, Caldwell &
Berkowitz, PC
1600 West End Avenue, Suite 2000
Nashville, Tennessee 37203
Telephone: (615) 726-5600
Facsimile: (615) 726-0464
jhicks@bakerdonelson.com
cthorsen@bakerdonelson.com

/s/ Andrew J. Finn *w/permission*
Sharon L. Nelles (*pro hac vice*)
Andrew J. Finn (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (917) 558-3588

*Counsel for Defendants J.P. Morgan
Securities LLC, Citigroup Global Markets
Inc., BofA Securities, Inc., Jefferies LLC, UBS
Securities LLC, Credit Suisse Securities
(USA) LLC, Guggenheim Securities, LLC,
Stifel, Nicolaus & Company, Incorporated,
William Blair & Company, L.L.C. and Loop
Capital Markets LLC*

# <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was filed and served electronically upon the following via the Court's ECF system on this the 14th day of May, 2021:

Michael Albert
malbert@rgrdlaw.com

Paul Kent Bramlett
Pknashlaw@aol.com

Wade B. Cowan
wcowan@dhhrplc.com

James M. Ficaro
jmf@weiserlawfirm.com

James A. Holifield, Jr.
aholifield@holifieldlaw.com

J. Alexander Hood, II
ahood@pomlaw.com

Lewis S. Kahn
Lewis.kahn@ksfcounsel.com

Ashley M. Kelly
akelly@rgrdlaw.com

Phillip Kim
pkim@rosenlegal.com

Jeremy A. Lieberman
jalieberman@pomlaw.com

Ting H. Liu
tliu@rgrdlaw.com

Richard A. Maniskas
rmaniskas@sbtklaw.com

E. Powell Miller
epm@millerlawpc.com

Danielle S. Myers
danim@rgrdlaw.com

Christopher Nelson
cln@weiserlawfirm.com

Melinda A. Nicholson
Melinda.nicholson@ksfcounsel.com

Michael J. Palestina
Michael.Palestina@ksfcounsel.com

Ira M. Press
ipress@kmllp.com

Darren J. Robbins
darrenr@rgrdlaw.com

Laurence M. Rosen
lrosen@rosenlegal.com

Scott H. Saham
scotts@rgrdlaw.com

John Tate Spragens
john@spragenslaw.com

Tara L. Swafford
tara@swaffordlawfirm.com

Christopher M. Wood
cwood@rgrdlaw.com


*/s/Steven A. Riley*