# Exhibit N

**American Association of Orthodontists**
**Happy Mouth Now Campaign**
*Challenger:*         *SmileDirectClub, LLC*
*Product Type:*      *Drugs/Health/Health Aids*
*Issues:*           *Administrative/Jurisdictional; Disparagement Claims; Implied Claims/Consumer Perception; Performance Claims; Puffery*
*Disposition:*       *Substantiated In Part/Modified-Discontinued In Part*

- **Speech can have multiple purposes. Even if one purpose of that speech is educational, if another important purpose of the speech is to promote a product or service, it may also be commercial and, therefore, advertising.**

- **Exaggerated images and humor can be used to highlight a truthful message, but should not falsely disparage competitors.**

**Basis of Inquiry:** Claims made by the American Association of Orthodontists ("AAO" or the "advertiser") on YouTube, Facebook and a microsite for the fictional Happy Mouth Now tooth aligner product were challenged by the SmileDirectClub, LLC ("SDC" or the "challenger"), a teledentistry company that manufactures at-home tooth aligner products. The following are representative of the claims that served as the basis for NAD's inquiry:

Implied Claims:

The AAO's newly-launched "Happy Mouth Now" series of videos and associated microsite imply that SDC and its goods and services are utterly worthless.

The AAO's advertisements state or imply falsely that no professionals are involved in the services SDC facilitates with its teledentistry platform.

The AAO's advertisements make numerous false and disparaging statements regarding SDC's impression kits, SmileShops, and the clear aligners manufactured in connection with prescriptions written by the state licensed dentists and orthodontists who use SDC's teledentistry platform and dental support organization ("DSO") services.

The AAO's advertisements state or imply falsely that the clear aligner therapy treatment rendered using SDC's teledentistry platform and DSO services is dangerous, ineffective and "do-it-yourself" ("DIY")[1]

**Evidence:**

To support the challenged claims, the advertiser provided:

- Better Business Bureau consumer complaints

---

[1] The challenger explained that DIY orthodontics was coined after reports surfaced concerning a dangerous rise in self-administered orthodontic treatments following the advent of social media. According to the challenger, DIY orthodontics involves "consumers were attempting to move their own teeth by using rubber bands, dental floss, fishing line, paper clips, biting on pencils, creating fake retainers, and pushing teeth with fingers."

- Investigative reports by the Canadian Broadcasting Corporation, National Broadcasting Company, and Hindenburg Research evaluating the challenger's business practices and discussing instances of consumer harm
- The Wexler Study, which surveyed user experiences with direct-to-consumer aligners
- Information from the SDC's website about its teledentistry platform
- Information on the risks of DIY orthodontics

The challenger provided:

- Background information on the SDC and AAO
- Information on the risks of DIY orthodontics
- Information on the pain and discomfort associated with orthodontic treatment

**Decision:**

I.  <u>Background</u>

The challenger provides orthodontic services through its direct-to-consumer ("DTC") teledentistry platform, which enables consumers to straighten their teeth using clear plastic aligners "from the safety and comfort of home."[2] Patients with mild to moderate malocclusion – the misalignment of the teeth or jaws – can begin orthodontic treatment by receiving an in-person dental scan at the challenger's "Smile Shop" or by requesting a dental impression kit to be mailed to their home. After the scan or impression process is complete, lab technicians draft a custom treatment plan[3] and upload the plan into a database. The plan is then reviewed by a licensed dentist or orthodontist ("Treating Doctor") in the patient's state. After the treatment plan is approved, the Treating Doctor writes a prescription for the aligners, the challenger manufactures the aligners, and the aligners are then shipped directly to the patient. The Treating Doctor – who contracts with the challenger through the professional dental practices they are affiliated with – is responsible for checking-in remotely with the patient for the duration of the treatment or at the patient's request.

The challenger maintains it is an industry "disruptor" that has "revolutionized the way in which orthodontic care is administered by leveraging technology." By contrast, the advertiser is the world's oldest and largest dental specialty organization, representing nearly 19,000 accredited orthodontists in the United States, Canada and abroad. The advertiser's stated mission is to "advance our members' success through education, advocacy, and research that drive excellence in patient care."[4] In addition to providing resources for its member orthodontists, the advertiser has a consumer-oriented website that provides information about orthodontic treatment options and a "Find an Orthodontist" search tool to locate local member orthodontists. According to the advertiser, the Happy Mouth Now advertising campaign was launched to "raise public awareness of the dangers posed by DTC and DIY orthodontics." The advertiser stated that the intended goal of the campaign was to convey the message "that direct-to-consumer and do-it-yourself orthodontics present very real risks to consumers, and that

---

[2] https://smiledirectclub.com/telehealth/ (last visited 2/11/2021).
[3] According to the challenger, the 800 lab technicians it employs are overseen by more than 60 licensed orthodontist and dentists as an "extra measure of quality assurance."
[4] https://www2.aaoinfo.org/about/ (last visited 2/11/2021).

orthodontic care is best conducted in person and with careful professional oversight." The campaign, which uses "satire and humor to encourage patients to seek in-person professional orthodontic care rather than attempting to treat themselves through DTC or DIY orthodontics," has garnered millions of impressions across Facebook and YouTube.

At issue here is whether the Happy Mouth Now campaign falsely conveys disparaging messages about the challenger's DTC teledentistry platform. The challenger argued that the campaign portrays its goods and services as "utterly worthless," as having no professional involvement, and as dangerous, ineffective and do-it-yourself. The challenger also alleged that the campaign misrepresents the at-home impression kit and SmileShop retail experiences, as well as the aligner manufacturing process.

In an NAD proceeding, advertisers bear the burden of demonstrating that they have a reasonable basis for their advertising claims and need to provide support for all messages reasonably conveyed, not just the message they intended to convey.[5] NAD reviews the support provided by an advertiser to determine its reliability and assess the fit between the claims made and its supporting evidence.[6] Once an advertiser meets its burden of presenting a reasonable basis for its claims, the burden shifts to the challenger to establish that the advertiser's substantiating evidence is materially flawed or that it has better data demonstrating a different result.[7]

II. <u>Jurisdictional Objections</u>

     A. The Happy Mouth Now Campaign Is a Paid Commercial Message

As a preliminary matter, the advertiser argued that NAD lacks jurisdiction over the inquiry pursuant to *NAD Policies and Procedures* Section 2.1(C)(6), which provides that "[c]omplaints regarding…political and issue advertising" are "not within NAD's mandate." According to the advertiser, the Happy Mouth Now campaign is issue advertising because the campaign is not trying to sell products or services. Instead, it merely warns the public of the very real health dangers associated with DTC and DIY orthodontics, as compared to the professional oversight provided by traditional in-person orthodontic care. The advertiser also asserted that the Happy Mouth Now campaign is not transformed into advertising simply because some of its members use competing aligner products, as its organization is rooted in advocacy, not profit.

In response, the challenger argued that the Happy Mouth Now campaign is commercial speech, not issue advertising. The challenger noted that the advertiser is a leading trade organization that represents the interest of for-profit orthodontists. According to the challenger, it is a stretch for the advertiser to argue that no product or service is advertised in the campaign given that the challenged videos end with the AAO logo and tagline, "Some things are best left to the professionals," and the campaign's microsite urges consumers to "see an orthodontists in person," then directly links to the advertiser's "Find an Orthodontist" search tool.

---

[5] <u>Johnson & Johnson Consumer Inc. (Neutrogena® UltraSheer® Dry-Touch SPF 100+ Sunscreen)</u>, Report #6059, *NAD/CARU Case Reports* (March 2017).
[6] <u>Id.</u>
[7] <u>Id.</u>

NAD's jurisdiction is limited to "any paid commercial message" that "has the purpose of inducing a sale or other commercial transaction or persuading the audience of the value or usefulness of a company, product or service."[8] To assess whether the challenged advertising falls within its mandate, NAD first considered whether the speech contained in the challenged advertising is a "paid commercial message." In assessing whether speech is commercial, NAD has considered the five factors described by the Federal Trade Commission (FTC) in R.J. Reynolds Tobacco Co. ("Of Cigarettes and Science"),[9] which include:

> (1) the content of the speech, i.e., whether it contained a message promoting the demand for a product or service; (2) whether the speech referred to a specific product or service; (3) whether the speech included information about attributes of a product or service, such as type, price, or quality, including information about health effects associated with the use of a product; (4) the means used to publish the speech, including whether it is paid-for advertising; and (5) the speaker's economic or commercial motivation.

First, in considering the content of the speech and whether it contains a message promoting the demand for a product or service, the advertiser noted that the challenged Happy Mouth Now campaign uses "satire and humor to encourage patients to seek in-person professional orthodontic care rather than attempting to treat themselves through DTC or DIY orthodontics." The challenged videos also end with the tagline "Some things are best left to the professionals" alongside the AAO logo and the challenged microsite states, "Your mouth's journey shouldn't start anywhere but at an orthodontist" then links to a search tool that locates member orthodontists. Consequently, NAD determined that the challenged advertising promotes the demand for the in-person orthodontic services offered by the advertiser's members.

Second, the Happy Mouth Now campaign refers to the in-person orthodontic services offered by the advertiser's members, as well as the DTC teledentistry services offered by the challenger.[10] Third, the challenged advertising highlights attributes of the challenger's DTC teledentistry platform and alleges there are health and safety risks associated with DTC teledentistry. Indeed, the advertiser stated that the campaign is intended to convey the message that "DTC orthodontics are not a good choice for consumers because they lack in-person doctor oversight, involve self-administered dental impressions, can be dangerous, and are often ineffective." Fourth, the Happy Mouth Now campaign is published on Facebook, YouTube and a microsite, and is paid-for.

---

[8] *NAD Policies & Procedures*, Section 1.1(A).

[9] See BuzzFeed, Inc. (Shopping Guides – St. Ives Renewing Collagen & Elastin Moisturizer), Report #6210, *NAD/CARU Case Reports* (September 2018) (citing R.J. Reynolds Tobacco Co., 111 F.T.C. 539, 544-46 (1988)), *appeal docketed on other grounds*, No. 13-1060 (D.C. Cir. Mar. 8, 2013).

[10] With respect to the second factor, the FTC noted, "In many cases, the product reference includes the brand name of a product offered for sale. However, the Bolger court stated that a generic reference to a product would not necessarily remove it from the category of commercial speech: 'For example, a company with sufficient control of the market for a product may be able to promote the product without reference to its own brand name. Or, a trade association may make statements about a product, without reference to specific brand names.'" R.J. Reynolds Tobacco Co., 111 F.T.C. 539 at 463 U.S. at 66-67 n. 13 (citing with approval National Commission on Egg Nutrition v. FTC 570 F. 157 (7th Cir. 1977), cert. denied (11) 439 U.S. 821 (1978)).

Fifth, though the advertiser argues the motivation for its speech is educational, there is an economic motivation for the speech as well. Speech can have multiple purposes. Even if one purpose of that speech is educational, if another important purpose of the speech is to promote a product or service, it may also be commercial and, therefore, advertising. In <u>Nuclear Energy Institute</u>, NAD considered whether advertising claims by NEI, a trade association that represented nuclear power producers, constituted issue advertising. NAD acknowledged "while NEI may have had a genuine interest in dispelling long-held misconceptions and providing the public with important environmental information regarding nuclear energy, it cannot be ignored that a similar (if not greater) incentive for the speech, is to make consumers aware of, feel positive about, and ultimately purchase, the product offered by the advertiser's members." [11] Likewise, the advertiser here may have a genuine interest in educating the public about the purported dangers and risks of DTC orthodontics, but NAD cannot ignore that the Happy Mouth Now campaign is designed to encourage consumers to ultimately purchase the in-person orthodontic services offered by the advertiser's members.

Based on the Reynolds factors, NAD determined that the Happy Mouth Now campaign constitutes commercial speech, and, pursuant to NAD's procedures, is a "paid commercial message" for the purpose of "persuading the audience of the value or usefulness of company, product or service." [12] As a result, the Happy Mouth Now campaign is within NAD's mandate to review.

### B. The Happy Mouth Now Campaign Warrants the Expenditure of NAD's Resources

The advertiser raised a second jurisdictional objection pursuant to Section 2.1 (C)(1)(f) of the *NAD Policies and Procedures*, which states that NAD must administratively close the proceeding if the claims are "without sufficient merit to warrant the expenditure of NAD's resources." The advertiser asserted that the challenged claims are "overly vague" because the challenger failed to point to any specific advertising claims to evaluate or defend. For instance, the advertiser argued, the complaint alleged that the Happy Mouth Now campaign implies that the challenger's services are "utterly worthless," but the campaign videos do not state anywhere that the challenger's service are "worthless." Likewise, the complaint alleged that the campaign videos falsely state or imply that the challenger's treatment is "dangerous, ineffective, and do-it-yourself," but the advertiser contended that the complaint "does not point to any specific advertising claim in the AAO's videos that directly targets SDC."

NAD determined that the challenged claims are not overly vague because they concern implied, but not express claims. It is well established that "an express claim is literally made in the ad," "an implied claim is one made indirectly or by inference" and that an advertiser must substantiate both express and implied claims. [13] Here, the challenger has identified a number of implied claims that it believes are communicated by the Happy Mouth Now campaign. While the advertiser may disagree that these claims are reasonably conveyed by its advertising, this is a substantive objection, not an objection to

---

[11] <u>NUCLEAR ENERGY INSTITUTE (Nuclear Energy)</u>, Report #3508, *NAD/CARU Case Reports* (November 1998).
[12] Section 1.1 (A), *NAD Policies and Procedures*.
[13] Federal Trade Commission (FTC), Advertising FAQ's: A Guide for Small Business, https://www.ftc.gov/tips-advice/business-center/guidance/advertising-faqs-guide-small-business (emphasis in original).

whether the dispute is properly before NAD. Therefore, NAD declined to administratively close the matter on this ground.

### C. Challenger Did Not Violate NAD's Confidentiality Rules

The advertiser raised a third jurisdictional objection pursuant to Section 2.1 (C)(7) of the *NAD Policies and Procedures*, which states, "NAD reserves the right to refuse to open or to continue to handle a case where a party to an NAD proceeding publicizes, or otherwise announces, to third parties not directly related to the case the fact that specific advertising will be, is being, or has been, referred to NAD for resolution." In a separate matter, AAO challenged SDC's advertising practices and NAD's decision was appealed to the National Advertising Review Board (NARB). During the course of the NARB proceedings, SDC twice disclosed the existence of the pending Happy Mouth Now challenge to the NARB panel. Based on this purported violation of NAD's confidentiality rules, the advertiser argued the instant matter should be dismissed. While NAD does not condone SDC's actions before NARB, NAD found that the disclosure of a pending case to NARB, which is part of the same advertising self-regulatory system as NAD, did not violate NAD's procedures.

For these reasons, NAD found the challenged advertising to be within its purview and considered the dispute on its merits.

### III. <u>Challenged Advertising</u>

The Happy Mouth Now advertising campaign consists of 4 videos and a related microsite. The videos are found on YouTube and Facebook and are all captioned: "Happy Mouth Now is fake, but the risks of not seeing an orthodontist in person are real." Each video also ends with the AAO's name and logo, as well as the tagline, "Some things are best left to the professionals."

### A. The Original Advertisement

In the original 90-second video advertisement ("Original Advertisement"), a woman picks up a sleekly labeled Happy Mouth Now box off her front porch while the voiceover states, "It's the 21st century and you deserve a happy mouth without ever having to go see a doctor in-person." As the woman brings the box inside her home and opens it on her kitchen counter, the voiceover continues: "Introducing Happy Mouth Now! The newest, do-it-yourself, at-home aligner kit."

The scene shifts to a curly-haired man with a mustache holding towering stacks of Happy Mouth Now product boxes, grinning inanely at the camera. The voiceover says, "It all started when Eric Matthews realized that as long as you advertise everywhere, and have employees that smile a lot, people will try orthodontic treatment without ever seeing a doctor in person. So he opened the first Happy Mouth Now stores." In a slapstick sequence, "Eric Matthews" tosses the product boxes into the air after being surprised by two smiling, look-alike employees that have fake mustaches and curly hair as well. The Eric Mathews character continues smiling mindlessly at the camera and announces: "Your mouth's journey begins here."

In the next scene, the original woman struggles to use the Happy Mouth Now dental impression kit that was mailed to her home. The impression tray is overfilled with a goopy substance, which causes

her to gag. The voiceover states: "Happy Mouth's Now mouth mold kit is easy to use – and you never have to see a doctor in person who can help or supervise with the mold." Eric Matthews and his two look-alikes are shown again with their backs to the viewers, in another slapstick sequence, constructing an object with toy tools, while making silly hacking motions and bumping into each other, as a chainsaw effect is heard in the background. In the next scene, the woman has received her aligners (presumably just constructed by Eric Matthews and his look-alikes) and is shown inserting and adjusting the aligner with a degree of uncertainty and discomfort, before shrugging her shoulders and walking away. A parting shot of Eric Matthews smiling alongside his look-alikes dissolves to a final end card that shows the AAO's name, logo and "Some things are best left to the professionals" tagline.

B.   The Store Advertisement

In this two-minute video advertisement, the woman from the Original Advertisement is shown wandering around a Happy Mouth Now retail store, looking for assistance ("Store Advertisement"). The voiceover states, "Introducing a brand new way to make your mouth happy. Our Happy Mouth Now stores are the perfect place to consult one of our mouth helpers." The woman approaches the Eric Matthews character and attempts to get his attention before he slowly turns to her, clasps his hands, and draws out, "Ahhhhhh…yes, hello." He then introduces himself in the same slow manner as the "founder of Happy Mouth Now." The woman asks, "Can I see a doctor?" and Eric Matthews holds up a finger and replies, "Ahhhhhh, a Mouth Helper will be here shortly."

One of Eric Matthews' look-alikes from the Original Advertisement then bumps into the woman and asks, "How may I assist you in your mouth's journey?" When the woman says that she would like to see an orthodontist because she has "a question about a tooth," the look-alike store employee anxiously states, "You mean a Mouth Helper. Sure, you can talk to a Mouth Helper." Suspenseful music ratchets up in the background as the woman insists on seeing "an actual orthodontist," and the look-alike urges the woman to crouch down low so as not to be seen by other store employees. He quickly explains, "I'll be honest. We don't have orthodontists or dentists here, okay? So if you could, just ask me about something on this script," as he points to a customer service script on the clipboard he is holding. The pair is then interrupted by Eric Matthews who asks, "And how is the journey coming along?" before urging them to "Smile On," a mantra which the employee earnestly repeats.

Once Eric Matthews turns away, the woman asks with increasing alarm, "So you're not an orthodontist or dentist?" and "Is there not even an orthodontist or dentist in this building?" to which the look-alike employee whisper-yells, "NO!" to both questions. Eric Matthews suddenly turns his attention back to the pair, as the suspenseful music swells. With his boss's eyes on him, the employee then convinces the reluctant woman to complete a customer survey, before chirping "Smile On!", which is repeated by Eric Matthews and the second look-alike, in a cult-like fashion. The second look-alike is briefly shown "scanning" the woman's teeth with what appears to be a handheld barcode scanner as the voiceover states, "Make your mouth happy and visit the Happy Mouth Now store today." The scene ends with the AAO's name, logo and "Some things are best left to the professionals" tagline.

### C. The Testimonial Advertisement

In this 90-second video advertisement ("Testimonial Advertisement"), the Eric Matthews character is joined by the same two look-alike employees, who clap him on the back in celebration, as the voiceover states, "Happy Mouth Now is the number one choice when it comes to having the mouth you want. Just listen to these celebrities who claim to have used our product." The scene shifts to the first celebrity, a "Wild Man Extraordinaire" named Duke Firecracker with spiky hair and day-glow clothing. While flipping his skateboard in his hands, Duke says that he enjoys doing "sick jumps on my board and setting myself on fire on YouTube," then explains that Happy Mouth Now is his favorite sponsor, because "I don't have time to see a doctor about my teeth." Meanwhile, the second "celebrity," Addison Chardonnay, is introduced as a "Influencer/Brunchologist." As she checks herself out on her phone's camera, she declares, "Oh my god, I look amazing. Happy Mouth Now. Smile and stuff Facebook at me," as a slew of social media reaction emojis float by her chair. She waves her hands in front of her mouth, "It made my teeth look like this. You can trust me, I'm an influencer!" Duke and Addison then exchange "Smile On" lines back and forth, with Addison dragging the final syllable of the last "Smile On" out for ten seconds while smirking at the camera. Eric Matthews briefly pops up in a small bubble to confirm for Addison that Happy Mouth Now also offers tooth whitening. The scene ends with the AAO's name, logo and "Some things are best left to the professionals" tagline.

### D. The Happy Eyes and Happy Bones Advertisement

In the final 90-second video ("Happy Eyes and Bones Advertisement"), a flashback from the Original Advertisement is shown, which once again depicts the woman struggling with the goopy at-home dental impression kit. The scene shifts to show the same woman opening a Happy Mouth Now box with an "eyes" sticker pasted over the word "mouth." The voiceover touts, "From the geniuses that brought you the at-home teeth aligner kit, Happy Mouth Now, comes… Happy Eyes Now!" The woman removes a shoddily constructed helmet with goggles from the box, which is attached to a long cord that ends at a box with large, colored buttons. The voiceover continues, "Laser eye surgery you can do at home! It's just as simple as point and click. Just make sure not to point at anything of value. Or click any of the buttons." The woman puts the device over her eyes, but is apparently electrocuted; she shakes and yells before finally emerging with blinded white eyes.

The now-blinded woman is then shown falling down a set of stairs, which results in an obviously broken leg. As the woman lays on the ground due to her broken leg, the familiar Happy Mouth Now box drops from the sky, but now with a "bones" sticker pasted over the term "mouth." The voiceover introduces "Happy Bones Now, an on-the-go, broken bone correction kit." While the blinded woman (still laying on the floor) struggles to open the package, the narrator explains that Happy Bones Now is "the right fit for you!" The woman gives an enthusiastic thumbs up before the scene briefly transitions to an image of Eric Matthews, his two look-alikes and the Happy Mouth Now logo. The video ends with a final end card showing the AAO's name, logo and "Some things are best left to the professionals" tagline.

E. The Microsite

The Happy Mouth Now campaign also has its own microsite, which links to the advertiser's main website. On the microsite, the advertiser claims "Your mouth's journey shouldn't start anywhere but an orthodontist," directly above a link to the advertiser's "Find an Orthodontist" search tool. The advertiser asks, "What's your smile worth?" before claiming "Yeah, it's the 21st century and the internet can do a lot, but it can't fix your smile." It goes on to state that "100% of our orthodontists can see you in person. An in-person evaluation and supervision throughout treatment are very important…" The site then also directs consumers to "Leave it to the pros" before repeating the tagline, "These scenarios and products above aren't real, but the risks of not seeing an orthodontist are." The microsite includes links to purchase the Happy Mouth/Eyes/Bones Now kits, but upon clicking the "Buy Now" button, viewers are directed to a page that states "Oops, looks like it's time to see an orthodontist," with a link to the advertiser's provider locator tool.

IV. <u>Messages Reasonably Conveyed And Evidence Offered in Support</u>

It has long been recognized that humor can be an effective and creative way for advertisers to highlight the differences between products. "However, humor and hyperbole do not relieve an advertiser of its obligation to support messages that their advertisements might reasonably convey – especially when the advertising disparages a competitor's product."[14] Exaggerated images and humor can be used to highlight a truthful message, but should not falsely disparage competitors.[15]

There was no consumer perception evidence in the record. In the absence of consumer perception evidence, NAD uses its expertise to determine the messages reasonably conveyed by the challenged advertisements. When analyzing the messages conveyed, NAD typically reviews the net impression created by an advertisement as a whole, not merely words or phrases standing alone and taking into consideration both the words and the visual images.[16] As always, an advertiser is responsible for all reasonable interpretations of its claims, not simply the messages it intended to convey.[17]

As a preliminary matter, NAD noted that while the Happy Mouth Now campaign features a fictional DTC tooth aligner product and contains no explicit mention of the challenger, a reasonable consumer is likely to take away the message that the featured product is representative of the challenger's goods and services, as the challenger is the market leader in this DTC category. The campaign also mimics the challenger's DTC platform in key respects, which further supports the reasonableness of this consumer takeaway. For instance, the challenged advertising uses the term "mouth journey" (similar to the challenger's trademarked "smile journey"), the Store Advertisement references "Mouth Helpers" (similar to the challenger's "Smile Guides") and also depicts a retail setting (similar to the

---

[14] <u>AT&T Services, Inc. (AT&T's Wireless Network ("Best Network")</u>, Report #6401, *NAD/CARU Case Reports* (August 2020) (citing <u>AT&T Services, Inc. (AT&T's Wireless Network "Best Wireless Network")</u>, Report #6323, *NAD/CARU Case Reports* (November 2019)).

[15] <u>Id.</u> (citing <u>Comcast Communications, LLC (Comcast XfinityTelevision Service)</u>, Report #6207, *NAD/CARU Case Reports* (August 2018)).

[16] <u>SmileDirectClub, LLC (Smile Direct Club Clear Aligners)</u>, Report #6360, *NAD/CARU Case Reports* (April 2020).

[17] <u>Owlet Baby Care, Inc. (Smart Sock Baby Monitor)</u>, Report #6282, *NAD/CARU Case Reports* (June 2019).

challenger's SmileShop). An advertiser does not need to mention a particular competitor in order for the claim to be comparative.[18]

A.  Messages Reasonably Conveyed by the Original Advertisement

NAD first considered the messages reasonably conveyed by the Original Advertisement. The Original Advertisement begins with a tongue-in-cheek statement: "It's the 21st Century and you deserve a happy mouth without ever having to go see a doctor in person." It then introduces Happy Mouth Now as the "newest, do-it-yourself, at-home aligner kit." Next, a woman is shown attempting to use an at-home dental impression mold. The mold tray is filled with a thick, goopy substance. As the woman struggles to fit the messy tray into her mouth then gags, the voiceover observes how "easy" the impression kit is to use and that "you never have to see a doctor in person who can help or supervise with the mold." These contradictory verbal statements and visual depictions reasonably convey that the impression kit is difficult for consumers to use at home on their own.

The Original Advertisement then portrays the dental mold being shipped to the Happy Mouth Now store. The voiceover wryly notes that Happy Mouth Now will "use that mold to make an appliance that *actually* moves your teeth." Bumbling store representatives are shown with a tape measurer, an instruction manual and toy-like tools (as a chainsaw sound effect is heard in the background), which they apparently use to construct a mouth aligner, all while stumbling around and crashing into each other. While no reasonable consumer would believe that the challenger's product is constructed by actual store employees in this manner, these images nevertheless suggest that the challenger's teledentistry platform lacks oversight by medical professionals and that consumers are taking a considerable risk by entrusting the challenger with the movement of their teeth.[19] This imagery, combined with the repeated (tongue-in-cheek) references to consumers not needing to see a doctor in-person who can help, the "do-it-yourself, at-home aligner kit" statement,[20] the depiction of the woman struggling to use the at-home impression kit on her own and then later struggling with the fit of her aligner alone in her bathroom, the YouTube video caption (i.e., "Happy Mouth Now is fake, but the risks of not seeing an orthodontist in person are real"), and the claim at end of the video (i.e., "Some things are best left to the professionals"), conveys the net impression that the challenger's

---

[18] Reynolds Consumer Products (Hefty Ultra Strong Trash Bags), Report #6049, *NAD/CARU Case Reports* (January 2017)

[19] The challenger also argued that the portrayal of bumbling store employees constructing a tooth aligner product conveys that their product is "utterly worthless." NAD did not believe that consumers would reasonably takeaway the message that the challenger's DTC aligner product was of no value or an "utter waste," as this advertisement did not communicate an efficacy message, but rather a message about the risks associated with the lack of in-person medical professional oversight.

[20] The challenger took issue with the Original Advertisement's reference to the "do-it-yourself, at-home aligner kit." The challenger explained that DIY orthodontics involve consumers attempting to move their teeth at home on their own using everyday products, such as rubber bands, paper clips and fishing wire. The challenger maintained that its teledentistry platform is DTC – not DIY – because numerous professionals oversee the manufacture of the clear aligners and the treatment of patients. Thus, the challenger argued, the reference to "do-it-yourself" is false and misleading on its face. While DIY orthodontics may have a specific meaning amongst industry professionals, there is no evidence in the record that consumers have a similar understanding of this term. Here, the "do-it-yourself" phrase, in the context in which it appears, reasonably communicates that consumers will be using the challenger's DTC aligner product on their own, without in-person oversight by a medical professional, not that they will be using everyday household items to move their teeth without any outside involvement.

teledentistry platform is risky because it lacks in-person medical professional oversight by a dentist, orthodontist or doctor (i.e., a medical professional).

1. Puffery

In support of its claims, the advertiser initially argued that the Original Advertisement is puffery as no consumer would believe its "exaggerated representations" and "satirical imagery" are literally true. The challenger rejected the puffery defense and contended that humor is only an acceptable means of conveying a claim if the claim itself is true. According to the challenger, the advertiser has not provided sufficient evidence to support the takeaways from the advertising at issue.

Whether a specific claim falls within puffery's protective reach is largely dependent on whether any consumer expectations are created by the claim. Generally speaking, statements of puffery are statements for which reasonable consumers will not expect substantiation.[21] If a claim consists of obvious hyperbole, exaggerated or vague displays of a manufacturer's pride in its product, or other non-provable opinion for which the truth and accuracy cannot be determined, reasonable consumers will generally not expect substantiation.[22] Because such statements of puffery do not create an expectation that they are backed by supporting evidence, it is not required. Conversely, where an objective representation is made (i.e., termed in fact rather than opinion) regarding the performance or other tangible attributes of a product, that is sufficiently specific and material enough to create expectations in consumers, then substantiation for the claim is required.[23]

While the Original Advertisement may be humorous and satirical, it is not puffery. By communicating that the challenger's DTC teledentistry platform is risky due to the absence of in-person medical oversight, and by conveying a message that the at-home impression kit is difficult for consumers to use on their own, the advertiser is making objective representations regarding material attributes of the challenger's teledentistry platform, representations that must be supported by evidence in the record.

That the Original Advertisement makes objective claims requiring substantiation is not truly in dispute. The advertiser itself conceded that the commercial's use of goopy impressions, impractical tools and the chainsaw effect was intended to "effectively convey its underlying message that DTC and DIY orthodontic care present very real risks to consumers, and that effective orthodontic care is best conducted in person and with careful professional oversight." The advertiser also acknowledged that "any implied claim that SDC's treatment imposes dangerous risks to consumers is true" and broadly noted that "[t]o the extent these videos include implied representations that DTC orthodontics are not a good choice for consumers because they lack in-person doctor oversight, involve self-administered dental impressions, [and] can be dangerous … the AAO believes such representations to be true." Moreover, the Original Advertisement expressly warns consumers about the "real" risks of DTC orthodontics in the caption to the video, which states, "Happy Mouth Now is fake, but the risks of not seeing an orthodontist in person are real."

---

[21] The Procter & Gamble Company (Pepto Bismol Ultra), Report #6307, *NAD/CARU Case Reports* (September 2019).
[22] Id.
[23] Id.

While the advertiser must provide reliable evidence to support its claims that the challenger's DTC teledentistry platform is risky and that the impression kit is difficult to use, the parties do not dispute that the challenger's DTC platform does not provide patients with in-person, physical oversight by a medical professional. As such, the advertiser's claim that the challenger's platform lacks in-person medical oversight is supported based on the evidence in the record.

> 2.   Advertiser's Evidence that the Challenger's Platform is Risky and Difficult to Use

To substantiate its claim that the challenger's teledentistry platform is risky because it lacks in-person medical oversight, the advertiser argued that the sheer volume of Better Business Bureau ("BBB") consumer complaints against the challenger – more than 2,600 at the initiation of the challenge – was sufficient to demonstrate that the challenger's business practices puts patient safety at risk. The advertiser also submitted a handful of individual BBB consumer complaints against SDC, which detailed changed dental bites, tooth loss, and gum damage, as evidence of the "very real dangers to DTC orthodontics."

In addition to the consumer complaints, the advertiser provided evidence of investigative reports, including media reports by the Canadian Broadcasting Corporation ("CBC") and the National Broadcasting Company ("NBC"), as well as a financial report by Hindenburg Research. The Hindenburg Research investigation revealed, for example, that a shopper was deemed "a great candidate" for SDC's aligners after writing "I have zero teeth left in my mouth" in the SDC online patient intake form. Likewise, the four undercover reporters used by the CBC during a hidden camera investigation were all deemed appropriate candidates for the SDC's services, but an orthodontist who participated in the investigation determined that the majority of the proposed treatment plans would not work and could cause these consumers more harm than good. Additionally, an NBC investigation revealed that one SDC consumer reported losing several teeth and another reported a "crossbite" or "misalignment," which resulted in painful symptoms such as strain in her neck and jaw muscles, as well as migraines.

While these BBB consumer complaints and investigative reports raise issues that may be ripe for further in-depth, methodologically sound research, this evidence is inadequate to support the claim at issue. As NAD has routinely stated, the experiences of individual consumers are insufficient support for product performance claims absent a showing that the experience of the individual consumers is representative of the experience of consumers generally with the product.[24] Here, the advertiser has not demonstrated that the individual experiences of the BBB complainants, or the instances of consumer harm identified by the investigative reports, are representative of the general experience of consumers using the challenger's teledentistry platform in the U.S. As a result, the complaints and investigative reports are considered anecdotal and unreliable.[25]

---

[24] Implus, LLC (Airplus Shoe Insoles), Report #6161, *NAD/CARU Case Reports* (February 2018). See also Church & Dwight Co., Inc. (Arm & Hammer Slide Cat Litter), Report #6137, *NAD/CARU Case Reports* (December 2017) (finding submission of negative product consumer reviews to be anecdotal and unreliable).

[25] With respect to the issue of the 2600+ BBB consumer complaints, it was unclear how many involved instances of consumer harm as opposed to other unrelated types of consumer complaints. Regardless, consumer complaints are generally not reliable evidence of product performance.

The advertiser also submitted the Wexler Study to support its claims regarding the risks associated with the challenger's teledentistry platform. In the study, 470 users of DTC aligners were recruited from social media sites (Instagram, Facebook, etc.) and were surveyed to better understand users' experiences with at-home aligners. Notably, the study included users of any DTC aligner product, not just the challenger's product. The Wexler Study found that DTC users reported mild pain (77%) and that some users (6.6%) also reported that they experienced severe adverse effects and consulted with their family dentist or another orthodontist because of those issues.

NAD had several concerns with the Wexler Study. First, from a methodological perspective, the study authors could not confirm whether the survey respondents actually purchased DTC aligners. The study authors also acknowledged that the sample of social media users was likely not representative of the general population of DTC aligner users. Moreover, the study respondents were not limited to SDC customers, so the relevance of the findings to the claims at issue is unclear. Nevertheless, while the study reported that 6.6% of respondents chose to consult with a dentist or orthodontics because of perceived adverse effects, NAD agreed with the challenger that this is not evidence that DTC aligners are generally dangerous or unsafe. At best this data reveals that a small percentage of respondents potentially experienced an adverse effect related to their use of DTC orthodontics.[26] Lastly, the advertiser expressed concern that 77% of respondents experienced mild pain, but the study authors themselves acknowledged that "pain and discomfort can be expected for aligner treatment" and there was evidence in the record indicating that pain and discomfort is a common side of effect of any type of orthodontic treatment. For all these reasons, NAD found that the Wexler Study did not support the claim that the challenger's teledentistry platform is risky because it lacks in-person medical oversight.[27, 28]

In addition to providing evidence about the purported risks associated with the challenger's DTC teledentistry platform, the advertiser provided evidence that the challenger's at-home impression kit is difficult for consumers to use on their own. Specifically, the advertiser submitted several BBB complaints where individual consumers described their troubles using the challenger's impression kit. As NAD determined above, evidence of individual consumer complaints is anecdotal and is insufficient to support the challenged claims. The advertiser also pointed to the challenger's website, which states that the SDC sends its customers an extra set of impressions because "mistakes happen" as well as lists "common mistakes people make while taking their impressions with the SmileDirectClub impression kit." NAD found that this evidence shows that some consumers make

---

[26] There was no reliable evidence of the adverse effects associated with traditional in-person orthodontic care in the record. NAD observed the potential difficulty of assessing the clinical relevance of reported adverse effects resulting from DTC orthodontic care without also understanding how this data compares to the reported adverse effects associated with in-person orthodontic care.

[27] As additional support for the claim that the challenger's DTC teledentistry platform is risky, the advertiser cited to an American Dental Association ("ADA") policy statement, which stated that it "strongly discourages [DIY] orthodontics because of the potential for harm to patients." The advertiser concluded that this policy statement "demonstrates that the enhanced risks related to DTC orthodontics are indisputable." While it appears that DIY and DTC orthodontic are being conflated here (see also fn. 20 supra), the advertiser provides no underlying data to support the ADA's conclusory assertion.

[28] To the extent the advertising at issue communicates that the challenger's remote aligner treatment involves "greater risk to patients than traditional orthodontic care," as argued in the advertiser's supplemental submission, this claim is also not supported by the data in the record, which is noncomparative.

mistakes while using the at-home impression kit, not that the impression kit is generally difficult to use.

For the foregoing reasons, NAD determined the advertiser's evidence was insufficient to support the claims at issue. Consequently, NAD recommended that the advertiser discontinue the Original Advertisement together with claims that the challenger's DTC teledentistry platform is risky and the at-home impression kit is difficult to use. Nothing in this decision prevents the advertiser from communicating the message that the challenger's remote aligner treatment platform lacks in-person oversight by a medical professional.

### B. Messages Reasonably Conveyed by the Store Advertisement

In the Store Advertisement, a woman wanders around a Happy Mouth Now retail store requesting assistance from a doctor or orthodontist, but is repeatedly referred to a "mouth helper" instead. Eventually, a store employee confesses, "We don't have orthodontists or dentists here, okay?" then covertly admits that he is not an orthodontist or a dentist and that "there [is] not even an orthodontist or dentist in this building."

The challenger maintained that the Store Advertisement falsely communicates the message that no professionals are involved in its DTC teledentistry platform. The challenger explained that Treating Doctors (i.e., state licensed dentists and orthodontist) oversee all clinical aspects of the patient's evaluation, diagnosis, prescription, and treatment, including routine check-ins with patients. The advertiser disputed this contention, arguing "[t]o the extent [the challenger] means to argue that the [] campaign videos imply that no *professional* orthodontists are readily available throughout the DTC treatment process, such an implication is true and fully substantiated by numerous sources." (emphasis in original) The advertiser alternatively asserted that the Store Advertisement specifically communicates that the challenger's SmileShops lack on-site orthodontists.

After careful review, NAD determined that the Store Advertisement reasonably conveys the message that the challenger's retail shops lack on-site medical professionals. In reaching this conclusion, NAD observed that the advertisement expressly promotes the Happy Mouth Now retail stores and is set entirely inside a retail shop. Indeed, the Store Advertisement begins by informing consumers that they can consult with "mouth helpers" at Happy Mouth Now stores (i.e., "Our Happy Mouth Now stores are the perfect place to consult one of our mouth helpers") and ends by encouraging consumers to visit these stores ("So make your mouth happy and visit a Happy Mouth Now store today"). Moreover, the entire commercial consists of a woman walking around a retail store asking to speak with doctor or dentist about a tooth. After some evasive maneuvering by the store employees, the woman is eventually told "We don't have orthodontists or dentists here, okay?" and later confirms that there is "not even an orthodontist or dentist in this building."

As always, NAD carefully scrutinizes denigrating claims to ensure that they are truthful, accurate and narrowly drawn.[29] NAD found that the Store Advertisement's retail store setting, its repeated emphasis on consumers visiting retail shops, as well as its description of medical professionals as not

---

[29] <u>Unilever United States, Inc. (Dove Deep Moisture Body Wash)</u>, Report #5599, *NAD/CARU Case Reports* (June 2013).

being "here" or "in the building" (i.e., the challenger's retail shop), reasonably communicates the narrow message that the challenger's retail shops lacked on-site medical professionals, rather than the broad message that medical professionals are generally uninvolved throughout the entire treatment process. Likewise, the tagline shown in during the last scene, "Some things are best left to the professionals," in the context of this advertisement, suggests that dental health inquiries are best directed to medical professionals, such as the advertiser's member orthodontists, not to laypersons in the challenger's retail stores.[30]

The challenger did not dispute that medical professionals are not available at its SmileShop locations. Consequently, NAD found that the Store Advertisement's claim that the challenger's retail shops lack on-site medical professionals was supported by the evidence in the record.

With that said, NAD cautioned the advertiser that a broader claim – e.g., that "no professional orthodontists are readily available throughout the DTC treatment process" – would not be supported by the evidence in the record. In support for the broader claim, the advertiser submitted evidence demonstrating that the challenger's at-home impression kits and SmileShop digital mouth scans are both completed without the involvement of a medical professional. While notable, this evidence does not demonstrate that medical professionals are unavailable *throughout* the challenger's treatment process, only that they are not involved at this particular stage of treatment. The advertiser also pointed to the CBC investigative report and the BBB consumer complaints, which revealed instances of consumers being unable to communicate with their assigned Treating Doctors. However, as NAD previously determined, this evidence is anecdotal and is insufficient to substantiate a broader claim.

Lastly, the advertiser argued that the Wexler Study results also confirmed that DTC orthodontic companies provide virtually no professional support for consumers throughout treatment. In Wexler, of the 102 respondents who reported attempting to communicate with a DTC company dentist during treatment, 16 (15.7%) were unable to reach the provider. In addition to the methodological concerns discussed previously, NAD observed that there is no evidence that these 16 users were SDC customers, as the Wexler Study respondents included users of any DTC aligner product. Regardless, evidence that 16 respondents were unable to communicate with a company's dentist is not a good fit to support the broad claim that medical professionals are generally unavailable throughout the challenger's treatment process.

Based on the foregoing, NAD determined that the Store Advertisement reasonably conveys the message that the challenger's retail shops lack on-site medical professionals, a message that was supported by the evidence in the record. NAD cautioned the advertiser, however, against making the

---

[30] To the extent the advertiser argued that the entire Store Advertisement is puffery, NAD found that the challenged advertisement contains objective representations for which consumers would expect the advertiser to have substantiation, specifically that the challenger's retail shops lack on-site medical professionals. With that said, the challenger argued that the Store Advertisement falsely disparaged its digital tooth scanning process because it shows a store employee scanning a woman's teeth using a barcode scanner typically used for consumer goods, not teeth. NAD observed that this depiction is fleeting and from a distance, so it is unclear whether consumers would even notice this or understand it was meant to depict the challenger's digital tooth scanning process. Regardless, this specific depiction constitutes puffery; consumers would not reasonably believe this is a portrayal of the actual digital tooth scanning process or expect the advertiser to substantiate this imagery.

unsupported, broad claim that medical professionals are generally not involved throughout the challenger's entire treatment process.

### C. Messages Reasonably Conveyed by the Testimonial Advertisement

In the Testimonial Advertisement, two over-the top influencers with nonsensical titles (i.e., "Wild Man Extraordinaire" and "Influencer/Brunchologist") promote the fictious Happy Mouth Now product. Their commentary is inane (e.g., "I like… setting myself on fire on YouTube," "I don't have time to see a doctor about my teeth. That's why my favorite sponsor is Happy Mouth Now," "Smile and stuff Facebook at me," and "You can trust me, I'm an influencer!"). NAD observed that their senseless ramblings and wacky personas implore consumers to consider the wisdom of relying on social media personalities when making health care choices. As such, NAD determined that the net impression of the Testimonial Advertisement is that the challenger's social media influencers are absurd and should be regarded with a great deal of skepticism.

While the Testimonial Advertisement certainly provides a sharp commentary on the challenger's use of influencers to promote its goods and services, NAD found that the claims made in the Testimonial Advertisement are largely puffery. In reaching this conclusion, NAD noted that this advertisement is likely to be generally understood by consumers as an expression of the advertiser's poor opinion of the challenger's social media influencers and not a factual claim for which consumers would expect the advertiser to have substantiation.[31]

With that said, the challenger argued that the Testimonial Advertisement portrays its product as ineffective because the Addison Chardonnay Influencer/Brunchologist character states that Happy Mouth Now made her teeth "look like this" and smiles to reveal very obviously misaligned bottom teeth. NAD agreed that the depiction of the crooked tooth reasonably communicates that the challenger's tooth aligner product is ineffective. In support of its efficacy claims, the advertiser again referenced the BBB consumer complaints and the investigative media reports, which NAD previously found to be insufficient claim support. Without any reliable evidence demonstrating that the challenger's product is ineffective, NAD recommended that this claim be discontinued.

The challenger also argued that the statement, "Just listen to these celebrities who claim to have used our product," suggests that the endorsers are being less than truthful when they "claim" to use the product. As NAD has observed, consumers do not typically parse components of a commercial to determine the message that is conveyed.[32] NAD did not agree that consumers hearing a single reference to "claim" during the 90-second video would reasonably take away a net impression that the challenger's social media influencers are lying about using its DTC product and, as a result, are untrustworthy. Instead, NAD found that consumers are likely to take away the message that the challenger's social media influencers are absurd and should be treated with skepticism.

For these reasons, NAD recommended that the advertiser discontinue the Testimonial Advertisement's claim that the challenger's DTC aligner product is ineffective, but otherwise determined that the Testimonial Advertisement is puffery.

---

[31] The Procter & Gamble Company (Pepto Bismol Ultra), Report #6307, supra.
[32] Reckitt Benckiser LLC (Air Wick Home Fragrance Products), Report #6374, *NAD/CARU Case Reports* (June 2020)

D. Messages Reasonably Conveyed by the Happy Eyes Now and Happy Bones Now Advertisement

The Happy Eyes Now and Happy Bones Now Advertisement begins with a flashback from the Original Advertisement where a woman struggles with the goopy at-home dental impression kit. It then portrays the same woman receiving an at-home DTC laser eye surgery device "[f]rom the geniuses that brought you the at-home teeth aligner kit, Happy Mouth Now." Not only does the device fail to correct the woman's vision, but it also malfunctions and permanently blinds her. After falling down a set of stairs and breaking her leg due to her blindness, the woman is then sent a DTC bone repair kit. Notably, both the Happy Eyes Now and Happy Bones Now devices arrive in the Happy Mouth Now box, just with "eyes" and "bones" stickers over the word "Mouth."

The advertiser argued that the Happy Eyes Now and Happy Bones Now advertising conveys the message that "the provision of medical care be left to trained professionals," but also generally contended, "to the extent these videos include implied representations that DTC orthodontics are not a good choice for consumers because they lack in-person doctor oversight, involve self-administered dental impressions, can be dangerous, and are often ineffective, among other concerns, the AAO believes such representations to be true."

By depicting the disastrous impact of DTC laser eye treatment on the woman's health and well-being, NAD agreed that the challenged advertising reasonably communicates to consumers that DTC medical treatments, including the DTC orthodontic treatments referenced repeatedly in the advertisement, are dangerous and ineffective. In support of this message, the advertiser provided evidence that the challenger's DTC aligner therapy is risky and ineffective – in the form of BBB consumer complaints, investigative reports and the Wexler Study. NAD previously determined that this evidence was unreliable and, therefore, insufficient to support the claims that the challenger's treatment platform is dangerous and ineffective (let alone the broader message that DTC medical treatments are generally dangerous and ineffective).

Based on the foregoing, NAD recommended the advertiser discontinue the Happy Eyes Now and Happy Bones Now Advertisement together with claims that the challenger's DTC teledentistry platform is dangerous and ineffective.

E. Messages Reasonably Conveyed by the Microsite

On the landing page of the microsite, the fictitious Happy Mouth Now product is featured, along with the claim, "Your mouth's journey shouldn't start anywhere but at an orthodontist," and a link to the advertiser's "Find an Orthodontist" search tool. Below the search tool, the advertiser explains the importance of an in-person evaluation and in-person supervision by a medical professional, then poses the question:

> Would you rather trust a mouth helper or medically trained doctor? An AAO orthodontist has an additional two to three years of specialized education, beyond dental school, to learn the proper way to align teeth and correct bite.

Beneath this statement is the "Leave it to the pros" claim and, after providing links to purchase the Happy Mouth/Eyes/Bones Now kits, the advertiser states, "These scenarios and products above aren't real, but the risks of not seeing an orthodontist are."

The challenger contended that the microsite falsely implies that the challenger's DTC orthodontic care is risky, dangerous and undesirable because no dental professionals are involved. The advertiser acknowledged that the goal of the Happy Mouth Now campaign advertising is to "effectively convey its underlying message that DTC and DIY orthodontic care present very real risks to consumers, and that effective orthodontic care is best conducted in person and with careful professional oversight."

NAD determined that the microsite reasonably communicates the messages that medical professionals are generally not involved throughout the challenger's DTC treatment process and that using the challenger's teledentistry platform is risky. By contrasting "medically trained doctors" to "mouth helpers," the advertiser reasonably conveys the message that the AAO provides trained medical professionals to treat patients, whereas the SDC provides only untrained mouth helpers. The phrase "Leave it to the pros," in proximity to the "mouth helpers" claim, also reinforces that the advertiser – unlike the challenger – utilizes medical professionals. Likewise, NAD observed that the claim "the risks of not seeing an orthodontist are [real]," in this context, further communicates to consumers that the challenger's DTC teledentistry platform is risky because orthodontists are not involved with its treatment process.[33]

As discussed previously, the evidence in the record – i.e., the BBB consumer complaints, the investigative reports, as well as the Wexler Study – did not reliably support the message that the challenger's DTC teledentistry platform is risky or the message that medical professionals are not involved throughout the challenger's treatment process. Consequently, NAD recommended that the advertiser discontinue claims challenged on the microsite that the challenger's DTC platform is risky and that medical professionals are not involved throughout the challenger's treatment process.

**Conclusion:**

NAD recommended that the advertiser discontinue the Original Advertisement together with claims that the challenger's DTC teledentistry platform is risky and that the at-home impression kit is difficult to use.

NAD determined that the Store Advertisement reasonably conveyed the message that the challenger's retail shops lack on-site medical professionals, a message NAD found was supported.

---

[33] The advertiser broadly argued that its Happy Mouth Now campaign, including the microsite, is puffery. On the microsite, the advertiser makes objective representations concerning tangible attributes of the challenger's DTC orthodontic platform, specifically that DTC remote aligner treatment is risky and that medical professionals are not involved throughout the challenger's treatment process. These are factual claims for which consumers would expect the advertiser to have substantiation and, thus, removes these claims from the realm of puffery.

NAD recommended that the advertiser discontinue the Testimonial Advertisement's claim that the challenger's DTC aligner product is ineffective, but otherwise determined that the Testimonial Advertisement is puffery.

NAD recommended the advertiser discontinue the Happy Eyes Now and Happy Bones Now Advertisement together with claims that the challenger's DTC teledentistry platform is dangerous and ineffective.

Finally, NAD recommended that the advertiser discontinue claims challenged on the microsite that the challenger's DTC teledentistry platform is risky and that medical professionals are not involved throughout the challenger's treatment process.

**Advertiser's Statement:**

Although AAO respectfully disagrees with many of the NAD's conclusions, AAO will comply with the NAD's recommendations regarding its Happy Mouth Now campaign. AAO supports the NAD and self-regulatory process, and appreciates the NAD's efforts in reviewing the claims at issue. AAO is pleased the NAD found that the Store Advertisement is substantiated by the record, but respectfully disagrees with the NAD's other findings. **(#6917 RL, closed 02/18/2021)**

© 2021. BBB National Programs.