UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ADAM FRANCHI, Individually and on Behalf of All Others Similarly Situated,<br><br>                    Plaintiff,<br><br>        vs.<br><br>SMILEDIRECTCLUB, INC., et al.,<br><br>                    Defendants. | Civil Action No. 3:19-cv-00962<br>**(Consolidated)**<br><br><u>CLASS ACTION</u><br><br>Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensley<br><br>PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS THE AMENDED CONSOLIDATED COMPLAINT |

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................1

II. STATEMENT OF FACTS .......................................................................................2

    A. At the IPO, SDC Was Not Experiencing "Accelerating Growth"...........................2

    B. SDC Misrepresented Customer Satisfaction.............................................................5

    C. SDC's Teledentistry Platform Did Not Provide High Quality Care........................6

    D. SDC Did Not Warn Investors of Regulatory and Legal Challenges that
        Had Materialized by the Time of the IPO..................................................................6

III. THE COMPLAINT ADEQUATELY ALLEGES A 1933 ACT VIOLATION.................7

    A. The Complaint Alleges Actionable Misstatements and Omissions..........................8

        1. The Registration Statement Falsely Stated that Growth Was
            Accelerating at the Time of the IPO .............................................................8

        2. Defendants Violated SEC Item 303.........................................................10

            a. Scienter Is Not an Element of a 1933 Act Claim, and the
                Requirements of SEC Item 303 Are Satisfied ...............................11

            b. The Misrepresented and Omitted Facts Were Material .................12

        3. The Registration Statement Misrepresented the Standard of Care
            SDC Provided and Its Customers' Satisfaction .......................................13

            a. The Registration Statement Contained Untrue Statements
                Concerning SDC's Standard of Care ..............................................14

            b. The Registration Statement Contained Untrue Statements
                Concerning Member Satisfaction ...................................................15

            c. Defendants' Risk Disclosures Were Misleading ...........................17

    B. Loss Causation Is an Affirmative Defense to a Section 11 Claim.........................20

IV. THE COMPLAINT ALLEGES VIOLATIONS OF THE 1934 ACT..............................21

    A. The Complaint Adequately Alleges Loss Causation .............................................21

4814-3775-4352.v1

B.     The Complaint Pleads a Strong Inference of Scienter ...........................................23

　　　1.     Defendants Had Actual Knowledge of the Alleged False and
　　　　　　Misleading Statements and Omissions .......................................................23

　　　2.     Katzman and Other SDC Insiders Pocketed $630 Million as Part of
　　　　　　the IPO ........................................................................................................25

V.     CONCLUSION....................................................................................................................25

4814-3775-4352.v1

Case 3:19-cv-00962     Document 93     Filed 06/28/21     Page 3 of 37 PageID #: 2583

**TABLE OF AUTHORITIES**

**Page**

**CASES**

*Azzolini v. Corts Tr. II for Provident Fin. Tr. I,*
2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005)........................................................20

*Basic Inc. v. Levinson,*
485 U.S. 224 (1988)..................................................................................................13

*Bondali v. Yum! Brands, Inc.,*
620 F. App'x 483 (6th Cir. 2015) .......................................................................15, 18

*Castro Bustillo v. McAleenan,*
2020 WL 1274600 (M.D. Tenn. Mar. 17, 2020) ......................................................20

*Chevalier v. Estate of Barnhart,*
803 F.3d 789 (6th Cir. 2015) ...................................................................................18

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.,*
399 F.3d 651 (6th Cir. 2005) .............................................................................10, 13

*City of St. Clair Shores Police & Fire Ret. Sys. v.
Nationstar Mortg. Holdings Inc.,*
2016 WL 4705718 (S.D. Fla. June 21, 2016) .....................................................11, 25

*Curran v. Freshpet, Inc.,*
2018 WL 394878 (D.N.J. Jan. 12, 2018) ...................................................................12

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v.
Nomura Holding Am., Inc.,*
873 F.3d 85 (2d Cir. 2017)..........................................................................................7

*Frank v. Dana Corp.,*
646 F.3d 954 (6th Cir. 2011) ....................................................................................23

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.,*
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ......................................................15

*Grae v. Corr. Corp. of Am.,*
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017).................................................. *passim*

*Halford v. AtriCure, Inc.,*
2010 WL 8973625 (S.D. Ohio 2010)........................................................................22

*Helwig v. Vencor, Inc.,*
251 F.3d 540 (6th Cir. 2001) ...................................................................... *passim*

4814-3775-4352.v1

*Herman & MacLean v. Huddleston*,
459 U.S. 375 (1983)..........................................................................................7, 11

*In re Allscripts, Inc. Sec. Litig.*,
2001 WL 743411 (N.D. Ill. June 29, 2001) ..................................................16

*In re Blue Apron Holdings, Inc.*,
2020 WL 1950783 (E.D.N.Y. Apr. 22, 2020) ..............................................10

*In re Burlington Coat Factory Sec. Litig.*,
114 F.3d 1410 (3d Cir. 1997)..........................................................................11

*In re Direct Gen. Corp. Sec. Litig.*,
398 F. Supp. 2d 888 (M.D. Tenn. 2005)......................................................9, 13

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019) ..............................18, 20, 23

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)........................................................11, 17

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004)............................................................8

*In re Ford Motor Co Sec. Litig., Class Action*,
381 F.3d 563 (6th Cir 2004) ...........................................................................17

*In re Greenlane Holdings, Inc. Sec. Litig.*,
2021 WL 53188 (S.D. Fla. Jan. 6, 2021) .......................................................18

*In re NationsMart Corp. Sec. Litig.*,
130 F.3d 309 (8th Cir. 1997) .............................................................................8

*In re Netflix, Inc. Sec. Litig.*,
2005 WL 1562858 (N.D. Cal. June 28, 2005)...........................................16, 17

*In re Ply Gem Holdings, Inc. Sec. Litig.*,
2016 WL 5339541 (S.D.N.Y. Sept. 23, 2016)................................................11

*In re Prison Realty Sec. Litig.*,
117 F. Supp. 2d 681 (M.D. Tenn. 2000).........................................................8

*In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*,
166 F. Supp. 3d 948 (W.D. Tenn. 2014).......................................................20

4814-3775-4352.v1

*In re Sirrom Cap. Corp. Sec. Litig.*,
  84 F. Supp. 2d 933 (M.D. Tenn. 1999)..................................................................8, 9

*In re Vivendi, S.A. Sec. Litig.*,
  838 F.3d 223 (2d Cir. 2016).................................................................................9

*Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*,
  2021 WL 1316705 (M.D. Tenn. Apr. 8, 2021)..................................................21, 23

*Ind. State Dist. Council of Laborers & Hot Rod Carriers Pension &*
  *Welfare Fund v. Omnicare, Inc.*,
  583 F.3d 935 (6th Cir. 2009) ...............................................................................7

*J & R Mktg., SEP v. Gen. Motors Corp.*,
  549 F.3d 384 (6th Cir. 2008) ..............................................................................20

*Kyrstek v. Ruby Tuesday, Inc.*,
  2016 WL 1274447 (M.D. Tenn. Mar. 31, 2016) ...................................................24

*Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*,
  2018 WL 6181356 (M.D. Tenn. Nov. 27, 2018) ..................................................20

*Litwin v. Blackstone Grp., L.P.*,
  634 F.3d 706 (2d Cir. 2011)....................................................................10, 11, 12

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*,
  622 F.3d 471, 479 (6th Cir. 2010) .......................................................................23

*Lubbers v. Flagstar Bancorp. Inc.*,
  162 F. Supp. 3d 571 (E.D. Mich. 2016).................................................................18

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011).........................................................................................10, 13

*Milman v. Box Hill Sys. Corp.*,
  72 F. Supp. 2d 220 (S.D.N.Y. 1999)......................................................................11

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
  2016 WL 4098584 (M.D. Tenn. June 16, 2016),
   *rev'd on other grounds*, 877 F.3d 687 (6th Cir. 2017) .............................14, 15, 18

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys. Inc.*,
  877 F.3d 687 (6th Cir. 2017) ...............................................................................22

4814-3775-4352.v1

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) ................................................................................21

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012).................................................................................10

*Pinter v. Dahl*,
486 U.S. 622 (1988)................................................................................................7

*Pittman v. Unum Group*,
2020 WL 2846929 (E.D. Tenn. June 1, 2020)......................................................17

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ...............................................................................16

*Santa Fe Indus., Inc. v. Green*,
430 U.S. 462 (1977)..............................................................................................17

*Schuh v. HCA Holdings, Inc.*,
947 F. Supp. 2d 882 (M.D. Tenn. 2013)........................................................ *passim*

*Shah v. Zimmer Biomet Holdings, Inc.*,
348 F. Supp. 3d 821 (N.D. Ind. 2018) ................................................................12

*Song v. City of Elyria*,
985 F.2d 840 (6th Cir. 1993) ...............................................................................20

*St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Heathcare Co., Inc.*,
2021 WL 195370 (M.D. Tenn. Jan. 20, 2021).....................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..............................................................................................25

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976)..............................................................................................13

*Tuchman v. DSC Commc'ns Corp.*,
14 F.3d 1061 (5th Cir. 1994) ...............................................................................15

*Universal Health Servs., Inc. v. United States*,
___ U.S. ___, 136 S. Ct. 1989 (2016)....................................................................9

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019)..........................................................17, 18

4814-3775-4352.v1

*Winslow v. BancorpSouth, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011)........................................................19

*Zwick Partners, LP v. Quorum Health Corp.*,
2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)..............................................19, 23

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 9(b) ..........................................................................................7, 8, 9. 16
Rule 12(d) ...............................................................................................20
Rule 12(b)(6).............................................................................................20
Rule 56 .................................................................................................20

17 C.F.R.
§229.303(a)(3)(ii)..........................................................................................10

4814-3775-4352.v1

## I. INTRODUCTION

This case has nothing to do with whether SDC was a "pioneer" or whether it "disrupted" the orthodontic industry.[1] It is about whether the Registration Statement used by defendants to amass fortunes through the sale of $1.3 billion in stock to investors misrepresented or omitted material facts about SDC's business. The answer to this question is yes. Defendants are strictly liable for their violations of §§11, 12(a)(2) and 15 of the 1933 Act; and, as detailed below in §IV, SDC, David Katzman ("Katzman") and Kyle Wailes ("Wailes") are also liable for violating the 1934 Act.

First, the Complaint alleges that the Registration Statement misrepresented that SDC's "strength" was due to its purported "accelerating growth," when, in fact, SDC's three key business metrics (revenue, gross profit and Adjusted EBITDA (earnings before interest, taxes, depreciation and amortization ("EBITDA")) were actually *declining*.

Second, the Registration Statement claimed SDC's high level of customer satisfaction would drive future growth while omitting that: (i) SDC customers had lodged complaints about the Company's products and services, including many involving serious injury; (ii) SDC had deployed a hardball litigation campaign designed to suppress statements and disclosures from SDC customers and medical professionals critical of SDC's products and business practices; (iii) SDC was being investigated in California for the illegal practice of dentistry without a license; and (iv) the California Senate had passed legislation that would thwart SDC's improper business practices.

Third, while claiming SDC provided high quality care at lower cost by streamlining the orthodontic process, the Registration Statement omitted that SDC had endangered the health of many of its customers by prescribing aligners to customers who were not suitable candidates and by failing to provide adequate, or any, ongoing dental care to, and supervision of, its customers.

---

[1] All capitalized terms in this opposition not otherwise defined herein have the same meaning as set forth in the Complaint. ECF No. 85. Additionally, all "¶_" or "¶¶_" citations herein are to the Complaint and all emphasis is added and citations are omitted, unless otherwise noted.

- 1 -

As to the 1934 Act claims, the Complaint also adequately alleges: (i) a strong inference of scienter, as the Exchange Act Defendants knowingly or recklessly utilized a Registration Statement that was false and misleading to raise more than $1.3 billion via the IPO; and (ii) loss causation, as the Exchange Act Defendants' conduct inflated the price of SDC's common stock, which declined by as much as 77% after the concealed and misrepresented truth was belatedly disclosed.

## II.    STATEMENT OF FACTS

SDC operates as a teledentistry company.  The Company manufactures, markets and sells 3D-printed clear dental aligners to treat malocclusion.  In May 2019, defendants filed the Registration Statement with the SEC in connection with the planned sale of SDC Class A common stock.  On September 12, 2019, defendants completed SDC's IPO.  The Registration Statement contained untrue statements of material fact regarding SDC's then-existing operations and omitted other material facts necessary to make the statements made therein not false or misleading.

### A.    At the IPO, SDC Was Not Experiencing "Accelerating Growth"

The Registration Statement falsely represented that one of SDC's "Strengths" was its "Accelerating Growth," portraying SDC's revenue, gross profit and Adjusted EBITDA as growing. ¶¶5, 44, 50, 55.  In fact, SDC's revenue, gross profit and Adjusted EBITDA were not growing but had reversed course and were declining by the time of the IPO.  ¶¶5, 44-54.  The decline in SDC's most important financial metrics represented a distinct reversal in the Company's growth trends portrayed in the Registration Statement.  These trend changes – both the termination of SDC's historical positive trends and its new downward trends – were omitted from the Registration Statement.  *Id.*  The undisclosed reversal in SDC's revenue, gross profit and Adjusted EBITDA trends from positive to negative "cause[d] reported financial information" in the Registration Statement to "***not . . . be . . . indicative of future operating results***" as, at the time of the IPO, SDC's growth was no longer accelerating as represented in the Registration Statement.  ¶¶5, 47, 49.

- 2 -

The Registration Statement presented impressive quarterly growth in Adjusted EBITDA, reporting a trend in which Adjusted EBITDA had increased from negative $12.7 million in 4Q18 to negative $3.9 million in 1Q19 to *positive* $6.2 million in 2Q19 (the last period reported in the Registration Statement), as shown in the left chart below:

 

The Registration Statement, however, failed to disclose that by the date of the IPO, SDC's Adjusted EBITDA growth trend had halted and had commenced a downward trend materially different from the one portrayed, as illustrated in the right chart above. Thus, SDC's representation that it was experiencing "accelerating growth" and the Company's reported growth in Adjusted EBITDA as portrayed in the Registration Statement were misleading and were *not* indicative of SDC's current, let alone future, performance. ¶¶49-50. Similarly, as shown in the left chart below, the Registration Statement presented impressive quarterly gross profit growth, with gross profit increasing by nearly 80% from $90.8 million in 4Q18 to $161.1 million in 2Q19 (the last period reported in the Registration Statement).

- 3 -




The gross profit reported in the Registration Statement was misleading as, by the date of the IPO, SDC's gross profit trend had halted and had commenced a downward trend materially different from that portrayed in the Registration Statement, as illustrated in the right chart above. ¶51.

The Registration Statement further represented that SDC's revenue had grown sequentially each quarter since 4Q17, reaching over $423.2 million in 2018 from $146.0 million in 2017, and that SDC's revenue for the six months ended June 30, 2019 had increased an additional 113% over the same period in 2018. This revenue growth rate portrayed in the Registration Statement was misleading and not indicative of SDC's revenue performance at the time of the IPO. ¶52.

Because the Registration Statement omitted any disclosure of the known reversal in SDC's revenue, gross profit and Adjusted EBITDA trends, the claim of "accelerating growth" and the reported positive growth contained in the Registration Statement was false and/or misleading and was neither indicative of, nor consistent with, SDC's current or future operating results. ¶¶5, 53.

The declines in SDC's most important financial metrics were known to defendants as *SDC closely tracked its revenue, gross profit and Adjusted EBITDA in connection with its ongoing operations and in connection with the IPO*. ¶¶6, 54.

- 4 -

### B. SDC Misrepresented Customer Satisfaction

SDC claimed its number one strength was "positive member experience." ¶¶7, 55-56, 106. Because SDC's business model was predicated on customers purportedly ***not*** being satisfied with traditional orthodontics, the Company emphasized that its "primary focus is on delivering an exceptional member experience" and that "member satisfaction" was fundamental to "maintain[ing] our position as the leading direct-to-consumer clear aligner provider." ¶¶7, 55-56.

In fact, ***thousands of SDC customers*** were neither "highly satisfied" nor had "highly positive experiences" with SDC's products and services. ¶¶8, 57. Rather, SDC molds and aligners were causing serious health problems for thousands of customers who received missing or misshapen aligners and were seeking (and experiencing difficulties in obtaining) refunds. ¶¶8, 57(a), 107, 127, 144. For example, the BBB alone registered more than ***1,800 complaints*** against SDC, notwithstanding the fact that the BBB had expressly discouraged customers from even submitting complaints to BBB before first contacting SDC directly. ¶144. Members were dissatisfied because, contrary to defendants' statements in the Registration Statement, SDC's primary focus was on signing up as many customers as possible to report increased revenue and financial trends in advance of the IPO. ¶¶8, 57(b). SDC sold aligners to customers who were not appropriate candidates for SDC's treatment, pressured sales associates to close sales irrespective of a customer's suitability and approved treatment plans without any meaningful review from dentists. ¶¶8, 57(b)-(c). In addition, SDC took drastic steps to reduce or eliminate criticism, including by employing aggressive litigation against journalists, customers and an affiliate of the ADA and requiring that customers sign NDAs in order to receive refunds. ¶¶9, 42(b), 57(f), 97. Complaints against SDC to the Dental Board of California ("DBC") led to an investigation and raids on the Company's stores beginning in late 2017, none of which was disclosed in the Registration Statement. ¶¶42(d), 57(g), 101.

- 5 -

## C.    SDC's Teledentistry Platform Did Not Provide High Quality Care

The Registration Statement claimed that SDC's teledentistry platform allowed it to provide "**excellent clinical care**" and "**professional-level service**." ¶¶10, 58.  According to the Registration Statement, "**trained technicians**" created treatment plans, and the Company's "SmileCheck" program allowed a "**treating doctor** to monitor [the] member's progress and enable[d] **seamless communication** with the member over the course of treatment." *Id.*

In truth, SDC's teledentistry model was endangering the health of many of its customers by prescribing aligners to unsuitable candidates in order to inflate revenues.  ¶¶11, 59(b)-(h).  The Registration Statement failed to disclose that SDC doctors were not reviewing dental x-rays or conducting dental examinations prior to prescribing aligners to customers – instead, customers were self-certifying their dental health.  ¶¶11, 59(b).  Nor did the Registration Statement inform investors that the Company was engaged in the unlicensed practice of dentistry and that SDC's treating dentists had no meaningful contact with customers.  ¶¶11-12, 59(f).

## D.    SDC Did Not Warn Investors of Regulatory and Legal Challenges that Had Materialized by the Time of the IPO

The Registration Statement advised investors that regulatory and legal challenges "**could have a material adverse effect on our business**."  The purported "risk warnings" were themselves false and misleading as, by the time of the IPO, the risks that SDC warned of **had already** manifested.  For example, the Registration Statement omitted that dozens of complaints had been filed by state chapters of the ADA, the American Association of Orthodontics and similar organizations.  ¶¶12, 62(a).  The Registration Statement similarly omitted the fact that SDC was under investigation by the DBC for engaging in the unlicensed practice of dentistry.  ¶62(b).  The Registration Statement omitted entirely legislation passed by the California Senate, which required fundamental changes in SDC's business model in one of its largest markets.  ¶62(e).  The legislation

- 6 -

requires teledentistry platforms to provide each customer with the treating dentist's name, license number and dental board contact; mandates reviews of a patient's most recent radiographs prior to beginning orthodontic treatment; and requires teledentistry providers to conduct a full patient examination prior to the enactment of the plan – requirements not implemented by SDC. *Id.*

## III.     THE COMPLAINT ADEQUATELY ALLEGES A 1933 ACT VIOLATION

The "chief innovation" of the 1933 Act "was to replace the traditional buyer-beware or *caveat emptor* rule of contract with an affirmative duty on sellers to disclose all material information fully and fairly prior to public offerings of securities. That change marked a paradigm shift in the securities markets." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 96 (2d Cir. 2017). The Supreme Court has repeatedly emphasized that the 1933 Act's purpose of promoting "full and fair disclosure" is effectuated by means of strict liability, "even for innocent misstatements." *Pinter v. Dahl*, 486 U.S. 622, 646 (1988).

The elements of a §11 claim are minimal: "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his *prima facie* case." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983). "'Neither scienter, reliance, nor loss causation is an element of §11 or §12(a)(2) claims.'" *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 886 (M.D. Tenn. 2013). As the U.S. Supreme Court has made clear, 1933 Act "[l]iability . . . is virtually absolute, even for innocent misstatements," as the 1933 Act "places a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. at 382; *Schuh*, 947 F.2d at 886.

Defendants incorrectly contend that the 1933 Act claims should be subject to Rule 9(b). Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint (ECF No. 91) ("Defs' Mem.") at 12. A §11 claim is only subject to Rule 9(b) of the Federal Rules of Civil Procedure (the "Rules") if it "sounds in fraud." *Ind. State Dist. Council of Laborers & Hot Rod*

4814-3775-4352.v1

*Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009); *see also In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 314 (8th Cir. 1997) ("Rule 9(b) does not apply . . . because proof of fraud or mistake is not a prerequisite to establishing liability under §11").

Where §11 claims are premised on allegations independent of fraud, the claims do not "sound in fraud." *In re Sirrom Cap. Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 938 (M.D. Tenn. 1999) (Rule 9(b) pleading standard inapplicable where "[p]laintiffs speak in terms of [d]efendants' failure to make a reasonable investigation or possess reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were true"); *accord In re Prison Realty Sec. Litig.*, 117 F. Supp. 2d 681, 688 (M.D. Tenn. 2000). The Complaint's 1933 Act claims are grounded not in fraud but rather in defendants' failure to exercise reasonable care to ensure that the Registration Statement was accurate. ¶¶42, 44-45, 54, 57, 59, 62. In addition, the Complaint expressly disclaims allegations of fraud with respect to these claims. ¶¶64, 75, 83. Such disclaimers preclude the application of Rule 9(b)'s heightened pleading standards. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 602 & n.19 (N.D. Ohio 2004); *Prison Realty*, 117 F. Supp. 2d at 688-89.[2]

### A. The Complaint Alleges Actionable Misstatements and Omissions

#### 1. The Registration Statement Falsely Stated that Growth Was Accelerating at the Time of the IPO

A company cannot project "financial well-being . . . while knowingly omitting material facts that would have tempered their optimism." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 544 (6th Cir. 2001). Otherwise, a company could "offer a patchwork of honesty and omission. This proposition is untenable, however, both as a matter of policy and precedent." *Id*. at 560-61; *see also Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *13 (M.D. Tenn. Dec. 18, 2017).[3]

---

[2] Regardless, the Complaint alleges falsity with particularity. ¶¶44-54, 57, 59, 62.

[3] "[W]hether and when [d]efendants had a duty to disclose the adverse information . . . must be determined by the trier of fact . . . who must determine the factual circumstances under which these

- 8 -

The Registration Statement misrepresented that "Accelerating Growth" was one of SDC's "Strengths" and that SDC's revenue, gross profit and Adjusted EBITDA were growing dramatically. ¶¶5, 44. These representations were untrue as the Registration Statement omitted that SDC's growth was not accelerating. Rather, SDC's revenue, gross profit and Adjusted EBITDA growth trends had turned negative by the time of the IPO. The failure to disclose this adverse information rendered the Registration Statement's claims of "accelerating growth" false, and the accelerating revenue, gross profit and Adjusted EBITDA growth trends portrayed therein misleading. ¶¶45-54.

Defendants insist that there is no 1933 Act violation because the Registration Statement provided accurate historical information. Defs' Mem. at 2, 13. Defendants' contention not only fails to reckon with the applicable case law cited above but also ignores the fact that by the date of the IPO, approximately 10 of the 12 weeks of 3Q19 had already transpired, rendering the half-truths in the Registration Statement materially misleading. Even under Rule 9, "representations that state the truth only so far as it goes, while omitting critical qualifying information – can be actionable misrepresentations." *Universal Health Servs., Inc. v. United States*, ___ U.S. ___, 136 S. Ct. 1989, 2000 (2016). Defendants simply ignore the well-established "rule against half-truths, or statements that are misleading by omission." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 240 (2d Cir. 2016).

Although the Registration Statement characterized SDC's "accelerating growth" as a "strength," portraying dramatic increases in revenue, Adjusted EBITDA and gross profit, it failed to disclose that at the time of the IPO, SDC was experiencing Adjusted EBITDA, gross profit and revenue declines that rendered the assertions of ***accelerating growth*** materially misleading. While defendants argue they had no duty to disclose this information, the Registration Statement boasted about SDC's positive growth; once defendants spoke, they had a duty to speak truthfully and

alleged false statements and omissions were made." *In re Direct Gen. Corp. Sec. Litig.*, 398 F. Supp. 2d 888, 896 (M.D. Tenn. 2005); s*ee also Sirrom*, 84 F. Supp. 2d at 944.

- 9 -

completely. *Helwig*, 251 F.3d at 561. "'[C]orporate officers are not required to speak, but once they do, they must be truthful if their comments are material to investors' decision making.'" *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 673 (6th Cir. 2005).

### 2. Defendants Violated SEC Item 303

The change in trends from the growth represented in the Registration Statement to the dramatic declines in Adjusted EBITDA, revenue and gross profit at the time of the IPO were all known negative trends or uncertainties that existed at the time of the IPO. Defendants had a duty to disclose these material changes in trends or uncertainties under Item 303, which requires companies to "'[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations.'" 17 C.F.R. §229.303(a)(3)(ii); *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011); *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 121 (2d Cir. 2012).

In attempting to sidestep the mandatory disclosure requirements of Item 303, defendants argue they were not required to disclose SDC's change in revenue, Adjusted EBITDA and gross profit trends that were occurring at the time of the IPO because the quarter had yet to be completed. Defs' Mem. at 13-14. Judge Sharp rejected this assertion in *Schuh*, recognizing that "what may not constitute a trend in one industry may signal a trend in another" and rejecting the argument that, as a matter of law, "'a two month period of time does not establish a "trend" for purposes of the disclosures required by Item 303.'" *Schuh*, 947 F. Supp. 2d at 891-92;[4] *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 39-40 (2011) ("bright-line" and "categorical" rules "'artificially exclud[e] . . . information [that] would otherwise be considered significant to the trading decision of

---

[4]     Defendants cite *Schuh* for the proposition that the "relevant comparison is year-over-year, not quarter-to-quarter." Defs' Mem. at 15. First, no such requirement can be found in Item 303. *See In re Blue Apron Holdings, Inc.*, 2020 WL 1950783, at *8 (E.D.N.Y. Apr. 22, 2020). Moreover, Judge Sharp expressly held that "what may not constitute a trend in one industry may signal a trend in another." *Schuh*, 947 F. Supp. 2d at 891.

- 10 -

a reasonable investor'"). Other district courts are in accord. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 513 (S.D.N.Y. 2013) (defendants had a duty to disclose a material negative impact to revenues that occurred ***ten days prior*** to the initial public offering); *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999) (requiring disclosure of a known declining sales trend caused by a loss of key customers during the same quarter of the company's IPO).[5]

Defendants' assertion that no disclosure of SDC's "financial results themselves" was required (Defs' Mem. at 16) ignores the clear mandate of Item 303, which requires an issuer to disclose the full extent to which adverse trends were expected to affect its business, as well as "uncertainties." *See In re Ply Gem Holdings, Inc. Sec. Litig.*, 2016 WL 5339541, at *6 (S.D.N.Y. Sept. 23, 2016); *Litwin*, 634 F.3d at 718-19. The dramatic declines here in Adjusted EBITDA, gross profit and revenue occurred prior to the IPO and triggered Item 303's disclosure requirements.

### a. Scienter Is Not an Element of a 1933 Act Claim, and the Requirements of SEC Item 303 Are Satisfied

Defendants' assertion that knowledge has not been adequately alleged is unavailing. Defs' Mem. at 14-15. "'***[S]cienter*** [is not] an element of §11 or §12(a)(2) claims.'" *Schuh*, 947 F. Supp. 2d at 886. As the U.S. Supreme Court made clear decades ago, 1933 Act "[l]iability . . . is virtually absolute, even for ***innocent*** misstatements." *Huddleston*, 459 U.S. at 382. Defendants are liable for ***innocent or negligent*** material misstatements or omissions, including those alleged in ¶¶5, 44, 53, 55 – that the Registration Statement falsely or misleadingly represented that ***accelerating growth*** was a ***strength*** – as no knowledge requirement exists for these claims. *Id.*

---

[5]   *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410 (3d Cir. 1997), and *City of St. Clair Shores Police & Fire Ret. Sys. v. Nationstar Mortg. Holdings Inc.*, 2016 WL 4705718 (S.D. Fla. June 21, 2016), are inapposite. *See* Defs' Mem. at 13-14. *Burlington* was a 1934 Act securities fraud case where plaintiffs expressly did not raise Item 303 claims on appeal. 114 F.3d at 1419 n.7. In *Nationstar*, the court held that the defendant had ***already warned*** that it was being negatively impacted by the allegedly undisclosed impact of declining interest rates. 2016 WL 4705718, at *8.

- 11 -

With respect to Lead Plaintiff's Item 303 claim, the Complaint alleges that the change in trend was **known**, as ***SDC closely tracked*** its revenue, gross profit and Adjusted EBITDA in connection with its ongoing operations and in connection with the IPO. ¶¶6, 54. Defendants seemingly argue that alleging defendants' awareness of the trend is insufficient. Yet a 1933 Act claim is adequately pled where a plaintiff alleges "that there was a downward trend of which [defendants] had knowledge. The details can be fleshed out later." *Schuh*, 947 F. Supp. 2d at 891.

Any contention about defendants' lack of awareness is particularly misplaced here, where the decline in Adjusted EBITDA was in part the result of increased marketing, selling and legal expenses that had already been incurred at the time of the IPO as a result of the serious problems alleged in the Complaint. *Compare* ¶¶6, 54, 97 (SDC had received thousands of complaints prior to the IPO), ¶¶8-9, 12, 42(b), 57(a) (prior to the IPO, SDC filed lawsuits and vigorously pursued NDAs against customers who made their complaints public), ¶¶12, 42(d), 57(g) (detailing dental board investigations of SDC prior to the IPO), *with Litwin*, 634 F.3d at 716 (finding Item 303 claim sufficiently pled where "[p]laintiffs allege that the downward trend in the real estate market was already known and existing at the time of the IPO"). At a bare minimum, these allegations (and defendants' response) raise a factual question for the jury. *See Shah v. Zimmer Biomet Holdings, Inc.*, 348 F. Supp. 3d 821, 839-40 (N.D. Ind. 2018) (requiring disclosure where issues were known and "it [was] not a stretch to think" future issues were "inevitable"); *Curran v. Freshpet, Inc.*, 2018 WL 394878, at *6, *8 (D.N.J. Jan. 12, 2018).

### b. The Misrepresented and Omitted Facts Were Material

The change in trends in the Company's three key financial metrics from growth to significant declines was material and required disclosure in the Registration Statement. The Supreme Court and the Sixth Circuit (sitting *en banc*) have both held that "the issue of materiality is a mixed question of law and fact [and] [c]ourts generally reserve such questions for the trier of fact." *Helwig*, 251 F.3d

- 12 -

at 563 (citing *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)); *Direct Gen.*, 398 F. Supp. 2d at 896 ("whether the information withheld was material . . . must be determined by the trier of fact").  Thus, "'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so ***obviously unimportant*** to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Helwig*, 251 F.3d at 563.

Defendants' arguments regarding materiality (Defs' Mem. at 15-16) are meritless. Information is material if a "'reasonable investor' would have considered [it] significant" in making investment decisions.  *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988).  It is impossible to credibly contend that a reasonable investor would not have found it significant that SDC's three core business metrics were no longer growing but rather were suffering dramatic declines at the time of the IPO. For example, Adjusted EBITDA ***plummeted by over $50 million*** from the Registration Statement's last reported positive growth of $6.2 million to a decline of $45.2 million.  Likewise, gross profit was no longer growing by 80%; it, too, was in a state of decline.  Defendants cannot credibly contend that the omitted information is "'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.'" *Bridgestone*, 399 F.3d at 681.  Accordingly, materiality "***must*** be determined by the trier of fact." *Direct Gen.*, 398 F. Supp. 2d at 896; *see also Matrixx*, 563 U.S. at 47.

### 3. The Registration Statement Misrepresented the Standard of Care SDC Provided and Its Customers' Satisfaction

Using clear aligners to treat malocclusion is not new or innovative; similar therapies have been offered by companies and dental practitioners for years.  Nevertheless, SDC claimed that its business model was unique because it was a "direct-to-consumer clear aligner provider" that

- 13 -

provided "professional level service" with unparalleled customer satisfaction in an industry plagued with high costs and high levels of customer dissatisfaction.  ¶¶10-11, 42(b), 56, 58-59.

Having chosen to speak about SDC's quality and customer satisfaction, defendants had a "'duty to speak fully and truthfully on th[e] subject[].'"  *Grae*, 2017 WL 6442145, at *13; *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 2016 WL 4098584, at *12 (M.D. Tenn. June 16, 2016) ("*Norfolk Cnty. I*"), *rev'd on other grounds*, 877 F.3d 687 (6th Cir. 2017).

### a. The Registration Statement Contained Untrue Statements Concerning SDC's Standard of Care

The Registration Statement contained false statements and omissions about SDC's standard of care.  ¶¶58-59.  The Registration Statement stated that SDC's teledentistry platform provided "*excellent clinical care*" and "*professional-level service*."  ¶¶10, 58.  Unbeknownst to investors, SDC's teledentistry model could not provide the standard of care necessary to move a customer's teeth safely as there was not sufficient interaction with a licensed dentist to ensure the safe and effective orthodontic treatment being promised. ¶¶11, 58-59.  In fact, SDC customers were virtually always instantaneously approved for aligners and interacted with sales assistants who worked on commission and were required to meet Company-mandated sales metrics. ¶¶57(c), 59(e).  The lack of interaction with dentists, and high pressure sales tactics, resulted in poor care.  *Id.*

While the Registration Statement emphasized that "trained technicians" created customer treatment plans (¶¶10, 58), it was sales assistants who handled customer consultations – completing highly specialized tasks without meaningful oversight from a licensed dentist.  *Compare* ¶¶10, 58, *with* ¶¶11, 59(c).  Likewise, the Registration Statement stated that its "SmileCheck" program gave customers "*seamless communication*" with their "*treating doctor*."  ¶¶10, 58.  But SDC's dentists had no meaningful contact with customers, their only involvement being a superficial review of a

4814-3775-4352.v1

photo or impression of a customer's teeth. ¶¶8, 11, 59(h). If customers had issues, they were directed to speak with hygienists rather than a licensed dentist. *Id.*

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.* is on point. There, under the PSLRA's stringent standards, Judge Haynes found that statements such as "PSI 'provide[s] higher care than our competitors,' 'the most intensive level of care' [and] 'highly coordinated treatment'" were hard facts alleged to be materially misleading. 2011 WL 1335803, at *49 (M.D. Tenn. Mar. 31, 2011); *see also Grae*, 2017 WL 6442145, at *8 (upholding statements under §10(b), including statements regarding "'provid[ing] quality corrections services'").[6]

Moreover, as defendants themselves concede, Chancellor Russell T. Perkins **upheld** "substantially the same Securities Act claims asserted here." Defs' Mem. at 11. While defendants contend Tennessee's pleading standards are more liberal than those required in federal court, the portion of Chancellor Perkins' holding highlighted by defendants – that "[m]any of the parties' arguments turn[] on characterizations along a 'how much is enough' continuum of what was disclosed" – is no different from the standard in federal court, which recognizes that whether an omission is material is a question for the trier of fact. *Id.*; *supra* at n.5, 16-17.

> **b.** **The Registration Statement Contained Untrue Statements Concerning Member Satisfaction**

The Registration Statement claimed SDC's model was unique because of its unparalleled customer satisfaction in an industry with high levels of customer dissatisfaction. ¶¶42(b), 55-56. Customer satisfaction was supposedly so important to SDC that the Company claimed "positive

---

[6] *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483 (6th Cir. 2015) and *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994), are inapposite. *See* Defs' Mem. at 19. *Bondali* held that an aspirational statement in defendant's code of conduct about "a strict food safety testing program" was not misleading merely because it could have been strengthened. 620 F. App'x at 487. *Tuchman* held that "conclusory disparaging characterizations of [a defendant's] products and market position" were insufficient to plead scienter, which is not an element of the 1933 Act claim. 14 F.3d at 1070. Neither suggests statements about a company's most important product are inactionable.

4814-3775-4352.v1

member experience" was its number one strength and that SDC's "primary focus is on delivering an exceptional member experience." *Id.*

In fact, thousands of SDC customers were not "highly satisfied" nor did they have "highly positive experiences." Rather, customers were dissatisfied because, contrary to defendants' statements in the Registration Statement, SDC's primary focus was on signing up as many customers as possible to enable SDC to report strong growth in advance of the IPO. ¶¶8, 57(b). SDC sold aligners to customers who were not appropriate candidates, pressured sales associates to close sales irrespective of a customer's suitability and approved treatment plans without meaningful review from dentists. *Id.* In addition, SDC took drastic steps to silence critics, including by employing aggressive litigation against journalists, customers and an affiliate of the ADA and by requiring that customers sign NDAs in order to receive refunds. ¶¶9, 57(e). Complaints against SDC to the DBC led to an investigation and raids on the Company's California stores beginning in late 2017, none of which was disclosed in the Registration Statement. ¶¶9, 42(d), 57(g).

Defendants contend they had no duty to disclose negative member experiences. Defs' Mem. at 17.[7] But having chosen to discuss how essential customer satisfaction was, defendants had a "'duty to speak fully and truthfully on th[e] subject[].'" *Grae*, 2017 WL 6442145, at *13. The judges of this Court have repeatedly found falsity adequately alleged under similar circumstances, even under the heightened pleading standards of the PSLRA and Rule 9(b). *Garden City*, 2011 WL

---

[7]     *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001), was a securities fraud case where, as with *In re Netflix, Inc. Sec. Litig.*, 2005 WL 1562858 (N.D. Cal. June 28, 2005) and *In re Allscripts, Inc. Sec. Litig.*, 2001 WL 743411 (N.D. Ill. June 29, 2001), and unlike the 1933 Act claims here, plaintiffs were required to meet the heightened pleading standard of the PSLRA and Rule 9(b) in order to plead falsity with particularity. Regardless, in *Ronconi*, the court also held that the plaintiffs' complaint did "not explain what the 'serious operational problems' were, what kind of 'substantial difficult[ies]' were being experienced, and why these 'difficult problems' decreased revenues." 253 F.3d at 434. Here, the Complaint pleads much more, including complaints by customers that mirror precisely the warnings SDC sought to suppress from medical professionals regarding the dangers of harm inherent in its business model. ¶¶8-9, 42(b), 57(a).

- 16 -

1335803, at \*45; *Grae*, 2017 WL 6442145, at \*13.[8]  Defendants' reliance on *Ford* is inapposite. Defs' Mem. at 17.  The court noted that "'loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available'" were immaterial.  *In re Ford Motor Co Sec. Litig., Class Action*, 381 F.3d 563, 571 (6th Cir 2004); *see also Netflix*, 2005 WL 1562858, at \*7.  Here, customer satisfaction was a critical component of SDC's business; SDC's product was not unique, so "delivering an exceptional member experience" was fundamental.  *See* ¶¶7, 56.[9]

### c. Defendants' Risk Disclosures Were Misleading

SDC's so-called risk disclosures were misleading as they warned investors that legal and regulatory risks "***may*** impact its business when that risk ha[d] ***already*** materialized." *Facebook*, 986 F. Supp. 2d at 516.  Cautionary language provides no protection to someone "'"who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away."'" *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019).

The Registration Statement advised investors that with regard to future regulations or legal risks – "[o]ur business ***could be adversely affected*** by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states." ¶60.  In truth, by the time of the IPO, dozens of complaints ***had already been filed*** by state chapters of the ADA and other similar trade organizations challenging SDC's practice of teledentistry as it utterly "fail[ed] to meet the standard of care for a comprehensive oral

---

[8]  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462 (1977), is inapposite as the plaintiffs alleged breaches of fiduciary duty to minority shareholders in connection with a short-form merger.

[9]  For the same reasons, defendants' reliance on *Pittman v. Unum Group*, 2020 WL 2846929 (E.D. Tenn. June 1, 2020), is misplaced.  There, the court held that "descriptive phrases as 'gone pretty well,' 'we've made good progress' or 'we've been effective' are the kind of statements that go directly to the speaker's optimistic opinion about the performance of the company" and do not "significantly change the general gist of available information." *Id.* at \*15.  This is not the case here.

- 17 -

examination." ¶62(a).  The Registration Statement failed to disclose that SDC was **already** under investigation for engaging in the unlicensed practice of dentistry. ¶62(b).  These "risk disclosures" were misleading as they did not alert investors to legal risks that **had already occurred**.  *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at \*16 (M.D. Tenn. Nov. 19, 2019) (cautions about "'the risk of changes in volume, payor mix and third-party reimbursement rate[]' is only meaningful to the extent that such changes have not already occurred").[10]

Furthermore, though the Registration Statement mentioned the potential adverse effects that **could** occur as a result of changes in regulations governing teledentistry, that risk had already begun to materialize.  By the time of the IPO, legislation in California designed specifically to curtail SDC's practices had already **unanimously** passed the California Senate.  *See* ¶¶12, 62(e).[11]  The legislation required teledentistry platforms to provide each customer with the treating dentist's contact information, mandated the review of a patient's radiographs prior to beginning orthodontic treatment and required the teledentistry provider to conduct a full patient examination.  ¶¶12, 62(e). The legislation also prohibited SDC or anyone else from preventing dissatisfied customers from making reports to the DBC, thereby eliminating SDC's then-existing practice of using NDAs to

---

[10]  *Bondali*, 620 F. App'x 483, is not only at odds with the Sixth Circuit's *en banc* decision in *Helwig*, it is unpublished and therefore neither binding precedent nor binding authority.  *Weiner*, 365 F. Supp. 3d at 910-11; *see also Chevalier v. Estate of Barnhart*, 803 F.3d 789, 796 n.4 (6th Cir. 2015) (observing that unpublished decisions are "binding on only the parties").  Two separate district court opinions have emphasized *Bondali*'s holding that "'there may be circumstances under which [such] a risk disclosure might support Section 10(b) liability'" and upheld misleading risk disclosures.  *Weiner*, 365 F. Supp. 3d at 910; *Norfolk Cnty. I*, 2016 WL 4098584, at \*13-\*14.

[11]  For this reason, *In re Greenlane Holdings, Inc. Sec. Litig.*, 2021 WL 53188 (S.D. Fla. Jan. 6, 2021), is off base.  There, the court noted that the "Proposed Ordinances had not yet been promulgated – the Plaintiffs, in fact, do not allege that their passage was anything near certain – and even the Plaintiffs' evidence supports the Defendants' view that, at the time of the IPO . . . the Proposed Ordinances had absolutely no effect on market price."  *Id.* at \*8.  Similarly, in *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571 (E.D. Mich. 2016), the defendants disclosed that the company was "subject to governmental agency investigations" and that "there were **ongoing** investigations into whether [the company] had properly complied with laws and regulations."  *Id.* at 580.  No such disclosures exist in this action.

- 18 -

silence customers. *Id.* As the purported risk disclosures only "portended the future, but did not alert investors about the conditions that then existed," SDC's risk disclosures were "meaningless." *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011); *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *7 (M.D. Tenn. Apr. 19, 2018).

Defendants disingenuously assert Lead Plaintiff has not alleged that the California regulations would have a material impact on SDC's business. Defs' Mem. at 21. Lead Plaintiff has pled that the new legislation in one of SDC's largest markets would fundamentally and materially alter SDC's business model. ¶¶12, 62(e). It is beyond dispute that the legislation would change the way SDC did business in California; as discussed *supra*, the legislation mandated the implementation of several new facets that would run contrary to SDC's entire teledentistry model. *Id.* Nor can defendants evade liability by arguing that their omissions are not actionable because they successfully rushed the IPO out the door *before* the California law was enacted. Defs' Mem. at 20. In *Helwig*, the Sixth Circuit upheld claims where defendants failed to disclose the potential impact of pending legislation in statements beginning in February in spite of the fact that the legislation in question was not passed by Congress until June. 251 F.3d at 545-46. Here, the California legislation had already unanimously passed the California Senate by the time of the IPO, and final approval was all but assured. *See* ¶¶12, 104; Defs' Mem. at 20. *Helwig* thus reaffirmed that "a party who discloses material facts in connection with securities transactions 'assume[s] a duty to speak fully and truthfully on those subjects.'" 251 F.3d at 561.

Defendants chose to make statements regarding the *potential* for regulatory and legal risks pertaining to its business model, including references to risks it faced due to rulemaking in specific states (Georgia and Alabama) that would "limit or restrict our ability to conduct our business as currently conducted." ¶60. The Registration Statement inexplicably failed to disclose the far more

restrictive legislation in California, one of SDC's largest markets. ¶62(e). *Helwig* expressly rejects such selective disclosures, finding that a company may not "choose which contingencies to expose and which to conceal." 251 F.3d at 560-61. Defendants' own authority is in accord. *See J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 394 (6th Cir. 2008) ("A company has to disclose additional information only when what it has disclosed would be rendered misleading without that additional information.").

Relying on materials outside of the pleadings, defendants proffer their own narrative regarding a lawsuit against the Company by the New Jersey Dental Association. *See* Defs' Mem. at 6, 18. Defendants are well aware their proffer of a counter-narrative is not appropriate at this stage of the case.[12] Regardless, "the meaningfulness of the cautionary statement cannot be determined without a determination of the facts . . . . The Court cannot make such a factual determination on a motion to dismiss." *Envision*, 2019 WL 6168254, at \*16.

### B. Loss Causation Is an Affirmative Defense to a Section 11 Claim

Loss causation is an affirmative defense, not an element of a §11 claim. *Id.* at \*27; *Schuh*, 947 F. Supp. 2d at 886. As a result, loss causation is "unsuitable for adjudication on a motion to dismiss." *In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014). *Azzolini v. Corts Tr. II for Provident Fin. Tr. I*, 2005 WL 3448053, at \*5 (E.D. Tenn. Dec. 14, 2005), is inapposite as the *Azzolini* complaint, on its face, alleged that the omitted facts had been revealed "two years before Plaintiffs claim they suffered any losses." *Id.* at \*6. Here,

---

[12] "As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d)." *Castro Bustillo v. McAleenan*, 2020 WL 1274600, at \*3 (M.D. Tenn. Mar. 17, 2020) (Richardson, J.). Moreover, "a court may not consider materials outside the pleading that 'rebut, challenge, or contradict anything in the plaintiffs' complaint" without converting the motion to one for summary judgment. *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, 2018 WL 6181356, at \*2 (M.D. Tenn. Nov. 27, 2018); *see also Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993).

- 20 -

the Complaint contains no such allegations. Defendants therefore cannot possibly meet their burden of establishing that the Complaint on its face demonstrates a lack of loss causation.[13]

## IV. THE COMPLAINT ALLEGES VIOLATIONS OF THE 1934 ACT

To state a *prima facie* claim of securities fraud under §10(b) of the 1934 Act, a plaintiff must allege: "'(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 383-84 (6th Cir. 2016). The Complaint alleges material misrepresentations and omissions. *Supra* at 8-20. Defendants' contentions that the Complaint fails to plead loss causation or scienter are misguided.

### A. The Complaint Adequately Alleges Loss Causation

"'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Ohio Pub. Emps' Ret. Sys.*, 830 F.3d at 384. Alleging loss causation "is 'not meant to impose a great burden upon a plaintiff,' but to 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* Plaintiff need only plead a "plausible" theory and may do so by alleging "'that negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" *Id.* at 384-85; *see also Ind. Pub. Ret. Sys. v. AAC Holdings, Inc.*, 2021 WL 1316705, at *12 (M.D. Tenn. Apr. 8, 2021). The Complaint meets this standard as it alleges that class members suffered losses when the SDC shares they had purchased declined in value after the facts that were misrepresented and omitted in the Registration Statement were belatedly disclosed. ¶¶123-156. Nothing more is required.

---

[13] In fact, Plaintiffs' separate 1934 Act loss causation allegations, in contrast to *Azolini*, confirm that certain corrective disclosures occurred after the IPO and that SDC's stock price declined significantly as a result.

4814-3775-4352.v1

SEIU suffered economic harm as it purchased shares on September 12, 2019 and was injured when the value of those shares declined 17% following the filing of a complaint on September 24, 2019 by dentists and orthodontists detailing facts regarding SDC's unlicensed practice of dentistry. ¶¶124-125. Defendants' assertion (Defs' Mem. at 22) that a complaint, or the facts detailed within it, cannot constitute a corrective disclosure has been rejected. *See Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys. Inc.*, 877 F.3d 687, 695-96 (6th Cir. 2017) (rejecting defendants' "categorical" assertion that a "***complaint*** could not reveal the truth behind [a] prior misrepresentation"); *Halford v. AtriCure, Inc.*, 2010 WL 8973625, at \*18 (S.D. Ohio 2010) (when "the market reacted immediately" to revelation "that the DOJ was investigating" "with a drop in [the corporation's] stock price," "this is sufficient to show that 'economic loss occurred after the truth behind the misrepresentation or omission became known to the market'").

Defendants' assertions that the Retirement System's losses are not alleged to have been caused by alleged corrective disclosures are also wrong. The Retirement System purchased its SDC shares on October 24, 2019 at prices that were inflated as a result of defendants' fraud and was damaged when the truth was revealed through a series of corrective disclosures. First, on November 12, 2019, SDC disclosed for the ***first time*** declines in Adjusted EBITDA, gross profit and revenue, which were far different from the ***"accelerated growth" trends*** falsely reported in the Registration Statement. Following this revelation, SDC's stock price declined by over 20%. ¶¶141-142. Second, on February 13, 2020, *NBC Nightly News* broadcasted an investigative report detailing some of the 1,800 complaints received by SDC, the use of NDAs to silence harmed patients and hidden camera footage of SDC patients who were not having their cases reviewed by a dentist. Following this broadcast, SDC's share price declined 16%. ¶¶144-145. Finally, on February 25, 2020, SDC announced a further decline in Adjusted EBITDA caused by "continued elevated legal

- 22 -

and lobbying expenses" and "poor customer experience issues."  As a result, SDC's share price declined 29%.  ¶¶149-150.[14]

### B. The Complaint Pleads a Strong Inference of Scienter

Scienter may be alleged two ways: "'[1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'"  *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011).  When analyzing allegations of scienter, courts consider the totality of the circumstances (*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-22 (2007)), treating each allegation separately "risks losing the forest for the trees."  *Frank*, 646 F.3d at 961.  A complaint survives "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Tellabs*, 551 U.S. at 324; *AAC Holdings*, 2021 WL 1316705, at *19.

### 1. Defendants Had Actual Knowledge of the Alleged False and Misleading Statements and Omissions

One way to plead scienter is "by pleading with particularity facts that give rise to a strong inference that the defendant acted with knowledge . . . of the fraud being committed."  *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 479 (6th Cir. 2010).  In addition, "'[c]ourts may presume that high-level executives are aware of matter related to their business's operations where the misrepresentations and omissions pertain to "central, day-to-day operational matters."'"  *Envision*, 2019 WL 6168254, at *22; *Grae*, 2017 WL 6442145, at *21-*22 (same).

---

[14]  Defendants' suggestion (Defs' Mem. at 22-23), that the full truth had been disclosed prior to the Retirement System's stock purchase raises a factual issue that cannot appropriately be adjudicated on a motion to dismiss.  *See Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406, at *10 (M.D. Tenn. Apr. 19, 2018) (because the "'truth-on-the-market' defense . . . is intensely fact-specific, it is not appropriate for the Court to consider it on these Motions to Dismiss").  Furthermore, as detailed above, defendants' assertion is contradicted by: (1) the plain allegations of the Complaint; (2) the stock price decline following each alleged corrective disclosure; and (3) the fact that none of these contentions address the declining revenue, gross profit or adjusted EBITDA disclosed on November 12, 2019 and February 25, 2020.  ¶¶13, 123-156, 141, 149.

- 23 -

SDC, Katzman and Wailes had actual knowledge of the declining trends omitted from the Registration Statement. ¶¶96-99. SDC, Katzman and Wailes closely tracked SDC's revenue, gross profit and Adjusted EBITDA as those were "among the measures used by [SDC's] management team to evaluate [SDC's] operating performance and make day-to-day operating decisions." ¶96; *see also Kyrstek v. Ruby Tuesday, Inc.*, 2016 WL 1274447, at *9 (M.D. Tenn. Mar. 31, 2016) (finding scienter sufficiently pled where "[d]efendants' pre-class statements allegedly confirm that the Company was monitoring Lime Fresh's performance").

SDC, Katzman and Wailes had actual knowledge of the DBC's investigation into SDC, including that SmileShops in California had been "raided" by the DBC, that the Company's chief dentist, Sulitzer, had been under investigation by the Board of SDC since 2017 and that just two months before the IPO, one of SDC's mobile SmileShops was also raided. ¶¶100-102.

SDC, Katzman and Wailes had actual knowledge of California bill AB 1519, and the detrimental impact it would have on the Company. ¶¶103-105. Defendants "continually monitor[ed] . . . proposed laws and other legal and regulatory developments to understand their potential impact on [SDC's] operations," and SDC waged an aggressive yet unsuccessful lobbying effort to defeat the bill through August and September 2019 – actions which would make little sense had the bill not been expected to materially negatively impact SDC's operations. ¶¶103, 105.

SDC, Katzman and Wailes also oversaw wildly aggressive tactics intended to suppress negative reports about the Company, and drive revenues without regard to any semblance of a standard of care. Such tactics included: (i) silencing injured and dissatisfied customers by requiring NDAs in order to receive refunds (¶¶106-111); and (ii) incentivizing employees and dentists to approve customers for treatment without regard to medical necessity through both monetary compensation and threats of termination. ¶112. Such actions further contribute to a strong inference

- 24 -

of scienter.  *See St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Heathcare Co., Inc.*, 2021 WL 195370, at *7 (M.D. Tenn. Jan. 20, 2021) (holding that "compensation structures designed solely to reward short-term profit at the *expense of patient care*" supported a strong inference of scienter).

### 2. Katzman and Other SDC Insiders Pocketed $630 Million as Part of the IPO

The existence of "insider trading at a suspicious time or in an unusual amount" adds to the inference of scienter.  *Helwig*, 251 F.3d at 552.  Here, insiders, including Katzman, sold substantial amounts of SDC stock at artificially inflated prices while concealing the truth about SDC's business. In total, Katzman pocketed *$198.4 million* by selling Units and common stock back to the Company in connection with the IPO.  Indeed, Katzman, along with other insiders, pocketed *$632.8 million* as a result of the IPO.  ¶¶113-122.  As the market value of SDC's common stock declined by 77% in the months following these sales, Katzman avoided a *$150 million* loss and SDC insiders avoided losses of *over $480 million*.  *Id.*  While defendants suggest that "sales by parties who are not Exchange Act defendants . . . are irrelevant" to scienter, Judge Campbell reached the opposite conclusion just months ago in *St. Clair*, considering stock sales by a non-defendant, collectively with other allegations, to be sufficient to plead a strong inference of scienter.  2021 WL 195370, at *7.

## V.  CONCLUSION

For the reasons set forth herein, defendants' motion to dismiss should be denied.

DATED:  June 28, 2021          Respectfully submitted,

ROBBINS GELLER RUDMAN
 & DOWD LLP
CHRISTOPHER M. WOOD, #032977

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
SCOTT H. SAHAM
ASHLEY M. KELLY
TING H. LIU
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
scotts@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com

Lead Counsel for Lead Plaintiff

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 28, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:19-cv-00962 Franch v. SmileDirectClub, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Wade B. Cowan**
  wcowan@dhhrplc.com

- **James M. Ficaro**
  jmf@weiserlawfirm.com

- **Andrew J. Finn**
  finna@sullcrom.com

- **Elizabeth O. Gonser**
  egonser@rwjplc.com,nnguyen@rwjplc.com

- **Michael C. Griffin**
  michael.griffin@skadden.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Lewis S. Kahn**
  Lewis.Kahn@ksfcounsel.com

- **Jay B. Kasner**
  jay.kasner@skadden.com

- **Ashley M. Kelly**
  akelly@rgrdlaw.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Ting H. Liu**
  tliu@rgrdlaw.com

- **MICHAEL J MORSE**
  PKNASHLAW@AOL.COM

- **Richard A. Maniskas**
  rmaniskas@sbtklaw.com

- **E. Powell Miller**
  epm@millerlawpc.com

- **Scott D. Musoff**
  scott.musoff@skadden.com

- **Danielle S. Myers**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

Case 3:19-cv-00962    Document 93    Filed 06/28/21    Page 36 of 37 PageID #: 2616

- **Sharon L. Nelles**
  nelless@sullcrom.com

- **Christopher Nelson**
  cln@weiserlawfirm.com

- **Melinda A. Nicholson**
  Melinda.Nicholson@ksfcounsel.com

- **Michael J. Palestina**
  Michael.Palestina@ksfcounsel.com

- **Ira M. Press**
  ipress@kmllp.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com

- **John Tate Spragens**
  john@spragenslaw.com,stacia@spragenslaw.com,spragenslaw@ecf.courtdrive.com

- **Tara L. Swafford**
  tara@swaffordlawfirm.com

- **Christopher E. Thorsen**
  cthorsen@bakerdonelson.com,mbarrass@bakerdonelson.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,creis@rgrdlaw.com,AKellyRGRD@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)