# EXHIBIT A

**E-FILED**
**12/20/2019 11:45 AM**
**CLERK & MASTER**
**DAVIDSON CO. CHANCERY CT.**

**IN THE 20th JUDICIAL DISTRICT
CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
PART IV**

| | | |
|---|---|---|
| IN RE: SmileDirectClub, INC.<br>SECURITIES LITIGATION | ) )<br>)<br>)<br>)<br>)<br>) | **Lead Case No. 19-1169-IV** |
| | ) | **CLASS ACTION** |
| THIS DOCUMENT RELATES TO:<br>ALL ACTIONS. | )<br>) | |

## CONSOLIDATED COMPLAINT

### NATURE OF ACTION

1.	This is a securities class action on behalf of all purchasers of SmileDirectClub, Inc. ("SmileDirectClub" or the "Company") Class A common stock that was issued pursuant and/or traceable to the Company's Registration Statement and Prospectus (the "Offering Documents") filed with the U.S. Securities and Exchange Commission ("SEC") in connection with SmileDirectClub's September 12, 2019 initial public stock offering (the "IPO").

2.	Plaintiffs (defined below) allege that the Offering Documents violate Section 11, 12 and 15 of the Securities Act of 1933 (the "Securities Act"). The Securities Act protects investors and the capital markets of the United States by preventing companies and underwriters from issuing shares to investors by means of incomplete and inaccurate offering documents. To accomplish this, the Securities Act imposes an exacting duty on those involved in IPO's to disclose material facts in a complete and accurate manner. These duties come from the statute itself and from the regulations of the SEC, including Items 303 and 105 of Regulation S-K [17 C.F.R. §229.303 and §229.105, repsectively].

1

3.  Here, Plaintiffs allege that the Offering Documents violated the disclosure requirements imposed by the Securities Act by inadequately disclosing, or failing to disclose at all, adverse facts regarding (i) the degree of professional care rendered to SmileDirectClub customers, including the lack of actual oversight provided by dental professionals to the Company's members, (ii) the significant regulatory and legal risks facing SmileDirectClub across the country, including the then-known pending investigations and imminent adverse legislation in California, (iii) the heavy-handed tactics used to conceal customer complaints and, in turn, manipulate customer satisfaction with SmileDirectClub's products and services, and (iv) the magnitude of the losses SmileDirectClub suffered in the quarter during which it commenced its IPO.  These adverse facts, risks and significant trends existed at the time of the IPO and should have been disclosed to investors in the Offering Documents.

4.  Defendants failure to disclose the adverse facts detailed herein enabled them to accomplish an enormous IPO, raising over $1.3 billion from over 58.5 million shares at $23 each on a valuation of over $8.9 billion, which equaled well over double that of the Company's last venture capital valuation.  It also made co-founder Defendants Alexander Fenkell and Jordan Katzman, along with Jordan's father, Defendant David Katzman, instant billionaires, and generated over $67.3 million in underwriting fees.  In short, Defendants cashed out.

5.  Unfortunately, unsuspecting shareholders, including Plaintiffs, faired far worse, especially as adverse facts then-known by Defendants, but concealed from the market, seeped out. On the first day of trading, SmileDirectClub plunged a remarkable 27.5%, causing the media to characterize the Company's IPO as "the worst first-day showing in about two decades."  Since then, the Company's stock has continued to precipitously decline, trading as low as $7.56 per share, or 67% below the offering price.

2

6. Defendants are each strictly liable for the damages suffered by Plaintiffs and other members of the Class (defined below) related to these misstatements and omissions in their capacities as signers of the Offering Documents, control persons, and/or as an issuer, statutory seller, offeror, and/or underwriter of the shares sold pursuant to the Offering. Plaintiffs expressly disclaim any allegations that could be construed as alleging fraud or intentional or reckless misconduct.

## JURISDICTION AND VENUE

7. This Court has subject matter jurisdiction over the causes of action asserted herein pursuant to both Tenn. Code Ann. §16-10-101, because this case is a cause not given by statute to another tribunal in this State, and §22 of the Securities Act, 15 U.S.C. §77v. This action is not removable. *See* 15 U.S.C. §77v; *Cyan, Inc. v. Beaver Cty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1078 (2018).

8. This Court has personal jurisdiction over each of the defendants named herein because they conducted substantial business in, were citizens of, and/or orchestrated the IPO out of Tennessee, including SmileDirectClub, which maintained its principal place of business in Nashville, Tennessee at the time of the IPO. Each of the Underwriter Defendants (defined below) also conducts substantial business in this District. Further, the violations of law complained of herein occurred in Tennessee, including the preparation and dissemination of the materially false and misleading Offering Documents complained of herein, which were also disseminated into this State.

9. Venue is proper in Davidson County pursuant to Tenn. Code Ann. §20-4-101 as the acts and conduct complained of herein occurred in substantial part in this County.

## THE PARTIES

### A. Plaintiffs

3

10. Plaintiff Brittany Vang ("Vang") purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and Offering, and was damaged thereby.

11. Plaintiff Matthew G. Mancour ("Mancour") purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and Offering, and was damaged thereby.

12. Plaintiff Zachary Boorstein ("Z. Boorstein") purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and Offering, and was damaged thereby.

13. Plaintiff Robert Boorstein ("R. Boorstein") purchased shares of the Company's Class A common stock that were issued pursuant and traceable to the Registration Statement and Offering, and was damaged thereby.

14. Plaintiffs Vang, Mancour, Z. Boorstein and R. Boorstein are collectively referred to herein as "Plaintiffs."

## B. Defendants

### a. The Company

15. Defendant SmileDirectClub describes itself as a tele-dentistry company. Defendant SmileDirectClub is headquartered in Nashville, Tennessee and its shares are listed and trade on the NASDAQ under the ticker "SDC."

### b. The Individual Defendants

16. Defendants Jordan Katzman ("J. Katzman") and Alexander Fenkell ("Fenkell") are, and were at the time of the IPO, the co-founders of SmileDirectClub and members of its Board of Directors, having co-founded the Company in 2014 after securing funding from Defendant

4

Camelot Venture Group ("Camelot"), an investment firm run by Defendant J. Katzman's father Defendant David Katzman ("D. Katzman"). Defendant J. Katzman runs SmileDirectClub's IT department, while defendant Fenkell heads up its marketing department. Defendants J. Katzman and Fenkell became instant billionaires as a result of the IPO, each having a stake in the Company that was valued at the time of the IPO at about $1.2 billion and approximately $1 billion, respectively. Further, both J. Katzman and Fenkell own close to a quarter of SmileDirectClub's class B shares, which control 10 votes for every 1 vote offered to a Class A shareholder. Defendants J. Katzman and Fenkell participated in the preparation of, signed or authorized the signing of the Offering Documents.

17. Defendant D. Katzman is, and was at the time of the IPO, the Chief Executive Officer and Chairman of the Board of SmileDirectClub. D. Katzman is cofounder J. Katzman's father and, through his position as the managing partner of Camelot, provided the initial funding for the Company. Defendant D. Katzman is also SmileDirectClub's largest shareholder—holding nearly 30% of the vote with 87 million Class B shares—expected, at the time of the IPO, to have an estimated net worth of about $2 billion after the Offering. Through his stock ownership, stock voting agreement, and position as the managing partner of Defendant Camelot, D. Katzman controls the business operations of SmileDirectClub. Defendant D. Katzman participated in the preparation of, signed or authorized the signing of the Offering Documents.

18. Defendant Kyle Wailes ("Wailes") is, and was at the time of the IPO, the Chief Financial Officer of SmileDirectClub. In connection with the IPO, Defendant Wailes entered into an Incentive Bonus Agreement under which he was entitled to a payment of approximately $18.9 million, 60% of which vests upon the completion of the Offering and 40% of which will vest on a

5

monthly basis over the following 24 months. Defendant Wailes participated in the preparation of, signed or authorized the signing of the Offering Documents.

19.     Defendant Steven Katzman ("S. Katzman") is, and was at the time of the IPO, Chief Operating Officer and a director of SmileDirectClub. Defendant S. Katzman is co-founder J. Katzman's uncle. Through his stock ownership, stock voting agreement, and position as an advisor of Defendant Camelot, S. Katzman controls the business operations of SmileDirectClub. Moreover, between J. Katzman, D. Katzman and S. Katzman, the Katzman family controls more than 65% of the voting power of the Company. Defendant S. Katzman participated in the preparation of, signed or authorized the signing of the Offering Documents.

20.     Defendants Richard Schnall ("Schnall") and Susan Greenspon Rammelt ("Rammelt") are, and were at the time of the IPO, directors of SmileDirectClub. Defendant Rammelt has also served as General Counsel of Defendant Camelot since April 2018. Defendants Schnall and Rammelt participated in the preparation of, signed or authorized the signing of the Offering Documents.

21.     The defendants named in ¶¶16-20 are collectively referred to herein as the "Individual Defendants."

### c.  The Underwriter Defendants

22.     The following underwriters were also instrumental in soliciting and making the stock offered in the IPO available to the investing public:

| Name | Number of Shares |
|------|------------------|
| J.P. Morgan Securities LLC | 29,162,138 |
| Citigroup Global Markets Inc. | 14,257,045 |
| BofA Securities, Inc. | 3,295,888 |
| Jefferies LLC | 3,295,888 |
| UBS Securities LLC | 3,295,888 |
| Credit Suisse Securities (USA) LLC | 1,921,541 |
| Guggenheim Securities, LLC | 1,005,309 |

6

| Stifel, Nicolaus & Company, Incorporated | 1,005,309 |
|---|---|
| William Blair & Company, L.L.C. | 1,005,309 |
| Loop Capital Markets LLC | 292,685 |

23. Defendants J.P. Morgan Securities LLC ("JP Morgan"), Citigroup Global Markets Inc. ("Citigroup"), BofA Securities, Inc., Jefferies LLC, UBS Securities LLC, Credit Suisse Securities (USA) LLC, Guggenheim Securities, LLC, Stifel, Nicolaus & Company, Incorporated, William Blair & Company, L.L.C. and Loop Capital Markets LLC (the "Underwriter Defendants"), are investment banking firms that acted as underwriters of SmileDirectClub's IPO, helping to draft and disseminate the offering documents, with JP Morgan and Citigroup acting as representatives of the other Underwriter Defendants. Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a) The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared more than $67.3 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize SmileDirectClub stock in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from SmileDirectClub, met with potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

(b) The Underwriter Defendants also demanded and obtained an agreement from SmileDirectClub that it would indemnify and hold the Underwriter Defendants harmless from any liability under the federal securities laws. They also made certain that SmileDirectClub had purchased millions of dollars in directors' and officers' liability insurance.

7

(c)     Representatives of the Underwriter Defendants also assisted SmileDirectClub and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of SmileDirectClub, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning SmileDirectClub's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with SmileDirectClub's lawyers, management, and top executives and engaged in "drafting sessions" between at least May 3, 2019 and September 13, 2019. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which SmileDirectClub stock would be sold; (iii) the language to be used in the Offering Documents; (iv) what disclosures about SmileDirectClub would be made in the Offering Documents; and (v) what responses would be made to the SEC in connection with its review of the Offering Documents. As a result of those constant contacts and communications between the Underwriter Defendants' representatives and SmileDirectClub management and top executives, the Underwriter Defendants knew, or should have known, of SmileDirectClub's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Offering Documents to be filed with the SEC and declared effective in connection with offers and sales thereof, including to plaintiff and the Class (as defined below).

**d.  Additional Control Person Defendant**

8

24. Defendant Camelot Venture Group ("Camelot") is a partnership with its principal place of business located in Michigan. Camelot is controlled by its managing partner, Defendant D. Katzman, and is, as described on its website, the largest shareholder of SmileDirectClub and the managing member of the limited liability corporation that controls SmileDirectClub. As such, Camelot – through its stock ownership, its control as the managing member of SmileDirectClub, its ability to appoint D. Katzman and S. Katzman as the operating officers of SmileDirectClub, and its employment of Defendant Rammelt who also sits on the Company's Board – controls SmileDirectClub and is directly liable for the Company's actions and the violations of the Securities Act detailed herein.

25. SmileDirectClub, the Individual Defendants, the Underwriter Defendants and Camelot are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

## I. The Offering Documents Contained Materially Untrue and Misleading Statements

26. Defendant SmileDirectClub was co-founded in 2014 by Defendants J. Katzman and Fenkell. Its initial management and capital were provided by Defendant Camelot, owned and operated by Defendants D. Katzman and S. Katzman.

27. On or about May 3, 2019, SmileDirectClub filed with the SEC a Draft Registration Statement on Form S-1, which, after several amendments would later be utilized for the IPO. The SEC declared the Registration Statement effective on September 11, 2019. On September 13, 2019, SmileDirectClub and the Underwriter Defendants filed the final prospectus for the IPO with the SEC, which forms part of the Registration Statement, having priced the Company's IPO shares at $23.00 per share.

9

28. The Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

29. These material misstatements and omissions include (1) a false description of the level of professional care rendered to SmileDirectClub customers and critical omissions relating to the actual oversight provided by dental professionals; (2) material misstatements regarding the regulatory and legal risks facing SmileDirectClub across the country and specifically omissions regarding known investigations and imminent adverse legislation in the state of California; (3) material misstatements and omissions regarding customer satisfaction with SmileDirectClub's products and services; and (4) material misstatements and omissions regarding the magnitude of the Company's operating losses for the quarter in which it went public.

30. Under the rules and regulations governing the preparation of the Offering Documents, SmileDirectClub was required to disclose, *at the time of the IPO,* that the quality of SmileDirectClub's product offerings, professional services, and treatment success were subpar to those described in the Offering Documents. The Offering Documents contained no such disclosures.

31. Further, pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303] and the SEC's related interpretive releases thereto, issuers are required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." In violation of this duty to disclose, the Offering Documents did not disclose material facts concerning the fundamentals of the Company's business operation, specific regulatory and legislative risks in

10

California and elsewhere, the high level of customer dissatisfaction and harm (which had been masked by the forced signing of Non-Disclosure Agreements), and the sheer magnitude of the Company's ballooning operating losses, all of which were reasonably likely to (and did) have a material impact on SmileDirectClub's profitability, and, therefore, were required to be disclosed in the Offering Documents.

32. In addition, Item 105 of SEC Regulation S-K [17 C.F.R. §229.105] required, in the "Risk Factors" section of the Registration Statement, a discussion of the most significant factors that made the offering risky or speculative and that each risk factor adequately describe the risk. Because the omitted material facts alleged herein were not disclosed, as well as the consequent material adverse effects these material facts were likely to have (and had) on the Company's future results and prospects, defendants violated Item 105.

33. The IPO was successful for the Company, the Individual Defendants and the Underwriter Defendants, who sold over 58.5 million shares of SmileDirectClub Class A common stock to the public at $23 per share, raising more than $1.3 billion in gross proceeds for the Company.

34. As of December 19, 2019, SmileDirectClub stock was trading at $8.55 per share, 63*% below* the IPO price.

**A. The Offering Documents falsely overstate the caliber and scope of dental services SmileDirectClub customers receive and omit critical material information about the Company's true business model.**

35. According to the Offering Documents, SmileDirectClub is revolutionizing traditional orthodontic care through its direct-to-consumer platform that purports to obviate the need for in-office doctor visits. The Offering Documents repeatedly state, "[t]hrough our cutting-

11

edge teledentistry technology and vertically integrated model, we are revolutionizing the oral care industry."

36.     SmileDirectClub's Offering Documents plainly give the impression that dentists and orthodontists are highly involved in their customers' care, and, further, that the care received is substantially similar to that received via traditional orthodontic providers:

> We offer ***professional-level service*** and ***high-quality*** clear aligners at a cost of $1,895, up to 60% less than traditional orthodontic solutions. We achieve this cost savings while ***maintaining   high quality*** by removing the overhead cost of in-person doctor visits and managing the entire member experience, all the way from marketing to aligner manufacturing, fulfillment, ***treatment by a member's doctor, and monitoring through completion of their treatment, which is supported by our proprietary teledentistry platform ("SmileCheck").***  These efficiencies enable us to pass the cost savings directly to the members and ***allow doctors in our network to focus on what matters most: providing convenient access to excellent clinical care.***

(Emphasis Added).

37.     The Offering Documents explain the way SmileDirectClub works by emphasizing the simplicity and ease of the process for its customers and glossing over the actual medical treatment (or lack thereof) provided to its members. According to the Offering Documents, a customer is mailed a do-it-yourself impression kit so that the customer can make a mold of his or her own teeth to return to SmileDirectClub directly. Alternatively, a customer can visit a so-called "SmileShop" where non-licensed or otherwise credentialed employees take 3D pictures of a customers' teeth.  Specifically, the Offering Documents state:

> Our member journey starts with two convenient options: a member books an appointment to take a free, in-person 3D oral image at any of our over 300 SmileShops across the U.S., Puerto Rico, Canada, Australia, and the U.K., or orders an easy-to-use ***doctor prescribed*** impression kit online, which we mail directly to their door.

(Emphasis Added).

12

38.     From there, a "custom treatment plan" is created by SmileDirectClub employees in Costa Rica. No licensed dentist or orthodontist in the United States is involved in creating the treatment plan.

39.     The "custom treatment plan" is then reviewed by a "treating doctor." If the plan is approved then that doctor "prescribes custom-made clear aligners." The approval process by the "treating doctor" takes a matter of minutes, and SmileDirectClub purportedly pays these doctors $50 for each case they approve. SmileDirectClub pays "treating doctors" nothing should they determine a particular customer is inappropriate for treatment or otherwise decline to approve a treatment plan.

40.     If a customer orders the aligners, then SmileDirectClub claims the customer's progress is monitored by the "treating doctor" through a program called "SmileCheck."

41.     The message in the Offering Documents is clear—SmileDirectClub has used technology to disrupt the orthodontic industry while still providing patients with the same level of care of traditional orthodontists albeit remotely. But that message is false. SmileDirectClub has not really created a state-of-the-art platform in which to conduct comprehensive teledentistry. Rather, SmileDirectClub has merely realized considerable savings by eliminating the most basic functions of patient care—a fact that jeopardizes SmileDirectClub's entire business model.

42.     As described in more detail below, SmileDirectClub's business model is fundamentally flawed because it endangers the public by duping customers into believing that they are getting supervised dental treatment by licensed treating doctors via a remote teledentistry platform. They are not. The Offering Documents perpetuate this falsehood by reiterating "seamless communication" during regular "check ins" with a "treating doctor" after a customer orders and begins using the aligner:

SmileCheck is also used by the ***treating doctor to monitor the member's progress*** and ***enables seamless communication with the member*** over the course of treatment.

*     *     *

***SmileCheck facilitates real-time, remote sharing of treatment data between our members and their treating doctors, thus avoiding inconvenient, in person-doctor visits.***

*     *     *

*Vertical integration powered by SmileCheck allows us to optimize every step of the member journey*

We are the first clear aligner company to build a scalable, integrated technology platform and doctor network for teledentistry. We manage the entire end-to-end process in a member's journey, from the moment a member visits the website all the way through aligner manufacturing, fulfillment, ***treatment by a member's doctor***, and monitoring through completion of their treatment. Our proprietary software platform, ***SmileCheck, supports rapid and efficient communication between our members and their treating doctors***, and the clinical and customer care teams.

(Emphasis Added).

43. The Offering Documents also fail to disclose that its customers have no actual requirement to undergo any dental examination at all prior to shifting their teeth with SmileDirectClub's aligners, despite, in practice, implicitly acknowledging that dental supervision prior to utilizing its aligners is necessary. In fact, during the enrollment process, SmileDirectClub requires customers to attest to the fact that they have had a full dental examination and been pre-cleared by their own personal dentist prior to using SmileDirectClub's aligners. More specifically, SmileDirectClub's Consent and History form provides that:

By signing this Informed Consent, I understand that I am certifying that: My dentist cleaned my teeth. My dentist checked for and repaired cavities, loose or defective fillings, crowns or bridges. My dentist checked my last x-rays or has otherwise verified that I have no shortened or resorbed roots and I have no impacted teeth. My dentist has probed or measured my gum pockets and says I do not have periodontal or gum disease. My dentist preformed a full oral-cancer screening in

14

the last 6 months and I do not have oral cancer. I have no pain in any of my teeth. I have no pain in my jaws. I have no loose teeth. I have no 'baby teeth' and all of my permanent teeth are present.

44. Thus, the burden of getting pre-cleared by a licensed professional as to the appropriateness of aligners and reporting on the technical dental conditions that underlie such a decision is left entirely to the customer. The Offering Documents describe an entirely misleading process, complete with frequent and seamless communication between customer and treating doctor, hoping that investors will believe that the Company has created a robust teledentistry platform by removing the need for in person visits for orthodontic care. In reality, there is little to no actual "dentistry" taking place.

45. Moreover, SmileDirectClub does not require its customers to upload any dental records or to get any certifications from an actual treating dentist as to the viability of aligners. Notably, SmileDirectClub requires *the patient* to attest that a dentist has in fact taken x-rays and reviewed those x-rays for cavities, resorbed roots, and impacted teeth, but SmileDirectClub does not require the customer to upload any of those x-rays so they can be reviewed or confirmed by one of SmileDirectClub's so called "treating doctors." Likewise, SmileDirectClub requires *the patient* to attest that his or her "gum pockets" have been "probed" and no signs of "periodontal disease" were found, but requires no confirmatory proof. None of this shifting of medical responsibility onto the patient is disclosed of course in the Offering Documents, which instead misstates the actual role and involvement of any treating doctor in this process.

46. The only involvement of any licensed dentist in the United States prior to prescribing aligners is a cursory review of a treatment plan – at $50 a pop. This "treating doctor" has no meaningful contact with the patient.

47. Nevertheless, the Offering Documents claim that there are routine consultations with the "treating doctor" once the customer begins using the aligners, but this proves to be just as illusory as the "excellent clinical care" the customer receives prior to receiving the aligners. According to promotional material included in the Offering Documents, there are routine "check ins" during which time "[t]he treating duly licensed doctor reviews clinical progress through our remote teledentistry platform at least every 90 days." Unbeknownst to investors (and customers for that matter), however, is that this progress review consists, at most, of a review of images uploaded by the customers and does not include any substantive or meaningful interaction between the "treating doctor" and the customer.

48. Further, SmileDirectClub claims in its Offering Documents that its platform "enables seamless communication with the member over the course of treatment." Further, that SmileDirectClub provides:

> 24/7 customer care to our members through a variety of communication channels, including our website, phone, chat, email and social media as well as self-guided resources such as knowledge-based and how-to videos and articles on our website. We have a dedicated team of approximately 600 customer care team members in Nashville and Costa Rica, including general customer care team members, an advanced customer care team to address more complex questions, and a clinical customer care team of certified dental professionals available to answer clinical questions. In addition, ***each member's treating doctor is available to answer clinical questions*** as needed.

(Emphasis Added).

49. These statements imply that SmileDirectClub's "treating doctors" are involved in interactive sessions with SmileDirectClub customers using their so called "cutting-edge teledentistry technology" and are easily and readily accessible to address patient concerns, when in reality SmileDirectClub customers have no meaningful contact at all with any licensed professional. Contrary to the Offering Documents assertion that "members can connect with their

16

treating doctor at any point in the process," SmileDirectClub customers are not given their treating doctor's address or contact information, and have no real way to contact them, even through "SmileCheck," should a problem or question with their treatment arise.

50. Evidence of a lack of any meaningful patient care is found in abundance in the hundreds of complaints made by SmileDirectClub customers on the Better Business Bureau (BBB) website. When patients complain on that forum about SmileDirectClub aligners causing injury, SmileDirectClub responds by directing them to seek out the care of that customer's personal dentist rather than directing them to the so called "treating doctor" supposedly managing their care.

51. For example, on October 28, 2019, a customer posted on the BBB website the following:

> I had a back molar break off at the gum due to wearing the [SmileDirectClub] alligners. This incident happened on a Friday night, resulting in an ER visit to get meds as the nerve in my tooth is exposed. I am not very happy. I am pissed would be the exact word for it. As I am in a lot of pain and I can not afford to have this problem resolved by a dentist at the moment. Now I have to deal with a extremely sor[e] tooth until I get paid and to go to the dentist. I will not continue to wear these cheap crappy alligners. I wouldn't recommend these to anybody.

SmileDirectClub responded to this complaint on the same day as follows:

> Hi ****, Thank you for taking the time to leave us a complaint. I see that you spoke to our dental team yesterday who let you know that our aligners are not made from a material that would be able to cause a healthy tooth to chip. **The best thing to do would be to consult with your dentist before continuing treatment.** If you have any questions, please follow up with Brandi on our dental team, so she can assist. Best, *******

(Emphasis Added).

52. In other words, despite claiming in the Offering Documents that a customer's "treating doctor" will "monitor through the completion of their treatment" each customer's progress, the truth is that customers are actually left communicating with customer representatives

17

rather than licensed professionals and are forced to resort to third party consumer websites and their own third-party dentists (and orthodontists) for relief.

53. There is nothing "seamless" about customers with serious medical complications communicating their problems through the Better Business Bureau platform only to be told they should "consult with your dentist."

54. In fact, a survey of BBB complaints over an eight-day period in November 2019 is deeply troubling as it reveals that customers are routinely advised by their own personal dentists to discontinue using SmileDirectClub's aligners, indicating that they were likely inappropriate candidates for them in the first place. Additionally, the complaints demonstrate the significant difficulty customers have in eliciting assistance from SmileDirectClub and the Company's "treating doctors" to address serious medical conditions. These customers obviously feel that their only recourse is to take their grievances to the BBB.

55. Some excerpts of complaints to the BBB about SmileDirectClub between November 11, 2019 and November 19, 2019 include:

"After visiting a real dentist office, they advised me to stop wearing the aligners immediately. He said that my teeth might fall out if I don't." (November 19, 2019).

"Bottom aligners do not fit. Spoke with many Supervisors and 10 days later no resolve. Sent photos per request and *called approx[.] 5 different times*." (November 15, 2019) (Emphasis added).

"Experiencing a lot of pain after treatment. My dentist told me that if I continue using the retainers I may lose one of my bottom teeth :( After 5 months of treatment and a few months of wearing the retainers, I noticed there was a lot of gum inflammation, bleeding gums and a pain on the bottom/front/right side of my teeth. I went to my dentist and he told me that Smile Direct should've filed my front teeth due to lack of space, they should've also worked on my bite and give me followup procedures in the event of dental work. The retainers gave me an infection and loosened one of my front bottom teeth. *My dentist told me not to wear the retainers anymore or I can lose that tooth.* I was put on antibiotic and prescribed

18

mouthwash to reduce the pain and inflammation. I now have to start a treatment with my dentist to correct the damage." (November 11, 2019) (Emphasis added).

"The third week I began to experience mouth pain was was [sic] advised by an Orthodontist to visit my dentist. ***Because I have periodontist disease I require an orthodontist in which I can regularly visit in person. Smile Direct does not offer this service. In fact, the teeth aligners could possible result in tooth loss.*** I call Smile Direct of Oct 23, 2019. I call the following week, and the week after that. I was told each time someone would call me in 3-5 days." (November 11, 2019) (Emphasis added).

56. As illustrated above, SmileDirectClub's Offering Documents incorrectly describe the actual level of care its patients receive in an effort to portray itself as a provider of a state of the art teledentistry platform. These assertions jeopardize its entire business model as state and federal regulators, as well as dental associations in approximately 40 states, continue to examine SmileDirectClub's practices. As a result, the Offering Documents were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state required material facts.

57. In addition, Defendants violated Item 303 and 105 by failing to disclose these known facts, each of which has (and had) a material impact on SmileDirectClub's profitability and, further, made investing in the Company risky or speculative given their consequent material adverse effects on SmileDirectClub's future results and prospects.

**B. The Offering Documents understate regulatory and legislative risks in numerous states around the country.**

58. SmileDirectClub's risk disclosures in the Offering Documents are similarly false and misleading in that they understate the true regulatory landscape affecting the Company's business model and, further, omit key details about ongoing litigation and official investigations by state authorities or dental boards.

19

59.    SmileDirectClub's risk disclosures imply that future regulatory and legislative changes *may* impact its business model, ignoring that dental associations or dental boards across the country are, in fact, presently pushing for regulatory or legislative reform that severely cripples SmileDirectClub's growth and, in some cases, even its ability to conduct business at all.  For example, the Offering Documents assert that:

> ***Our business could be adversely affected by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states***
>
> A number of dental and orthodontic professionals believe that clear aligners are appropriate for only a limited percentage of their patients. ***National and state dental associations have issued statements discouraging use of orthodontics using a teledentistry platform***. Increased market acceptance of our remote clear aligner treatment may depend, in part, upon the recommendations of dental and orthodontic professionals and associations, as well as other factors including effectiveness, safety, ease of use, reliability, aesthetics, and price compared to competing products.

60.    In reality, at the time of the IPO, there had been numerous claims or complaints filed by state chapters of the American Dental Association (ADA), American Association of Orthodontics (AAO), or other similar trade organizations all challenging SmileDirectClub fundamental business concept of providing teledentistry with virtually no professional oversight by a licensed dentist. These complaints go to the very heart of SmileDirectClub's business model.

61.    Moreover, the Offering Documents' boilerplate language about potential risks related to legal and regulatory matters was wholly inadequate in light of imminent legislation in California, which was enacted into law less than a month after the Company's IPO.  The Offering Documents state in relevant part:

> Furthermore, our ability to conduct business in each state is dependent, in part, upon that particular state's treatment of remote healthcare and that state dental board's regulation of the practice of dentistry, each of which is subject to changing political, regulatory, and other influences. ***There is a risk that state authorities may find that our contractual relationships with our doctors violate laws and regulations***

20

*prohibiting the corporate practice of dentistry, which generally bar the practice of dentistry by entitie*s.

62.     The Offering documents continue:

In addition, a national orthodontic association has met with various dental boards across the country in an effort to advocate for new rules and regulations that could have the effect of interfering with our business model. Although, none of these efforts have resulted in rules and regulations being passed to date, *it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business*. *If* adverse regulations are adopted or any such claims are successful, and we were unable to adapt our business model accordingly, our operations in such states would be disrupted, which *could* have a material adverse effect on our business, financial condition, and results of operations.

(Emphasis Added).

63.     In fact, on October 14, 2019, California enacted legislation that tightened the state's regulatory framework for companies involved in teledentistry. The legislation was directly aimed at curbing SmileDirectClub's practices, and once effective on January 1, 2020, is poised to have considerable impact on SmileDirectClub's ability to operate in California.

64.     Specifically, the newly enacted California law requires that a teledentistry platform provide each customer with the treating dentist's name, license number and the dental board contact information.  Additionally, the law mandates the review of a patient's most recent radiographs (i.e. x-rays) prior to beginning orthodontic treatment as well as requiring that the teledentistry provider conduct a full patient examination prior the enactment of a treatment plan. Finally, the statute prohibits preventing a disgruntled customer from making a report to the Dental Board of California even if he or she has signed a Non-Disclosure Agreement.  In other words, California's legislation is (and was) squarely aimed at addressing the complaints plaguing SmileDirectClub in the majority of states around the country, yet the Offering Documents contained not one word about the California legislation or the chances of its passage even though

21

it was signed into law only one month after the IPO. Thus, the Offering Documents purported warning is entirely inadequate.

65. Evidence of the materiality of this information is seen by the market's reaction to this news and SmileDirectClub shares falling approximately 13%.

66. In response, SmileDirectClub went on the offensive and issued a statement describing the legislation as "undebated" and including "last-minute policy additions." In truth, however, the relevant provisions in the legislation were added by amendment on July 3, 2019 and were public for ten weeks prior to the final passage of the legislation. Thus, SmileDirectClub was required to disclose it in the Offering Documents. Defendants' efforts to keep the investing public in the dark about this significant legislative threat to its business model in the country's largest state and it failure to disclose this material information in the Offering Documents was plainly misleading.

67. Unfortunately, the California legislation was not the only material omission related to adverse state action brewing in California. The Offering Documents also omitted any mention of a long running and, importantly, on-going regulatory investigation by the Dental Board of California. On October 16, 2019, once again barely a month after the IPO, SmileDirectClub sued the California Dental Board and some of its individual board members asserting that these state officials had engaged in overly aggressive investigatory tactics intended to intimated SmileDirectClub staff and costumers in a series of raids of SmileDirectClub shops and mobile clinics across the state of California. See *Sulitzer, et al v. Tippins, et al*, Case No: 2:19-CV-08902 (C.D. Cal., October 16, 2019) (the "California Complaint").

68. In the California Complaint, SmileDirectClub revealed, for the first time, that *it learned in 2017* it was under investigation for engaging in practicing dentistry without a license from a Dental Board of California investigator named Joseph Tippins.

69. In the California Complaint, SmileDirectClub alleges that on May 31, 2018, *over a year before the IPO*, the Dental Board of California "coordinated an unannounced, simultaneous state-wide raid of SMILESHOP stores in Oakland, San Francisco, and Hollywood, California." During this state-wide raid, SmileDirectClub further claims that California officials "demand[ed] information and files." According to SmileDirectClub, the raids caused a significant interruption to SmileDirectClub's business operations.

70. The California Complaint also describes another instance of Mr. Tippins, an enforcement official with the Dental Board of California, conducting an in-person operation, or raid, by boarding a so called "SmileBus" that was engaged in taking pictures of consumers' teeth on July 1, 2019 (two months *prior* to the IPO) at a fair in Sacramento, California. Mr. Tippins purportedly spoke to a SmileDirectClub customer and told that customer "that there was a complaint against SmileDirect, *that an active investigation by the Board existed*, and that his inspection was 'routine.'"

71. Nowhere in the Offering Documents does SmileDirectClub acknowledge that the state dental board of the most populated state in the country was investigating it for the unauthorized practice of dentistry, despite plainly knowing that the investigation was ongoing and active since at least 2017, and having that fact confirmed by an investigator just two months *prior* to the IPO.

72. Upon news of SmileDirectClub's lawsuit against California officials and the revelations it contained detailing the ongoing investigation and past highly disruptive "state-wide

23

raids," SmileDirectClub shares dropped as much as 12.7%, before closing over 5% lower than the day prior.

73.     SmileDirectClub's boilerplate disclosures regarding state regulatory and legislative risks were false and misleading as they failed to accurately describe the true regulatory and legal pressures SmileDirectClub faces throughout the country as evidenced by the post-IPO revelation of a long running and significant investigation in California, and the enactment of legislation that will dramatically alter how SmileDirectClub conducts business in that state.

74.     Again, Defendants violated Item 303 and 105 by failing to disclose these known facts, each of which has (and had) a material impact on SmileDirectClub's profitability and, further, made investing in the Company risky or speculative given their consequent material adverse effects on SmileDirectClub's future results and prospects.

**C. SmileDirectClub makes false and misleading statements about customer satisfaction in its Offering Documents.**

75.     The Offering Documents also contain inaccurate statements of material facts regarding customer satisfaction with SmileDirectClub's products and service.

76.     For example, the Offering Documents claim that SmileDirectClub's customers were "highly satisfied" with the Company's products and gave satisfaction scores many multiples above traditional orthodontic solutions.  The Offering Documents repeatedly state in pertinent part:

> Our primary focus is on delivering an exceptional customer ("member") experience.  ***Our average net promoter score of 57 since inception, compared to an average net promoter score of 1 for the entire dental industry (according to West Monroe Partners), and our average rating of 4.9 out of 5 from over 100,000 member reviews on our website, demonstrate that our members are highly satisfied***.  As a testament to our confidence in the quality and efficacy of our product, ***we offer a Smile Guarantee, which provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied***.

(Emphasis Added).

77. In particular, the Offering Documents highlight SmileDirectClub's "Smile Guarantee," stating that "[m]embers can feel confident in using our products and services on a risk-free basis," and that, "[a]s a testament to our confidence in the quality and efficacy of our product, we offer a Smile Guarantee: If our members are dissatisfied with their aligners for any reason within the first 30 days of their treatment, we allow them to return their aligners and receive a full refund." The Offering Documents further state that, "[a]alternatively, after the first 30 days, we allow members to return the remainder of their aligners for a pro-rated refund based on the number of aligners used," and that "[f]inally, if a member follows their treatment plan guidelines and does not achieve a smile they love, the treating doctor will re-evaluate the member's results, and we will provide additional aligners for further adjustment at no additional cost."

78. SmileDirectClub omits that it has achieved these supposed high customer satisfaction ratings through the assistance of aggressive lawyers, litigation, and the deployment of Non-Disclosure Agreements (NDAs).

79. In reality, SmileDirectClub has received thousands of customer complaints ranging from serious medical complications from using its products to ill-fitting aligners to difficulties in securing promised refunds.

80. As described above, the Better Business Bureau (BBB) reports over 1,500 consumer complaints against SmileDirectClub on its website and those complaints, along with SmileDirectClub's individualized responses, tell an entirely different story than what is portrayed in the Offering Documents. SmileDirectClub customers have lodged hundreds of detailed grievances such as (1) medical complications related to their use of SmileDirectClub aligners (2) defective aligners and (3) pressure to sign NDAs preventing reports to state dental boards and removal of negative social media posts prior to SmileDirectClub making any refunds.

25

81. The Company utilizes a number of techniques to obscure the vast number of dissatisfied customers that are omitted in the Offering Documents.

82. First, in order for SmileDirectClub customer to receive a refund, he or she must sign an NDA that requires the removal of any negative commentary from social media and prohibits any future public sharing of his or her adverse experiences using the Company's products. SmileDirectClub also attempts to prevent its customers from reporting issues to their respective state dental boards, but this practice has now been outlawed in California.

83. As a result of being forced to sign onerous NDAs that prevent customers from disparaging the Company or providing negative information about their experiences, its customer reviews and the measure of satisfaction provided in the Offering Documents are artificially skewed to mask problems with the Company's products and processes, and high levels of customer dissatisfaction.

84. Under the rules and regulations governing the preparation of the Offering Documents, SmileDirectClub was required to disclose, *at the time of the IPO*, that the quality of SmileDirectClub's product offerings, professional services and treatment success were subpar to those described in the Offering Documents, and had been obscured by SmileDirectClub's tactics of withholding refunds absent a NDA. The Offering Documents, however, contained no such disclosures.

85. In addition to NDAs, SmileDirectClub has hired lawyers to file lawsuits all around the country against any individual or group who dares express an unfavorable opinion of the Company's products, services or business practices. The Company has threatened legal action and sued dentists who have uploaded YouTube videos expressing their reservations about

26

SmileDirectClub's clinical care (or lack thereof) and dissatisfied customers who posted negative comments online or told their stories to the media.

86. SmileDirectClub even sued the Michigan Dental Association for publishing a four-paragraph announcement in its monthly newsletter soliciting information from its members about their experiences with SmileDirectClub and stating some general concerns about the Company providing unregulated and improperly supervised dental care to Michigan residents.

87. SmileDirectClub engages in these heavy-handed tactics of both threatening and filing numerous lawsuits around the country on dubious legal grounds for a reason – they have the intended effect of curbing criticism and reducing negative publicity.

88. All of these tactics are aimed at boosting the Company's online reputation and have heavily skewed the customer satisfaction metrics detailed in the Offering Documents, causing them to be false and misleading.

89. Likewise, pursuant to Item 303 and the SEC's related interpretive releases, issuers are required to disclose "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." The known trends and uncertainties associated with the high level of customer dissatisfaction and harm, which had been masked by the forced signing of NDAs, were reasonably likely to have a material impact on SmileDirectClub's profitability, and, therefore, were required to be disclosed in the Offering Documents.

**D. SmileDirectClub Failed to Disclose Ballooning Costs that had Occurred at the Time of the IPO**

90. The Offering Documents, which SmileDirectClub and the other Defendants used to secure over a billion dollars from investors, contained additional false and misleading statements and omitted material facts related to the Company's swelling costs.

27

91.     At the time of the IPO, SmileDirectClub was roughly two and a half weeks away from closing the book on its 2019 third quarter.  Yet, Defendants did not disclose to investors that SmileDirectClub would soon report for that same quarter, net losses of nearly $388 million, far greater than the Company's *entire* loss for 2018.

92.     The Offering Documents report data regarding the Company's net losses, claiming, for example, that despite "incurring net operating losses since inception," SmileDirectClub's rapid growth "validates our value proposition and compelling business model."  In the beginning pages, the Offering Documents provide investors insight into SmileDirectClub's net losses from previous periods, stating in relevant part:

> Since our founding in 2014, we have helped over 700,000 members across all 50 U.S. states, Puerto Rico, Canada, Australia, and the U.K., and have opened over 300 SmileShops, including in partnership with CVS and Walgreens. Our total revenues increased 190%, to $423.2 million in 2018 from $146.0 million in 2017. Our total revenues for the six months ended June 30, 2019 were $373.5 million, an increase of 113% over the same time period in 2018. ***We generated net losses of $(74.8) million and $(32.8) million and Adjusted EBITDA of $(16.9) million and $(21.1) million in 2018 and 2017, respectively, and net losses of $(52.9) million and Adjusted EBITDA of $2.3 million for the six months ended June 30, 2019.*** Our rapid growth validates our value proposition and compelling business model.

(Emphasis Added).

93.     The Offering Documents continue, explicitly identifying those areas of SmileDirectClub's business where significant funds have been spent:

> We have incurred net operating losses since inception. For the years ended December 31, 2018 and 2017, we incurred net losses of $(74.8) million and $(32.8) million, respectively, and we incurred $(52.9) million of net losses for the six months ended June 30, 2019. ***From inception through the present, we have spent significant funds in organizational and start-up activities, to recruit key managers and employees, to develop our clear aligners, to develop our manufacturing and member support resources, and for research and development***. It is possible that we will not achieve profitability or that, even if we do achieve profitability, we may not maintain or increase profitability in the future.

94.	In addition, the Offering Documents recount SmileDirectClub's previous marketing and selling expenses and its general and administrative expenses, stating in relevant part:

*Marketing and selling expenses*

Marketing and selling expenses as a percentage of revenues increased to 56% in the six months ended June 30, 2019 from 49% in the six months ended June 30, 2018, and increased to $209.1 million in the six months ended June 30, 2019 from $86.5 million in the six months ended June 30, 2018, primarily due to increased digital and media advertising and branding efforts, and by expansion of SmileShop locations to prepare for growth in the remainder of 2019 and beyond.

*General and administrative expenses*

General and administrative expenses increased $49.2 million, or 104%, to $96.5 million in the six months ended June 30, 2019 from $47.3 million in the six months ended June 30, 2018, primarily as a result of $26.1 million in salaries and wages from the expansion of our team member headcount, $5.7 million of payment processing fees from revenue growth, and $4.0 million of legal fees. General and administrative expenses as a percent of revenue decreased from 27% in the six months ended June 30, 2018 to 26% in the six months ended June 30, 2019, primarily as a result of improved leveraging of our fixed costs.

95.	The Offering Documents go on to say:

***We spend significant amounts on advertising and other marketing campaigns to acquire new members, which may not be successful or cost-effective.***

We market our aligners and other products through an omni-channel approach supported by media mix modeling and multitouch attribution modeling. Our marketing approach focuses on both offline activities, mainly television, and online digital marketing. We spend significant amounts on advertising and other marketing campaigns to acquire new members, and ***we expect our marketing expenses to increase in the future*** as we continue to spend significant amounts to acquire new members and increase awareness of our products.

96.	The statements in ¶¶ 92-95 were materially inaccurate, misleading, and/or incomplete because they failed to disclose, ***at the time of the IPO,*** the magnitude of the losses that the Company was on pace to report and that that these losses were substantially higher than at any other point in SmileDirectClub's operating history, including, in particular, the Company's sales

29

and marketing expenses and general and administrative expenses, which were already materially higher than the historical markers Defendants used in the Offering Documents. In fact, when SmileDirectClub' reported its third quarter 2019 earnings, for the period ended September 30, 2019—*a mere two and a half weeks after the IPO*—the Company revealed a shocking $388 million net loss, compared to $15 million a year prior.

97. Relatedly, the Offering Documents references to numerous possible risks that "*if*" they were to occur "*could*" or "*may*" adversely affect the Company were also misleading or false because they fail to disclose that these very "risks" had already begun to materialize *at the time of the IPO*. For example, the Offering Documents state:

> *Our business could be adversely affected by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states.*

> \* \* \*

> [I]t is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states *may* change or be interpreted in a manner unfavorable to our business. If adverse regulations are adopted or any such claims are successful, and we were unable to adapt our business model accordingly, our operations in such states *would* be disrupted, which *could* have a material adverse effect on our business, financial condition, and results of operations. In addition, a national dental association recently filed a citizen petition with FDA alleging that our manufacturing is in violation of "prescription only" requirements. Although FDA denied the petitioners' request to initiate enforcement action, the petition continues to be circulated by that national dental association and other third parties.

> \* \* \*

> *Extensive and changing government regulation of the healthcare industry may be expensive to comply with and exposes us to the risk of substantial government penalties.*

> The healthcare market itself is highly regulated and subject to changing political, economic, and regulatory influences. Complying with [ ] laws and regulations *could* be expensive and time-consuming, and *could* increase our operating costs or reduce or eliminate certain of our sales and marketing activities or our revenues.

(Emphasis Added).

30

98. The statements in ¶97 were materially inaccurate and/or incomplete because they failed to disclose that, *at the time of the IPO,* the Company was already spending significant quantifiable sums to fight legislation aimed at reining in online dentistry companies, leading it to report legal expenses at least two times more than any other period.

99. In addition to the foregoing affirmative misrepresentations, Defendants' failure to disclose the material information described herein in the Offering Documents violated Item 303 and Item 105 because, unbeknownst to investors, SmileDirectClub was experiencing losses substantially higher than at any other point in its operating history, which was reasonably likely to (and did) have a material impact on SmileDirectClub's profitability, and because the Offering Documents' discussion of risk factors did not even mention, much less adequately describe, the risk posed by the remarkable losses related to the Company's sales and marketing expenses and general and administrative expenses, nor the likely and consequent materially adverse effects on the Company's future results, share price, and prospects.

100. Moreover, by affirmatively raising these topics, Defendants took on a duty to be complete and truthful about such topics. Defendants' violated that duty by failing to disclose the material information described herein.

101. SmileDirectClub's failure to reveal the magnitude of these anticipated losses prevented investors—who collectively injected over $1 billion into the Company—from knowing the true extent of the Company's financial health in violation of the Securities Act and SEC regulations.

## II.    Additional Facts Demonstrating Materiality

102. SmileDirectClub's stock has declined precipitously as the aforementioned facts reached the market.

31

103.     On September 12, 2019, SmileDirectClub initiated its IPO, issuing shares at the inflated price of $23.00 per share.  That day the share price closed at $16.67 per share, representing a 27.5% decrease.  Bloomberg News dubbed it as "one of the worst stock-market debuts in more than a decade."

104.     During this debut, SmileDirectClub sold approximately 58.54 million Class A common stock shares and took in proceeds of approximately $1.29 billion net of underwriting discounts and commissions.

105.     On or around September 24, 2019 a class action lawsuit filed in federal court the Middle District of Tennessee by consumers, orthodontists, and dentists alleging that the company and its leadership were engaged in false advertising, unfair and deceptive trade practice, fraud, and other claims.  The plaintiffs in that lawsuit also alleged that the Registration Statement contained misstatements and inaccuracies and that SmileDirectClub was experiencing legal challenges in numerous states for operating as a dental practice without a proper license.

106.     Once this class action lawsuit became public, SmileDirectClub share prices tumbled again from $17.15 to $15.68 (a $1.47 loss or nearly 9%) on September 24, 2019.  The price continued to decline over the next two days closing at $12.94 on September 26, 2019 on heavy trading volume.

107.     On October 14, 2019, California Governor Gavin Newsom signed legislation into law that tightened the state's regulatory framework for companies involved in teledentistry. That legislation, described above, included provisions mandating x-rays reviewed by licensed dentists prior to prescribing aligners designed to move teeth and outlawing Non-Disclosure Agreements that prohibited consumers from submitting complaints to the California's Dental Board.  The

32

market reacted swiftly to this news from the largest state in the country, and SmileDirectClub shares fell approximately 13%.

108.    Three days later, on October 17, 2019, more bad news came out of California as it was revealed that the day prior SmileDirectClub sued the California Dental Board and some of its individual board members asserting that they had engaged in overly aggressive investigatory tactics intended to intimate SmileDirectClub staff and costumers in a series of raids of SmileDirectClub shops and mobile clinics across the state of California.  In that complaint, SmileDirectClub revealed that it had learned, as far back as 2017 that it was under investigation for engaging in practicing dentistry without a license.  Upon news of this lawsuit and the revelations it contained, SmileDirectClub shares dropped 12.7% or $1.27 per share, ultimately closing 5.9% down for the day.

109.    On November 12, 2019, during the Company's 3Q19 earnings conference call, discussing the Company's financial results for the period ended September 30, 2019, Defendant Wailes blamed costs related to SmileDirectClub's IPO, which "increased [the Company's] Q3 net loss by approximately $330 million," while also saying that the Company was continuing to make "significant strategic investments," which contributed to higher spending on marketing, sales, general and administrative, and legal expenses.  Specifically, Defendant Wailes stated in relevant part:

> *We also experienced a significant increase in legal expenses within the quarter*, resulting from the regulatory climate within which we operate. *Our legal expenses doubled in the third quarter of 2019* compared to the second quarter. You can expect to see this continue into the fourth quarter as we maintain our proactive stance to defend our mission in support of consumer access to care. Additionally, we continue to invest in human capital across the company in preparation for our long-term growth. This investment is focused on technology, marketing, data analytics, data science, finance and other corporate functions.

33

*Q3 net loss was $388 million compared to a $15 million net loss in Q3 2018. As I just mentioned, costs related to our IPO increased our Q3 net loss by approximately $330 million.*

(Emphasis Added).

110. Both analysts and media noted the Company's ballooning losses in reporting on the quarter. For example, the *Wall Street Journal* issued an article entitled, "SmileDirectClub Posts Losses on Sales, Marketing Spending," noting how the Company posted "wider losses in the latest quarter as the company continued to spend heavily on marketing and sales, as well as other expenses," how SmileDirectClub's "general and administrative expenses [ ] climbed," and how its "[s]ales and marketing expenses more than doubled in the quarter to $131.3 million, which is the equivalent of roughly 78% of SmileDirectClub's total revenue."

111. On this news, the Company's shares plummeted 20.3%, closing down from $11.08 per share on November 12, 2019 to $8.83 per share on November 13, 2019. As of the filing of this Consolidated Complaint, SmileDirectClub has traded as much as 67% below its offering price. Put simply, SmileDirectClub has had one of the worst Wall Street debuts in recent history.

## CLASS ALLEGATIONS

112. Plaintiffs brings this action as a class action on behalf of all purchasers of SmileDirectClub Class A common stock pursuant and/or traceable to the Offering Documents issued in connection with the IPO (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors or assigns and any entities in which defendants have or had a controlling interest.

113. The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and

34

can only be ascertained through appropriate discovery, Plaintiffs believe that there are thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by SmileDirectClub or its transfer agent and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

114. Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

115. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

116. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the Securities Act;

(b) whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

117. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden

35

of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## FIRST CAUSE OF ACTION

### For Violation of §11 of the Securities Act
### Against All Defendants

118. Plaintiffs incorporates ¶¶1-117 by reference.

119. This Cause of Action is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. This is a non-fraud cause of action. Plaintiffs do not assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

120. The Offering Documents used to effectuate the IPO were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

121. Defendants are strictly liable to Plaintiffs and the Class for the misstatements and omissions.

122. None of the Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omission of any material fact and were not misleading.

123. By reason of the conduct herein alleged, Defendants violated, and/or controlled a person who violated, §11 of the Securities Act.

124. None of the untrue statements or omissions of material fact in the Offering Documents alleged herein was a forward-looking statement. Rather, each such statement concerned existing facts. Moreover, the Offering Documents did not properly identify any of the

36

untrue statements as forward-looking statements and did not disclose information that undermined the putative validity of these statements.

125. Plaintiffs acquired SmileDirectClub Class A common stock pursuant or traceable to the Offering Documents.

126. Plaintiffs and the Class have sustained damages. The value of SmileDirectClub Class A common stock has declined substantially subsequent to and due to Defendants' violations.

127. At the time of their purchases of SmileDirectClub Class A common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year has elapsed from the time that Plaintiffs discovered or reasonably could have discovered the facts upon which this complaint is based to the time that Plaintiffs commenced this action. Less than three years has elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiffs commenced this action.

## SECOND CAUSE OF ACTION

**For Violation of §12(a)(2) of the Securities Act
Against All Defendants**

128. Plaintiffs incorporates ¶¶1-127 by reference.

129. This Cause of Action is brought pursuant to §12(a)(2) of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants. This is a non-fraud cause of action. Plaintiffs do no assert that Defendants committed intentional or reckless misconduct or that Defendants acted with scienter or fraudulent intent.

130. Defendants were sellers, offerors, and/or solicitors of purchasers of the Company's securities offered pursuant to the defective Offering Documents. Defendants issued or caused to

37

be issued the Offering Documents, which were used to induce investors, such as Plaintiffs and the other members of the Class, to purchase the Company's shares. Defendants solicited the purchase of securities motivated at least in part by a desire to serve their own financial interests.

131. The Offering Documents contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The actions of solicitation by Defendants included participating in the preparation of the false and misleading Offering Documents, roadshow, and marketing of SmileDirectClub's Class A common stock to investors, such as Plaintiffs and the other members of the Class.

132. Defendants owed to the purchasers of SmileDirectClub's Class A common stock, including Plaintiffs and other members of the Class, the duty to make a reasonable and diligent investigation of the statements contained in the Offering Documents to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. By virtue of Defendants' failure to exercise reasonable care, the Offering Documents contained misrepresentations of material facts and omissions of material facts necessary to make statements made therein not misleading. In alleging the foregoing, Plaintiffs specifically disclaim any allegation of fraud.

133. At the time of their purchases of SmileDirectClub Class A common stock, Plaintiffs and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.

134. By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §12(a)(2) of the Securities Act.

38

135. Plaintiffs acquired SmileDirectClub Class A common stock pursuant or traceable to the Offering Documents.

136. Plaintiffs and the Class have sustained damages. The value of SmileDirectClub Class A common stock has declined substantially subsequent to and due to Defendants' violations.

137. This claim is brought within one year after discovery of the untrue statements and omissions in the Offering Documents and within three years after the Company's shares were sold to the Class in connection with the Offering.

138. By reason of the conduct alleged herein, Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violation, Plaintiffs and the other members of the Class who purchased SmileDirectClub's Class A common stock pursuant to the Offering Documents sustained substantial damages in connection with their share purchases. Accordingly, Plaintiffs and the other members of the Class who hold the shares issued pursuant to the Offering Documents have the right to rescind and recover the consideration paid for their shares with interest thereon or damages as allowed by law or in equity. Class members who have sold their SmileDirectClub shares seek damages to the extent permitted by law.

## THIRD CAUSE OF ACTION

### For Violation of §15 of the Securities Act
### Against the Individual Defendants and Camelot

139. Plaintiffs incorporates ¶¶1-138 by reference.

140. This Cause of Action is brought pursuant to §15 of the Securities Act against the Individual Defendants and Camelot.

141. The Individual Defendants each were control persons of SmileDirectClub by virtue of their positions as directors and/or senior officers of SmileDirectClub. The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with

39

other directors and/or officers and/or major shareholders of SmileDirectClub. The Offering Documents expressly acknowledge that due to his stock ownership, "[a]fter the completion of this offering, pursuant to a Voting Agreement, David Katzman, our Chairman and Chief Executive Officer, will control a majority of the voting power of shares eligible to vote in the election of our directors," and "[a]s a result, we will be a 'controlled company' within the meaning of the corporate governance standards of NASDAQ."

142. Moreover, through its stock ownership, its control as the managing member of SmileDirectClub, its ability to appoint defendants David Katzman and Steven Katzman as the operating officers of SmileDirectClub, and as employer of Defendant Rammelt, who it appointed as general counsel of SmileDirectClub, Defendant Camelot controlled SmileDirectClub. As such, Defendant Camelot, along with Defendants D. Katzman, S. Katzman, and Rammelt, directed SmileDirectClub to undertake the IPO utilizing the materially false and misleading Offering Documents. Indeed, Defendants concede in the Offering Documents that 98% of the SmileDirectClub voting shares – and the day-to-day control of SmileDirectClub – will remain with the Katzmans and Camelot.

143. Similarly, each of the Individual Defendants not only controlled those subject to liability as primary violators of §§11 and 12(a)(2) of the Securities Act in the Causes of Action above, they directly participated in controlling SmileDirectClub by having signed or authorized the signing of the Offering Documents, and authorizing the issuance of SmileDirectClub stock to Plaintiffs and members of the Class.

144. As control persons of SmileDirectClub, Camelot and the Individual Defendants are jointly and severally liable pursuant to §15 of the Securities Act with and to the same extent as SmileDirectClub for its violations of §11 of the Securities Act.

40

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.      Determining that this action is a proper class action and certifying Plaintiffs as Class representatives under Tenn. R. Civ. P. 23;

B.      Awarding compensatory damages in favor of Plaintiffs and the other Class members against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class rescission on their §12(a)(2) claims;

D.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.      Such equitable/injunctive or other relief as deemed appropriate by the Court.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: December 20, 2019                    Respectfully submitted,


<u>/s/ Jerry E. Martin</u>
JERRY E. MARTIN (No. 20193)
DAVID W. GARRISON (No. 24968)
SCOTT P. TIFT (No. 27592)
**BARRETT JOHNSTON MARTIN & GARRISON, LLC**
Philips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 244-2202
Facsimile: (615) 252-3798
jmartin@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

THOMAS L. LAUGHLIN, IV (*pro hac vice* forthcoming)
MAX R. SCHWARTZ (*pro hac vice forthcoming*)
JEFFREY P. JACOBSON (*pro hac vice*

41

*forthcoming*)
JONATHAN M. ZIMMERMAN (*pro hac vice pending*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
tlaughlin@scott-scott.com
mschwartz@scott-scott.com
jjacobson@scott-scott.com
jzimmerman@scott-scott.com

*Co-Lead Counsel for Plaintiffs*

GREGORY DEL GAIZO
Attorney at Law
**ROBBINS LLP**
5040 Shoreham Place
San Diego, CA 92122
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
GDelGaizo@robbinsarroyo.com

JAMES G. STRANCH, III (TN BPR #02542)
JOE P. LENISKI, JR. (TN BPR #022891)
BENJAMIN A. GASTEL (TN BPR #28699)
**BRANSTETTER, STRANCH & JENNINGS, PLLC**
223 Rosa Parks Ave. Suite 200 Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
jims@bsjfirm.com
joeyl@bsjfirm.com
beng@bsjfirm.com

BRIAN J. SCHALL
**THE SCHALL LAW FIRM**
1880 Century Park E, Suite 404
Los Angeles, CA 90067-1604
Telephone: (310) 301-3335
Facsimile: (310) 388-0192
brian@schallfirm.com

*Additional Attorneys for Plaintiffs*

42

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and exact copy of the foregoing *Consolidated Complaint* was filed electronically and served upon the parties as indicated below via electronic and U.S. Mail on December 20, 2019:

MICHAEL C. GRIFFIN
SCOTT D. MUSOFF
**SKADDEN, ARPS, SLATE, MEAGHER
& FLOM, LLP**
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (212) 735-2000
michael.griffin@skadden.com
scott.musoff@skadden.com

*Attorneys for Defendants SmileDirectClub, Inc. and Individual Defendants*

ANDREW J. FINN
**SULLIVAN & CROMWELL, LLP**
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
finna@sullcrom.com

*Attorney for Underwriter Defendants*

STEVEN A. RILEY
MILTON S. MCGEE, III
ELIZABETH O. GONSER
**RILEY WARNOCK & JACOBSON, PLC**
1906 West End Avenue
Nashville, TN 37203
Telephone: (615) 320-3700
sriley@rwjplc.com
tmcgee@rwjplc.com
egonser@rwjplc.com

*Attorney for all Defendants*

PAUL KENT BRAMLETT

43

ROBERT PRESTON BRAMLETT
**BRAMLETT LAW OFFICES**
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
Telephone: (615) 248-2828
Facsimile: (866) 816-4116
pknashlaw@aol.com
robert@bramlettlawoffices.com

JEREMY A. LIEBERMAN
J. ALEXANDER HOOD II
**POMERANTZ LLP**
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

PATRICK V. DAHLSTROM
**POMERANTZ LLP**
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com

*Attorneys for Plaintiff Wei*

CHRISTOPHER M. WOOD
**ROBBINS GELLER RUDMAN
& DOWD LLP**
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: (615) 244-2203
Facsimile: (615) 252-3798
cwood@rgrdlaw.com

DARREN J. ROBBINS
BRIAN COCHRAN
**ROBBINS GELLER RUDMAN
& DOWD LLP**

44

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7424
darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

SAMUEL H. RUDMAN
MARY K. BLASY
**ROBBINS GELLER RUDMAN
& DOWD LLP**
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: (631) 367-7100
Facsimile: (631) 367-1173
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

*Attorneys for Plaintiff Fernandez*

/s/ Jerry E. Martin
**BARRETT JOHNSTON
MARTIN & GARRISON, LLC**

45