IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ADAM FRANCHI, individually and on behalf of all others similarly situated, | ) ) ) | NO. 3:19-cv-00962 |
| Plaintiffs, | ) ) | JUDGE RICHARDSON |
| v. | ) ) | |
| SMILEDIRECTCLUB, INC., et al., | ) ) | |
| Defendants. | ) | |

## <u>MEMORANDUM OPINION</u>

On September 24, 2019, dentists, orthodontists, and consumers filed a class action complaint against teledentistry company SmileDirectClub, Inc. ("SDC" or "the Company"), alleging false advertising, fraud, negligence, and unfair and deceptive trade practices.[1] Subsequently, in October 2019, three separate groups of plaintiffs each filed a complaint alleging that they purchased SDC, Class A common stock issued pursuant to SDC's initial public offering ("IPO"), that they lost money when the stock declined, and that the decline (and the plaintiffs' consequent financial loss) was due to false and misleading statements and omissions in the Registration Statement (Doc. No. 92-1) and Prospectus (Doc. No. 92-2) (together, "Registration Statement"[2]) that SDC issued in connection with its IPO. The Court consolidated the three matters such that the two related actions, *Ginsberg v. SmileDirectClub, Inc., et al.*, No. 3:19-cv-01040 and *Andre v. SmileDirectClub, Inc. et al.*, No. 3:19-cv-01057, are now consolidated with the present

---

[1] This lawsuit, currently pending before Judge Trauger, is captioned *Ciccio v. SmileDirectClub, LLC*, Case No. 3:19-cv-00845.

[2] Defendants use the term "Offering Documents" to refer collectively to the Registration Statement and Prospectus, but the Court will adopt the terminology used by Plaintiffs and refer to the Registration Statement and Prospective together as the "Registration Statement."

action. (Doc. No. 68). Following consolidation, the Court appointed SEIU to serve as Lead Plaintiff, represented by Robbins Geller, (*id*. at 10), to represent a Class consisting of "purchasers of SDC common stock during the Class Period."[3] (Doc. No. 85 at ¶ 18).

Plaintiffs then filed an Amended Consolidated Complaint for Violations of the Federal Securities Laws (Doc. No. 85, "Complaint"), which remains the operative complaint.. Now pending before the Court is Defendants' Joint Motion to Dismiss the Amended Consolidated Complaint (Doc. No. 90), filed along with a supporting memorandum (Doc. No. 91). Plaintiffs responded. (Doc. No. 93). Defendants replied. (Doc. No. 95).

## BACKGROUND[4]

A. <u>Factual background</u>

SDC is a direct-to-consumer teledentistry company that manufactures and sells 3D-printed clear dental aligners to treat malocclusion. (Doc. No. 85 at ¶ 3). Defendants completed SDC's IPO in September 2019, raising over $1.3 billion through the sale of 58.5 million shares at $23 per share pursuant to a Registration Statement filed with the Securities and Exchange Commission ("SEC") on September 9, 2019. (Doc. No. 92-1).[5] (*Id*. at ¶ 4). The Registration Statement represented that SDC's revenue, gross profit, and Adjusted EBITDA were growing and described the company's key strengths to include "Accelerating Growth." (*Id*. at ¶ 5). In reality, at the time

---

[3] The (proposed) Class Period is between September 12, 2019 and March 12, 2020, inclusive. (Doc. No. 85 at ¶ 2).

[4] The facts in this section are taken from the Complaint (Doc. No. 85) and are accepted as true for purposes of the Motion. To the extent that allegations referred to below are legal conclusions, however, they are not accepted as true but rather are identified as merely what Plaintiffs claim, and not what the Court is accepting as true for purposes of the Motion.

[5] The Registration Statement may be considered in connection with the instant Motion because it is referenced throughout the Complaint and is integral to Plaintiffs' claims. *See Comm. Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (holding that a district court may consider documents referenced in the pleadings that are integral to the claims in deciding motion to dismiss). Defendants attach the Registration Statement to the Motion. (See Doc. No. 92-1).

of the IPO, those metrics were no longer growing but instead were declining. (*Id*.). The decline in Adjusted EBITDA in particular was, in part, the result of increased marketing and selling expense ($17.8 million) and the doubling of legal expenses incurred as a result of "pending investigations, litigation with dental associations and customers, and lobbying against pending legislation." (*Id*. at 6). SDC closely tracked its revenue, gross profit, and Adjusted EBITDA and knew at the time of the IPO that these financial metrics demonstrated a dramatic decline. (*Id*.).

The Registration Statement also included figures regarding customer satisfaction. (*Id*. at 7). Defendants indicated in the Registration Statement that SDC had an "average rating of 4.9 out of 5 from over 100,000 member reviews on our website" and that the Company's "Smile Guarantee" was a "testament to [SDC's] confidence in the quality and efficacy of our product." (*Id*. at 7). At the same time, thousands of SDC customers were suffering from serious health problems resulting from missing or misshapen SDC aligners and facing difficulties in obtaining refunds from Defendants. (*Id*. at 8). At the time, the Better Business Bureau had registered over 1,000 complaints against SDC. (*Id*.). Much of this customer dissatisfaction stemmed from SDC's primary focus on obtaining as many customers as possible to report favorable revenue and financial trends in advance of the IPO, thus leading to sales by SDC to customers ill-fitted for SDC's treatment, pressure by SDC on its sales associates to close sales irrespective of a customer's suitability, and approval by SDC of treatment plans without meaningful review from dentists. (*Id*.).

SDC also employed "aggressive" litigation against journalists, customers, and an American Dental Association affiliate and required customers sign Non-Disclosure Agreements in order to receive refunds. (*Id*. at 9). In addition, the Dental Board of California received repeated complaints against SDC, leading to an investigation and raids on SDC's California stores in 2017. (*Id*.).

The Registration Statement also maintained that the SDC platform provided "excellent clinical care" and "professional-level service," as its "trained technicians" created customer treatment plans and the Company's SmileCheck program allowed a "treating doctor to monitor [the] member's progress and enable[d] seamless communication with the member over the course of treatment." (*Id*. at 10). However, the Registration Statement did not disclose that: "(i) SDC doctors were not reviewing dental x-rays or conducting dental exams prior to prescribing aligners to customers—instead, customers were required to self-certify their own dental health; and (ii) the Company was engaged in the unlicensed practice of dentistry with SDC's treating dentists having no meaningful contact with customers and sales assistants handling customers and completing 3D scans of a patient's mouth." (*Id*. at 11).

The Registration Statement included the "risk warning" that regulatory and legal challenges could have a material adverse effect on SDC's business. (*Id*. at 12). Not mentioned, however, were the regulatory and legislative risks that had already manifested themselves at the time. (*Id*.). The Registration Statement did not mention, for example, that dozens of complaints had been filed by state chapters of the American Association of Orthodontics, that SDC was under investigation by the Dental Board of California for engaging in the unlicensed practice of dentistry, and that legislation passed by the California Senate required fundamental changes in SDC's business models (including requiring teledentistry platforms to provide each customer with the treating dentist's name, license number and dental board contact; mandating reviews of a patient's most recent radiographs prior to beginning orthodontic treatment; and requiring teledentistry providers to conduct a full patient examination prior to the enactment of their plan). (*Id*.).

Between September 24, 2019 and March 12, 2020 (the "Class Period"), a series of disclosures took place regarding SDC's business model and declining results. (*Id*. at 13). After

each partial disclosure, SDC's stock price declined "immediately and significantly." (*Id.*). SDC's stock had declined to $5.30 per share by March 12, 2020, 77% below the $23 IPO price and the price at which Defendants had sold more than $625 million of their own SDC stock. (*Id.*).

### B. Parties

#### 1. **Securities Act Plaintiff**

Lead Plaintiff 1199 SEIU Health Care Employees Pension Fund ("SEIU") is a multi-employer Taft-Hartley defined benefit plan providing benefits to working and retired healthcare industry workers and their families in New York City and surrounding areas. SEIU purchased or otherwise acquired SDC common stock during the Class Period. (*Id.* at ¶ 24).

#### 2. **Securities Act Defendants**

In addition to SDC, the Complaint brings Securities Act claims against the following individual Defendants ("Individual Securities Act Defendants"):

- David Katzman, Chief Executive Officer and Board Chairman of SDC. David Katzman controlled the business operations of SDC through stock ownership, stock voting agreement, and as the managing partner of Camelot—a venture group that provided funding for SDC. David Katzman signed the Registration Statement and participated in its preparation and dissemination. In connection with the IPO, and using entities he controlled and of which he is the beneficiary, David Katzman sold 8,998,951 Units and shares of common stock to the Company for proceeds of more than $198.4 million. (*Id.* at ¶ 26).

- Kyle Wailes, Chief Financial Officer of SDC. Wailes signed the Registration Statement and participated in its preparation and dissemination. (*Id.* at ¶ 27).

- Steven Katzman, Chief Operating Officer and director of SDC. Steven Katzman controlled the business operations of SDC through stock ownership, stock voting agreement, and

position as an advisor to Camelot. Steven Katzman signed the Registration Statement and participated in its preparation and dissemination. Steven Katzman sold 663,595 Units and shares of the common stock to the Company for proceeds of more than $14.5 million. Steven Katzman is also the trustee for the David B. Katzman 2009 Family Trust, which sold 2,907,335 Units and shares of common stock for proceeds of more than $64 million. (*Id*. at ¶ 28).

- Jordan Katzman, co-founder of SDC and member of its Board of Directors. Jordan Katzman signed the Registration Statement and participated in its preparation and dissemination. Jordan Katzman, through entities which he controls and of which he is the beneficiary, sold 7,141,516 Units and shares of common stock to the Company for proceeds of more than $157 million. (*Id*. at ¶ 29).

- Alexander Fenkell, cofounder of SDC and member of its Board of Directors. Fenkell signed the Registration Statement and participated in its preparation and dissemination. Fenkell, through entities which he controls and of which he is the beneficiary, sold 6,521,446 Units and shares of common stock to the Company for proceeds of more than $143.75 million. (*Id*. at ¶ 30).

- Richard Schnall, director of SDC and a partner of Clayton, Dublier & Rice ("CD&R"). Schnall signed the Registration Statement and participated in its preparation and dissemination. CD&R, through its subsidiaries, sold 2,275,857 Units to the Company for proceeds of more than $49 million. (*Id*. at ¶ 31).

- Susan Greenspon Rammelt, director of SDC. Rammelt signed the Registration Statement and participated in its preparation and dissemination. Rammelt sold 29,964 Units and shares of common stock to the Company for proceeds of more than $650,000. (*Id*. at ¶ 32).

The Complaint also brings Securities Act claims against the following "Underwriter Defendants," each of which allegedly "acted as underwriters of the IPO and participated in the drafting and dissemination of the Registration Statement as well as the sale of more than $1.345 billion of SDC common stock to the Class": J.P. Morgan Securities LLC, Citigroup Global Markets Inc., BofA Securities Inc., UBS Securities LLC, Jefferies LLC, Credit Suisse Securities (USA) LLC, Guggenheim Securities, LLC, Stifel, Nicolaus & Company, Incorporated, William Blair & Company, L.L.C. and Loop Capital Markets LLC. (*Id*. at ¶ 35). The Complaint alleges that these entities "acted together as an underwriting syndicate and drafted and disseminated the Registration Statement in connection with the IPO," "were responsible for ensuring the completeness and accuracy of the various statements contained in, or incorporated by reference into, the Registration Statement used in connection with the IPO," and collectively received over $67 million for participating in the IPO. (*Id*. at ¶ 35).

Finally, the Complaint brings Securities Act claims against Camelot—a private investment group founded and controlled by its managing partner defendant David Katzman. Camelot is the largest shareholder of SDC and the managing member of the entity that controls SDC. (*Id*. at ¶ 36).[6]

---

[6] The Complaint alleges additionally that Camelot is "the managing member of the entity that controls SDC." Doc. No. 85 at ¶ 36). But the Complaint is less than clear as to the identity of the "entity that controls SDC." One would think that it would be a limited liability company ("LLC"), which is the kind of entity that has a "managing member" as this entity allegedly had. The complaint does not refer anywhere to an LLC, although it does refer to "the limited liability *corporation* [whatever that may be] that controlled SDC at the time of the IPO." (*Id*. at ¶ 84). The undersigned was unsuccessful in determining from the Complaint what this entity was. Moreover, the allegation that this unidentified entity "controls" SDC cannot easily be squared with other allegations in the Complaint, which ascribe control of SDC not to such entity (*i.e.*, the entity of which Camelot is the managing member), but rather to David Katzman, Steven Katzman, and Camelot. (*Id*. at ¶¶ 26, 28, 36). So the Court declines to accept as true the allegation— which does not appear material in any event for present purposes—that some (unnamed) entity "controls" SDC.

### 3. Exchange Act Plaintiffs

The Complaint's Exchange Act claims are brought by SEIU and Plaintiff Bucks County Employees Retirement System ("Retirement System"). The Retirement System is a single-employer retirement system that serves public employees and retirees of Bucks County, Pennsylvania. The Retirement System is administered by the County and offers pension, retirement plans, and various other benefits to its participants. The Retirement System purchased or otherwise acquired SDC common stock during the Class Period. (*Id.* at ¶ 36).

### 4. Exchange Act Defendants

The Exchange Act Plaintiffs bring claims under the Exchange Act against Defendant SDC and Individual Exchange Act Defendants David Katzman and Wailes (collectively, "Exchange Act Defendants"). (*Id.* at ¶ 88–91).

C. <u>Claims</u>

### 1. Securities Act claims

SEIU brings claims against the Securities Act Defendants except Camelot for (alleged) violations of the Securities Act of 1933 ("Securities Act") and against the Individual Securities Act Defendants and Camelot for violations of Section 15 of the Securities Act.

### 2. Exchange Act claims

The Exchange Act Plaintiffs bring claims against SDC and the Individual Exchange Act Defendants for (alleged) violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and against the Individual Exchange Act Defendants for violations of Section 20(a) of the Exchange Act.

## LEGAL STANDARD

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual

allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment. *Doe v. Ohio State Univ.,* 219 F.Supp.3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

On a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir.2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## DISCUSSION

Plaintiffs bring claims under Sections 11, 12(a)(2), and 15 of the Securities Act, and claims under Sections 10(b) and 20(a) of the Exchange Act. Section 11 of the Securities Act prohibits misstatements and omissions in a Registration Statement, which is the document filed with the SEC in order to register securities for sale to the public. 15 U.S.C. § 77k. Section 12 of the Securities Act prohibits oral misstatements and omissions, or misstatements and omissions in the

Prospectus, which is a part of the Registration Statement. 15 U.S.C. § 77*l*(a)(2). *Schuh v. HCA Holdings, Inc.*, 947 F. Supp. 2d 882, 886 (M.D. Tenn. 2013). "Sections 11 and 12 both impose a duty to disclose additional facts when a statement of material fact made by the issuer is misleading, and they both impose liability for failing to fulfill that duty of disclosure, as well as for misstating a material fact." *J & R Mktg., SEP v. General Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008). Section 15 of the Securities Act, in turn, provides secondary liability for persons who control others and attaches only "on the corporation being found liable under Section 11 or 12." *Id.*; *see,* 15 U.S.C. § 77*o*. *Schuh*, 947 F. Supp. 2d at 886.

Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security. *Grae v. Corrections Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at * 13 (M.D. Tenn. Dec. 18, 2017). Liability under Rule 10b-5 is implicated when an individual, in connection with the purchase or sale of any security, either directly or indirectly, (a) employs any device, scheme, or artifice to defraud, (b) makes any untrue or misleading statement of a material fact, or (c) engages in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5.[7]

---

[7] In full, Rule 10b-5 provides as follows:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim under Section 10(b) and Rule 10b–5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant;[8] (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Jackson Cty. Employees' Ret. Sys. v. Ghosn*, 2020 WL 7711378, at *13 (M.D. Tenn. Dec. 29, 2020) (citing *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) [hereinafter, "*Omnicare*"]). Stated another way, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Id.*

Section 20(a) of the Exchange Act imposes liability upon a company's "controlling person" for Rule 10b–5 violations. The Sixth Circuit has held that if the predicate 10b–5 claims lack merit, then the controlling persons claims under Section 20(a) fail. In *re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 664 (M.D. Tenn. 2001) (citing *Stavroff v. Meyo*, 1997 WL 720475, at *7 n. 5 (6th Cir. Nov.12 1997)).

Plaintiffs' securities fraud claims implicate the heightened pleading standards of Federal Rule of Civil Procedure 9(b), *Jackson Cty*, 2020 WL 7711378, at *5, which require that a party "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, the Complaint must "(1) specify the statements that Plaintiffs contend were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Jackson Cty.*, 2020 WL 7711378, at *5 (citing *Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 978 (6th Cir. 2018)). The Private

---

[8] "Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Jackson Cty.*, 2020 WL 7711378 at *14 (citing *Omnicare*, 769 F.3d at 470).

Securities Litigation Reform Act ("PSLRA")—in particular, 15 U.S.C. § 78u–4(b)(1) and (2), respectively—requires that a plaintiff's complaint (1) specify each statement alleged to have been misleading along with the reason(s) why the statement is misleading, and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *Id.*

Historically, the first two of the six elements have been notoriously difficult to articulate. As the Sixth Circuit noted a half-dozen years ago:

> Our court has covered the standards for pleading these elements many times, and yet for all of our efforts and many pronouncements, the precise requirements for sufficiently pleading them, at least in this circuit, remain somewhat hazy and muddled. Therefore, before analyzing KBC's actual allegations, we will attempt to state the doctrine simply and in a straightforward manner in the hope of clearing away any confusion.

*Omnicare*, 769 F.3d at 469. The Court herein will attempt to do likewise, relying on *Omnicare* (and whatever clarity it provided) and other extant cases.

Defendants present two bases for dismissal of all claims: a) Plaintiffs' purported failure to allege any misrepresentation or actionable omission; b) the purported fact that the alleged losses were not caused by the offering documents. And Defendants present one additional basis for the dismissal of the Exchange Act claims in particular, namely, Plaintiffs' purported failure to allege the scienter necessary to state claims under the Exchange Act. The Court will discuss each of these three challenges in turn.

A. Material Misrepresentation or Omission

The Sixth Circuit has explained that

> A misrepresentation is an affirmative statement that is misleading or false. When an alleged misrepresentation concerns "hard information"—"typically historical information or other factual information that is objectively verifiable"— it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading. *Murphy v. Sofamor*

*Danek Grp., Inc.* (*In re Sofamor Danek Grp., Inc.*), 123 F.3d 394, 401 (6th Cir.1997) (internal quotation marks omitted); *see City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669–70 (6th Cir.2005). When an alleged misrepresentation concerns "soft information," which "includes predictions and matters of opinion," *id.*, a plaintiff must additionally plead facts showing that the statement was "made with knowledge of its falsity," [*Indiana State District Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 945-46 (6th Cir. 2009) ("*Omnicare I*")].

It is this latter type of alleged misrepresentation that is at issue here and that has given us and other courts such trouble because it adds a subjective inquiry to an otherwise objective element, thus conflating two elements of the six-element cause of action—an actionable misrepresentation and scienter. *See, e.g.*, *Brown v. Credit Suisse First Bos. LLC* (*In re Credit Suisse First Bos. Corp. Sec. Litig.*), 431 F.3d 36, 48 (1st Cir. 2005) (recognizing that "the subjective aspect of the falsity requirement and the scienter requirement essentially merge"), *overruled on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L. Ed. 2d 179 (2007); *In re Salomon Analyst AT & T Litig.*, 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) (recognizing same). Until now, we have ignored this merger of elements and analyzed whether a defendant had actual knowledge under both Elements One and Two. *See, e.g.*, *Omnicare I*, 583 F.3d at 945–47 (analyzing knowledge of falsity under the material-misrepresentation requirement); *Zaluski*, 527 F.3d at 573 (same); *City of Monroe*, 399 F.3d at 670–76, 684–88 (analyzing knowledge of falsity under both requirements). In doing so, we have muddled the analytical framework, making it more difficult for lower courts and parties to evaluate whether a plaintiff has sufficiently pleaded a cause of action.

In the end, we must choose one way or the other to analyze a defendant's actual knowledge. Whether courts choose to evaluate this subjective component as part of their material-misrepresentation analysis or their scienter analysis makes little difference for the parties. Under either approach, Plaintiffs will need to allege particular facts demonstrating that defendants had actual knowledge that their statements concerning soft information were false or misleading at the time that they were made. But for the sake of clarity, it makes the most sense to adopt the First Circuit's approach and conceive of this additional requirement as raising the bar for alleging scienter. *See In re Credit Suisse*, 431 F.3d at 48–49; *see also* Wendy Gerwick Couture, *Opinions Actionable as Securities Fraud*, 73 La. L. Rev. 381, 394–401 (2013). Doing so would allow courts to evaluate materiality and whether the statement was misleading or false—two objective inquiries—under the material-misrepresentation prong and then to save all subjective inquiries for the scienter analysis. In addition, whether someone made a statement with the knowledge that it was false is, at bottom, a question of someone's state of mind— the general subject of a scienter inquiry.

*Omnicare*, 769 F.3d at 470–71.

Defendants argue that all of Plaintiffs' claims fail because (according to them) Plaintiffs do not allege any misrepresentation or actionable omission. In particular, Defendants claim that 1) the Registration Statement did not fail to disclose known trends about SDC's revenue, gross profits, or adjusted EBITDA; 2) the Registration Statement did not misrepresent SDC's member satisfaction; 3) the Registration Statement did not misrepresent any standard of care; and 4) the Registration Statement disclosed SDC's legal and regulatory risks. (Doc. No. 91 at 19–25).

1. **Failure to disclose known trends regarding revenue, gross profits, and adjusted EBITDA**

Plaintiffs allege that Defendants violated the Securities Act by omitting information they were required to include in the Registration Statement. *See* 15 U.S.C. § 77k(a). "There are two accepted methods of determining whether a duty exists for the offeror to disclose certain information in the context of a public offering. First, an offeror is duty-bound to disclose all material information required to be disclosed by statute. *City of Monroe Employees Ret. Sys. v. Bridgestone Corp.,* 399 F.3d 651, 669 (6th Cir. 2005); *see also* 15 U.S.C. § 77k (stating that a person is liable when a registration statement omits a material fact 'required to be stated therein'). Second, an offeror has a duty to disclose any additional information required to make another statement, whether required or voluntarily made, not misleading. *Rubin v. Schottenstein,* 143 F.3d 263, 268 (6th Cir. 1998) (en banc)." *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 390 (6th Cir. 2008).

a. *Statutorily-mandated disclosures (Item 303)*

Plaintiffs allege that Regulation S-K Item 303(a)(3)(ii), 303(b) (and Instruction No. 3 to Paragraph 303(a)) (together, "Item 303") requires companies to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," and that

any such descriptions "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results." (Doc. No. 85 at ¶ 47). As this Court has explained,

> Item 303(a)(3)(ii) of Regulation S–K [ ] requires a registrant to "[d]escribe any known trends or uncertainties . . . that the registrant reasonably expects will have a material . . . unfavorable impact on . . . revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). "According to the SEC's interpretive release regarding Item 303, the Regulation imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Panther Partners Inc.*, 681 F.3d at 120 (citation omitted). "To plausibly plead such a failure to disclose claim, a complaint must allege (1) that a registrant knew about an uncertainty before an offering; (2) that the known uncertainty is 'reasonably likely to have material effects on the registrant's financial condition or results of operation'; and (3) that the offering documents failed to disclose the known uncertainty." *Silverstrand Inv. v. AMAG Pharm., Inc.*, 707 F.3d 95, 102–103 (1st Cir. 2013).

*Schuh*, 947 F. Supp. 2d at 888.

Defendants first argue that Item 303 does not require any disclosures that they did not make, because Plaintiffs did not allege facts showing that Defendants actually knew of any declining trends in SDC's revenue, gross profit, and Adjusted EBITDA at the time of the IPO; according to Defendants, Plaintiffs' allegations that Defendants must have known because Defendants closely tracked these metrics is not enough to require disclosure under Item 303. (Doc. No. 91 at 20). As stated previously by this Court, "[w]hile the Sixth Circuit stated in [*J & R Mktg.*] that pleading a trend was 'knowable' was not sufficient[,] . . . [e]ven under Fed. R. Civ. P. 9(b) 'knowledge . . . may be alleged generally,' and the Court does not read *J & R Mktg.* as imposing a heightened pleading standard with regard to knowledge." *Schuh*, 947 F. Supp. 2d at 887. Here, the Court finds that Plaintiffs' allegations that Defendants tracked their metrics regarding their own company's revenue, gross profit, and Adjusted EBITDA are enough to meet the standard set forth

by both the Sixth Circuit and Fed. R. Civ. P. 9(b) for pleading knowledge sufficient to state a claim based on the alleged violation of the requirements of Item 303.

Defendants also argue that because revenue and gross profit actually increased from Q3 2018 to Q3 2019, and because the relevant benchmark for measuring trends is yearly and not quarterly, there was no declining trend for Defendants to disclose under Item 303. (*Id*. at 21–22). However, the Court finds that Plaintiffs have sufficiently stated a claim that Defendants were required to, but did not, disclose that SDC's revenue, gross profits, and Adjusted EBITDA were declining at the time of the IPO. First, the case law is far from settled regarding the length of time necessary to constitute a "trend" for purposes of Item 303. Though Defendants cite *Schuh* when arguing that a "quarter-to-quarter" comparison is not relevant, *Schuh* rejects the notion that "[a]s a matter of law, a two month period of time does not establish a 'trend' for purposes of the disclosures required by Item 303" and instead embraces a more fact-specific approach to what disclosures are required by Item 303. 947 F. Supp. 2d at 891–92. *Schuh* also quotes the Eleventh Circuit, which has explained the "known trends" element of Item 303 by stating:

> [W]e interpret this element to require an assessment of whether an observed pattern accurately reflects persistent conditions of the particular registrant's business environment. It may be that a particular pattern is, for example, of such short duration that it will not support any conclusions about the registrant's business environment. Release 6835 states that management's assessment "must be objectively reasonable, viewed as of the time the determination is made." *Id.*
>
> [. . .]
>
> Item 303(a)(3)(ii) essentially says to a registrant: If there has been an important change in your company's business or environment that significantly or materially decreases the predictive value of your reported results, explain this change in the prospectus. The obvious focus is on preventing the latest reported results from misleading potential investors, thereby promoting a more accurate picture of the registrant's future prospects.

*Oxford Asset Mgmt. Ltd. v. Jaharis*, 297 F.3d 1182, 1191–92 (11th Cir. 2002). The Court likewise rejects Defendants' suggestion that as a blanket rule, one quarter's financial results is not enough to establish a trend requiring disclosure under Item 303.

The Court also rejects Defendants' argument that "there was no declining 'trend' to disclose" because other metrics (such as monthly revenue) demonstrated increases. (Doc. No. 91 at 21). At the motion-to-dismiss stage, Plaintiffs need only make plausible factual allegations that there was a downward trend of which Defendants had knowledge but failed to disclose. Plaintiffs meet this threshold by alleging factual matter that indicates the trends Defendants claimed were "accelerating" were actually experiencing a sudden downward trend. By presenting the graphs included in ¶ 50 of the Complaint (and the facts underlying these graphs) regarding the sudden change, the Court finds, Plaintiffs have sufficiently plead a material omission under Item 303. *See Schuh*, 947 F. Supp. 2d at 890 (declining to dismiss claim that defendants failed to disclose steep decline in revenue occurring just before issuance of the IPO despite concerns about the "macro view" chart created by the plaintiffs).

Finally, Defendants argue that Item 303 requires disclosure only of trends or uncertainties that could impact financial results (as opposed to the disclosure of financial results themselves), and that Plaintiffs do not allege any such trends or uncertainties. (*Id*. at 22). Courts do not read Item 303 so narrowly. As stated by this Court in *Schuh*, "in the absence of discovery, Plaintiffs cannot be expected to know exactly what may or may not have happened [ ] to cause the downward trend (if there was one)." 947 F. Supp. 2d at 890 ("It suffices for present purposes that Plaintiffs allege (and with support from a chart presumably based upon some facts) that there was a downward trend of which [defendants] had knowledge. The details can be fleshed out later."). Plaintiffs have alleged to the best of their knowledge, prior to conducting discovery, that

Defendants failed to disclose a sharp and sudden decline in three different financial metrics related to SDC's operations. The Court finds this to be sufficient to state a claim that Defendants failed to disclose a known trend as required by Item 303, despite Plaintiffs not having pointed to a specific event triggering this change in revenue (though, in Plaintiffs' favor, they do allege in the Complaint certain factors that they surmise may have led to this change in SDC's growth trends). (Doc. No. 85 at 6 ("[T]he decline in Adjusted EBITDA referenced above was, in part, the result of increased marketing and selling expense ($17.8 million) and the doubling of legal expenses that had already been incurred prior to the IPO as a result of pending investigations, litigation with dental associations and customers, and lobbying against pending legislation, of which defendants were aware."). Accordingly, the Court finds that Plaintiffs have stated a plausible claim based on Item 303.

          *b.  Duty to disclose additional information required to make another statement not misleading*

Plaintiffs allege that the Registration Statement omitted that SDC's revenue, gross profits, and Adjusted EBITDA "reversed course and turned negative" at the time of the IPO, thus rendering misleading Defendants' statements that these measures were growing and that "Accelerating Growth" was one of SDC's "Strengths." (Doc. No. 85 at ¶ 44–46).

Defendants argue that "Plaintiffs refer exclusively to a single graphic that simply lists 'accelerating growth' among SDC's key strengths" and that this graphic "does not reference any particular metric or time period" that would communicate a "guarantee" that these metrics would increase in the ongoing third quarter. (Doc. No. 91 at 19). Because Q3 2019 was still in progress at the time of the IPO, and because SDC's growth in the years leading up to Q3 2019 is undisputed, Defendants argue, this graphic depicting past successes does not implicitly represent to the public that such trends will continue, and did not require the company to update the public as to Q3 2019.

(*Id*.). Defendants also contend that elsewhere in the Offering Documents, Defendants "bespeak caution" and included warnings that "the third quarter has historically tended to have less growth relative to other quarters," "operating results have fluctuated in the past," and that SDC anticipated "future quarterly and annual operating results to fluctuate as [it] focus[es] on increasing demand for [its] products." (*Id*. at 19–20).

The Court finds Plaintiffs have, in part, plausibly alleged an actionable omission based on Defendants portraying a positive trend in SDC's revenue, gross profits, and Adjusted EBITDA while omitting the fact that these metrics were actually declining at the time of the IPO. As an initial matter, contrary to Defendants' argument, Plaintiffs do not rest their allegations only on the inclusion of "Accelerating Growth" in the graphic depicting SDC's strengths; Plaintiffs also allege that Defendants described positive growth trends elsewhere in the Offering Documents while failing to mention the actual downward trends in revenue, gross profits, and Adjusted EBITDA. (Doc. No. 85 at ¶ 44 ("The Registration Statement represented that "Accelerating Growth" was one of SDC's "Strengths" *and that the Company's revenue, gross profit and Adjusted EBITDA were growing*.") (emphasis added)). The Court will address each of these representations in turn.

The Court first addresses whether the inclusion of "Accelerating Growth" in a graphic depiction of SDC's "strengths" (set forth immediately below) created a duty to disclose that SDC's revenue, gross profits, and Adjusted EBITDA were declining at the time of the IPO.



**Our Strengths**

We believe our strengths will allow us to maintain and extend our position as the leading direct-to-consumer clear aligner provider. Below is a summary of our key strengths:

(Doc. No. 92-1 at 18).

The Court finds that this graphic does not create such a duty of disclosure. The graphic simply depicts that "Accelerating Growth" is among SDC's "key strengths," but does not represent that SDC is experiencing "accelerating growth" in any particular area of the company and over any particular time period. In other words, one could take "Accelerating Growth" to mean, for example, that the company is experiencing accelerating growth in the number of customers it reaches or the number of employees it hires. The graphic also does not include any relevant time period during which SDC claims "Accelerating Growth." This representation that one of SDC's strengths is "Accelerating Growth" is thus simply too vague to form the basis for an actionable omission (particularly when listed alongside other vague "strengths," including SDC's "control of [its] destiny.") (*Id.*). Put yet another way, the non-disclosure of a decline in revenue, gross profits,

or Adjusted EBITDA in conjunction with this graphic does not render the "Accelerating Growth" aspect of the graphic false or misleading. This aspect of Plaintiffs' claims thus will not survive the Motion.

Plaintiffs also claim that Defendants' representations that the Company's revenue, gross profit, and Adjusted EBITDA were growing constitute misleading statements or omissions. (Doc. No. 85 at 44–46). Plaintiffs do not specifically identify particular places within the Registration Statement where Defendants depict these metrics as growing, but the Court understands Plaintiffs' allegation to refer generally to any items in the Registration Statement that literally depict the change in these metrics. Examples of these depictions are found in the sections of the Registration Statement titled "Selected Consolidated Historical Financial Data" (Doc. No. 92-1 at 84–85) and "Unaudited Consolidated Pro Forma Financial Information," where Defendants note key financial data points over the last several quarters. (*Id*. at 86–93). In the Complaint, Plaintiffs generate graphical depictions of this information, along with the undisclosed/omitted data points, to demonstrate their allegation that Defendants' non-disclosure of current revenue, gross profit, and Adjusted EBITDA rendered their reported growth under these metrics misleading or false:



(Doc. No. 85 at 20).



(Doc. No. 85 at 22).

Plaintiffs do not dispute that the financial statements included in the Registration Statement are accurate. Instead, they argue that these disclosures form the basis for an actionable misrepresentation or omission. Thus, Defendants' reference to the holding in *In re Envision Healthcare Corp. Sec. Litig.* No. 3:17-cv1112, 2019 WL 6168254, *9 (M.D. Tenn. Nov. 19, 2019), that "[accurate] reports of historical income and EBITDA growth are not themselves actionable statements" is not particularly relevant when, like the plaintiffs in *Envision* or the instant Plaintiffs, the plaintiffs argue that the accurate financial statements included in the Registration Statement *provide the basis (context) for* (rather than themselves constitute) alleged misrepresentations. *Id.* at *9. Instead, the issue here is whether a plaintiff plausibly alleges a misrepresentation or omission for purposes of the Securities Act and/or the Exchange Act where the defendant fails to disclosure a sudden decline in financial metrics after such metrics had previously been steadily increasing— and in particular, when the financial quarter containing such metrics is still ongoing at the time of the IPO (here, two weeks prior to the end of the quarter in progress).

As mentioned by Defendants, "courts have been reluctant to impose liability based upon a failure to disclose financial data for a fiscal quarter in progress." *In re Focus Media Holding Ltd. Litig.*, 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010) (citation omitted). *See also Zucker v. Quasha*, 891 F. Supp. 1010 (D.N.J. 1995), aff'd, 82 F.3d 408 (3d Cir. 1996) (finding offering documents not misleading in failing to disclose increase in rate returns for quarter that was in progress when the offering documents became effective, particularly where defendants did not make any public projections as to the undisclosed figures); *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1418–19 (9th Cir. 1994) (court did not impose liability based upon corporate official's failure to disclose financial data for the fiscal quarter in progress where claim alleged that the prospectus failed to disclose how far sales were lagging behind internal sales projections for the quarter in

progress during IPO). But that is not to say that courts *never* impose liability based on non-disclosure of financial data for a quarter in progress (or that the aforementioned cases strictly forbid imposing liability on such basis). In *Shaw v. Digital Equip. Corp.*, the First Circuit rejected "any bright-line rule that an issuer engaging in a public offering is obligated to disclose interim operating results for the quarter in progress whenever it perceives the possibility that the quarter's results may disappoint the market," stating that

> Present, known information that strongly implies an important future outcome is not immune from mandatory disclosure merely because it does not foreordain any particular outcome. The question whether such present information must be disclosed (assuming the existence of a duty), poses a classic materiality issue: given that at any point in a quarter, the remainder of the period may not mirror the quarter-to-date, is there a sufficient probability that unexpectedly disastrous quarter-to-date performance will carry forward to the end of the quarter, such that a reasonable investor would likely consider the interim performance important to the overall mix of information available?

82 F.3d 1194, 1210 (1st Cir. 1996), *abrogated on other grounds by* 15 U.S.C. § 78u–4(b)(2). The Court described the relevant inquiry as "whether the nondisclosure of interim facts rendered the prospectus materially incomplete." *Id*. In *Shaw*, the Court ultimately held that the plaintiffs stated a cognizable claim under Section 11 of the Securities Act, given that i) "the prospectus in question was filed 11 days prior to the end of the quarter in progress,", ii) "[t]he results for that quarter turned out to be, by all accounts, the product of more than a minor business fluctuation," and iii) the court was obligated to accept as true the plaintiffs' allegation that the defendant "was in possession of information about the company's quarter-to-date performance (e.g., operating results) indicating some substantial likelihood that the quarter would turn out to be an extreme departure from publicly known trends and uncertainties" at the time of the IPO. *Id.* at 1211.

The Court finds that Plaintiffs have plausibly alleged an actionable misrepresentation or omission based on Defendants' failure to disclose current financial metrics at the time of the IPO.

Plaintiffs have sufficiently alleged factual matter showing that, as illustrated by the graphs included above, the change in financial metrics was more than a minor business fluctuation and was instead an extreme departure from previous trends. Thus, Plaintiffs' allegations support a finding that a reasonable investor would consider the data that was undisclosed to be important to the overall financial picture such that the prospectus was "materially incomplete" without the inclusion of the quarter-in-progress data. Plaintiffs' claim that Defendants' failure to disclose their current revenue, gross profit, and Adjusted EBITDA at the time of the IPO rendered their representations of current financial growth misleading or false will survive the Motion.

### 2. **Misrepresentation of member satisfaction**

Plaintiffs allege that in the Registration Statement, Defendants misrepresented their customers' satisfaction. (Doc. No. 85 at 23–27). The Registration Statement includes statements that SDC's "primary focus is on delivering an exceptional member experience," that "member satisfaction" was fundamental to "maintain[ing] [SDC's] position as the leading direct-to-consumer clear aligner provider," and that SDC's number one strength was "positive member experience." (*Id*. at ¶ 7). The Registration Statement also mentions that SDC had an "average rating of 4.9 out of 5 from over 100,000 member reviews on [SDC's] website" and that the Company's "Smile Guarantee" was a "testament to [SDC's] confidence in the quality and efficacy of our product." (*Id*.).

Plaintiffs claim that these representations are false and/or misleading because in reality, (allegedly) "thousands of SDC customers were neither 'highly satisfied' nor had 'highly positive experiences' with SDC's products and services," in part because "SDC molds and aligners were causing serious health problems for thousands of customers who received missing or misshapen aligners and were seeking (and experiencing difficulties in obtaining) refunds." (Doc. No. 85 at ¶

8). The BBB (allegedly) had over 1,800 complaints against SDC as of February 2020, revealing that many customers suffered adverse health consequences caused by SDC's aligners. (*Id.* at ¶ 144).

Defendants argue that the Offering Documents do not misrepresent SDC's member satisfaction because, according to Defendants: (1) the relevant statements are "inactionable puffery"; and (2) the documents "do not claim 100% customer satisfaction," meaning that the "alleged dissatisfaction of some customers (like any business has) does not render disclosures about the high satisfaction of others false or misleading." (Doc. No. 91 at 22–23).

The Sixth Circuit in *Omnicare I* described the type of corporate "puffery" Defendants refer to here, stating that "[c]ourts have consistently found immaterial a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important." *Omnicare I*, 583 F.3d at 944 (internal quotation marks and citations omitted). A corporate statement will be deemed "puffery" where it does "nothing more than vaguely predict positive future results, a claim so banal and ubiquitous that it cannot engender reliance by reasonable investors." *Id.* Such statements "both on their own terms and in context, lack[] a standard against which a reasonable investor could expect them to be pegged" and "are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671 (6th Cir. 2005) (dismissing as immaterial claims based on statements "best characterized as loosely optimistic statements insufficiently specific for a reasonable investor to find them important to the total mix of information available").

The statements[9] at issue here are not actionable false statements or misrepresentations for purposes of securities law. SDC's generalized statements regarding customer satisfaction are most appropriately characterized as puffery that a reasonable investor would not likely rely upon. Statements that SDC's "primary focus is on delivering an exceptional member experience" and that SDC's number one strength was "positive member experience" are examples of "rosy affirmations" and "loosely optimistic statements" that are untethered to any indicators of success such that a reasonable investor would rely on them. Further, Plaintiffs allege no factual matter demonstrating that it was false that SDC had a rating of "4.9 out of 5 from over 100,000 member reviews on [SDC's] website" at the time of the IPO.

Courts have found similar statements regarding a company's view of their customers' satisfaction to be an inadequate basis for a securities law claim. *See, e.g., Xu v. Chinacache Int'l Holdings Ltd.*, No. 215CV7952CASRAOX, 2016 WL 4370030, at *9 (C.D. Cal. Aug. 15, 2016) ("[A] claim to 'enhanced customer satisfaction' is non-actionable puffery."); *Wozniak v. Align Tech.*, Inc., 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (concluding that the phrase "so far we're getting really great feedback" was non-actionable puffery); *Orton v. Parametric Tech. Corp.*, 344 F. Supp. 2d 290, 300–01 (D. Mass. 2004) ("This Court holds that the statement steps over the line into the realm of corporate puffery. That [the defendant company] was "pleased with . . . the

---

[9] One of the statements included by Plaintiffs here, that the Company's "Smile Guarantee" was a "testament to [SDC's] confidence in the quality and efficacy of our product," does not appear to the Court to make any representations regarding the customer base's satisfaction with SDC's products or services. The "Smile Guarantee" is a feature that "provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied." (Doc. No. 85 at ¶ 56). Plaintiffs do not include any information that demonstrates how many customers made use of the "Smile Guarantee" (thus indicating that these customers were not in fact "entirely satisfied"), nor do Plaintiffs explain the significance of this statement as it relates to their claim. In other words, unlike the other statements included by Plaintiffs as forming the basis for a misrepresentation related to SDC's customers' satisfaction, this statement does not really communicate that SDC's customers were in fact satisfied. Instead, the mere existence of the "Smile Guarantee," and SDC's corresponding commentary that the "Smile Guarantee" is a "testament" to SDC's confidence in its product, fails to constitute or reflect any statement about whether in fact SDC's customers were on the whole satisfied with their experience with SDC.

confirmation [they] receiv[ed] from the market and [their] customers" is a subjective opinion that the Purchasers could not specifically prove or disprove.") (citation omitted).

Therefore, Plaintiffs' claim that Defendants made false or misleading statements regarding their customers' satisfaction will not survive the Motion.

### 3. Misrepresentation of standard of care

Plaintiffs allege that the Registration Statement contained false and misleading statements regarding SDC's standard of care. (Doc. No. 85 at ¶ 58). Plaintiffs state,

> The Registration Statement stated that SDC's teledentistry platform provided "excellent clinical care" and "professional-level service." ¶¶10, 58. Unbeknownst to investors, SDC's teledentistry model could not provide the standard of care necessary to move a customer's teeth safely as there was not sufficient interaction with a licensed dentist to ensure the safe and effective orthodontic treatment being promised. ¶¶11, 58-59. In fact, SDC customers were virtually always instantaneously approved for aligners and interacted with sales assistants who worked on commission and were required to meet Company-mandated sales metrics. ¶¶57(c), 59(e). The lack of interaction with dentists, and high pressure sales tactics, resulted in poor care. *Id.*

> While the Registration Statement emphasized that "trained technicians" created customer treatment plans (¶¶10, 58), it was sales assistants who handled customer consultations – completing highly specialized tasks without meaningful oversight from a licensed dentist. *Compare* ¶¶10, 58, *with* ¶¶11, 59(c). Likewise, the Registration Statement stated that its "SmileCheck" program gave customers "seamless communication" with their "treating doctor." ¶¶10, 58. But SDC's dentists had no meaningful contact with customers, their only involvement being a superficial review of a photo or impression of a customer's teeth. ¶¶8, 11, 59(h). If customers had issues, they were directed to speak with hygienists rather than a licensed dentist. *Id.*

(Doc. No. 93 at 22–23).[10] Defendants respond by first arguing that "SDC does not provide clinical care" and explaining that "a member's treating doctor—not SDC—is responsible for all clinical care, including approving the member's treatment plan, prescribing their custom aligners and

---

[10] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ ¬ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if (as with the instant citation) such page number differs from the page number originally provided by the author/filer of the document.

monitoring their progress." (Doc. No. 91 at 24). Defendants then argue that SDC's protocols were "accurately disclosed" in the Registration Statement and "Plaintiffs' subjective disagreement with the Company's business strategy does not state a claim for a disclosure-based securities violation." (*Id*. at 25).

Plaintiffs' claim that the Registration Statement misrepresented SDC's standard of care will survive the Motion. Defendants' argument here—that SDC does not provide clinical care—serves only to highlight the fact that if the Registration Statement is construed to represent that SDC provides clinical care, such representation would be a misrepresentation. And the Registration Statement can be construed that way. Defendants claim that "SDC does not provide clinical care," but the Registration Statement does not make this clear. Instead, the Registration Statement describes SDC's services as "providing convenient access to excellent clinical care" and notes that SDC manages "the entire member experience." (Doc. No. 92-1 at 12). The Registration Statement states that SDC has "a network of approximately 240 orthodontists and general dentists. . . who are fully licensed[.] . . . These doctors in our network evaluate our members' progress throughout treatment, and are available to answer any questions should members need additional assistance." (Doc. No. 92-1 at 19). These statements suggest that SDC *does* (through "[its] network") engage in teledentistry and provide clinical care. Further, Defendants do not respond to Plaintiffs' allegations that rather than "trained technicians" creating customer treatment plans, in reality, it was sales assistants who "handled customer consultations" and "complet[ed] highly specialized tasks without meaningful oversight from a licensed dentist." (Doc. No. 93 at 22).

Thus, the Court finds that Plaintiffs have sufficiently alleged that SDC's statements regarding their standard of care were false or misleading, and these claims will survive the Motion.

4. **Failure to disclose legal and regulatory risks**

Finally, Plaintiffs allege that the Registration Statement contained false and misleading statements regarding the regulatory and legislative risks faced by SDC. (Doc. No. 85 at ¶¶ 60–63). In particular, Plaintiffs challenge the Registration Statement's framing of regulatory and legislative risks as being merely possible risks that *could* be faced by SDC in the future, while in reality, by the time of the IPO, "dozens of complaints had already been filed by state chapters of the ADA and other similar trade organizations challenging SDC's practice of teledentistry," "SDC was already under investigation for engaging in the unlicensed practice of dentistry," and "legislation in California designed specifically to curtail SDC's practices had already unanimously passed the California Senate." (Doc. No. 93 at 25–27).

Defendants argue that this claim should be dismissed because SDC warns in the Registration Statement that its "business could be adversely affected by ongoing professional and legal challenges to [its] business model or by new state actions restricting [its] ability to provide our products and services in certain states" and cites "examples of active litigation with dental boards and associations in Georgia, Alabama and New Jersey." (Doc. No. 91 at 25). Defendants also contend that the Registration Statement discloses "a petition submitted to the FDA urging it to initiate enforcement action against SDC, which the FDA rejected" and warns that "the traditional dental industry's attacks on the Company were ongoing and could result in new actions or regulations that could adversely affect the business." (*Id*. at 25–26). The Court is unpersuaded, however, that Plaintiffs have not plausibly alleged actionable misrepresentations or omissions here.

First, Defendants' general cautionary language does not insulate them from liability for any specific misrepresentations or omissions. *S.E.C. v. Merchant Capital, LLC,* 483 F.3d 747, 768

(11th Cir. 2007) ("[G]eneral cautionary language does not render omission of specific adverse historical facts immaterial."). *See also Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at \*16 (M.D. Tenn. Apr. 26, 2011), *report and recommendation approved*, 2012 WL 214635 (M.D. Tenn. Jan. 24, 2012) (finding that risk warnings were "meaningless because such warnings portended the future, but did not alert investors about the conditions that then existed" and holding that failure to disclose relevant risks formed proper basis for Section 10(b) claim despite defendants having made general risk warnings); *Helwig*, 251 F.3d at 559 ("[Defendant-company]'s blanket statements concerning pending legislation offered investors no guidance about the consequences of health care reform upon the company's business. These statements were not meaningful and were hardly even cautionary."). Further, Defendants cannot be immunized by risk disclosures "where the risk allegedly disclosed has already occurred" but such actual occurrence has not been disclosed *Freudenberg v. E\*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 193 (S.D.N.Y. 2010); *see also Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004) ("Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired").

Therefore, Defendants' warnings—that its "business could be adversely affected by ongoing professional and legal challenges to [its] business model or by new state actions restricting [its] ability to provide our products and services in certain states" and that that "the traditional dental industry's attacks on the Company were ongoing[11] and could result in new actions or regulations that could adversely affect the business"—do not necessary militate against a finding of actionable omissions. Instead, these warning would fail to insulate Defendants from liability if in fact (a) Defendants were already being adversely affected by these risks, and (b) Defendants did not disclose that such risks had already manifested themselves (and such disclosure could have

---

[11] This general disclosure that such "attacks on the Company were ongoing" is not specific enough such that a reasonable investor could rely on such disclosure when making an informed decision.

affected the behavior of a reasonable investor). *Winslow*, 2011 WL 7090820, at *16 ("Such allegations suggest that general market disclaimers and vanilla assertions about possibilities (e.g. 'business may be adversely affected by conditions in the financial markets and economic conditions generally') may not have been sufficient for a reasonable investor to make an informed decision.").

Here, although the Registration Statement does reference several examples of litigation against SDC in "Georgia, Alabama and New Jersey" and "a petition submitted to the FDA," Plaintiffs allege the existence of significant additional legal and regulatory risks presently (at the time of the IPO) faced by SDC that go beyond the limited risks disclosed by Defendants. In particular, Plaintiffs allege that SDC failed to mention noteworthy legislation passed by the California Senate and allege the material impact this legislation would have on SDC. (Doc. No. 85 at ¶¶ 12, 62(e)).

Plaintiffs cite *Helwig* in support of this argument. There, the defendants did mention in their offering documents a specific piece of pending legislation, but the defendants claimed that they were unable to assess the impact of the legislation on the defendant-corporation and thus omitted such details. *Helwig*, 251 F.3d at 554. While the factual scenario in *Helwig* is distinct from that present here, the case still provides helpful guidance, particularly in its view that it would be "untenable" to allow a company to "offer a patchwork of honesty and omission" by "choos[ing] which contingencies to expose and which to conceal." *Id*. at 560. Defendants here create such a patchwork by selectively disclosing particular regulatory and legislative risks while failing to disclose others. And contrary to Defendants' contention that Plaintiffs failed to allege the California legislation "had or [was] expected to have a material effect on SDC's business," Plaintiffs make such allegations in the Complaint. (Doc. No. 85 at ¶¶ 12, 62(e)).

Thus, Plaintiffs' claim that Defendants misrepresented or omitted certain legal and regulatory challenges in the Registration Statement will survive the Motion.

B. Loss Causation[12]

Defendants argue that "[a]ll of Plaintiffs' claims independently fail for lack of causation." (Doc. No. 91 at 27). Defendants contend that

> The securities laws protect investors only "against those economic losses that misrepresentations actually cause." *Dura Pharm.*, 544 U.S. at 345. Plaintiffs must plead facts establishing loss causation as an element of their Exchange Act claims. *Id.* at 338. Similarly, "[i]f it is apparent on the face of the complaint [that] the decline in share value is not related to any material misstatement and/or omission," then the Securities Act claims should be dismissed based on the affirmative defense of negative causation. *Azzolini v. Corts Tr. II for Provident Fin. Tr. I*, No. 103CV1003, 2005 WL 3448053, at *5 (E.D. Tenn. Dec. 14, 2005); see also 15 U.S.C. § 77k(e).

(*Id.* at 27–28).

First, regarding the Section 11 claim, Plaintiffs argue that loss causation is "unsuitable for adjudication on a motion to dismiss" because (lack of) loss causation is an affirmative defense and not an element of a Section 11 claim. (Doc. No. 93 at 28 (citing *In re Regions Morgan Keegan Sec., Derivative & Erisa Litig.*, 166 F. Supp. 3d 948, 968 (W.D. Tenn. 2014))). Defendants do not reply to this argument, but from their opening brief in support of the Motion, it appears that they assert loss causation as a ground only to dismiss the Exchange Act claims, not to dismiss the Section 11 (Securities Act) claim. (Doc. No. 91 at 28 ("Plaintiffs must plead facts establishing loss causation as an element of their Exchange Act claims.")). And in any event, the Sixth Circuit in *Omnicare I* held that dismissal of a Section 11 claim for a lack of loss causation is inappropriate. 583 F.3d at 947 ("Loss causation, however, is not an element of a § 11 claim, but an affirmative defense to it. *See* 15 U.S.C. § 77*l* (b). Thus, the district court erred in dismissing this claim on that

---

[12] The Complaint's allegations concerning loss causation are found in paragraphs 123–156. (Doc. No. 85).

ground.")). Thus, the Court declines to consider the purported lack of loss causation as a possible ground for dismissal of Plaintiffs' Section 11 claim.

For Plaintiffs' Exchange Act claims (brought under Sections 10-b and 20(a) of the Exchange Act), however, Plaintiffs must plead loss causation and bear the burden to prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). The Sixth Circuit has defined loss causation (somewhat tautologically) as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.,* 830 F.3d 376, 384 (6th Cir. 2016). The requirement to allege loss causation is subject only to the general pleading principle of Federal Rule of Civil Procedure 8(a)(2), which in this context entails that Plaintiffs need only set forth briefly and plainly the alleged facts showing loss causation. Fed. R. Civ. P. 8(a)(2); *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 WL 6168254, at *23 (M.D. Tenn. Nov. 19, 2019). The pleading requirement is meant not to impose a great burden upon a plaintiff, but to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. *Ohio Pub. Emps.,* 830 F.3d at 384. At the motion-to-dismiss stage, it is sufficient that the plaintiff's allegations be plausible; no final determination of amount of loss or its cause is required. *Id.*

The Sixth Circuit has recognized two methods by which a plaintiff can show loss causation:

> (1) through a corrective disclosure; and (2) through materialization of a concealed risk. *Envision Healthcare,* 2019 WL 6168254, at *24 (citing *Ohio Pub. Emps.*, 830 F.3d at 384-85)). "Under the first method, a corrective disclosure reveals the fraud and the market reacts negatively to the disclosure of [what was concealed by] the

fraud." *Id.*[13] Under the materialization of the risk theory, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor."

*Id.* (quoting *Ohio Pub. Emp.*, 830 F.3d at 384).[14] Corrective disclosures can come in a multitude

of forms, as the Sixth Circuit has explained:

> Sometimes defendants reveal their own fraud via a "corrective disclosure," *i.e.*, a statement that reveals what the defendants themselves previously concealed. But such admissions can be hard to come by, and courts have otherwise held that revelations can come from many sources, including whistleblowers, analysts, and newspaper reports. *See FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011); *see also, e.g.*, *Pub. Emps. Ret. Sys. of Miss. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (Wall Street Journal article). Likewise such revelations need not come all at once, but can come in a series of partial disclosures. *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 472 (4th Cir. 2011). Of course, for the revelation to cause the plaintiffs' losses, the information must in a practical sense be new; otherwise the market will have processed and reacted to that information already. *See Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1180 (8th Cir. 2016). And the plaintiffs must allege more than that they bought the shares at an inflated price, since they could resell at that price and thus not lose anything. *See Dura*, 544 U.S. at 342, 125 S.Ct. 1627.

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017).

Plaintiffs allege that Defendants deceived Plaintiffs and the Class through their false and

misleading statements, which artificially inflated SDC's stock prices and resulted in economic

harm to Plaintiffs and the Class when the truth reached the market and SDC's stock price fell

---

[13] A plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Envision Healthcare*, 2019 WL 6168254, at *24. This is the easiest loss causation to show because the stock price drops immediately following the revelation of the fraud to the public. *Id.*

[14] Loss causation is not exactly analogous to the common law tort concept of proximate causation, because the alleged misstatements do not generally cause a security to drop in value; rather, the underlying circumstance that is concealed or misstated does (once it is revealed). *Ohio Pub. Emp.*, 830 F.3d at 384. In the securities fraud context, then, a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor. *Id.*, cited in *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 771 (N.D. Ohio 2020).

precipitously as the prior artificial inflation came out of the stock price. (Doc. No. 85 at ¶ 123). Plaintiffs support this theory with a series of plausible allegations regarding Plaintiffs and class members suffering losses when the SDC shares they had purchased declined in value following the disclosure of the Registration Statement's misrepresentations and omissions. (Doc. No. 85 at ¶¶ 123–156).

Defendants claim that "[l]ead Plaintiff SEIU sold all of its SDC shares *before* any corrective disclosure and thus has no recoverable losses" and "Plaintiff Bucks County . . . did not purchase any SDC shares until October 24, 2019, *after* the *Ciccio* action, the short-seller report, the enactment of the California legislation and the *Sulitzer* action detailing the California dental board's investigation." (Doc. No. 91 at 28–29 (emphasis added)). The Court will next address loss causation with respect to each of the Plaintiffs in turn.

### 1. **Plaintiff SEIU**

Plaintiffs have properly alleged loss causation as it pertains to Lead Plaintiff SEIU. SEIU purchased its shares on September 12, 2019, and sold its shares between September 25 and 27, 2019. (Doc. No. 33-3 at 3).[15] Plaintiffs allege that SEIU suffered economic harm when the value

---

[15] Generally, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Rule 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). However, there is an exception to this Rule: "When a court is presented with a Rule 12(b)(6) motion, it may [without converting the motion into one for summary judgment] consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008); *see also Herpst v. Parkridge Med. Ctr., Inc.*, No. E201700419COAR3CV, 2018 WL 4052208, at *3 (Tenn. Ct. App. Aug. 23, 2018); Doe, 219 F. Supp. 3d at 652-53; Blanch, 333 F. Supp. 3d at 791-92. "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

of its shares declined following the filing of a federal class action complaint (Doc. No. 92-4, the "*Ciccio* complaint") by dentists, orthodontists and consumers against SDC, David Katzman, Steven Katzman, and Camelot on September 24, 2019. (Doc. No. 93 at 30; Doc. No. 85 at ¶¶ 124, 125). Defendants claim that the "allegations of unproven misconduct" contained in this complaint are insufficient to constitute a "corrective disclosure" for purposes of pleading loss causation. (Doc. No. 91 at 28). Though colorable, this claim ultimately is unpersuasive under applicable law.

The Sixth Circuit has discussed the relevance of a complaint, in particular, when considering whether a plaintiff has adequately pled a corrective disclosure as the basis for alleged loss causation in a securities action. In *Norfolk Count Retirement System*, the Sixth Circuit rejected "as a categorical [rule]" the argument that a complaint "could not reveal the truth behind [the defendant's] prior alleged misrepresentations because complaints can reveal only allegations rather than truth." 877 F.3d at 696. The Sixth Circuit went on to explain that

> [E]very representation of fact is in a sense an allegation, whether made in a complaint, newspaper report, press release, or under oath in a courtroom. The difference between those representations is that some are more credible than others and thus more likely to be acted upon as truth. Statements made under oath are deemed relatively credible because the speaker typically makes them under penalty of perjury. *See, e.g.*, 18 U.S.C. § 1621. And a defendant's own admissions of wrongdoing are credible because they are statements against interest. Cf. Fed. R. Evid. 804(b)(3). Mere allegations in a complaint tend to be less credible for the opposite reason, namely that they are made in seeking money damages or other

---

Defendants cite to a filing outside the pleadings—SEIU's Pension Fund Certification ("Certification")—when reciting the above-referenced three-day period during which SEIU sold its SDC shares. (Doc. No. 91 at 13, 28). And the Complaint expressly refers to the Certification. (Doc. No. 85 at ¶ 24). Though Plaintiffs do not plead the specific dates on which SEIU sold its SDC shares, Plaintiffs do not appear to dispute that they were sold between September 25 and 27, 2019, and this is what the Certification shows. (Doc. No. 93 at 30). As for when SEIU purchased its shares, the Complaint does not expressly say, but the Certification states the date of purchase as September 12, 2019 (and only September 12, 2019). Defendants do not expressly state a date of purchase by SEIU, but by indicating that SEIU sold all of its shares after September 24, 2019, Defendants necessarily imply that SEIU purchased all of its SEIU shares on or before September 24, 2019. Thus, the Court will accept as true that SEIU purchased all its SDC shares on September 12, 2019 (and certainly not later than September 24, 2019) and sold all of its SDC shares between September 25 and 27, 2019, because these facts are set forth in a document referred to in the Complaint (the Certification) and are not disputed by the parties..

relief. But these are differences of degree, not kind, and even within each type of representation some are more credible than others. Hence we must evaluate each putative disclosure individually (and in the context of any other disclosures) to determine whether the market could have perceived it as true. *See, e.g., Amedisys*, 769 F.3d at 322-26.

*Id*. The court then went on to examine the particular circumstances of the complaint at issue in that case and concluded that the complaint was properly deemed to have effected a corrective disclosure because (i) the defendant's CFO "promptly [partially] admitted the truth of one of the complaint's core allegations," thus revealing (in conjunction with the allegations of the complaint itself) a material fact that the defendant had previously concealed from the market; and (ii) the complaint itself included expert analyses that made it plausible that the complaint revealed a truth that the defendant had until then fraudulently concealed. *Id*. at 696–697.

Defendants first argue that the *Ciccio* complaint does not constitute a "corrective" disclosure because it is merely a complaint containing "allegations of unproven misconduct." (Doc. No. 91 at 28). True, as noted by the Sixth Circuit, the mere allegations in the *Ciccio* complaint are less credible than some types of representations. But the Court finds that the *Ciccio* complaint is sufficiently credible such that an individual would likely act upon it as if it were true.[16] First, the *Ciccio* complaint was brought, in part, by three licensed, then-practicing orthodontists (Doc. No. 92-4 at 5). Just as in *Norfolk*, where the Sixth Circuit found supportive of the truthfulness of the complaint the fact that the complaint included the analyses of experts, here the fact that three "experts" in the field of orthodontics make allegations regarding SDC's degree of compliance with

---

[16] Defendants attach the *Ciccio* complaint to its Motion, and the Court finds it appropriate to rely on this filing. The *Ciccio* complaint was referred to in the Complaint (though not by name (*see* Doc. No. 85 at ¶ 124)), it appears in the record of this case, and it is integral to the claims in that it forms the basis for Plaintiffs' loss causation allegations pertaining to SEIU. Thus, as discussed previously, it may be considered without converting the motion to dismiss into one for summary judgment. *Doe,* 219 F. Supp. 3d at 652-53; *Blanch*, 333 F. Supp. 3d at 791-92.

(among other things) the relevant standard of care, the doctor-patient relationship, and dentistry industry standards makes the *Ciccio* complaint more credible than it would be had it been brought by a layperson.[17]

Defendants additionally challenge Plaintiffs' reliance on the *Ciccio* complaint as merely "regurgitating" accusations that were already then public and therefore, failing to disclose any "new" information. (Doc. No. 91 at 28 ("[T]he *Ciccio* complaint merely regurgitates accusations by the ADA, AAO and others that had long been public.")). The Court finds this to be a dispute of fact that it cannot resolve on a motion to dismiss. In particular, Defendants contend that the allegations contained in the *Ciccio* complaint had been made public long ago by the ADA, AAO, and non-specified "others." (*Id.*). Defendants point generally to their "Exhibits P–W" (Doc. Nos. 92-16–92-23) in support of this notion. As an initial matter, were the Court to rely on these exhibits (none of which were referenced in the Complaint, from what the Court can gather), this would (unlike the *Ciccio* complaint, which was referenced in the Complaint and is integral to Plaintiffs' claims) convert the motion to dismiss into one for summary judgment, as explained above. Further, the Complaint alleges that Defendants employed aggressive tactics to "subvert revelations about existing adverse developments, including by employing aggressive litigation against journalists, customers and an affiliate of the American Dental Association (the "ADA")." (Doc. No. 85 at ¶ 9). It is thus reasonable that this information was not already public, and in any event, the Court must construe this factual dispute in Plaintiffs' favor.

---

[17] To be clear, the Court takes no position as to whether the allegations in the *Ciccio* complaint are *in fact* true. Instead, the Court focuses on whether the fact that the complaint was brought by licensed orthodontists renders the complaint more credible such that an investor would have reasonably perceived its allegations as being true. *Norfolk*, 877 F.3d at 696-97.

Thus, the Court finds that Plaintiffs have set forth briefly and plainly a set of alleged facts plausibly suggesting loss causation as it relates to claims brought by SEIU, such that Plaintiffs have given Defendants an indication of the loss and causal connection Plaintiffs have in mind. *Ohio Pub. Emps.,* 830 F.3d at 384.

### 2. **Plaintiff Bucks County**

Plaintiffs also have plausibly alleged loss causation as it pertains to Plaintiff Bucks County.

Plaintiffs summarize their allegations of loss causation as to Bucks County in their Response:

> The Retirement System purchased its SDC shares on October 24, 2019 at prices that were inflated as a result of defendants' fraud and was damaged when the truth was revealed through a series of corrective disclosures. First, on November 12, 2019, SDC disclosed for the first time declines in Adjusted EBITDA, gross profit and revenue, which were far different from the "accelerated growth" trends falsely reported in the Registration Statement. Following this revelation, SDC's stock price declined by over 20%. ¶¶141- 142. Second, on February 13, 2020, NBC Nightly News broadcasted an investigative report detailing some of the 1,800 complaints received by SDC, the use of NDAs to silence harmed patients and hidden camera footage of SDC patients who were not having their cases reviewed by a dentist. Following this broadcast, SDC's share price declined 16%. ¶¶144-145. Finally, on February 25, 2020, SDC announced a further decline in Adjusted EBITDA caused by "continued elevated legal and lobbying expenses" and "poor customer experience issues." As a result, SDC's share price declined 29%. ¶¶149-150.

(Doc. No. 93 at 30–31).

Defendants argue that Plaintiffs fail to plead loss causation because Bucks County purchased its SDC shares following the occurrence of three events included by Plaintiffs in the Complaint when pleading loss causation generally ("the *Ciccio* action, the short-seller report, the enactment of the California legislation and the *Sulitzer* action detailing the California dental board's investigation") and therefore, these events could not constitute corrective disclosures. (Doc. No. 91 at 29). Though Defendants do not explicitly so state, the Court takes Defendants' argument to be that because these three events had already revealed the truth prior to Bucks County purchasing its SDC shares, any future events cited by Plaintiffs could not be a "corrective

disclosure" (because a reasonable investor would already know the truth behind the alleged misrepresentations and omissions).

True, these three events could not conceivably be the grounds for loss causation here because they occurred before Bucks County purchased its shares. However, Plaintiffs allege separate grounds for loss causation (their own disclosure of declines in Adjusted EBITDA, gross profit, and revenue on November 12, 2019, the NBC broadcast[18] on February 13, 2020, and SDC's February 25, 2020 announcement of further declines in Adjusted EBITDA) pertaining to Bucks County and also allege drops in SDC's share price corresponding with each of these events. (Doc. No. 85 at ¶¶ 141–150). Defendants argue in their reply that everything revealed by the NBC broadcast and the November 2019 and February 2020 SDC disclosures did not reveal any prior misrepresentation by SDC. But Plaintiffs plausibly allege otherwise, and whether Plaintiffs can ultimately prove their allegations and establish loss causation based on these is not yet at issue. For purposes of surviving the Motion, the Complaint adequately alleges loss causation. Drawing all reasonable inferences in Plaintiffs' favor as required at this stage, the Court finds that Plaintiffs have plausibly alleged loss causation for Bucks County's purchase of SDC shares.

---

[18] Defendants attempt to cast doubt on the truthfulness of the NBC broadcast by stating that "SDC has also sued NBC for its false and misleading reporting." (Doc. No. 95 at 14 n.12). Defendants provide no context for this allegation aside from providing a case name and number. Thus, all the Court can glean from this footnote is that Defendants sued NBC in May of 2020 for false and misleading reporting. This does nothing to undermine the truthfulness of the particular NBC broadcast mentioned by Plaintiffs, because Defendants allege no factual matter that undermines the investigative report broadcasted therein, nor do Defendants even claim or show that they have been successful in their lawsuit against NBC. Further, the Court does not weigh disputed facts at the motion-to-dismiss stage and instead views all allegations in the light most favorable to the plaintiff. Thus, the Court accepts as true, for purposes of the Motion, that whatever was reported on during this broadcast is the truth. In particular, Plaintiffs allege that the broadcast revealed the existence of consumer concerns with SDC products (including that cross-bites, strained neck muscles, and migraines were likely caused by SDC's aligners), that SDC had over 1,8000 BBB complaints (many related to treatment results), that members of the U.S. House of Representatives had urged the FDA and FTC to investigate SDC's practices, the existence of hidden camera footage showing SDC employees stating that seeing a dentist prior to treatment was not mandatory and that "anything can go wrong" when using SDC's products, and the existence of a requirement for a harmed customer to sign an NDA containing confidentiality provisions prior to receiving a refund. (Doc. No. 85 at ¶ 144).

C. <u>Scienter</u>

"[T]he complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). This required state of mind, referred to as "scienter," has been defined as a mental state embracing intent to deceive, manipulate, or defraud. *Jackson Cty.*, 2020 WL 7711378, at *18 (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 48 (2011)). "In the securities fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness."[19] *Id.* (citing *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016)); *see also Dougherty v. Esperion Therapeutics, Inc.*, 905 F. 3d 971, 979 (6th Cir. 2018). Whether someone made a statement with the knowledge that it was false is, at bottom, a question of someone's state of mind, which is the general subject of a scienter inquiry. *Omnicare*, 769 F.3d at 471.

The Supreme Court has set forth a framework for analyzing the scienter element as follows:

> We establish the following prescriptions: First, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true . . . .

> Second, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry, as several Courts of Appeals have recognized, is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

> Third, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences . . . .

---

[19] Under the general PSLRA standard, a complaint may allege scienter based on "either knowing falsity or recklessness." *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020).

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences.". . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007) (citations omitted).

In *Matrixx*, the Court provided a post-*Tellabs* example of how to consider scienter pleadings "holistically" in Section 10(b) cases. *See Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) ("*Dana II*") (citing *Matrixx*, 563 U.S. at 48). "Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, did not parse out the allegations for individual analysis." *Id.* "This is the only appropriate approach following *Tellabs*'s mandate to review scienter pleadings based on the collective view of the facts, not the facts individually." *Id.*[20] (citing *Tellabs*, 551 U.S. at 322–23 ("The inquiry . . . is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.")).

As part of that analysis, the Sixth Circuit has noted recently, nine non-exhaustive factors ("the *Helwig* factors") should be considered: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later

---

[20] The former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. *Dana II*, 646 F.3d at 961. Furthermore, after *Tellabs*, conducting an individual review of myriad allegations is an unnecessary inefficiency. *Id.*

disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 813 (6th Cir. 2022) (citing *Helwig*, 251 F.3d at 552).

Thus, the Court will address Plaintiffs' claims holistically, considering the *Helwig* factors, but it also will address the specific arguments in Defendants' Motion. Plaintiffs argue that the Complaint "pleads a strong inference of scienter" via its allegations that 1) Defendants had actual knowledge of the alleged false and misleading statements and omissions, thus supporting a strong inference of scienter; and 2) Katzman and other SDC insiders sold substantial amounts of SDC stock in connection with and/or as a result of the IPO. (Doc. No. 93 at 31–37).

The Court finds that Plaintiffs have alleged facts that make a scienter inference "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–24. Plaintiffs allege that the Exchange Act Defendants were aware (*i.e.,* must have been aware) of the financial metrics omitted from the Registration Statement because these metrics were central to SDC's operations, closely tracked by senior management, and negatively impacted by the Exchange Act Defendants' own conduct. (Doc. No. 85 at ¶¶ 96–99). SDC's own lawsuit against the Dental Board of California ("DBC") in October 2019 demonstrated that the Exchange Act Defendants were aware that the DBC had initiated an investigation into SDC's practices, that

certain Smile Shops in California had been raided by the DBC, and that formal accusations had been made against SDC's Chief Clinical Officer for purported violations of California's Dental Practice Acts and related laws. (*Id*. at ¶¶ 100–102). Plaintiffs also allege that the Exchange Act Defendants actively lobbied against the California legislation that was omitted from the Registration Statement (and was a "registered opponent of the bill prior to the IPO"). (*Id*. at ¶¶ 103–105). Plaintiffs allege that the Exchange Act Defendants "implemented an aggressive sales culture monitoring customer conversion rates on an hourly, daily and weekly basis" whereby an employee's failure to meet these rates led to that employee's termination, and whereby SDC dentists were encouraged to treat customers rejected by their competitors, thus encouraging dentists and employees to "make sales at any cost, even if the treatment was not medically appropriate or suitable for the customer." (*Id*. at ¶ 112). Finally, Plaintiffs allege that a scienter inference is supported by the fact that "SDC's insiders sold nearly 30 million shares and units in connection with and as part of the IPO at inflated prices, allowing them to pocket $630 million." (*Id*. at ¶¶ 113–122). Considering these factual allegations collectively, the Court finds that the inference that the Exchange Act Defendants acted with actual knowledge or reckless disregard for the misleading nature of their statements in the Registration Statement is at least as strong as any opposing inference. *Tellabs*, 551 U.S. at 326.

Defendants argue that Plaintiffs' Exchange Act claims fail because "Plaintiffs do not allege particularized facts giving rise to the requisite strong inference of scienter." (Doc. No. 91 at 29). In particular, Defendants argue that: 1) Plaintiffs make insufficient allegations to support an inference of scienter as to the Individual Exchange Act Defendants (Katzman and Wailes); 2) SDC's buyback of pre-IPO interests held by Katzman, and the bonus Wailes received upon completion of the IPO, fail to support a scienter inference; 3) Plaintiffs' motive argument is

nonsensical; and 4) Plaintiffs assert an incoherent theory of fraud. (*Id*. at 29–31). The Court will address each of Defendants' arguments in turn.

1. **Individual Exchange Act Defendants**

Defendants argue that Plaintiffs fail to allege direct evidence that the Individual Exchange Act Defendants intended to defraud investors and, instead, allege only that they "must have known about certain information that was not specifically disclosed." (Doc. No. 91 at 30). Defendants argue that Plaintiffs' allegations "provide no support" for a scienter inference as to these individual defendants, particularly absent a duty on their part to disclose the information that was allegedly not included in the Registration Statement. (*Id*.).

In their memorandum in support of the Motion, Defendants argue that Plaintiffs failed to show that the Individual Exchange Act Defendants "knew that the [Registration Statement] [was] false or misleading" and that there was a duty to disclose the information. (Doc. No. 91 at 30). Defendants cite to the Second Circuit's statement in *In re Centerline Holding Co. Sec. Litig.*, 380 F. App'x 91, 93 (2d Cir. 2010) that "where liability is premised upon alleged material omissions, if the complaint 'does not present facts indicating a clear duty to disclose . . . plaintiff's scienter allegations do not provide strong evidence of conscious misbehavior or recklessness.'" (citation omitted). Here, the Court has already found that (as described above), Plaintiffs have plausibly alleged facts supporting the duty to disclose the following information that was omitted from the Registration Statement: the current financial metrics at the time of the IPO (revenue, gross profits, and adjusted EBITDA), SDC's standard of care, and certain regulatory and/or legal challenges faced by SDC. Thus, to the extent Defendants' argument is based on the idea that there was no duty to disclose any of these things in the Registration Statement, Defendants' argument fails. And

as discussed further below, the Court finds that Plaintiffs sufficiently alleged facts supporting scienter as to the Individual Exchange Act Defendants.

In the Reply, Defendants also argue, "[a]s to Katzman and Wailes' alleged knowledge, the Sixth Circuit recently reiterated that '[t]he fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent' and 'is not a scienter-bolstering fact.'" (citing *Pittman v. Unum Grp.*, No. 20-5710, 2021 WL 2646065, at *3 (6th Cir. June 28, 2021)). The Sixth Circuit has held that merely having access to information is not sufficient to establish a strong inference of scienter. *See e.g.*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004) ("[F]raudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information."), *abrogated on other grounds by Tellabs,*, 551 U.S. 308; *Loc. 295/Loc. 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.,* 731 F. Supp. 2d 689, 726 (S.D. Ohio 2010) ("Scienter, however, cannot be inferred merely because of the defendants' positions in the company or the fact that they had access to the company's financial information.").

However, in the Sixth Circuit, "high-level executives can be presumed to be aware of matters central to their business's operation." *PR Diamonds*, 364 F.3d at 688 (emphasizing that only knowledge of "central, day-to-day operational matters," however, may be presumed). Though the Court in *PR Diamonds* acknowledges the applicability of this so-called "core operations doctrine," the Sixth Circuit has not clearly stated whether this doctrine survived the PSLRA. But as the undersigned recently explained:

> In *Stein v. U.S. Xpress Enterprises, Inc.*, No. 1:19-cv-98, 2020 WL 3584800 (E.D. Tenn. June 30, 2020), . . . the court noted that a majority of district courts appear to have concluded that the doctrine survived, albeit only as a supplementary consideration that may bolster other well-pleaded facts. 2020 WL 3584800, at *39 (concluding that the core-operations theory, even assuming the doctrine survives, provided the plaintiff in that case no support). Although the "core-operations"

inference generally will not establish a strong inference of scienter by itself, it can be one relevant part of a complaint supporting that inference. *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021).

Thus, the Court considers the "core-operations" allegations, albeit not as an independent means to show scienter, but rather as one possible indicator of scienter under a holistic examination.

*Indiana Pub. Ret. Sys. v. AAC Holdings, Inc.*, No. 3:19-CV-00407, 2021 WL 1316705, at *19 (M.D. Tenn. Apr. 8, 2021) (Richardson, J.). Here, too, the Court will treat "core-operations" allegations as relevant in the holistic *Tellabs* scienter analysis, without treating them as sufficient by themselves to show scienter or otherwise relying on the core-operations doctrine as an independent means of showing scienter.

The Complaint provides sufficient factual matter regarding Defendants Katzman and Wailes such that the core-operations doctrine is relevant to the scienter inquiry for these Individual Defendants. David Katzman is the Chief Executive Officer and Board Chairman of SDC, and he controlled the business operations of SDC through stock ownership, stocking voting agreement, and as the managing partner of Camelot—a venture group that provided funding for SDC. (Doc. No. 85 at ¶ 26). Katzman signed the Registration Statement and participated in its preparation and dissemination. (*Id*.). Kyle Wailes is the Chief Financial Officer of SDC. (*Id*. at ¶ 27). Wailes signed the Registration Statement and participated in its preparation and dissemination. (*Id*.). From this, it is reasonably inferable that these Individual Defendants were situated to be extremely familiar with SDC's operations such that they would be aware of core financial metrics such as the SDC's revenue, gross profits, and Adjusted EBITDA at the time the IPO was issued. Further, Katzman in particular was situated to be aware of significant legal and regulatory risks faced by SDC at the time of the IPO. Plaintiffs also allege that both Katzman and Wailes were involved in the preparation of the Registration Statement such that they would be aware that certain information

was not included in it. Therefore, an inference of knowledge under the core-operations doctrine is permissible as to the Individual Exchange Act Defendants and will be considered by the Court as part of the overall scienter analysis (but, as noted above, a scienter finding will not be based on this inference of knowledge alone, and instead this inference will be a supplementary consideration that only bolsters other facts that support scienter). *See also Grae v. Corr. Corp. of Am.*, No. 3:16-CV-2267, 2017 WL 6442145, at \*21 (M.D. Tenn. Dec. 18, 2017) (applying "core-operations doctrine" to find that executives had knowledge of certain topics that were not "obscure or arcane").

### 2**. SDC's buyback of pre-IPO interests and Wailes' bonus**

Defendants next argue that "SDC's buyback of certain pre-IPO interests held by Mr. Katzman and others and . . .the bonus Mr. Wailes received upon completion of the IPO" do not support scienter because "Plaintiffs do not allege that the terms of the buyback or Mr. Wailes' bonus were affected in any way by what was or was not disclosed in the Offering Documents" and because "sales by parties who are not Exchange Act defendants (see AC ¶¶ 117-20) are irrelevant." (Doc. No. 91 at 30).

#### a. *Insider trading (IPO buy-back)*

First, regarding the IPO buy-back, Plaintiffs respond that the sale of "substantial amounts of SDC stock at artificially inflated prices" by "insiders, including Katzman" adds to the inference of scienter, quoting *Helwig*, 251 F.3d at 552 for the notion that "insider trading at a suspicious time or in an unusual amount" (the first *Helwig* factor) supports scienter. (Doc. No. 93 at 33). Plaintiffs also challenge Defendants' argument that sales by shareholders who are not defendants on Exchange Act claims do not support a scienter finding, noting that this Court relied on just such

a sale in *St. Clair Cnty. Employees' Ret. Sys. v. Acadia Healthcare Co., Inc.*, No. 3:18-CV-00988, 2021 WL 195370, at *7 (M.D. Tenn. Jan. 20, 2021) (Campbell, J.).[21]

in *St. Clair*, 2021 WL 195370, at *7, (*Id.*).

The Sixth Circuit recently explained when discussing the "insider trading" *Helwig* factor,

> [The individual defendant]'s stock sales are another indication of his intent. "Unusual trading or trading at suspicious times or in suspicious amounts by corporate insiders has long been recognized as probative of scienter." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197 (1st Cir. 1999). "Courts generally consider the following factors in analyzing allegations of insider trading: (1) whether the alleged trades were 'normal or routine' for the insider; (2) whether profits reaped 'were substantial enough in relation to the compensation levels for any of the individual defendants so as to produce a suspicion that they might have had an incentive to commit fraud'; and (3) whether, in light of the insider's total stock holdings, the sales are unusual or suspicious." *In re Cardinal Health Inc., Sec. Litig.*, 426 F.Supp.2d 688, 728 (S.D. Ohio 2006); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1423–25 (3d Cir. 1997).

*City of Taylor Gen. Emps. Ret. Sys. v. Astec Indus., Inc.*, 29 F.4th 802, 814 (6th Cir. 2022). Thus, executive officers' stock sales that are "unusual in scope or timing" may support an inference of scienter. *Burlington Coat Factory*, 114 F.3d at 1424.

Defendants cite no law to support their argument that, for alleged "unusual trading" to support an inference of scienter, Plaintiffs needed to allege facts showing that the alleged "unusual trading" was affected by what was or was not disclosed in the Registration Statement. In fact, this principle is not included among the relevant considerations set forth by the Sixth Circuit in *City of Taylor*. Instead, the Court finds that the alleged sales of stock by Katzman and other SDC "insiders" identified in the Complaint support a finding of scienter because Plaintiffs allege facts showing that the sales were exceptionally vast and suspiciously timed.

---

[21] Specifically, Judge Campbell relied in part on the fact that "the Individual [Exchange Act] Defendants and one of Acadia's founders [who was unnamed here but clearly not a defendant] unloaded more than $600 million in Acadia stock while its price was inflated by fraud." *St. Clair*, 2021 WL 195370, at *7

Plaintiffs allege that SDC purchased over $630 million of shares from Katzman and other SDC insiders in connection with the IPO. (Doc. No. 85 at ¶ 115). Plaintiffs allege that although "the market value of SDC's common stock declined by 77% during the Class Period, these Individual Exchange Act Defendants and their affiliates profited by over $480 million via their one day selling spree." (*Id.* at ¶ 122). Plaintiffs make no allegations (and Defendants make no argument) as to whether such sales were "normal or routine" for these insiders, and Plaintiffs do not allege facts regarding the compensation levels for the insiders. But Plaintiffs do indicate via a chart the aggregate proceeds received by each insider. This chart reveals that each insider received between $654,713 and $198,411,369 in proceeds from such sales; thus, even absent particular facts regarding these individuals' compensation, the Court finds that the amount profited was not insignificant. (*Id.* at ¶ 115).[22] The timing of the sales also supports a scienter inference. *City of Taylor*, 29 F.4th 802, 814 (6th Cir. 2022) ("This multi-million-dollar sale right before a foreseeable stock-value drop raises a suspicion that [the defendant] might have had an incentive to commit fraud.") (internal citation omitted). Plaintiffs allege SDC purchased, using IPO-investor proceeds, a total of over $630 million worth of shares from eight different sellers (three of which are not Defendants herein) who were each an SDC insider or an insider's affiliate just before "the truth about the Exchange Act Defendants' fraudulent practices were revealed to the market." (Doc. No. 85 at ¶¶ 113–114). Further, "the number of insiders selling" supports a scienter inference here, *Rothman v. Gregor*, 220 F.3d 81, 94 (2d Cir. 2000), as Plaintiffs allege (as noted above) that eight insiders or their affiliates engaged in the IPO-buyback sales. Additionally, the Court finds it appropriate to consider the sales between SDC and sellers who are not Defendants herein,

---

[22] Defendants argue that "although Mr. Katzman sold a small fraction of his interest in SDC in connection with the IPO, he retained more than 90% of his stake." (Doc. No. 91 at 31). The Court cannot accept this as true, however, because the Court does not see where any facts underlying this contention are alleged in the Complaint, nor can the Court accept Defendants' bare assertions as true.

consistent with the approach in *St. Clair*, although these non-defendant sales are not particularly probative. The Court thus rejects Defendants' argument that the "IPO-buyback" does not support scienter, and the Court will consider the "IPO-buyback" as one factor that supports an inference of scienter when undertaking the holistic analysis.

   b. *Wailes' bonus*

Plaintiffs allege that "Wailes entered into an incentive bonus agreement with the Company under which he was entitled to a payment of approximately $18.9 million, 60% of which ($11.3 million) vested immediately upon completion of the IPO. The remaining bonus will vest on a monthly basis over the two-year period immediately following the IPO." (Doc. No. 85 at ¶ 121). The Sixth Circuit has explained, when considering whether a bonus compensation arrangement favors scienter,

> Our starting point is *Helwig*. There we explained that "the self-interested motivation of defendants in the form of saving their salaries or jobs" tends to support a finding of scienter. *Helwig*, 251 F.3d at 552 (the ninth factor). In applying this principle to executive compensation, we have explained that merely alleging that an executive's "compensation is directly tied to the company's performance" is not enough to bolster an inference of scienter. *Dougherty*, 905 F.3d at 981. However, where a bonus is "directly tied" to fraudulent metrics promoted by an executive, that fact bolsters scienter. *Frank v. Dana Corp.*, 646 F.3d 954, 960, 962 (6th Cir. 2011).

*Pittman*, 861 F. App'x at 57.

Here, Plaintiffs allege only that Wailes was entitled to receive a bonus upon completion of the IPO. Wailes' bonus was not "directly tied" to any fraudulent metrics; rather, it appears that he would be awarded a bonus regardless of whether the IPO contained the alleged misrepresentations or omissions and regardless of whether SDC reached any particular financial metrics. Thus, Plaintiffs' allegations regarding Wailes' bonus compensation agreement fail to show that the bonus

compensation arrangement supports an inference of scienter and will be disregarded when making the holistic scienter inquiry.

### 3. Motive

Defendants argue that "Plaintiffs' motive argument makes no sense" because "Wailes did not sell, but received 259,665 shares of SDC stock in connection with the IPO." (Doc. No. 91 at 30). The Court does not see where in the Complaint Plaintiffs make any allegations that Wailes sold shares of SDC stock in connection with the IPO (Doc. No. 85 at ¶ 115 (listing all of the SDC insiders, or their affiliates, that Plaintiffs allege sold shares in connection with the IPO and omitting Wailes from this list)). And the Court certainly does not see where Plaintiffs claim specifically that Wailes's desire to sell SDC shares at an inflated price gave him or any other Defendant a motive to inflate the stock price via misrepresentations. Thus, the Court finds that this argument carries no weight.

### 4. Fraud

Finally, Defendants argue that "Plaintiffs' entire theory of fraud is incoherent" because "[t]he information that Plaintiffs claim the Offering Documents omit either was already public . . . or would be public imminently." (Doc. No. 91 at 31). Defendants argue that therefore "the far more compelling inference is that the Offering Documents reflect a good faith effort to disclose all required information and present a candid picture of the Company's business, strengths and risks[.]" (*Id*.). But as explained above, the inference that the Exchange Act Defendants acted with scienter does not need to be the "most plausible" of the competing inferences, nor does it need to be more compelling than the innocent explanation(s) offered by Defendants. The requirement is actually slightly less onerous for Plaintiffs; the inference of scienter needs only to be at least as

compelling as Defendants' alternative explanation(s), and the Court finds that it is. *Tellabs*, 551 U.S. at 322–24.

As explained previously when discussing the issue of loss causation, the Court does not find at this stage that the relevant information omitted from the Registration Statement was already public. And to the extent that some of this information would be "public imminently," that would not undermine Plaintiffs' theory of fraud. The Court does not find that, as Defendants claim, the only plausible explanation of the underlying facts is that the Registration Statement demonstrates a "good faith effort" by SDC to disclose all relevant information about the actual state of SDC's affairs at the time of the IPO. Instead, as described above, the Court finds that it is just as plausible, based on the facts alleged, that SDC intentionally omitted key information, including information regarding known trends in SDC's revenue, gross profits, and adjusted EBITDA; SDC's actual standard of care; and known regulatory and legal risks. Of course, Plaintiffs' allegations ultimately may not be proven, but at this stage the Court assumes that they are true.

### 5. Conclusion

Even after excluding Wailes' bonus compensation arrangement, the Court finds that Plaintiffs still have alleged sufficient facts to make an inference of scienter "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 322–24. Thus, the Court will not dismiss the Exchange Act claims based on a purported failure to allege facts sufficient to support an inference of scienter.

**CONCLUSION**

For the reasons discussed above, Defendants' Motion will be denied, subject to the limited exceptions set forth herein and as indicated via an appropriate contemporaneous order.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE