# EXHIBIT E

IN THE 20th JUDICIAL DISTRICT
CHANCERY COURT FOR DAVIDSON COUNTY, TENNESSEE
PART IV

| | |
|---|---|
| IN RE: SMILEDIRECTCLUB, INC. SECURITIES LITIGATION<br><br><br>This Document Related To:<br><br>ALL ACTIONS. | Lead Case No. 19-1169-IV<br><br>CLASS ACTION |

MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO STAY OR, IN THE ALTERNATIVE, TO DISMISS

Steven A. Riley (TN #6258)
Elizabeth O. Gonser (TN #26329)
**RILEY WARNOCK & JACOBSON, PLC**
1906 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737

*Counsel for All Defendants*

Sharon L. Nelles (*pro hac vice*)
Andrew J. Finn (*pro hac vice*)
**SULLIVAN & CROMWELL LLP**
125 Broad Street
New York, New York 10004
Telephone: (212) 558-400
Facsimile: (917) 558-3588

*Counsel for Defendants J.P. Morgan
Securities LLC, Citigroup Global Markets
Inc., BofA Securities, Inc., Jefferies LLC, UBS
Securities LLC, Credit Suisse Securities
(USA) LLC, Guggenheim Securities, LLC,
Stifel, Nicolaus & Company, Inc., William
Blair & Company, L.L.C. and Loop Capital
Markets LLC*

Jay B. Kasner (*pro hac vice*)
Scott D. Musoff (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (917) 735-2000

*Counsel for Defendants SmileDirectClub,
Inc., David Katzman, Kyle Wailes, Steven
Katzman, Jordan Katzman, Alexander
Fenkell, Susan Greenspon Rammelt, Richard
Schnall and Camelot Venture Group*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

PRELIMINARY STATEMENT .......................................................................................... 1

STATEMENT OF FACTS .................................................................................................. 5

    A.    SmileDirectClub Pioneers Teledentistry and
           Disrupts the Traditional Orthodontic Industry ........................................................ 5

    B.    The Offering Documents Disclose the Risks of Legal
           and Regulatory Challenges by Organized Dentistry ............................................. 6

    C.    SmileDirectClub's Stock Drops Significantly on the Day of Its IPO ..................... 8

    D.    After the IPO, SmileDirectClub Faces Further Attacks from
           Organized Dentistry, as the Offering Documents Warned Might Happen ............. 9

    E.    Duplicative Securities Lawsuits Are Filed Against SmileDirectClub
           in State and Federal Courts in Tennessee, Michigan and New York ..................... 10

    F.    SmileDirectClub Announces Its Q3 2019 Results, Which
           Include Significant One-Time Costs Associated with the IPO .............................. 11

    G.    Plaintiffs File the Consolidated Complaint Here .................................................. 12

ARGUMENT ...................................................................................................................... 13

I.    THIS ACTION SHOULD BE STAYED IN FAVOR OF THE PARALLEL
      LITIGATION OF THE SAME CLAIMS IN FEDERAL COURT ................................. 13

II.    ALTERNATIVELY, THIS ACTION SHOULD BE
       DISMISSED FOR FAILURE TO STATE A CLAIM ...................................................... 17

    A.    Plaintiffs Fail To Allege Any Material Misstatement or Actionable Omission .... 18

          1.    The Offering Documents Did Not Misrepresent
                SmileDirectClub's Business Model or Quality of Care ............................. 18

          2.    The Offering Documents Disclosed the Legal
                and Regulatory Risks SmileDirectClub Faces ......................................... 22

          3.    SmileDirectClub's Customer Satisfaction
                Ratings Were Not False or Misleading ...................................................... 27

          4.    There Was No Duty to Disclose SmileDirectClub's
                Q3 2019 Financial Results Before the IPO ............................................... 29

    B.    The Complaint Establishes the Affirmative Defense of Negative Causation ........ 30

CONCLUSION .................................................................................................................. 31

# TABLE OF AUTHORITIES

## CASES

*In re Allscripts, Inc. Securities Litigation,*
No. 00 C 6796, 2001 WL 743411 (E.D. Ill. June 29, 2001) ........................................... 22

*Azzolini v. Corts Trust II for Provident Financial Trust I,*
No. 103CV1003, 2005 WL 3448053 (E.D. Tenn. Dec. 14, 2005) .............................. 17, 31

*In re BankAmerica Corp. Securities Litigation,*
263 F.3d 795 (8th Cir. 2001) ................................................................................. 15

*Bell v. Todd,*
206 S.W.3d 86 (Tenn. Ct. App. 2005) ...................................................................... 13

*Bondali v. Yum! Brands, Inc.,*
620 F. App'x 483 (6th Cir. 2015) .............................................................. 18, 20, 24, 26

*Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.,*
866 F. Supp. 2d 223 (S.D.N.Y. 2012) ...................................................................... 30

*Chenault v. Walker,*
36 S.W.3d 45 (Tenn. 2001) .................................................................................... 17

*City of Livonia Retiree Health & Disability Benefits Plan v. Pitney Bowes Inc.,*
No. X08 FST CV 18 6038160 S., 2019 WL 2293924 (Conn. Super. Ct. May 15,
2019) ................................................................................................................ 15

*Curry v. Yelp Inc.,*
No. 14-cv-03547-JST, 2015 WL 7454137 (N.D. Cal. Nov. 24, 2015), *aff'd*, 875
F.3d 1219 (9th Cir. 2017) ...................................................................................... 19

*Cyan, Inc. v. Beaver County Employees Retirement Fund,*
138 S. Ct. 1061 (2018) .......................................................................................... 16

*DeMaria v. Andersen,*
318 F.3d 170 (2d Cir. 2003) ............................................................................... 29, 30

*Dura Pharmaceuticals, Inc. v. Broudo,*
544 U.S. 336 (2005) .............................................................................................. 31

*In re Everquote, Inc. Securities Litigation,*
65 Misc. 3d 226 (Sup. Ct. N.Y. Cty. 2019) .............................................................. 15

*In re Ford Motor Co. Securities Litigation,*
381 F.3d 563 (6th Cir. 2004) ................................................................................. 28

Case 3:19-cv-00962   Document 137-5   Filed 06/05/23   Page 4 of 40 PageID #: 3383

*Haynes v. Bass*,
No. W2015-01192-COA-R3-CV, 2016 WL 3351365 (Tenn. Ct. App. June 9, 2016) ................................................................................................................4

*IBEW Local No. 58 Annuity Fund v. EveryWare Global, Inc.*,
849 F.3d 325 (6th Cir. 2017) ...............................................................................31

*Iron Worker Local Union No. 405 Annuity Fund v. Dollar Gen. Corp.*,
No. 3:17 CV 63, 2018 WL 10152459 (M.D. Tenn. Mar. 8, 2018)...............24, 26

*J & R Marketing, SEP v. General Motors Corp.*,
549 F.3d 384 (6th Cir. 2008) ..........................................................................21, 27

*Landis v. North American Co.*,
299 U.S. 248 (1936)..............................................................................................13

*In re Lions Gate Entertainment Corp. Securities Litigation*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ......................................................................25

*In re Morgan Stanley Information Fund Securities Litigation*,
592 F.3d 347 (2d Cir. 2010)..................................................................................17

*New Jersey Carpenters Health Fund v. DLJ Mortgage Capital, Inc.*,
No. 08 Civ 5653(PAC), 2010 WL 1473288 (S.D.N.Y. Mar. 29, 2010) ..............30

*In re N2K Securities Litigation*,
82 F. Supp. 2d 204 (S.D.N.Y. 2000)....................................................................30

*In re Netflix, Inc. Securities Litigation*,
No. C04-2978 FMS, 2005 WL 1562858 (N.D. Cal. June 28, 2005) ....................19

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x. 617 (2d Cir. 2009)...............26

*Riggs v. Burson*,
941 S.W.2d 44 (Tenn. 1997)............................................................................17, 22

*Ronconi v. Larkin*,
253 F.3d 423 (9th Cir. 2001) ................................................................................19

*Runyon v. Zacharias*,
556 S.W.3d 732 (Tenn. Ct. App. 2018).................................................................17

*Sanjines v. Ortwein & Associates, P.C.*,
984 S.W.2d 907 (Tenn. 1998)...............................................................................13

*Scott v. General Motors Co.*,
46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015)....................21

iii

*In re Sofamor Danek Group, Inc.*,
 123 F.3d 394 (6th Cir. 1997) ........................................................................................24, 25

*Stadnick v. Vivint Solar, Inc.*,
 861 F.3d 31 (2d Cir. 2017)..............................................................................................26, 29

*In re State St. Bank & Trust Co. Fixed Income Funds Investment Litigation*,
 774 F. Supp. 2d 584 (S.D.N.Y. 2011)....................................................................................31

*State v. Casper*,
 297 S.W.3d 676 (Tenn. 2009)................................................................................................15

*In re UBS AG Securities Litigation*,
 No. 07 Civ. 11225(RJS), 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub
 nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173
 (2d Cir. 2014)........................................................................................................................28

## STATUTES

15 U.S.C. § 77k(a) ............................................................................................................................17

15 U.S.C. § 77k(e) ............................................................................................................................31

15 U.S.C. § 77*o*(a) ............................................................................................................................17

15 U.S.C. § 77z-1(a)(3)(B) ..............................................................................................................10

15 U.S.C. § 77z-1(b)(1) ....................................................................................................................15

15 U.S.C. § 78aa(a)............................................................................................................................14

15 U.S.C. § 77*l*(a)(2)..........................................................................................................................17

## REGULATIONS

17 C.F.R. § 229.105 ..........................................................................................................................27

17 C.F.R. § 229.303(a)(3)(ii)............................................................................................................25

iv

Defendants respectfully submit this memorandum in support of their motion to (i) stay this Action pending resolution of a more comprehensive parallel federal action, or, in the alternative, (ii) to dismiss this Action entirely under Rule 12.02(6) for failure to state a claim.

## PRELIMINARY STATEMENT

Plaintiffs, like their counterparts in a parallel federal litigation, attempt to manufacture a shareholder class action under the federal securities laws based on nothing more than the disappointing early stock performance of Defendant SmileDirectClub, Inc. ("SmileDirectClub" or the "Company") following its initial public offering in September 2019 (the "IPO"). But Plaintiffs' buyer's remorse is not actionable under the federal securities laws.

Although all of Plaintiffs' claims here fail as a matter of law and should be dismissed, the Court need not delve into these issues of federal securities law at all since the same claims are being litigated in a parallel federal lawsuit captioned *Franchi v. SmileDirectClub, Inc.*, No. 19-cv-962 (M.D. Tenn. 2019) (Richardson, J.) (the "Federal Action") against the same defendants on behalf of the same putative class based on substantially the same allegations. Both this Action and the Federal Action assert claims under Sections 11, 12(a)(2) and 15 of the federal Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), 77*o*, against SmileDirectClub, certain of its officers and/or directors and its IPO underwriters on behalf of a putative class of purchasers of SmileDirectClub stock pursuant and/or traceable to the IPO. However, the Federal Action also asserts claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78a et seq., over which the federal courts have exclusive jurisdiction, based on substantially the same underlying allegations. Proceeding with this Action in parallel with the Federal Action would result in a needless and costly duplication of effort, waste of judicial resources, risk of inconsistent rulings on identical issues, and piecemeal

litigation of only some of the claims being adjudicated in the Federal Action. Accordingly, this Action should be stayed pending resolution of the Federal Action. (*See infra* § I.)

In any event, regardless of where the claims proceed, they have no merit and fail as a matter of law. Founded in 2014, SmileDirectClub is an oral care company providing dental support organization services with a pioneering direct-to-consumer medtech platform for transforming smiles. Its revolutionary teledentistry platform has democratized access to care by enabling dentists and orthodontists to provide patients with clear aligner therapy at a fraction of the historical cost and enabling remote access to state-licensed dentists and orthodontists. This innovative approach aims to solve the critical problems of cost, convenience and access to care that plague traditional orthodontic treatment. Unsurprisingly, SmileDirectClub's disruptive (and rapidly growing) business has sparked fierce opposition from organized dentistry bent on preserving its longstanding, highly profitable monopoly on beautiful smiles. All of this was disclosed in the Company's detailed registration statement and prospectus (the "Offering Documents") for the IPO, which Plaintiffs now challenge.

Unlike a typical securities class action, this case does not involve a financial restatement, regulatory enforcement action or any corporate scandal. Instead, the purported losses Plaintiffs seek to recover occurred almost immediately. On SmileDirectClub's first day of public trading, its stock closed down 27.5 percent from the IPO price. The slide continued over the following weeks based on a series of external events that occurred after the IPO, such as a meritless lawsuit (the "*Ciccio* action") brought by three orthodontists and a consumer attacking SmileDirectClub's business model (whose claims in turn were based on sham petitioning by the American Dental Association ("ADA") to the Federal Trade Commission ("FTC") and Food and Drug Administration ("FDA") that resulted in no action or investigation by either agency) and new

2

teledentistry regulations enacted in California (which had no effect on SmileDirectClub's business model)—the exact types of risks the Company warned investors about in the Offering Documents.

For each of their claims, Plaintiffs must allege facts showing that the Offering Documents contained a material misstatement or omitted material information they were required to disclose. Plaintiffs fail to do either. Indeed, Plaintiffs' core complaints are not directed at the Offering Documents at all, but rather at Plaintiffs' view of SmileDirectClub's business model, which is apparently based on the *Ciccio* action and/or the ADA's sham petitioning. For example, Plaintiffs claim the Company should have described its teledentistry model as "subpar" and contend that the customer satisfaction ratings the Company disclosed are misleading because less than 0.02 percent of SmileDirectClub's customers have made complaints to the Better Business Bureau (the vast majority of which have nothing to do with the quality of the clear aligner therapy that the Company's teledentistry model enables and are mostly about shipping and billing issues). But whatever Plaintiffs think of the merits of SmileDirectClub's business, it was accurately described in the Offering Documents. Plaintiffs' subjective disagreement with the Company's disruptive business strategy or the efficacy of its aligners does not state a claim under the disclosure-based Securities Act. (*See infra* §§ II.A.1, II.A.3.)

Plaintiffs' omission claims are equally meritless and based solely on hindsight. For example, Plaintiffs claim that the Offering Documents should have disclosed new teledentistry regulations in California, but those regulations were not enacted until a month **after the IPO** and the Offering Documents **did warn** that various state dental boards were targeting the Company's business and that "[a]lthough[] none of these efforts have resulted in rules and regulations being passed to date, it is possible that the rules and regulations governing the practice of dentistry and

3

orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business." (Ex. B, Prospectus, at 38.[1]) Regardless, Plaintiffs also fail to allege any facts showing the new rules were expected to have a material impact on the Company (and indeed they have not). Accordingly, the Offering Documents' extensive legal and regulatory risk disclosures were not misleading or incomplete because they did not specifically mention the then-proposed California regulations. (*See infra* § II.A.2.)

Similarly, Plaintiffs fault the Offering Documents for not including the Company's financial results for the quarter ending September 30, 2019 ("Q3 2019"), but that quarter was still in progress at the time of the IPO on September 12, 2019. Moreover, Plaintiffs' real complaint about the Q3 2019 results—that the market was supposedly "shock[ed]" by the Company's $387 million net loss—ignores that $330 million of that loss was due to one-time IPO-related expenses, which the Offering Documents did disclose. (*Id.* at 88 ("We expect to incur a material one-time compensation expense, in the quarter of this offering in connection with the payment of cash bonus amounts and issuance of shares of Class A common stock[.]").) Nothing more was required. (*See infra* § II.A.4.)

In addition to failing to allege any misstatement or actionable omission, Plaintiffs' claims also should be dismissed because any purported loss they suffered was caused by normal market activity and external post-IPO developments, not by a corrective disclosure of some falsehood in the Offering Documents or the materialization of some undisclosed risk. (*See infra* § II.B.)

---

[1] Exhibits cited herein are attached to the accompanying Declaration of Elizabeth Gonser, dated February 10, 2020. "[M]atters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint . . . may be considered by the . . . judge without converting the motion [to dismiss] into one for summary judgment." *Haynes v. Bass*, No. W2015-01192-COA-R3-CV, 2016 WL 3351365, at *4 (Tenn. Ct. App. June 9, 2016).

4

<u>**STATEMENT OF FACTS**</u>

**A.      SmileDirectClub Pioneers Teledentistry and**
         <u>**Disrupts the Traditional Orthodontic Industry**</u>

The traditional orthodontic model typically costs $5,000–$8,000 or more, requires a series of time-consuming office visits during limited hours and is available in less than 40% of the counties in the U.S. alone. (Ex. B, Prospectus, at 1.[2]) SmileDirectClub uses cutting-edge teledentistry technology and a vertically integrated model to democratize access to a more affordable, convenient and accessible solution for a straighter smile:

> We offer professional-level service and high-quality clear aligners at a cost of $1,895, up to 60% less than traditional orthodontic solutions. We achieve this cost savings while maintaining high quality by removing the overhead cost of in-person doctor visits and managing the entire member experience, all the way from marketing to aligner manufacturing, fulfillment, treatment by a member's doctor, and monitoring through completion of their treatment, which is supported by our proprietary teledentistry platform ("SmileCheck"). These efficiencies enable us to pass the cost savings directly to the members and allow doctors in our network to focus on what matters most: providing convenient access to excellent clinical care.

(*Id.* at 2; *see also* Consolidated Complaint, filed Dec. 20, 2019 ("Compl.") ¶¶ 35-36.)

The Offering Documents describe a typical "member journey":

> Our member journey starts with two convenient options: a member books an appointment to take a free, in-person 3D oral image at any of our over 300 retail stores ("SmileShops") . . . or orders an easy-to-use doctor prescribed impression kit online, which we mail directly to their door. Using the image or impression, we create a draft custom treatment plan that demonstrates how the member's teeth will move during treatment. Next, via SmileCheck, a state licensed doctor within our network reviews and approves the member's clinical information and treatment plan. If the member is a good candidate for clear aligners and decides to purchase, the treating doctor prescribes custom-made clear aligners, which we then manufacture and ship directly to the member. . . . SmileCheck is also used by the treating doctor to monitor the member's progress and enables seamless communication with the member over the course of treatment.

(Ex. B, Prospectus, at 4; *see also id.* at 103-05; Compl. ¶¶ 37-40.)

---

[2]      When referring to the Offering Documents, this brief cites to the prospectus as representative. As relevant to this Action, the registration statement (Ex. A) and prospectus contain materially identical disclosures.

As of the IPO, SmileDirectClub had helped more than 700,000 members. (Ex. B, Prospectus, at 2.) In 2018, the Company's revenue increased 190% year-over-year to $423.2 million. (*Id.*) In the first six months of 2019, revenue was already up 113% from the first half of 2018, totaling $373.5 million. (*Id.*)

**B.     The Offering Documents Disclose the Risks of Legal and Regulatory Challenges by Organized Dentistry**

Threatened by SmileDirectClub's innovative value proposition and rapid growth, the American Dental Association, American Association of Orthodontics and other similar trade organizations have challenged SmileDirectClub's pioneering use of teledentistry. (Compl. ¶ 60.) The Offering Documents expressly and repeatedly warn investors about this risk:

> ***Our business could be adversely affected by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states.***
>
> A number of dental and orthodontic professionals believe that clear aligners are appropriate for only a limited percentage of their patients. **National and state dental associations have issued statements discouraging use of orthodontics using a teledentistry platform**. Increased market acceptance of our remote clear aligner treatment may depend, in part, upon the recommendations of dental and orthodontic professionals and associations, as well as other factors including effectiveness, safety, ease of use, reliability, aesthetics, and price compared to competing products.
>
> Furthermore, our ability to conduct business in each state is dependent, in part, upon that particular state's treatment of remote healthcare and that state dental board's regulation of the practice of dentistry, each of which is subject to changing political, regulatory, and other influences. There is a risk that state authorities may find that our contractual relationships with our doctors violate laws and regulations prohibiting the corporate practice of dentistry, which generally bar the practice of dentistry by entities. . . . **If adverse regulations are adopted or any such claims are successful, and we were unable to adapt our business model accordingly, our operations in such states would be disrupted, which could have a material adverse effect on our business, financial condition, and results of operations**.

(Ex. B, Prospectus, at 37-38 (underlined emphases added); Compl. ¶¶ 59, 61, 97.)

6

The Offering Documents also disclose specific *then-existing* regulatory challenges in various states:

> We periodically receive communications from state and federal regulatory and similar agencies inquiring about the nature of our business activities, licensing of professionals providing services, and similar matters. Such matters are routinely concluded with no financial or operational impact on us. Currently there are no actions with any agency that are expected to have a material adverse effect on our business, results of operations, and financial condition.

(Ex. B, Prospectus, at 128.)

Additionally, the Offering Documents describe active lawsuits that SmileDirectClub has brought against state dental boards in Georgia and Alabama:

> Two state dental boards have established new rules or interpreted existing rules in a manner that purports to limit or restrict our ability to conduct our business as currently conducted. The Georgia Board of Dentistry passed a new rule that requires a licensed dentist to be present when 3D oral images are taken by a dental assistant, and the Board of Dental Examiners of Alabama has interpreted existing rules to require "direct supervision" (meaning the dentist must be physically present somewhere in the building) for the taking of digital oral images. **In both Georgia and Alabama, we have filed lawsuits in Federal court against the dental boards and their individual members alleging, among other things, violations of the Sherman Act, and we will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model.**

(Ex. B, Prospectus, at 38 (emphasis added); *see also id.* at 123-24, 128.)

Similarly, the Offering Documents also describe a then-ongoing lawsuit filed against SmileDirectClub by the New Jersey Dental Association (*id.* at 124), in which the court recently granted summary judgment in SmileDirectClub's favor at oral argument (*see* Ex. O, *Galkin* Summary Judgment Transcript, at 77:23-78:3 (concluding "summary judgment is proper for SmileDirectClub" because "there's nothing . . . to indicate they're in any way violating the law"). The Offering Documents further disclose that "a national dental association recently filed a citizen petition with FDA alleging that [SmileDirectClub's] manufacturing is in violation of 'prescription only' requirements" and caution that "[a]lthough **FDA denied the petitioners'**

7

**request to initiate enforcement action**, the petition continues to be circulated by that national dental association and other third parties." (*Id.* at 38 (emphasis added).) Most importantly, the Offering Documents make clear that these challenges were likely to continue and could result in new rules or regulations that could adversely affect SmileDirectClub's business:

> In addition, a national orthodontic association has met with various dental boards across the country in an effort to advocate for new rules and regulations that could have the effect of interfering with our business model. Although, none of these efforts have resulted in rules and regulations being passed to date, it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business.

(*Id.* at 38; *see also id.* at 26, 124; Compl. ¶ 62.)

Finally, the Offering Documents warn that SmileDirectClub "could be the target of claims relating to false, misleading, deceptive, or otherwise noncompliant advertising or marketing practices," which "could also result in litigation, fines, penalties, and adverse publicity that could cause reputational harm and loss of member trust, which could have an adverse effect on our business." (Ex. B, Prospectus, at 46.)

### C. SmileDirectClub's Stock Drops Significantly on the Day of the IPO

On September 12, 2019, SmileDirectClub completed its IPO, issuing shares at a price of $23.00 each. (Compl. ¶ 102.) By the end of the first trading day, however, the share price closed down 27.5% at $16.67 per share. (*Id.* ¶¶ 5, 102; Ex. E, Stock Prices, at 1.) Bloomberg News described it as "one of the worst stock-market debuts in more than a decade." (Compl. ¶ 102.) Plaintiffs do not allege the drop was caused by any corrective disclosure or other revelation about the Company. The stock price recovered somewhat over the next week, reaching $19.48 per share on September 18, 2019. (Ex. E, Stock Prices, at 1.) It then fell again each consecutive day until September 27, 2019—when this Action was filed—when it closed up six cents to $13.00 per share. (*Id.*)

8

**D.      After the IPO, SmileDirectClub Faces Further Attacks from
          <u>Organized Dentistry, as the Offering Documents Warned Might Happen</u>**

In the middle of that stock slide, on September 24, 2019, (and, tellingly, just two days

before the first of these shareholder lawsuits was filed), three orthodontists and a single

consumer filed a putative class action in federal court captioned *Ciccio v. SmileDirectClub, LLC*,

No. 19-cv-845 (M.D. Tenn.), asserting claims for false advertising, unfair and deceptive trade

practice and fraud—just as the Offering Documents had warned could happen. (Compl. ¶ 105;

Ex. G, *Ciccio* Complaint.) The *Ciccio* complaint, despite not being brought by investors, claims

that the Offering Documents contained misstatements and omitted that the Company was

allegedly experiencing legal challenges in several states for purportedly operating as a dental

practice without a license. (*Id.*)[3]

A few weeks later, on October 14, 2019, California enacted new rules for teledentistry

which did not that go into effect until January 1, 2020. (Compl. ¶ 103.) Among other things,

these rules—which were tacked onto the California Dental Board's sunset bill—require a

licensed dentist to review the patient's most recent x-rays or other bone imaging suitable for

orthodontia before prescribing teeth aligners and prohibit non-disclosure agreements that would

prevent consumers from submitting complaints to the Dental Board. (*Id.*) While California

Governor Gavin Newsom felt constrained to sign the bill to ensure the Dental Board could

continue to operate, he issued a stern rebuke regarding the new teledentistry regulations. (Ex. P,

Signing Statement for CA Assembly Bill 1519.) Although this law was intended to attack

teledentistry, these new laws did not have any material impact on SmileDirectClub's operations

---

[3]     The consumer claims have since been dismissed. The Company's motion to dismiss the orthodontist claims
remains pending.

in California. Nevertheless, the Company's share price fell approximately 13% to $9.70 on the heels of posts by short sellers about the new rules. (Compl. ¶ 107; Ex. E, Stock Prices, at 1.)

Two days later, on October 16, 2019, SmileDirectClub and its Chief Clinical Officer, Dr. Jeffrey Sulitzer, D.M.D., filed a lawsuit captioned *Sulitzer v. Tippins*, No. 19-cv-8902 (C.D. Cal.), against the California Dental Board based on the overly aggressive tactics of one of the board's investigators. (Compl. ¶ 67; Ex. H, *Sulitzer* Complaint.) This was consistent with the Offering Documents' disclosure that the Company "will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model." (Ex. B, Prospectus, at 38.) Nevertheless, the next day, the Company's stock price fell 5.90% to $9.41 per share. (Compl. ¶ 72; Ex. E, Stock Prices, at 1.)

### E. Duplicative Securities Lawsuits Are Filed Against SmileDirectClub in State and Federal Courts in Tennessee, Michigan and New York

Based on these post-IPO developments, various putative shareholders began filing duplicative securities actions in state and federal courts just two weeks after the IPO. All federal cases were consolidated before Judge Eli J. Richardson in the Middle District of Tennessee, and, on January 28, 2020, Magistrate Judge Jeffrey S. Frensley appointed an institutional investor as lead plaintiff pursuant to the Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 77z-1(a)(3). (*See* Ex. L, *Franchi* Consolidation Order.) Lead Plaintiff's consolidated amended complaint is due on or before February 21, 2020, and Defendants' motion to dismiss is due 30 days thereafter. (*See* Ex. M, *Franchi* Scheduling Stipulation.)

Six other duplicative actions were filed in state courts in Tennessee, Michigan and New York. The New York plaintiff agreed to a stay pending resolution of any motions to dismiss in the other actions. (*See* Ex. N, *Sasso* Order Staying Action.) In Michigan, certain defendants, including SmileDirectClub, moved to dismiss for lack of personal jurisdiction. The remaining

10

defendants moved to dismiss or stay in favor of the Federal Action and on the basis of *forum non conveniens*. Those motions are scheduled for argument on February 26, 2020. Finally, the four actions filed in Tennessee state court were consolidated into this Action.

**F.    SmileDirectClub Announces Its Q3 2019 Results, Which Include Significant One-Time Costs Associated with the IPO**

On November 12, 2019—eight weeks after the IPO—SmileDirectClub announced its Q3 2019 results, for the quarter ended September 30, 2019, during which the IPO occurred. (Compl. ¶ 109.) Overall, the results were positive. For example, total revenue increased by $60.5 million, or 50.6%, compared to the third quarter of 2018 and unique aligner shipments increased 46.5% year-over-year to 106,070. (Ex. C, Q3 2019 Press Release, at 1.) Nevertheless, the Company also reported a net loss of $387.6 million. (*Id.*) As Kyle Wailes, SmileDirectClub's Chief Financial Officer and a Defendant here, explained on the accompanying earnings call, "costs related to our IPO increased our Q3 net loss by approximately $330 million." (Compl. ¶ 109; Ex. D, Q3 2019 Transcript, at 8.) More specifically, he explained:

> General and administrative expenses were $390 million in Q3 compared to $30 million in the prior year period. G&A expenses in the current year period include a one-time charge of $324 million related to equity based compensation and $6 million of other one-time IPO specific costs during the third quarter. **As we mentioned [in] our [Offering Documents], we expected to have a one-time charge in third quarter as a result of compensation expense related to the IPO**.

(*Id.* (emphasis added).) Indeed, the Offering Documents warned investors that the Company "expect[ed] to incur a material one-time compensation expense, in the quarter of this offering in connection with the payment of cash bonus amounts and issuance of shares of Class A common stock[.]" (Ex. B, Prospectus, at 88.)

Excluding this one-time IPO-related compensation expense, the Company's net loss was only $57.6 million, which was consistent with the Company's history of net losses "since inception"—as the Offering Documents also disclosed. (*See id.* at 25-26 (disclosing net losses of

11

$32.8 million for 2017, $74.8 million for 2018 and $52.9 million for the first half of 2019, and cautioning "[i]t is possible that we will not achieve profitability or that, even if we do achieve profitability, we may not maintain or increase profitability in the future"); Compl. ¶ 93.) Additionally, the Offering Documents disclosed a trend of increasing sales and marketing expenses and cautioned that the Company "expect[s] to continue to invest heavily in sales and marketing[.]" (Ex. B, Prospectus, at 84, 88-89.) That trend continued for Q3 2019, due in part to increased legal expenses, which approximately doubled in Q3 2019 and are expected to do so again in Q4 2019, in no small part due to this and the other shareholder actions. (Compl. ¶ 109.)

### G. Plaintiffs File the Consolidated Complaint Here

On December 20, 2019, Plaintiffs filed the Consolidated Complaint against the Company, certain of its officers and/or directors[4], the investment banking firms that acted as underwriters for its IPO[5] and Camelot Venture Group ("Camelot"), a private investment group that invests primarily in direct-to-consumer brands. (*Id.* ¶¶ 15-25.) Plaintiffs assert claims under Sections 11, 12(a)(2) and 15 of the Securities Act on behalf of all purchasers of SmileDirectClub's Class A common stock issued pursuant and/or traceable to the Offering Documents. (*Id.* ¶¶ 1-2.) They claim that the Offering Documents "inadequately disclos[ed], or fail[ed] to disclose at all, adverse facts regarding (i) the degree of professional care rendered to SmileDirectClub customers . . . (ii) the significant regulatory and legal risks facing SmileDirectClub across the country . . . (iii) the heavy-handed tactics used to conceal customer complaints and, in turn,

---

[4] David Katzman, Chief Executive Officer and Chairman of the Board; Kyle Wailes, Chief Financial Officer; Steven Katzman, Chief Operating Officer and a director; Jordan Katzman, co-founder and a director; Alexander Fenkell, co-founder and a director; Susan Greenspon Rammelt, Chief Legal Officer and a director; and Richard Schnall, an independent director. (*Id.* ¶¶ 16-20.)

[5] J.P. Morgan Securities LLC; Citigroup Global Markets Inc.; BofA Securities, Inc.; Jefferies LLC; UBS Securities LLC; Credit Suisse Securities (USA) LLC; Guggenheim Securities, LLC; Stifel, Nicolaus & Company, Incorporated; William Blair & Company, L.L.C. and Loop Capital Markets LLC. (*Id.* ¶ 23.)

12

manipulate customer satisfaction . . . , and (iv) the magnitude of the losses SmileDirectClub

suffered in the quarter during which it commenced its IPO." (*Id.* ¶ 3.) As shown below, each

theory fails and this Action should be stayed in favor of the Federal Action or dismissed entirely.

**ARGUMENT**

**I.      THIS ACTION SHOULD BE STAYED IN FAVOR OF THE PARALLEL
        LITIGATION OF THE SAME CLAIMS IN FEDERAL COURT**

"[T]he power to stay proceedings is incidental to the power inherent in every court to

control the disposition of the causes on its docket with economy of time and effort for itself, for

counsel, and for litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). "The exercise of

this authority requires an exercise of judgment and the careful weighing of the competing

interests." *Bell v. Todd*, 206 S.W.3d 86, 93 (Tenn. Ct. App. 2005) (citing *Landis*). "Those

concerns include . . . whether a stay would promote judicial economy and the conservation of

judicial resources by reducing the duplication of legal issues to be litigated . . . ." *Sanjines v.*

*Ortwein & Assocs., P.C.*, 984 S.W.2d 907, 911 (Tenn. 1998).

More specifically, "[c]ourts customarily consider the following factors, among others, in

deciding whether to stay a civil proceeding . . . : (1) the extent to which the issues in the [two

cases] overlap, (2) the status of the [other] proceeding, (3) the plaintiff's interests in expeditious

civil proceedings weighed against the prejudice to the plaintiff caused by the delay, (4) the

hardship on the defendant, including the burden on the defendant if the cases go forward in

tandem, (5) the convenience of both . . . courts, and (6) the interests of third parties and the

public." *See Bell*, 206 S.W.3d at 94 (considering whether to stay civil proceeding pending

resolution of parallel criminal action). Here, all of these factors favor staying this Action.

First, this Action substantially overlaps with the Federal Action. Although the federal

lead plaintiff has not yet filed a consolidated amended complaint (due February 21, 2020),

13

viewing the three current federal complaints collectively (Exs. I–K), they are substantially similar to this Action. For example, both this Action and the federal complaints assert the same claims (under Sections 11, 12(a)(2) and 15 of the Securities Act) against the same defendants (SmileDirectClub, certain of its officers and/or directors and its IPO underwriters) on behalf of the same putative class (of all purchasers of SmileDirectClub's stock pursuant and/or traceable to its IPO) based on the same purported misstatements or omissions in the Offering Documents (regarding SmileDirectClub's business model, the safety and efficacy of its aligners and the legal and regulatory risks the Company faces). Thus, adjudicating both actions would require the same parties to litigate the same issues, which heavily favors a stay.[6]

Indeed, the only significant difference between this Action and the Federal Action is that one of the federal complaints (*Ginsberg*) also asserts claims under the Exchange Act based on the same underlying allegations. Unlike Securities Act claims, Exchange Act claims may be brought only in federal court. *See* 15 U.S.C. § 78aa(a) ("The district courts of the United States . . . shall have exclusive jurisdiction . . . of all suits in equity and actions at law brought to enforce any liability or duty created by [the Exchange Act] or the rules and regulations thereunder."). In other words, only the federal court can offer a complete resolution of all shareholder claims arising out of the IPO. This further supports a stay.[7]

---

[6] While the Federal Action does not currently assert alleged omissions regarding the California regulation and investigation or SmileDirectClub's Q3 2019 earnings, the four initial complaints consolidated into this Action did not either, and such claims are likely to be asserted in the consolidated complaint in the Federal Action just as they were in the Consolidated Complaint here. Indeed, SmileDirectClub's Q3 2019 earnings were released after the current federal complaints were filed and thus could not have been included there. Regardless, even without these issues, this Action and the Federal Action overlap substantially enough to warrant a stay.

[7] The date on which the respective actions were filed—essentially contemporaneous—does not provide any meaningful differentiation. The first state court action (*Mancour*) was filed on September 27, 2019, followed by the second state court action (*Vang*) three days later and the first federal action (*Andre*) two days after that. Then came the other two state court actions (*Fernandez* and *Wang*) and the other two federal court actions (*Ginsberg* and *Franchi*). All seven complaints were filed within one month of each other.

14

Second, both this Action and the Federal Action are still in the pleading stage. This Motion is Defendants' first response to any of the complaints in either action. Defendants will similarly move to dismiss the Federal Action on or before March 23, 2020. Defendants have not filed an answer in either case, no discovery has occurred in either case and no class has been certified in either case. That this Action is in the earliest stages supports a stay.[8]

Third, Plaintiffs—and the putative class—face no conceivable prejudice from a stay here. As noted above, the same claims seeking the same relief for the same putative class are being pursued in the Federal Action. To the contrary, the putative class could be prejudiced if this Action is **not** stayed. For starters, the four individuals who are Plaintiffs here have not made any showing that they are well-suited to pursue these claims. In stark contrast, SEIU Health Care Employees Pension Fund ("SEIU"), the court-appointed lead plaintiff in the Federal Action, prevailed over four competing movants in the PSLRA-mandated lead plaintiff appointment process, with Judge Frensley concluding that SEIU is most capable of adequately representing the interests of class members and controlling the litigation. (*See* Ex. L, *Franchi* Consolidation Order, at 6-9.)[9] Additionally, as explained above, the putative class cannot pursue Exchange Act

---

[8] On January 14, 2020, Plaintiffs here served Defendants with initial requests for the production of documents. On February 10, 2010, Defendants timely objected to those requests as premature in light of this motion and in direct violation of the PSLRA-mandated automatic stay of discovery pending resolution of any motions to dismiss. *See* 15 U.S.C. § 77z-1(b)(1) ("In any private action arising under this subchapter [i.e., the Securities Act], all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss . . . ."). While some plaintiffs have argued the stay d court, "[t]he statute simply does not say that the automatic stay is limited to claims brought pursuant to the [Securities] Act in federal court." *In re Everquote, Inc. Secs. Litig.*, 65 Misc. 3d 226, 237 (Sup. Ct. N.Y. Cty. 2019) (enforcing the PSLRA discovery stay in a private putative class action under the Securities Act filed in New York state court); *City of Livonia Retiree Health & Disability Benefits Plan v. Pitney Bowes Inc.*, No. X08 FST CV 18 6038160 S., 2019 WL 2293924, at *4 (Conn. Super. Ct. May 15, 2019) (same in Connecticut state court; holding that the PSLRA "is not ambiguous and that its plain meaning compels the conclusion that the statute . . . applies to actions commenced in state court under the Securities Act"). "When the statutory language is clear and unambiguous, [courts] simply apply its plain meaning." *State v. Casper*, 297 S.W.3d 676, 683 (Tenn. 2009).

[9] Indeed, some federal courts have gone so far as to enjoin parallel state court securities actions to protect the "significant federal rights" conferred on the federal lead plaintiff by the PSLRA. *See, e.g., In re BankAmerica Corp. Sec. Litig.*, 263 F.3d 795, 801, 803 (8th Cir. 2001), as amended (Oct. 3, 2001) ("[T]he rights created by § 77z–1(a)(3)(B) are meaningless if a state-court plaintiff who has won the race to the state courthouse may seize

15

claims here. Thus, because Plaintiffs and the putative class face no prejudice from a stay and may in fact be prejudiced absent a stay, this factor also supports a stay.

Fourth, on the other hand, if this Action is not stayed, Defendants face obvious prejudice from the costly duplication of effort that would be required to simultaneously defend against the same claims in both actions. Moreover, parallel litigation would create an unseemly risk of inconsistent rulings at every turn, including on the adequacy of the pleadings and—if the actions were to survive dismissal, which they should not—on discovery, class certification and ultimately the merits. This can all be avoided by simply staying this Action.

Fifth, and similarly, a stay would also promote efficiency and judicial comity. While this Court is unquestionably capable of adjudicating these federal Securities Act claims and has jurisdiction to do so, *see Cyan*, 138 S. Ct. at 1069, there is no reason for the Court to expend its finite resources resolving these issues when Judge Richardson necessarily has to do the same in the Federal Action.

Sixth, and finally, the public interest likewise favors litigating these claims in federal court. Plaintiffs do not purport to be from this county (or even this state) and do not assert any claims under Tennessee law. Rather, they seek to represent a nationwide class for exclusively federal claims. Thus, although this Court has some interest in hearing this Action because SmileDirectClub is headquartered here in Nashville, the federal court has a much greater interest in ensuring an accurate and uniform application of the federal securities laws. Accordingly, absent dismissal, this Court should exercise its sound discretion to stay this Action.

---

control of the litigation of the federal claims."). This rationale is not undermined by the Supreme Court's ruling in *Cyan, Inc. v. Beaver County Employees Retirement Fund*, 138 S. Ct. 1061 (2018), which merely held that state courts have concurrent jurisdiction over certain Securities Act claims—not that duplicative litigations asserting such claims should proceed simultaneously in both state and federal court.

16

## II. ALTERNATIVELY, THIS ACTION SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Regardless of where these claims proceed, they fail as a matter of law. To survive a motion to dismiss under Tennessee Rules of Civil Procedure 12.06, a complaint "must contain sufficient factual allegations to articulate a claim for relief." *Runyon v. Zacharias*, 556 S.W.3d 732, 736-37 (Tenn. Ct. App. 2018). Such factual allegations "must raise the pleader's right to relief beyond the speculative level." *Id.* The Court "should not credit conclusory allegations or draw farfetched inferences." *Chenault v. Walker*, 36 S.W.3d 45, 56 (Tenn. 2001). Similarly, "the legal conclusions set forth in a complaint are not required to be taken as true." *Riggs v. Burson*, 941 S.W.2d 44, 47-48 (Tenn. 1997).

"Claims under sections 11 and 12(a)(2) are . . . Securities Act siblings with roughly parallel elements[.]" *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). To state a claim under Section 11, Plaintiffs must allege facts demonstrating that "part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). Stating a claim under Section 12(a)(2) requires the same showing for a Prospectus. *See* 15 U.S.C. § 77*l*(a)(2). Section 15 provides for liability of persons who "control" any person liable under Section 11 or 12. *See* 15 U.S.C. § 77*o*(a). In other words, for any of Plaintiffs' claims to survive dismissal, they must allege facts showing a material misstatement or actionable omission in the Offering Documents. Additionally, "[i]f it is apparent on the face of the complaint [that] the decline in share value is not related to any material misstatement and/or omission, dismissal is appropriate." *Azzolini v. Corts Tr. II for Provident Fin. Tr. I*, No. 103CV1003, 2005 WL 3448053, at *5 (E.D. Tenn. Dec. 14, 2005) (dismissing Securities Act claims based on negative causation).

**A.      Plaintiffs Fail To Allege Any Material Misstatement or Actionable Omission**

**1.      The Offering Documents Did Not Misrepresent SmileDirectClub's Business Model or Quality of Care**

Plaintiffs' first theory is that the Offering Documents supposedly contained "a false description of the level of professional care rendered to SmileDirectClub customers and critical omissions relating to the actual oversight provided by dental professionals." (Compl. ¶ 29; *see generally id.* ¶¶ 35-57.) But Plaintiffs do not allege any facts showing the Offering Documents were false or omitted material information they were required to disclose.

**(a)      The Offering Documents Accurately Describe SmileDirectClub's Business**

As noted above, Plaintiffs' real issue is not with the Offering Documents, but with SmileDirectClub's business model itself. For example, Plaintiffs contend that "SmileDirectClub has not really created a state-of-the-art platform in which to conduct comprehensive teledentistry," and instead "has merely realized considerable savings by eliminating the most basic functions of patient care." (Compl. ¶ 41.) Thus, Plaintiffs conclude, "SmileDirectClub's business model is fundamentally flawed because it endangers the public by duping customers into believing that they are getting supervised dental treatment by licensed treating doctors via a remote teledentistry platform." (*Id.* ¶ 42.) But regardless of what Plaintiffs think about the merits of teledentistry and SmileDirectClub's business, they were accurately disclosed in the Offering Documents. (*See supra* at 3-4.) Plaintiffs' subjective disagreement with the Company's business strategy does not state a claim for a disclosure-based securities violation. *See Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 490 (6th Cir. 2015) ("To the extent the plaintiffs take issue with the efficiency or effectiveness of [defendant's] monitoring system, the plaintiffs raise a claim of corporate mismanagement, not investor deception.").

Plaintiffs' reference to certain complaints submitted to the Better Business Bureau ("BBB") does not help their cause. (Compl. ¶¶ 51, 55.) "Plaintiffs must show more than the mere existence of a few customer complaints per year to adequately plead that Defendants'. . . [statements] were false or misleading." *Curry v. Yelp Inc.*, No. 14-cv-03547-JST, 2015 WL 7454137, at *7 (N.D. Cal. Nov. 24, 2015) (noting plaintiffs "failed to direct the Court to any case holding that customer complaints alleging circumstances that are contrary to defendant's representations independently suffice to establish the falsity of those representations"), *aff'd*, 875 F.3d 1219 (9th Cir. 2017); *see also In re Netflix, Inc. Sec. Litig.*, No. C04-2978 FMS, 2005 WL 1562858, at *7 (N.D. Cal. June 28, 2005) (existence of customer complaints insufficient to allege that the Company suffered from a "failing business model" and "was aware that its service was much worse than represented and was leading to customer defections"). On their face, the BBB complaints do not expose any fundamental issue with SmileDirectClub's business, much less reveal any misrepresentation in the Offering Documents. *See Ronconi v. Larkin*, 253 F.3d 423, 434 (9th Cir. 2001) ("Problems and difficulties are the daily work of business people. That they exist does not make a lie out of any of the alleged false statements.") In any event, the complaints amount to less than one quarter of one percent of SmileDirectClub's members, and in cherry-picking a handful of complaints to quote, Plaintiffs ignore that overall the BBB gives the Company an A- rating and customer reviews on the BBB average four out of five stars. (Ex. F, BBB Profile, at 1.)[10]

---

[10] Additionally, as Plaintiffs recognize, many of the complaints come from individuals who "were likely inappropriate candidates for [SmileDirectClub] in the first place" and involve issues that are beyond the scope of services provided on SmileDirectClub's platform. (Compl. ¶ 54.) For example, Plaintiffs quote one individual reporting a broken molar and exposed nerve. (*Id.* ¶ 51.) That obviously cannot be resolved via teledentistry and requires an in-person dental visit.

Case 3:19-cv-00962   Document 137-5   Filed 06/05/23   Page 25 of 40 PageID #: 3404

Plaintiffs' complaints about what the Offering Documents actually said fare no better. For example, the Offering Documents explain that the Company "create[s] a draft custom treatment plan" for each new member, which "a state licensed doctor within [the Company's] network reviews and approves[.]" (Ex. B, Prospectus, at 4.) But Plaintiffs acknowledge that each treatment plan is reviewed and approved by the treating doctor. (Compl. ¶¶ 38-39.) Similarly, Plaintiffs point to promotional material included in the Offering Documents that describe routine "check ins" where "[t]he treating duly licensed doctor reviews clinical progress through our remote teledentistry platform at least every 90 days." (Compl. ¶ 47.) Again, Plaintiffs do not contend that this statement is false (i.e., that such check-ins do not, in fact, occur at least every 90 days). Instead, Plaintiffs simply complain about what they perceive as shortcomings in those reviews, arguing that "this progress review consists, at most, of a review of images uploaded by the customers and does not include any substantive or meaningful interaction between the 'treating doctor' and the customer." (*Id.*) But Plaintiffs' opinion of the whether the check-ins are sufficiently thorough does not render anything in the Offering Documents false or misleading. *See Bondali*, 620 F. App'x at 490 (description of protocols as "'strict' . . . is not 'disproven' just because [company] could have strengthened its standards and protocols"; "all the plaintiffs have done is shown that whether [company's] standards and protocols could be described as 'strict' is a question subject to reasonable debate").

Relatedly, Plaintiffs argue that "despite claiming in the Offering Documents that a customer's 'treating doctor' will 'monitor through the completion of their treatment' each customer's progress, the truth is that customers are actually left communicating with customer representatives rather than licensed professionals and are forced to resort to third party consumer websites and their own third-party dentists (and orthodontists) for relief." (Compl. ¶ 52.) But,

even if true, which it is not, the fact that some customers had issues with their treatment and sought assistance from SmileDirectClub's customer service representatives or their regular dentist does not mean that their treating doctor, through SmileDirectClub, was not monitoring their progress. Moreover, as Plaintiffs acknowledge, the Offering Documents disclosed that SmileDirectClub has "a dedicated team of approximately 600 customer care team members in Nashville and Costa Rica, including general customer care team members, an advanced customer care team to address more complex questions, and a clinical customer care team of certified dental professionals available to answer clinical questions." (Ex. B, Prospectus, at 116; Compl. ¶ 52.) Again, Plaintiffs do not allege any facts showing these disclosures were false or misleading.

### (b) The Offering Documents Do Not Omit Anything They Were Required To Disclose

Plaintiffs' omission-based claims are similarly meritless. It is axiomatic that "[t]here is no general duty on the part of a company to provide the public with all material information." *J & R Mktg., SEP v. Gen. Motors Corp.*, 549 F.3d 384, 397 (6th Cir. 2008). Rather, a duty to disclose under the Securities Act arises only for "material information required to be disclosed by statute" or "additional information required to make another statement, whether required or voluntarily made, not misleading" *Id.* at 390.

Plaintiffs contend that "SmileDirectClub was required to disclose . . . that the quality of SmileDirectClub's product offerings, professional services, and treatment success were subpar[.]" (Compl. ¶ 30.) But the federal securities laws do not require "corporate officials [to] present an overly gloomy or cautious picture of current performance and future prospects." *Scott v. General Motors Co.*, 46 F. Supp. 3d 387, 397 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015). Indeed, "a duty to disclose [declines in customer satisfaction] would not comport with

21

the way the business world works." *In re Allscripts, Inc. Sec. Litig.*, No. 00 C 6796, 2001 WL 743411, at *6 (E.D. Ill. June 29, 2001).[11]

Plaintiffs' passing reference to Items 303 and 105 of SEC Regulation S-K offers no support for their claims. In a single sentence, Plaintiffs assert "Defendants violated Item 303 and 105 by failing to disclose these known facts, each of which has (and had) a material impact on SmileDirectClub's profitability and, further, made investing in the Company risky or speculative given their consequent material adverse effects on SmileDirectClub's future results and prospects." (Compl. ¶ 57.) But mere "legal conclusions set forth in a complaint are not required to be taken as true," *Riggs*, 941 S.W.2d at 47-48, and Plaintiffs fail to allege what these supposedly "known facts" were or what "material impact" they would have had.

### 2. The Offering Documents Disclosed the Legal and Regulatory Risks SmileDirectClub Faces

Next, Plaintiffs claim that the Offering Documents supposedly contained "material misstatements regarding the regulatory and legal risks facing SmileDirectClub across the country and specifically omissions regarding known investigations and imminent adverse legislation in the state of California." (Compl. ¶ 29; *see generally id.* ¶¶ 58-74.) But Plaintiffs again fail to identify any false or misleading disclosures or any duty to disclose additional information.

---

[11] Plaintiffs also claim that the Offering Documents "fail to disclose that its customers have no actual requirement to undergo any dental examination at all prior to shifting their teeth with SmileDirectClub's aligners[.]" (Compl. ¶ 43.) Yet in the very next sentence, Plaintiffs concede that "[i]n fact, during the enrollment process, SmileDirectClub requires customers to attest to the fact that they have had a full dental examination and been pre-cleared by their own personal dentist prior to using SmileDirectClub's aligners." (*Id.*) Plaintiffs apparently fault the Offering Documents for not describing this part of the enrollment process (*id.* ¶ 45), but they do not (and cannot) identify any statute or other legal obligation that required disclosure of such detail.

22

### (a) The Offering Documents Extensively Disclosed the Relevant Risks

As shown above, the Offering Documents repeatedly disclose, in detail, the legal and regulatory risks that SmileDirectClub faces. (*See supra* at 5-7.) For example, SmileDirectClub expressly warned that "[o]ur business could be adversely affected by ongoing professional and legal challenges to our business model or by new state actions restricting our ability to provide our products and services in certain states." (Ex. B, Prospectus, at 37.) Far from mere "boilerplate," as Plaintiffs claim (Compl. ¶ 73), the Company's disclosures could hardly have been more specific. The Offering Documents detail regulations passed in Georgia and Alabama at the urging of those states' dental boards and SmileDirectClub's related pending lawsuits against the boards for their anticompetitive conduct. (Ex. B, Prospectus, at 38; *see also id.* at 123-24, 128.) Similarly, the Offering Documents describe a lawsuit against the Company by the New Jersey Dental Association claiming the Company engages in the illegal corporate practice of dentistry—which the court recently rejected entirely. (*Id.* at 124; Ex. O, *Galkin* Summary Judgment Transcript, at 77:23-78:3 (concluding "summary judgment is proper for SmileDirectClub" because "there's nothing . . . to indicate they're in any way violating the law").) The Offering Documents also disclose the sham petition that the American Dental Association submitted to the FDA urging the FDA to initiate enforcement action against SmileDirectClub, which the FDA rejected. (Ex. B, Prospectus, at 38.) And, perhaps most importantly, the Offering Documents warned that these attacks were likely to continue and could result in new rules or regulations that could adversely affect SmileDirectClub's business:

> [A] national orthodontic association has met with various dental boards across the country in an effort to advocate for new rules and regulations that could have the effect of interfering with our business model. Although, none of these efforts have resulted in rules and regulations being passed to date, it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business.

23

(*Id.* at 38, 124; *see also id.* at 26.)

In light of these extensive, company-specific risk disclosures, Plaintiffs' conclusory assertions that the Offering Documents "fail[] to accurately describe the true regulatory and legal pressures SmileDirectClub faces" (Compl. ¶ 73) and "ignor[e] that dental associations or dental boards across the country are, in fact, presently pushing for regulatory or legislative reform that severely cripples SmileDirectClub's growth" (*id.* ¶ 59) fail as a matter of law even at the pleading stage. *See Bondali*, 620 F. App'x at 491 ("[C]autionary statements are 'not actionable to the extent plaintiffs contend defendants should have disclosed risk factors "are" affecting financial results rather than "may" affect financial results.'" (citation omitted)); *Iron Worker Local Union No. 405 Annuity Fund v. Dollar Gen. Corp.*, No. 3:17 CV 63, 2018 WL 10152459, at *12 (M.D. Tenn. Mar. 8, 2018) (dismissing securities fraud claims where defendant made "the very disclosure Plaintiffs contend was missing and therefore made the statement misleading").

(b)      There Was No Duty To Disclose the California
Dental Board Investigation or Proposed Regulations

Ultimately, Plaintiffs' only issue with the Company's legal and regulatory disclosures is that they did not include an alleged ongoing investigation by the California Dental Board and proposed regulations that were being considered by the California legislature at the time of the IPO.  (Compl. ¶¶ 63-73.)  But "[b]efore liability for non-disclosure can attach, the defendant must have violated an affirmative duty of disclosure." *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997).  The Complaint fails to allege facts giving rise to any duty to disclose more than SmileDirectClub did in the Offering Documents.

Plaintiffs cannot rely on SmileDirectClub's lawsuit against the California Dental Board, filed *after* the IPO, to contend that the Company had some duty to disclose the Dental Board's investigation to investors.  "[A] government investigation, without more, does not trigger a

24

generalized duty to disclose" and there "[t]here is no duty to disclose litigation that is not 'substantially certain to occur.'" *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016). Here, SmileDirectClub disclosed in the Offering Documents that it had received "communications from state and federal regulatory and similar agencies inquiring about the nature of our business activities," and that "[s]ome state dentistry boards have established new rules or interpreted existing rules in a manner that limits or restricts our ability to conduct our business as currently conducted in other states." (Ex. B, Prospectus, at 128.) And the Complaint alleges no facts suggesting the California Dental Board's inquiries rendered those statements misleading in any material way.

Nor can Plaintiffs rely on Items 303 and 105 to claim additional disclosure was required. (Compl. ¶ 74.) Item 303 requires disclosure only of "known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii). Plaintiffs do not allege that the California Dental Board's investigation has had or is reasonably expected to have any impact—much less the requisite material impact—on SmileDirectClub's net sales, revenue or income from continuing operations. Indeed, Plaintiffs do not allege that SmileDirectClub has been subject to any fines, penalties or other enforcement action resulting from the investigation (because it has not been). Accordingly, Item 303 did not require any additional disclosure. *See In re Sofamor Danek Grp.*, 123 F.3d at 402 (no duty to disclose under Item 303 where company "had no way of knowing . . . that the . . . practices in question would have a material adverse impact upon future operating results").

Likewise, Plaintiffs do not allege that SmileDirectClub reasonably expected the new California regulations, which were merely a proposal at the time of the IPO, to have a material

25

impact on net sales, revenue or income from continuing operations. To the contrary, Company executives stated the opposite on the Q3 2019 earnings call, which Plaintiffs rely on and directly quote in the Consolidated Complaint. (Compl. ¶ 109.) SmileDirectClub's CEO squarely addressed this issue, stating the new regulations have "**no impact on the businesses** as we stated **presently or anticipated**" because the Company is "in compliance with all regulatory laws across California, as well as the United States." (Ex. D, Q3 2019 Transcript, at 11 (emphasis added).) He further explained that the Company's opposition to the new regulations was not because they would hurt SmileDirectClub's business, but rather "based on the principle that we do not think clinical patient specific decisions should be made by the legislature." (*Id.*) The Company's CFO later added that even in "the possible worst case scenario . . . if we had to put an X-ray in the shop . . . it doesn't impact the unit economics that we've always talked about." (*Id.* at 13.) Thus, there was no duty to disclose the proposed regulations under Item 303. "The securities laws do not require clairvoyance in the preparation of offering documents." *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x. 617 (2d Cir. 2009); *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 39 (2d Cir. 2017) (rejecting Item 303 claim based on alleged omission of regulatory changes where company's "registration statement included ample warning that its business could be affected by evolving regulatory regimes"); *Iron Worker Local Union No. 405 Annuity Fund*, 2018 WL 10152459, at *12 (no duty to disclose effect of regulatory change absent factual allegations showing defendants "could or should have predicted" the impact); *see also Bondali*, 620 F. App'x at 491 (no duty to disclose where "plaintiffs have not alleged facts suggesting the issues . . . were so severe that they would have resulted in financial loss").

Plaintiffs' reliance on Item 105, which requires "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky," 17 C.F.R. § 229.105, is equally misplaced. To the extent the California regulations or investigation posed any risk, the Offering Documents specifically warned that "various dental boards across the country" were "advocate[ing] for new rules and regulations" and "it is possible that the rules and regulations governing the practice of dentistry and orthodontics in one or more states may change or be interpreted in a manner unfavorable to our business." (Ex. B, Prospectus, at 38; *see also id.* at 26, 124.) Nothing more was required. *See J & R Mktg.*, 549 F.3d at 394 (it "is surely not the law" that if a company says "anything" about a topic, it "must disclose all 'material, non-public, adverse information' about that general topic" (citation omitted)).

### 3. SmileDirectClub's Customer Satisfaction Ratings Were Not False or Misleading

Third, Plaintiffs claim that the Offering Documents misrepresented "customer satisfaction with SmileDirectClub's products and services." (Compl. ¶ 29; *see generally id.* ¶¶ 75-89.) Specifically, Plaintiffs challenge the following paragraph in Offering Documents:

> Our primary focus is on delivering an exceptional customer ("member") experience. Our average net promoter score[12] of 57 since inception, compared to an average net promoter score of 1 for the entire dental industry (according to West Monroe Partners), and our average rating of 4.9 out of 5 from over 100,000 member reviews on our website, demonstrate that our members are highly satisfied. As a testament to our confidence in the quality and efficacy of our product, we offer a Smile Guarantee, which provides members a refund or additional treatment, at no extra cost, if they are not entirely satisfied.

(Ex. B, Prospectus, at 2; Compl. ¶ 76.) Once again, Plaintiffs do not claim that this disclosure was false (e.g., that the Company actually had a different average net promoter score).

---

[12] As the Offering Documents explain, "Net Promoter Score is a metric used for measuring customer satisfaction and loyalty." (*See* Ex. B, Prospectus, at iii (describing methodology).)

27

Instead, Plaintiffs argue these statements were misleading because SmileDirectClub allegedly "achieved these supposed high customer satisfaction ratings through the assistance of aggressive lawyers, litigation, and the deployment of Non-Disclosure Agreements (NDAs)." (Compl. ¶ 78.) Plaintiffs do not allege a single lawsuit by SmileDirectClub against any customer or otherwise explain how SmileDirectClub has supposedly used "aggressive lawyers" and "litigation" to increase its customer satisfaction ratings. To the extent Plaintiffs are referring to the Company's ongoing legal battles with organized dentistry, the Offering Documents disclosed those litigations in detail and made clear that the Company "will continue to pursue litigation where appropriate to combat anticompetitive or otherwise illegal behavior targeting our business model." (Ex. B, Prospectus, at 38.) The Company's customer satisfaction ratings also are not misleading because some customers agree to confidentiality provisions as part of a general release when refunds are issued outside of the Company's refund policy. Plaintiffs again point only to Item 303 as requiring disclosure (Compl. ¶ 89), but again fail to allege any facts showing SmileDirectClub reasonably expected the use of confidentiality agreements to have any impact on net sales, revenues or income from continuing operations. In any event, "absent an express prior disclosure, a corporation has no affirmative duty to speculate or disclose 'uncharged, unadjudicated wrongdoings or mismanagement.'" *In re UBS AG Sec. Litig.*, No. 07 Civ. 11225(RJS), 2012 WL 4471265, at \*31 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014).[13]

---

[13] Additionally, to the extent Plaintiffs challenge the Company's statements that it is focused on delivering an exceptional customer experience and is confident in the quality and efficacy of its product, those statements are plainly inactionable puffery. *See In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004) (dismissing securities fraud claims premised on statements that Ford makes "quality a top priority" and wants its "customers to feel safe and secure in their vehicles at all times" because such statements are "mere corporate puffery," which is inactionable as a matter of law, notwithstanding subsequent product recall).

### 4. There Was No Duty to Disclose SmileDirectClub's Q3 2019 Financial Results Before the IPO

Finally, Plaintiffs fault the Offering Documents for not disclosing "the magnitude of the Company's operating losses for the quarter in which it went public." (Compl. ¶ 29; *see generally id.* ¶¶ 90-101.) But courts have consistently rejected the contention that a company must disclose interim financial results in connection with an IPO, particularly where, as here, the "registration statement contained ample warnings and disclosures that explained shareholder revenue and earning fluctuations," including that the company "anticipated its substantial operating losses to continue." *Vivint Solar*, 861 F.3d at 39; *see also DeMaria v. Andersen*, 318 F.3d 170, 181 (2d Cir. 2003) (no duty to include interim financial results where offering materials disclosed history of losses and warned such losses were expected to continue).

The Offering Documents specifically warned investors that the Company has "incurred net operating losses since inception" and might "not achieve profitability . . . in the future." (Ex. B, Prospectus, at 25-26.) They also disclosed a trend of increasing sales and marketing expenses and cautioned that the Company "expect[s] to continue to invest heavily in sales and marketing[.]" (*Id.* at 84, 88-89.) And most importantly here, the Offering Documents expressly disclosed that the Company "expect[ed] to incur a material one-time compensation expense, in the quarter of this offering in connection with the payment of cash bonus amounts and issuance of shares of Class A common stock[.]" (*Id.* at 88.)

That is precisely what happened. As SmileDirectClub's CFO explained on the Q3 2019 earnings call, "costs related to our IPO increased our Q3 net loss by approximately $330 million." (Ex. D, Q3 2019 Transcript, at 8.) He reminded investors that the Company disclosed this before the IPO: "As we mentioned [in] our [Offering Documents], we expected to have a one-time charge in third quarter as a result of compensation expense related to the IPO." (*Id.*)

29

Thus, Plaintiffs' assertion that "the Company revealed a **shocking** $388 million net loss" (Compl. ¶ 96 (emphasis added)) and suggestion that this reflected some fundamental (and undisclosed) flaw in SmileDirectClub's business model is completely belied by the Company's actual disclosures. *See Bricklayers & Masons Local Union No. 5 Ohio Pension Fund v. Transocean Ltd.*, 866 F. Supp. 2d 223, 238 (S.D.N.Y. 2012) ("If a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, controls, and the court need not accept the allegations in the complaint as true [on a motion to dismiss].")

At bottom, the Q3 2019 results were consistent with the trends and risks disclosed in the Offering Documents and the Company had no duty to disclose anything further at the time of the IPO. *See DeMaria*, 318 F.3d at 181-82 ("cautionary statements and the specific, prominent disclosures . . . [of prior losses] do not paint an unrealistically optimistic picture . . . but instead 'bespeak caution' . . . . [and] would not have misled a reasonable investor"); *In re N2K Sec. Litig.*, 82 F. Supp. 2d 204, 209 (S.D.N.Y. 2000) (omission in April 15 IPO materials of increased losses for quarter ended March 31 not actionable where company warned it "intends to increase substantially its operating expenses . . . to fund increased sales and marketing" and "expects to continue to incur significant losses on a quarterly and annual basis for the foreseeable future").[14]

## B. The Complaint Establishes the Affirmative Defense of Negative Causation

Lastly, separate from Plaintiffs' failure to allege any misstatement or actionable omission, their claims independently fail for lack of causation. The securities laws do not "provide investors with broad insurance against market losses"; rather, they "protect [investors]

---

[14] Additionally, to the extent Plaintiffs' putative class definition includes after-market purchasers, such putative class members would lack standing to assert a claim under Section 12(a)(2) against the Defendants. *See, e.g., N.J. Carpenters Health Fund v. DLJ Mortg. Capital, Inc.*, No. 08 Civ 5653(PAC), 2010 WL 1473288, at *4 (S.D.N.Y. Mar. 29, 2010) ("The Complaint alleges only that Plaintiff purchased Certificates 'pursuant and traceable to' the Offering Documents. . . . This, however, is insufficient to assert standing for Section 12 claims." (citation omitted)).

30

against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). Accordingly, the Securities Act expressly provides an affirmative defense for negative causation, which bars recovery for losses that are not attributable to the alleged misrepresentation or omission in the registration statement. *See* 15 U.S.C. § 77k(e). Even at the pleading stage, dismissal is warranted "[i]f it is apparent on the face of the complaint [that] the decline in share value is not related to any material misstatement and/or omission." *Azzolini*, 2005 WL 3448053, at *5; *see also In re State St. Bank & Tr. Co. Fixed Income Funds Inv. Litig.*, 774 F. Supp. 2d 584, 588, 595 (S.D.N.Y. 2011) (same).

Here, Plaintiffs allege the Company's stock price fell 27.5 percent on its first day of trading, but do not claim this had anything to do with any purported misstatement or omission in the Offering Documents. (Compl. ¶ 103.) They then walk through various post-IPO events, such as the new California regulations and the *Ciccio* lawsuit, and the accompanying stock drops. (*Id.* ¶¶ 104-11.) None of these events revealed any misstatement or undisclosed risk in the Offering Documents. Thus, Plaintiffs' claims should be dismissed for negative causation.[15]

## CONCLUSION

For these reasons, this Action should be stayed pending resolution of the Federal Action, or, alternatively, dismissed with prejudice in its entirety for failure to state a claim.

---

[15] Because Plaintiffs fail to allege a primary violation under Section 11 or 12, their claims for control person liability necessarily fail as well. *See IBEW Local No. 58 Annuity Fund v. EveryWare Global, Inc.,* 849 F.3d 325, 328 (6th Cir. 2017) ("Without a substantive claim of violation of the Securities Act upon which relief can be granted, there can be no claim of secondary liability under § 15 of the Securities Act . . . .")

31

Dated: Nashville, TN
February 10, 2020

_[signature: Steven A. Riley]_

Steven A. Riley (TN #6258)
Elizabeth O. Gonser (TN #26329)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, Tennessee 37203
Telephone: (615) 320-3700
Facsimile: (615) 320-3737
sriley@rwjplc.com
egonser@rwjplc.com

*Counsel for All Defendants*

Sharon L. Nelles (*pro hac vice*)
Andrew J. Finn (*pro hac vice*)
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, New York 10004
Telephone: (212) 558-400
Facsimile: (917) 558-3588

*Counsel for Defendants J.P. Morgan
Securities LLC, Citigroup Global Markets
Inc., BofA Securities, Inc., Jefferies LLC, UBS
Securities LLC, Credit Suisse Securities (USA)
LLC, Guggenheim Securities, LLC, Stifel,
Nicolaus & Company, Incorporated, William
Blair & Company, L.L.C. and Loop Capital
Markets LLC*

Respectfully submitted,

Jay B. Kasner (*pro hac vice*)
Scott D. Musoff (*pro hac vice*)
Michael C. Griffin (*pro hac vice*)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Telephone: (212) 735-3000
Facsimile: (917) 735-2000

*Counsel for Defendants SmileDirectClub,
Inc., David Katzman, Kyle Wailes, Steven
Katzman, Jordan Katzman, Alexander
Fenkell, Susan Greenspon Rammelt, Richard
Schnall and Camelot Venture Group*

32

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on February 10, 2019 via electronic mail and U.S. mail upon:

Jerry E. Martin
David Garrison
Scott P. Tift
Barrett Johnston Martin & Garrison, LLC
Phillips Plaza
414 Union Street, Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com
dgarrison@barrettjohnston.com
stift@barrettjohnston.com

Thomas L. Laughlin, IV
Max R. Schwartz
Jeffrey P. Jacobson
Jonathan M. Zimmerman
Scott+Scott Attorneys at Law LLP
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
tlaughlin@scott-scott.com
mschwartz@scott-scott.com
jjacobson@scott-scott.com
jzimmerman@scott-scott.com

Gregory Del Gaizo
Robbins LLP
5040 Shoreham Place
San Diego, CA 92122
GDelGaizo@robbinsarroyo.com

Brian J. Schall
The Schall Law Firm
1880 Century Park E, Suite 404
Los Angeles, CA 90067-1604
brian@schallfirm.com

James G. Stranch, III
Joe P. Leniski, Jr.
Benjamin A. Gastel
Branstetter, Stranch & Jennings, PLLC
223 Rosa Parks Avenue, Suite 200
Nashville, TN 37203
jims@bsjfirm.com
joeyl@bsjfirm.com
beng@bsjfirm.com

Paul K. Bramlett
Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Pomerantz LLP
600 Third Avenue, 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com

Patrick V. Dahlstrom
Pomerantz LLP
10 South La Salle Street, Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

33

Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
414 Union Street, Suite 900
Nashville, TN 37219
cwood@rgrdlaw.com

Samuel H. Rudman
Mary K. Blasy
Robbins Geller Rudman & Dowd LLP
58 South Service Road, Suite 200
Melville, NY 11747
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

Darren J. Robbins
Brain Cochran
Robbins Geller Rudman & Dowd LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
darrenr@rgrdlaw.com
bcochran@rgrdlaw.com

34