UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ADAM FRANCHI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>SMILEDIRECTCLUB, INC., et al.,<br><br>Defendants. | Civil Action No. 3:19-cv-00962<br>**(Consolidated)**<br><br>CLASS ACTION<br><br>Judge Eli J. Richardson<br>Magistrate Judge Jeffery S. Frensley<br><br>JOINT DISCOVERY DISPUTE STATEMENT CONCERNING DOCUMENTARY DISCOVERY FROM UNDERWRITER DEFENDANTS |

Pursuant to §H of the Initial Case Management Order (ECF 121) and Local Rule 37.01, Plaintiffs and the Underwriter Defendants submit this Joint Discovery Dispute Statement ("Joint Statement") outlining two disagreements regarding the production of documents from the Underwriter Defendants.[1]

## I.   PLAINTIFFS' POSITION

### A.   Background

Plaintiffs served their first set of requests for production ("RFPs") on the Underwriter Defendants on December 15, 2022, and the Underwriter Defendants served their responses and objections ("R&Os") on January 17, 2023.  The Parties have held multiple meet-and-confer calls

---

[1]   "Plaintiffs" are Lead Plaintiff 1199SEIU Health Care Employees Pension Fund and plaintiff Bucks County Employees Retirement System.  The "Underwriter Defendant(s)" are J.P. Morgan Securities LLC ("JPMorgan"), Citigroup Global Markets Inc. ("Citi"), BofA Securities, Inc. ("BofA"), UBS Securities LLC ("UBS"), Jefferies LLC ("Jefferies"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), Guggenheim Securities, LLC ("Guggenheim"), Stifel, Nicolaus & Company, Incorporated, William Blair & Company, L.L.C. ("William Blair"), and Loop Capital Markets LLC (and together with Plaintiffs, the "Parties").

- 1 -

concerning the R&Os, including on January 23, 2023, March 8, 2023, March 21, 2023, and April 28, 2023. The Parties also exchanged correspondence about these issues on at least January 31, 2023, February 13, 2023, February 24, 2023, February 27, 2023, March 3, 2023, March 14, 2023, March 18, 2023, April 11, 2023, April 12, 2023, and April 14, 2023. The Parties reached an impasse on the issues discussed below during the Parties' March 21, 2023 meet-and-confer call, and thereafter began preparing this Joint Statement. The Parties exchanged drafts of this Joint Statement on April 12, 2023, April 21, 2023, May 15, 2023, June 8, 2023, and June 12, 2023 and met and conferred between exchanges. Through these efforts, the Parties narrowed the scope of the issues in dispute. However, the Parties remain at an impasse regarding two issues and require the Court's involvement to resolve them. The Parties' positions on these issues are outlined below.

> **B.      Plaintiffs Are Entitled to Further Information Regarding the Underwriter Defendants' Demonstrated Use and Improper Preservation of Messaging Platforms and Unapproved Electronic Communication Methods**

At least certain Underwriter Defendants used messaging platforms and unapproved electronic communication methods (such as texts, personal email, internal chat, and external messaging systems like WhatsApp) to communicate about the work they did on the SmileDirectClub, Inc. ("SDC" or the "Company") initial public offering (the "IPO"). JPMorgan has produced custodial emails that contain numerous references to such communications. *See, e.g.*, Ex. 1 (JPMorgan associate telling colleagues "please whatsapp or iMessage me if you need me to pay attention to anything in real time"); Ex. 2 at -573 (Philip Harrison, Director of Finance at SDC, emailing JPMorgan personnel to say "just texted you. Let me know if you can chat live at some point today."); Ex. 3 at -529 (email chain with JPMorgan personnel discussing different valuation options for the IPO, concluding with: "I texted w Chris – let's do 6-8x 2020"); Ex. 4 at -359-60 (Neil Dalal of JPMorgan, emailing other JPMorgan personnel that "Kyle just texted me – pls send" on an email

- 2 -

chain including SDC's CFO, defendant Kyle Wailes); Ex. 5 at -830 (Paul Mule of JPMorgan emailing other JPMorgan personnel, stating: "Anything material? I just texted him and he told me he spoke to you as well.").[2]

Documents from the other Underwriter Defendants contain similar references to off-channel substantive communications. Ex. 6 at -525 (Guggenheim personnel stating "I'm going to be driving tomorrow morning so text is no good."); Ex. 7 at -403 (Stifel personnel stating: "Kyle sent text and said will be what he originally said" in email chain discussing distribution of shares among underwriting syndicate); Ex. 8 at -892 (Citi personnel stating: "I have called and texted 3x."); Ex. 9 at -363 (Citi personnel stating: "I let Hite know that it was a productive discussion via text on Friday . . . ."); Ex. 10 at -485 (Citi personnel stating: "I will text on the side to see if this is convenience to us or something else" in reply to colleague's email stating: "Kyle pushing to just do by phone."); Ex. 11 at -874 (Citi personnel asking colleague: "Can you ping Kevin via text or something?" with response of: "Tried that . . . ."); Ex. 12 at -855 (Citi personnel asking colleagues: "Did we hear back from Kyle on the unanswered text from Saturday?" in email thread discussing "IPO structuring for Kyle.").[3]

These forms of communications violated at least certain Underwriter Defendants' internal policies, and these Underwriter Defendants very likely failed to preserve such communications despite their relevance. Indeed, in publicly filed settlement agreements with the U.S. Securities and Exchange Commission ("SEC"), six Underwriter Defendants – JPMorgan, Citi, BofA, UBS,

---

[2]   All exhibits referenced herein are attached hereto unless otherwise noted.

[3] Despite the obvious substantive nature of these unproduced texts, which concern everything from SDC's valuation to the distribution of shares from the IPO, the Underwriter Defendants ask Plaintiffs to forgo direct representations from the custodians and to instead accept counsel's secondhand and demonstrably false assurances that all texts the Underwriter Defendants made related to the IPO concerned purely "ministerial matters." *Infra* at 23.

4883-5567-9325.v2

Jefferies, and Credit Suisse ("SEC Underwriter Defendant(s)") – ***admitted*** they regularly used personal forms of communication for business purposes in violation of their internal policies and then failed to preserve those communications as required by the Securities Exchange Act of 1934 ("Exchange Act"). *See* Exs. 13-18. The SEC Underwriter Defendants' violations occurred during the same time period as the SDC IPO, which concluded on September 12, 2019. *Id.*

For example, in its settlement with the SEC, JPMorgan admitted: "From at least January 2018 through at least November 2020, JPMorgan employees often communicated about securities business matters on their personal devices, using text messaging applications (including WhatsApp) and personal email accounts," and "[n]one of these records was preserved by the firm." Ex. 13 at 2. JPMorgan further admitted personnel engaged in this conduct even though it "maintained certain policies and procedures designed to ensure the retention of business-related records," and "JPMorgan employees were advised that the use of unapproved electronic communications methods, including on their personal devices, was not permitted." *Id.* at 4.[4]

---

[4] Substantially similar language appears in the agreements between the SEC and the other five SEC Underwriter Defendants who settled. *See* Ex. 14 at 2, 5 ("[f]rom January 2018 through September 2021, tens of thousands of messages were sent and received that concerned the Respondents' securities business"; and BofA "did not maintain or preserve the substantial majority of these written communications," which represented a "longstanding failure of Respondents' employees throughout the firms, including at senior levels, to adhere to certain of these essential requirements and the firm's own policies"); Ex. 15 at 2, 4 ("[f]rom at least January 2018 through September 2021, tens of thousands of messages were sent and received that concerned the broker-dealer's business"; and Citi "did not maintain or preserve the substantial majority of these written communications," which represented a "widespread failure to implement its policies and procedures that prohibit such communications"); Ex. 16 at 2, 4 (same); Ex. 17 at 2, 4 ("[f]rom January 2018 through September 2021, tens of thousands of messages were sent and received that concerned the broker-dealer's business"; and Credit Suisse "did not maintain or preserve the substantial majority of these written communications," which represented a "widespread failure to implement its policies and procedures that prohibit such communications"); Ex. 18 at 2, 4 (same).

- 4 -

JPMorgan also acknowledged its failure to comply with the Exchange Act was pervasive as it spanned "firm-wide and involved employees at all levels of authority." *See* Ex. 13 at 2.[5]

As part of their settlements, the SEC publicly censured the SEC Underwriter Defendants and ordered them to cease and desist from ongoing record-keeping and preservation violations. All told, the SEC Underwriter Defendants paid a total of $650 million in fines to settle their disputes with the SEC.[6]

The Underwriter Defendants' messaging platforms and unapproved electronic communications, as well as the potential spoliation of such evidence, are relevant to the claims and defenses in this case. Such forms of communication are "well within the normal scope of discovery." *Schnatter v. 247 Grp., LLC*, 2022 WL 2402658, at *9 (W.D. Ky. Mar. 14, 2022) (collecting cases); *see also Benefield v. MStreet Ent., LLC*, 2016 WL 374568, at *6 (M.D. Tenn. Feb. 1, 2016). Further, "parties may investigate the adequacy of one another's preservation efforts through discovery," and "[s]uch investigation is especially relevant where the adequacy of a party's preservation efforts is in question." *Shufeldt v. Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C.*, 2020 WL 1532323, at *10 (M.D. Tenn. Mar. 31, 2020).

Accordingly, Plaintiffs asked the Underwriter Defendants to disclose:

(1) whether any Underwriter Defendant indicates it used another form of communication (text, personal email, external chat, internal messaging) and what type(s) it used; (2) whether you otherwise determine that such forms of communications were used by any Underwriter Defendant and what type(s) they used; (3) whether such forms of communication were preserved; and (4) whether you intend to search these sources for relevant documents as part of this litigation.

---

[5] The same was true of the other SEC Underwriter Defendants who settled with the SEC. *See* Ex. 14 at 2 (concluding the "failures were firm-wide, and involved employees at all levels of authority"); Ex. 15 at 2 (same); Ex. 16 at 2 (same); Ex. 17 at 2 (same); Ex. 18 at 2 (same).

[6] *See* Ex. 14 at 10 (noting "[r]espondents are censured" and ordering payment of $125 million in fines); Ex. 13 at 11 (same); Ex. 15 at 10 (same); Ex. 16 at 10 (same); Ex. 17 at 10 (same); Ex. 18 at 10 (noting "[r]espondents are censured" and ordering payment of $50 million in fines).

- 5 -

Ex. 19 at 3. The Underwriter Defendants have refused to answer these foundational questions. Instead, the Underwriter Defendants suggest Plaintiffs should forgo any direct representations from the Underwriter Defendants, and instead search their productions for alternative forms of communications in order to learn which forms they used. This opaque and backward approach is inadequate for many reasons, including because it does not provide any information about the alternative forms of communication they used and then likely destroyed in violation of the Exchange Act – information to which Plaintiffs are entitled. *Shufeldt*, 2020 WL 1532323, at *10.[7]

Accordingly, Plaintiffs respectfully request an order from the Court instructing each of the 14 current Underwriter Defendant custodians – and any future Underwriter Defendant custodians – to produce a sworn declaration that:

(a)     lists with specificity the types, if any, of messaging platforms and unapproved electronic communication methods the individual used for business purposes at the time of his or her work on the SDC IPO (*e.g.*, WhatsApp, text, personal email, internal messaging applications, etc.);

(b)     indicates, for each type of other communication used, whether the communications were: (i) entirely destroyed or otherwise unrecoverable; (ii) partially destroyed or unrecoverable (providing as much information about the quantity destroyed as possible); or (iii) fully recoverable; and

---

[7]    Underwriter Defendants' offer below to notify Plaintiffs only "[t]o the extent that any relevant and responsive communications are identified that were not retained" (*infra* at 20-21) likewise misses the mark. This approach would allow each custodian to withhold information from Plaintiffs about potentially relevant deleted communications so long as he or she **independently decides** the deleted messages: (1) might not have existed; (2) might not have been about the SDC IPO; (3) might not have been relevant; **or** (4) might not have been responsive to Plaintiffs' discovery requests. Pointed answers on these issues are necessary to ensure good faith representations.

- 6 -

(c)   attests that all forms of recoverable communication have been turned over to counsel for collection, review, and production.

In addition, Plaintiffs respectfully request an order compelling production from each Underwriter Defendant of: (i) all policies and procedures governing its use of messaging platforms and electronic communication methods; (ii) all policies and procedures governing the preservation of such communications in effect from January 1, 2019 to October 31, 2019; and (iii) all documents concerning violations of such policies during that same time frame.[8]

## C.   Plaintiffs Are Entitled to Probe the Scope of Potential Spoliation

The SEC Underwriter Defendants admitted that they used unapproved methods of communications during the same time period as the SDC IPO, in violation of their own internal policies, and failed to preserve a substantial majority of those communications, in "widespread failure[s]" that amounted to violations of the Exchange Act. *See* §I.B., *supra* (citing Exs. 13-18). Plaintiffs have identified documents demonstrating that several of the Underwriter Defendants used the same unapproved electronic communication methods in connection with the SDC IPO. *See* §I.B., *supra* (citing Exs. 1-12).

---

[8]   In the RFPs, Plaintiffs specifically requested "document retention policies," documents concerning "violations of, or deviations from such policies," and "all documents concerning the destruction of such documents." Ex. 20 at RFP Nos. 2, 40. The SEC requested the same information from each SEC Underwriter Defendant as part of their settlements. The SEC asked each bank to retain a compliance consultant that would, among other things:

> For two years following the entry of th[e] Order, [the bank] shall notify the Commission staff . . . of any discipline imposed by [the bank], including, but not limited to, written warnings, loss of any pay, bonus, or incentive compensation, or the termination of employment, with respect to any employee found to have violated [its] policies and procedures concerning the preservation of electronic communications, including those found on Personal Devices . . . .

Ex. 13 at 10; Ex. 17 at 9 (same); Ex. 18 at 9 (same); Ex. 16 at 9 (same); Ex. 14 at 9 (same); Ex. 15 at 9 (same).

Accordingly, Plaintiffs seek discovery probative of whether the same entities destroyed or failed to preserve communications relevant to this case, including a limited number of declarations, preservation policies, and documents concerning violations of those policies. At this time, Plaintiffs do not seek sanctions, but they are entitled to probe the issue. *See EPAC Techs., Inc. v. HarperCollins Christian Publ'g, Inc.*, 2018 WL 3342931, at \*2 (M.D. Tenn. Mar. 29, 2018 (collecting cases).

Indeed, "consideration of Federal Rule of Civil Procedure 37(e) is necessary to resolving Plaintiffs' motion to compel. Rule 37(e) addresses the failure to preserve electronically stored information and 'authorizes and specifies measures a court may employ if information that should have been preserved is lost, and specifies the findings necessary to justify these measures.'" *St. Clair Cnty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, 2022 WL 4095387, at\*5 (M.D. Tenn. Sept. 7, 2022) (granting a motion to compel as to, *inter alia*, a request for production nearly identical to RFP No. 2).

> [While] [n]o sanction under Rule 37(e) is requested by Plaintiffs . . . [w]hat is relevant to Plaintiffs' motion is the finding Rule 37(e) requires a court to make before determining if any curative measures are necessary: that "electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it and it cannot be restored or replaced through additional discovery."

*Id.*

The SEC Underwriter Defendants' admissions, and discovery to date, indicate that spoliation likely occurred and that Rule 37(e)'s curative measures may prove appropriate here. But Plaintiffs and the Court are left unable to resolve that preliminary question due to the Underwriter Defendants' refusals to provide the necessary information.

The Underwriter Defendants launch into a long analysis below about whether Plaintiffs have demonstrated that spoliation sanctions are appropriate now. *See infra* at 22-28 (citing *Halabu*

4883-5567-9325.v2

*Holdings, LLC v. Old Nat'l Bancorp*, 2020 WL 12676263, at *1 (E.D. Mich. June 9, 2020), and

*Brown v. Duke Energy Corp.*, 2019 WL 1439402, at *5-*6 (S.D. Ohio Mar. 31, 2019)). The

Underwriter Defendants' spoliation arguments are premature, and remain so until they share the

necessary information to assess whether spoliation occurred here. The Underwriter Defendants

complain that Plaintiffs have not demonstrated "any basis to lodge allegations of spoliation of

relevant information" *Infra* at 22. Plaintiffs, of course, disagree with this assessment – Plaintiffs

have demonstrated that certain Underwriter Defendants violated internal policies, used unapproved

electronic communication methods, and have a history of failing to preserve these materials.

Regardless, Plaintiffs cannot ignore the incongruity in the Underwriter Defendants' positions that:

(1) Plaintiffs do not have enough evidence to demonstrate spoliation; and (2) the Underwriter

Defendants should not have to provide evidence probative of whether that spoliation occurred.[9]

---

[9] The Underwriter Defendants complain that the proposed declarations constitute "unprecedented" "discovery about discovery." *Infra* at 15. But there is nothing "unprecedented" about the transparency Plaintiffs seek. Courts routinely order parties to provide information about sources of relevant discovery. *See Ruiz-Bueno v. Scott*, 2013 WL 6055402, at *4 (S.D. Ohio Nov. 15, 2013) (rejecting Defendants' argument and explaining "discovery about discovery" is permissible, especially when "a statement made under oath would seem to have a greater potential to move the case along rather than a mere representation by counsel"); *McMaster v. Kohl's Dep't Stores, Inc.*, 2020 WL 755379, at *2 (E.D. Mich. Feb. 15, 2020) ("Here, however, it is appropriate to require the Defendant to produce a declaration under oath, signed by the person or persons conducting the search for requested material, and stating in detail what was done to locate the documents.") (citing *Catrinar v. Wynnstone Communities Corp*., 2016 WL 1084687, *2-*3 (E.D. Mich. Mar. 21, 2016)); *Catrinar v. Wynnestone Communities Corp*., 2016 WL 1084687, at *3 (E.D. Mich. Mar. 21, 2016) ("as to any documents that Defendants claim they do not have, the person or persons who searched for those documents must provide to Plaintiff a written declaration, under oath, detailing the steps taken to locate responsive documents and the results of the search"); *Crocs, Inc. v. Effervescent, Inc.*, 2017 WL 1325344, at *8 (D. Colo. Jan. 3, 2017), *objections overruled*, 2017 WL 1325171 (D. Colo. Feb. 24, 2017) ("In general, such discovery will be allowed if a party's efforts to comply with proper discovery requests are reasonably drawn into question."). Plaintiffs only request sworn declarations here because the Underwriter Defendants repeatedly refused to provide the information on a less formal basis.

- 9 -

**D.** **The Requested Documents Are Within the Underwriter Defendants' Possession, Custody or Control**

The Underwriter Defendants argue that they are not required to search for or produce the requested documents because they do not have "unfettered possession, custody or control over their current and former employees to obtain broad information about their communication practices." *Infra* at 26. This argument misstates both the law and the facts.

The law does not require that parties have "unfettered possession" of targeted people or documents to compel discovery. Rather, "'[c]ontrol is defined as the legal right or ability to obtain the documents from another source upon demand . . . . Neither physical possession nor legal ownership of the documents is required.'" *St. Clair*, 2022 WL 4095387, at * 9 (granting motion to compel, finding documents held by a third-party corporation on another continent were in defendants' "possession, custody or control") (quoting *Libertarian Party of Ohio v. Husted*, 2014 WL 3928293, at *1 (S.D. Ohio Aug. 12, 2014)); *see also Union Com. Servs. Ltd. v. FCA Int'l Operations LLC*, 2018 WL 558760, at *2 (E.D. Mich. Jan. 25, 2018) ("discovery material is within a party's control when the party has the 'practical ability to obtain the documents, particularly when the opposing party does not have the same practical ability to do so'"); *Robinson v. Coey*, 2016 WL 3350471, at *2 (S.D. Ohio June 16, 2016) ("courts have frequently held that the Defendants . . . have the practical ability to obtain such documents and therefore must do so in response to a Rule 34 request").

The Underwriter Defendants have "the 'practical ability to obtain the documents'" from their current and former employees, as evidenced by the fact that they have already agreed to obtain other documents from those same employees. *Union Com. Servs.*, 2018 WL 558760, at *2.

- 10 -

**E. The Underwriter Defendants that Also Served as Analysts Should Be Required to Produce Documents Underlying Their Reports**

In addition to underwriting the SDC IPO, seven Underwriter Defendants – JPMorgan, BofA, UBS, Credit Suisse, Guggenheim, Jefferies, and William Blair (the "Analyst Underwriter Defendants") – also subsequently followed SDC as financial analysts and submitted reports to the investing public commenting on the Company's financials, explaining the basis for past stock price movements and predicting future financial performance. Plaintiffs seek discovery from the investment professionals who prepared such reports on behalf of the Analyst Underwriter Defendants, including the research materials, models, and communications underlying the reports. The Analyst Underwriter Defendants have refused to provide anything other than the reports themselves, which are already publicly available.

Case law is somewhat sparse on this issue, but in the few instances where a dispute over materials underlying analyst reports has resulted in a written opinion, the court has acknowledged their relevance. *See, e.g.*, *SEC v. AT&T, Inc.*, 2022 WL 4110466, at *22 (S.D.N.Y. Sept. 8, 2022) (finding "analyst notes have potentially formidable probative value"); *In re Seagate Tech. II Sec. Litig.*, 1993 WL 293008, at *1 (N.D. Cal. June 10, 1993) (denying protective order and acknowledging relevance of "documents relating to the valuation of Seagate's securities and copies or drafts of research and analyst reports").[10] The same rationale applies here, where such documents will help Plaintiffs and their experts establish the materiality of information disseminated to the investing public and provide insight into what caused SDC's stock price to drop, resulting in losses

---

[10] Defendants offer no authority suggesting such information is not discoverable, and Plaintiffs find none.

4883-5567-9325.v2

to the class.[11]  Notably, Plaintiffs have subpoenaed non-party analysts for the same types of internal documents, and several of those parties have already produced or agreed to produce these materials. Plaintiffs seek only the same level of cooperation from analysts who also happen to be defendants in this action.

**F.     Plaintiffs Are Coordinating Discovery with the Narrower State Court Case, but They Are Not Required to Accept Incomplete Discovery as a Consequence**

Contrary to the Underwriter Defendants' assertions below, Plaintiffs are attempting to coordinate discovery with the State Court Action, as all Defendants acknowledged during the May 8, 2023 Case Management Conference.  The parties in both cases have discussed sharing document productions and coordinating depositions in order to minimize the burden on Defendants.[12]

Plaintiffs' search terms and custodians are broader in this case, but that is largely because Plaintiffs' claims are broader in this case.  Namely, Plaintiffs assert claims under §§10(b) and 20(a) of the Exchange Act against the SDC Defendants that are not asserted in the State Court Action, and must therefore explore the issues of scienter, reliance, and loss causation.  Plaintiffs also assert claims under §12(a)(2) of the Securities Act of 1933, and Plaintiffs' claims are broader than those in the State Court Action as to the misstatements alleged under §11.  The State Court Action plaintiffs allege Defendants violated §11 by failing to disclose SDC's increasing costs, specifically its marketing and administrative expenses.  Plaintiffs here bring claims arising from Defendants' failure to disclose trends regarding revenue, gross profits, and adjusted EBITDA – thus implicating the

---

[11]   These issues relate to Plaintiffs' §10(b) claims against the SDC Defendants that span the entire Class Period.  Relevant documents are not, as the Underwriter Defendants suggest, limited to the time period of the IPO.  *Supra* at 29.

[12]   The "SDC Defendants" are SDC, David Katzman, Jordan Katzman, Steven Katzman, Alexander Fenkell, Richard Schnall, Susan Greenspon Rammelt and Camelot Venture Group (together with the Underwriter Defendants, "Defendants").

- 12 -

entirety of SDC's business operations, including cash in-flows like revenues, and not merely the increase in SDC's cash out-flows or costs.

Importantly, Plaintiffs have not asked the Underwriter Defendants to re-review any documents that they properly produced or collected in the State Court Action. Rather, Plaintiffs request only that the Underwriter Defendants review the documents not captured by the State Court Action's terms. Defendants are therefore incorrect when they claim Plaintiffs have asked them to "start from scratch" on discovery.

Regardless, Plaintiffs are not required to accept the discovery in the State Court Action, which they did not negotiate. That is particularly true in this case, where Plaintiffs have assessed the production from the Underwriter Defendants in the State Court Action and found it insufficient to meet the needs of this broader case. For example, nine of the ten Underwriter Defendants failed to produce a single custodial email. Six Underwriter Defendants produced fewer than 200 documents total, and one – William Blair – produced just two. Moreover, as discussed above, the productions do not include any communications from messaging platforms despite evidence of widespread use among the Underwriter Defendants.[13] Coordination does not obligate Plaintiffs to forgo relevant discovery. [14]

---

[13] The Underwriter Defendants insist below that the "productions in the State Court Action included messages from JPM's internal chat system," but that is misleading. *See infra* n.15. That production included two copies of a single one-page internal messaging chat. The Underwriter Defendants have since produced just two more chats, but still have not produced any materials from the other known methods of substantive communication, such as text messages.

[14]  Given the paltry productions from these Underwriter Defendants, and the fact that Plaintiffs seek only fulsome responses to their initial request for production, the Underwriter Defendants' citation to *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, which focused on a plaintiff's burden to show relevance only "in the context of a request for additional discovery" after "defendants' already voluminous productions," is misplaced. 2023 WL 2871090, at *8 (S.D.N.Y. Apr. 10, 2023).

- 13 -

## II. UNDERWRITER DEFENDANTS' POSITION

Plaintiffs' requests for information from the Underwriter Defendants about document retention and sell-side analysts have nothing to do with the merits of this case, and instead constitute a transparent fishing expedition aimed at imposing unreasonable costs and burdens on the Underwriter Defendants and their current and former employees. The Underwriter Defendants have a limited role in this case. They are named as defendants only in a subset of Plaintiffs' claims— under the Securities Act of 1933—which arise exclusively from their role as underwriters for SmileDirectClub, Inc.'s ("SDC") September 2019 initial public offering ("IPO"). Like most underwriters, the Underwriter Defendants here played a limited role in the IPO process—they agreed to purchase shares of SDC's stock and facilitate initial public trading pursuant to an underwriting agreement with SDC. They also conducted a due diligence review to determine whether there were reasonable grounds to believe that the statements in SDC's offering documents filed with the Securities and Exchange Commission ("SEC") were accurate.

The Underwriter Defendants have conducted extensive searches for documents relevant to this case, first in response to requests in the parallel and overlapping certified class action pending in the Tennessee Chancery Court, and then in an even broader search in response to the duplicative requests made by Plaintiffs here that tripled the number of custodians searched (from 4 to 14). As a result, the Underwriter Defendants have produced tens of thousands of communications and other records, all of which demonstrate that the Underwriter Defendants conducted reasonable diligence in their role as underwriters and did not uncover anything false or misleading about SDC's IPO offering documents. And none of those documents suggest the existence of *any* relevant information that has not been retained and searched. This is no surprise—mere weeks after the IPO, Plaintiffs' counsel and others reflexively filed various lawsuits after SDC's stock price declined, and the Underwriter Defendants promptly took appropriate steps to ensure that potentially relevant

- 14 -

information was preserved.  In short, this case has proceeded on a typical path for document discovery under the Federal Rules of Civil Procedure.  The next step should be depositions of fact witnesses.

Apparently uninterested in proceeding with the merits of the case, Plaintiffs instead seek unprecedented and irrelevant additional discovery from the Underwriter Defendants on two issues:

***Discovery about Discovery***:  First, Plaintiffs ask this Court to turn the normal discovery process on its head and do something wholly unprecedented: order that the Underwriter Defendants procure from current *and* former employees who are document custodians in this action (whose documents were already searched and are being produced) sworn declarations about their communication practices, which would include:

- a list of all messaging platforms and "unapproved communication methods" used by the custodian at the time of the SDC IPO (regardless of whether those methods were ever used to discuss the custodian's work on the SDC IPO);

- an indication whether the communications through those platforms are fully or partially recoverable, or destroyed; and

- an attestation that "all forms of recoverable communication" have been provided to counsel for review and production.  (*See supra* § I.B, at 7.)

Plaintiffs cite no authority for such an extraordinary request, instead relying on rank speculation that there must have been spoliation here because some of the Underwriter Defendants have entered into regulatory settlements with the SEC regarding historical record-keeping practices for certain communications on personal devices of employees.  Those publicly announced settlements say nothing about SDC's IPO and provide no justification for Plaintiffs to engage in their

- 15 -

own probe into document retention practices, where there is zero evidence that anything relevant to this case was not retained (and produced).

In fact, the 12 emails Plaintiffs cite that mention text messaging by certain individuals at four of the ten Underwriter Defendants—J.P. Morgan Securities LLC ("JPM"), Citigroup Global Markets Inc. ("Citi"), Guggenheim Securities, LLC ("Guggenheim"), and Stifel, Nicolaus & Company, Incorporated ("Stifel")—confirm that all *relevant* information about SDC's IPO is contained in emails that have been searched and produced. Of the 11 persons referenced in the emails cited by Plaintiffs, 6 are not even document custodians. And the Underwriter Defendants have already confirmed with each of the relevant custodians that are still employed by their respective banks that they did *not* engage in substantive communications relating to their work on the SDC IPO outside of their respective firms' normal channels (*i.e.*, emails or internal messaging systems that are already being searched).

Even if there was a legitimate concern about the Underwriter Defendants' document retention in this case (and there is none here), Plaintiffs fail to explain what additional relevant information their proposed declarations would provide that cannot be gleaned from the documents already gathered and produced. Further, the Underwriter Defendants cannot compel current *and* former employees to provide sweeping sworn declarations about *all* of their business communications. As to former employees, the Underwriter Defendants have no control over them. In any case, Plaintiffs have already indicated that they intend to take multiple depositions of witnesses from the Underwriter Defendants, where they can ask questions about their retention of relevant documents if they wish. There is no reasonable basis for any further discovery about discovery.

- 16 -

***Sell-Side Analyst Documents***:  Plaintiffs' additional request for broad discovery from sell-side equity analysts employed by seven of the Underwriter Defendants is likewise vexatious. Plaintiffs have not come anywhere close to meeting their "initial burden of proving the relevance of the information sought," *St. Clair*, 2022 WL 4095387, at *3, let alone whether they are proportional to the needs of the case in light of the significant burden they would impose on the Underwriter Defendants and the Underwriter Defendants' limited role in this case.  Equity analysts were not part of any underwriter's IPO deal team, and to the extent that their published reports on SDC issued after the IPO are relevant (which Plaintiffs have not shown), the Underwriter Defendants already agreed to produce—and have produced—those reports.

For these reasons, Plaintiffs' requests for additional discovery from the Underwriter Defendants must be denied.

## A.      The Underwriter Defendants' Limited Role in SDC's IPO and Plaintiffs' Claims

Plaintiffs' claims against the Underwriter Defendants are limited to purported violations of Sections 11 and 12(a)(2) of the Securities Act of 1933, and are based exclusively on specific alleged misrepresentations in the offering documents for SDC's September 2019 IPO.  (*See* Sept. 30, 2022 Mem. Opinion on Motion to Dismiss (Dkt. No. 106).)  Judge Richardson permitted Plaintiffs to proceed to discovery on only three limited theories about statements made in the offering documents: (i) alleged statements about some "positive trend in SDC's revenue, gross profits, and Adjusted EBITDA while omitting the fact that these metrics were actually declining at the time of the IPO" (*id.* at 20); (ii) alleged misrepresentations about "SDC's standard of care" (*id.* at 30); and (iii) alleged misrepresentations about "the regulatory and legislative risks faced by SDC" (*id.* at 31). Those claims focus exclusively on statements made by SDC, not the Underwriter Defendants, and the Underwriter Defendants are only parties to some but not all claims asserted in this case by virtue

of a statutory provision that renders them jointly and severally liable in certain limited circumstances. *See* 15 U.S.C. §§ 77k(a)(5), (f)(1) & 77*l*(a)(2).

In IPO securities cases such as this one, documents produced by underwriting banks are primarily relevant to the underwriters' so-called "due diligence" defense and not the plaintiffs' affirmative case. Under Section 11(b)(3) of the Securities Act, the Underwriter Defendants cannot be held liable for purported misrepresentations or omissions in IPO offering documents if they "had, after reasonable investigation, reasonable ground to believe and did believe . . . that the statements therein were true and that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(b)(3). Typically, and as was the case here, a small deal team from the lead underwriter coordinates the investigation and other work on an IPO for a syndicate of underwriters, including by scheduling due diligence calls and interfacing with the company on behalf of the other underwriters. JPM was a lead bookrunner in SDC's IPO and coordinated the due diligence activities with the other nine underwriters. Thus, like most lead underwriters, JPM would be expected to have the lion's share of documents related to SDC's IPO.

**B.      Plaintiffs Fail to Coordinate Discovery in the Related State Court Action and Instead Proceed to Demand Entirely New and Duplicative Document Searches**

As the Court is aware, this case followed another suit with substantively identical claims brought by plaintiffs in the Chancery Court for Davidson County, Tennessee, against the same Underwriter Defendants. That case has been certified as a class action captioned *In re SmileDirectClub, Inc. Securities Litigation*, Case No. 19-1169-IV ("State Court Action"). Given the substantial overlap between the two cases, Plaintiffs here agreed to coordinate discovery with the State Court Action, and that commitment is reflected in the Court's December 2, 2022 Initial Case Management Order. (Dkt. No. 121.) As part of that coordination, the Underwriter Defendants

- 18 -

produced to Plaintiffs more than 37,000 documents—comprising more than 250,000 pages—that were previously collected and produced in the State Court Action. Those productions include (i) emails and instant messages[15] collected from four key JPM custodians that were involved in the SDC IPO and (ii) each Underwriter Defendant's centrally stored deal file (or equivalent set of core files) related to its work as an underwriter of the IPO.[16]

Rather than coordinate document discovery with the State Court Action, Plaintiffs largely ignored the Underwriter Defendants' earlier productions and demanded that they start from scratch by running a different set of broad search terms for dozens of additional custodians across each of the ten banks involved in the IPO. All the while, Plaintiffs never once identified any holes in those prior productions or explained why any additional document discovery would be likely to lead to additional, non-duplicative discoverable material that is relevant to the limited claims remaining in this case. Plaintiffs' bald assertions that broader discovery is necessary because they allege certain federal securities claims that are not brought in the State Court Action do not justify the significantly broader discovery they seek against the Underwriter Defendants. The Underwriter Defendants are not parties to Plaintiffs' fraud claims under the Securities Exchange Act, and Plaintiffs have never explained what additional information they need from the Underwriter Defendants that could be relevant to the purported differences in their claims as compared with those asserted in the State Court Action.

---

[15] Plaintiffs' assertion that the productions in the State Court Action "do not include any communications from messaging platforms" (*supra* § I.F, at 13) is false. The Underwriter Defendants explained to Plaintiffs in letters and during meet-and-confer discussions that their productions in the State Court Action included messages from JPM's internal chat system.

[16] The Underwriter Defendants understand that SDC has also produced over 100,000 documents in the State Court Action, which would presumably include SDC's relevant communications with the Underwriter Defendants.

Nonetheless, as a compromise, the Underwriter Defendants offered to expand, and have expanded, their searches for documents: from the four key JPM custodians involved in SDC's IPO and the centrally-stored files already searched and produced from each of the Underwriter Defendants, to emails, instant messages, and other relevant communications of 14 individual custodians across all ten Underwriter Defendants. These custodians comprise the individuals that were primarily responsible for work on SDC's IPO. The Underwriter Defendants also largely agreed to Plaintiffs' different search terms, which will require duplicative searches of JPM custodians' documents. These additional searches involve the review of more than 25,000 additional documents at an estimated cost of at least $250,000 for lawyer review time and for data processing and hosting fees—which increases due to the fact that documents are being collected from ten different financial institutions with different systems. The Underwriter Defendants have substantially completed their productions of responsive documents from these additional searches, having now produced over 15,000 additional documents. Nothing in the Underwriter Defendants' productions suggests anything other than ordinary due diligence conducted over approved channels. And nothing in those documents suggests that the Underwriter Defendants uncovered any misstatements or omissions in SDC's offering documents.

Perhaps for this reason, Plaintiffs pivoted to pursue an irrelevant inquest into the Underwriter Defendants' document retention practices. Plaintiffs raised during a meet-and-confer call in January 2023 the fact that certain Underwriter Defendants had entered into settlements with the SEC regarding historical record-keeping practices for communications on employees' personal devices. In response, the Underwriter Defendants informed Plaintiffs that they would confirm with current employee custodians where their relevant and responsive business documents and communications were and collect them. To the extent that any relevant and responsive communications are identified

4883-5567-9325.v2

that were not retained, the Underwriter Defendants also agreed to disclose that fact. In other words, the Underwriter Defendants proposed to follow a rigorous document collection and production process to identify relevant documents and communications in response to the Plaintiffs' requests. The Underwriter Defendants have done just that, and there is no indication that other channels of communications like personal text messaging were used for substantive business relating to the SDC IPO.

### C. There Is No Indication of Any Spoliation of "Evidence" Relevant to the Claims and Defenses in this Action, and Plaintiffs' Unprecedented Request for Documents and Sworn Declarations Concerning Document Retention Is Unwarranted.

Pursuant to Rule 26(b)(1), discovery is limited to matters that are "relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." In addition, "[t]he burden of demonstrating relevance is on the party seeking discovery." *Trilegiant Corp.* v. *Sitel Corp.*, 275 F.R.D. 428, 431 (S.D.N.Y. 2011) (internal citations omitted). Discovery is also limited to information within a "party's possession, custody, or control." Fed. R. Civ. P. 34(a)(1). Plaintiffs have not come close to meeting this threshold burden with respect to their request for information concerning document preservation.

Plaintiffs primarily request sworn declarations from the 14 current or former employees of the Underwriter Defendants who are document custodians, requiring them to disclose *all* "messaging platforms and unapproved electronic communication methods the individual used for business purposes at the time of his or her work on the SDC IPO," without limiting the request to communications relating to SDC. (*Supra* § I.B, at 6.) Plaintiffs fail to articulate any additional

4883-5567-9325.v2

Case 3:19-cv-00962    Document 138    Filed 06/20/23    Page 21 of 36 PageID #: 3440

information that is relevant to *any claim or defense* that could possibly be gleaned from such a declaration. They also request document retention policies and "all documents concerning violations of" document retention policies within a ten-month period in 2019, again without any explanation of how that information is relevant to a claim or defense. (*Id.*)

Rather than identify any particular information relevant to this case that they are seeking but don't already have, Plaintiffs premise these requests on a bald assertion that "spoliation likely occurred," which in turn is based on the publicly announced SEC settlements by seven Underwriter Defendants and 12 emails out of more than *52,000* documents that the Underwriter Defendants produced. (*Supra* § I.C, at 8.) Neither provides any basis to lodge allegations of spoliation of relevant information here.

"[S]poliation" occurs only when: (1) "the party having control over the evidence had an obligation to preserve it at the time it was destroyed"; (2) "the records were destroyed with a culpable state of mind"; and (3) "the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Bunt* v. *Clarksville Montgomery Cnty. Sch. Sys.*, 2021 WL 685187, at *11 (M.D. Tenn. Feb. 2, 2021). Neither the SEC settlements nor the 12 emails on which Plaintiffs rely suggest any loss of any information—let alone any *spoliation* of evidence—relevant to any claim or defense *in this case*.

*First*, the SEC settlements that six of the ten Underwriter Defendants entered into in 2021 and 2022 in no way suggest that any information relevant to the claims and defenses *in this case* was not properly retained and produced. In fact, the SEC's consent orders nowhere mention SDC's IPO. Those settlements addressed general record-keeping practices and not the document retention efforts that occurred in this case. Here, following the filing of numerous securities class actions in the weeks after SDC's IPO, the Underwriter Defendants promptly placed relevant personnel involved in

- 22 -

that transaction on specific legal holds and notified them to retain all documents and communications of any kind related to the IPO. In addition, as part of the agreed-to expanded search of 14 custodians across all of the underwriters, all of the current employee custodians that the Underwriter Defendants have access to have now confirmed that they did not use personal text messaging or other channels of communication that have not already been collected for substantive business related to the SDC IPO. The two current JPM employee custodians who used text messaging did so on a limited basis for certain ministerial matters (as reflected and described in the emails that Plaintiffs cite).

*Second*, the handful of emails to which Plaintiffs cite to argue that the "Underwriter Defendants very likely failed to preserve . . . communications despite their relevance" (*supra* § I.B, at 3-4) in fact show the opposite. None of those emails, which are limited to a small number of current or former employees at four of the ten Underwriter Defendants, suggests that *any* relevant information concerning the Underwriter Defendants' work on SDC's IPO is missing from the productions. To the contrary, these documents clearly show that the Underwriter Defendants' custodians and other personnel used email to exchange substantive information concerning the IPO; the only passing references to text messaging involved ministerial matters, such as getting a person's attention to look at their email or a draft document (Ex. 1; Ex. 5; Ex. 11), arranging for a call (Ex. 2; Ex. 6; Ex. 10), asking someone to send a document over the weekend (which request is then memorialized in the email) (*see* Ex. 4), or confirming a limited point with a colleague (which confirmation is then memorialized in the email) (*see* Ex. 3; Ex. 9). Further, many of the emails that Plaintiffs cite relate to persons who are not even custodians for document collections here, and even in these instances the substance of the text communications is memorialized in the Underwriter Defendants' email productions. (*See, e.g.*, Ex. 8 & Ex. 12 (referencing communications with SDC's

- 23 -

CFO about whether to send over a document); Ex. 7 (referencing communications with SDC's CFO about confirming that the underwriters' incentive fee "will be what he originally said").)

The fact that a few employees of four Underwriter Defendants—most of whom are not even among the agreed-to custodians—used text messages to get a person's attention to look at their email or to schedule calls does not suggest in any way that *any* custodian was engaging in substantive business about SDC's IPO outside of written communication channels that have already been searched.[17] Thus, Plaintiffs come nowhere close to meeting their burden to "point to specific information that is relevant to their claims and would be found solely in the unproduced documents," such that an inquiry about document retention could be warranted. *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2023 WL 2871090, at *8 (S.D.N.Y. Apr. 10, 2023) (quotation marks omitted); *see also Roper* v. *Knoxville Assisted Living Ret. Cmty., LLC*, 2022 WL 3337280, at *8 (E.D. Tenn. May 27, 2022) (evidence that "many of Defendants' employees regularly texted using their personal cell phones" and testimony by management employee that she "may" have sent text messages about Plaintiff were insufficient to show that any of those messages were relevant to plaintiff's claims); *Brown* v. *Duke Energy Corp.*, 2019 WL 1439402, at *5-6 (S.D. Ohio Mar. 31, 2019) (deposition testimony that defendant's HR personnel communicated via instant messages did not demonstrate that unproduced instant messages were relevant to plaintiffs' employment discrimination claims).

---

[17] If Plaintiffs wish to test the completeness of JPM's and Citi's productions, they will have an opportunity to do so through the deposition of JPM and Citi witnesses in the coming months. *Cf. St. Clair*, 2022 WL 4095387, at *4–5 (noting that the plaintiffs sought deposition testimony about the defendants' document preservation and the scope of document collections before moving to compel production of document retention policies and additional email collections). Plaintiffs have already indicated that they intend to depose both a JPM and a Citi witness pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. Plaintiffs have not cited *any* evidence of texting even on ministerial matters by the other Underwriter Defendants' custodians, and there is no basis whatsoever for any further discovery about discovery from them.

*Third*, Plaintiffs' proposed declaration topics are not even aimed at identifying additional evidence relevant to the claims or defenses in this case. Instead, Plaintiffs seek general information about communication channels that each individual "used for business purposes at the time of his or her work on the SDC IPO" (*supra* § I.B, at 6)—*regardless whether those communications relate to SDC's IPO* or any matter that is relevant to any claim or defense in this case. In doing so, Plaintiffs ask to impose an extraordinary new discovery obligation for parties to try to compel their current and former employees to provide written testimony about their communication practices untethered to any claim or defense in the case. This is unprecedented, and far outside the bounds of reasonable discovery under Rules 26(b) or 34.

*Fourth*, Plaintiffs' proposed discovery compelling written declarations is in no way proportional to their speculation about the Underwriter Defendants' document preservation efforts. Plaintiffs seek sworn declarations from each of the Underwriter Defendants' 14 agreed custodians—comprising both current and former officers and employees, none of whom are parties to the litigation—and any other custodians that are added in the future. Plaintiffs' proposal is entirely backwards. During the normal course of discovery—and the process contemplated by the Federal Rules of Civil Procedure—the parties agree on custodians who are most likely to have the relevant information and whose documents should be searched. Then the party responsible for those custodians conducts a reasonable investigation to confirm where that custodian's business files are located so that they can be searched. That is precisely what the Underwriter Defendants have already done here.[18]

---

[18] Plaintiffs attempt to justify their request for sworn declarations by citing to cases where courts have "order[ed] parties to provide information about sources of relevant discovery." (*Supra* fn. 9.) But each of Plaintiffs' cases is inapposite. Three of Plaintiffs' four cases involved situations where the producing party either refused to provide any information about its document collection process, or where the party claimed that no responsive documents were found or that documents no longer

- 25 -

The requested declarations are also entirely impractical.  It is highly unlikely that individuals will be able to make a definitive certification about all of their communications that occurred four or five years ago.  And the burden and expense that preparing these declarations would involve is considerable; each of the requested declarants would potentially need individual counsel, and the declarations would require dozens of hours of the employees' and their attorneys' time.

*Fifth*, Plaintiffs fail to provide support for the unfounded proposition that the Underwriter Defendants have such unfettered possession, custody or control over their current and former employees to obtain broad information about their communication practices.  As courts in this Circuit and others have repeatedly held, as a general matter "a company does not possess or control the text messages from the personal phones of its employees and may not be compelled to disclose text messages from employees' personal phones."  *Halabu Holdings, LLC* v. *Old Nat'l Bancorp*, 2020 WL 12676263, at *1 (E.D. Mich. June 9, 2020) (quoting *Lalumiere* v. *Willow Springs Care, Inc.*, 2017 WL 6943148, at *2 (E.D. Wash. Sept. 18, 2017), and citing other cases).  Plaintiffs do not cite any case to the contrary; none of the cases that Plaintiffs rely on dealt with discovery from personal devices of current and former nonparty employees.  *See St. Clair*, 2022 WL 4095387, at *5, *13 (request for searches within emails and two shared drives of defendant's UK subsidiary, where

---

existed.  *See Ruiz-Bueno*, 2013 WL 6055402, at *3 (defendants "have not explained how they went about searching for [email] communications beyond the fact that each defendant was asked . . . to produce his or her relevant emails"); *Catrinar*, 2016 WL 1084687, at *2 (defendants claimed that they "conducted a diligent search and are not in possession of responsive documents"); *compare McMaster*, 2020 WL 755379, at *2 *with* Pls.' Motion to Compel (Dkt. 21) at 21-23, *McMaster* v. *Kohl's Dep't Stores, Inc.*, Case No. 2:18-cv-13875-SFC-RSW (E.D. Mich. Sept. 10, 2019) (granting motion to compel a declaration from defendant describing "what was done to locate . . . documents" where defendant stated in discovery responses that responsive documents "no longer exist").  And in Plaintiffs' fourth case, the plaintiff objected to providing deposition testimony about its document collection process.  *See Crocs, Inc.*, 2017 WL 1325344, at *8-9.  Here, the Underwriter Defendants have provided detailed information about their document collection efforts and produced tens of thousands of documents.  Moreover, the Underwriters Defendants are not objecting to reasonable questioning at depositions about communication practices as relevant to the claims and defenses in the case.

- 26 -

the defendant had already produced other emails from the subsidiary and had represented that it was "willing to discuss the collection and production of documents from certain additional custodians and noncustodial sources" at the subsidiary); *Union Com. Servs.*, 2018 WL 558760, at *4 (plaintiff admitted that it had possession, custody, or control over the hard copy documents at issue); *Robison*, 2016 WL 3350471, at *2 (request for documents in the possession of correctional facility). Plaintiffs have not pointed to any case holding that an employer has general control over non-party current *and* former employees such that the employer could compel them to provide written testimony about their communication practices. Moreover, Plaintiffs seek information from *former* employees over whom the Underwriters no longer have even an employment relationship.

*Sixth*, Plaintiffs have done nothing to justify their request for messaging policies and communication preservation policies, and "all documents concerning violations of such policies." (*Supra* § I.B, at 7.) Like their broad proposed declarations, this request too is not in any way limited to documents relevant to claims or defenses in this case. This is because, as described above, Plaintiffs have pointed to no evidence that the Underwriter Defendants failed to preserve any relevant information. For this reason alone, the cases Plaintiffs rely on are completely inapposite. Unlike here, the parties seeking further discovery or spoliation sanctions in those cases had specific proof that particular information relevant to the case existed but was not retained despite an obligation to do so. *See Schnatter*, 2022 WL 2402658, at *8, *10 (finding that plaintiff deleted text messages discussing the University of Louisville's decision to rename its football stadium, which was the basis for Plaintiff's breach of contract claim).[19] As those cases demonstrate, a party must

---

[19] *See also Benefield*, 2016 WL 374568, at *3, *6 (awarding spoliation sanctions for failure to preserve principals' and agents' text messages, based on finding that certain text messages that were produced in the litigation "do, in fact, contain discussion of matters related to [Defendants'] business operations"); *Shufeldt*, 2020 WL 1532323, at *10 (plaintiff "conce[ded] that his former counsel destroyed relevant evidence"); *St. Clair*, 2022 WL 4095387, at *4, *8 (plaintiffs showed that a

make some concrete showing of lost evidence relevant to the case in order to make the threshold "preliminary showing of spoliation" necessary to justify discovery on a party's document retention practices. *EPAC Techs.*, 2015 WL 13729725, at *6. Plaintiffs have not shown that any relevant, non-duplicative information is contained in channels of communications not yet collected and produced, let alone that such information was not retained.

*Finally*, Plaintiffs' request is premature. The Underwriter Defendants have substantially completed their productions of documents from all 14 of the custodians that they have agreed to search, and a small number of additional documents will be produced in the coming days. As counsel for the Underwriter Defendants informed counsel for Plaintiffs numerous times, if any relevant and responsive material is identified that was in the Underwriter Defendants' possession, custody or control but was not retained, the Underwriter Defendants will inform Plaintiffs. To date, the Underwriter Defendants have not identified any such material. Nor have Plaintiffs.

Plaintiffs' requests for discovery about discovery, including unprecedented sworn declarations from current and former employees and document retention policies, is a transparent fishing expedition and should be rejected.

### D. Plaintiffs Have Failed to Meet Their Burden of Showing that Sell-Side Analysts' Reports on SDC Are Relevant or that Discovery Concerning Those Reports Is Proportional to the Needs of the Case

Plaintiffs' request that the Underwriter Defendants collect and search the files of seven sell-side equity analysts employed by the Underwriter Defendants who published reports about SDC is likewise unreasonable. Plaintiffs fail to provide even a baseline articulation of the relevance of those

---

custodian's entire email account was deleted after he was placed on a litigation hold); *EPAC Techs.*, 2015 WL 13729725, at *6-*7 (defendant destroyed relevant physical evidence one month after receiving plaintiff's notice to retain records).

4883-5567-9325.v2

documents, let alone explain how costly and time-consuming searches of documents at seven of the Underwriter Defendants would be proportional to the needs of the case.

For evidence to be discoverable, "[t]he party seeking discovery must be able to articulate the possible linkage between the discovery sought and admissible evidence." *Bowman* v. *Skyview Apartments*, 2008 WL 11510509, at *1 (M.D. Tenn. Sept. 3, 2008). Plaintiffs' securities claims arise from purported misrepresentations or omissions in SDC's IPO offering documents that were filed with the SEC in 2019. There is no allegation that analysts either did any work on the IPO on behalf of the Underwriter Defendants, or were part of any IPO deal team. Instead, they issued independent research reports *after* the IPO occurred and SDC's stock began to trade publicly. Those reports have been produced in response to Plaintiffs' requests.

Nevertheless, Plaintiffs claim that the analysts' emails and internal documents underlying those reports will somehow "help Plaintiffs and their experts establish the materiality of information disseminated to the investing public and provide insight into what caused SDC's stock price to drop, resulting in losses to the class." (*Supra* § I.E, at 11-12.) But Plaintiffs fail to identify anything in any analyst's published report related to the materiality of any of the alleged misrepresentations *at issue in this case*, let alone that additional information from that analyst's files are needed. Given Plaintiffs' failure to articulate a cogent theory of relevance for the underlying notes and other materials that they seek, any "marginal utility" of that discovery beyond the published analyst reports cannot justify the expense of collecting and searching those materials. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 2023 WL 2871090, at *8. Moreover, the Underwriter Defendants should not be forced to donate their own analysts' market expertise to Plaintiffs' hired expert in the hope of finding something that will provide a plausible theory of materiality for Plaintiffs' case.

- 29 -

The two cases that Plaintiffs cite concerning analysts' documents do not support their request here. In *SEC* v. *AT&T*, the court considered a hearsay objection to equity analysts' notes, and the relevance of those analysts' information was not in dispute, unlike here. 2022 WL 4110466, at *22. Likewise, in *Seagate*—which involved alleged misstatements made long after Seagate's IPO—both sides agreed that analyst reports were relevant to specific disclosures of information that plaintiffs alleged had been omitted from the company's prior public statements. *See In re Seagate Tech. II Sec. Litig.*, 802 F. Supp. 271, 274-76 (N.D. Cal. 1992). That is not the case here, where Plaintiffs have not alleged that specific corrective disclosures caused SDC's stock to drop following the IPO, let alone identified any analyst reports shedding light on those disclosures.

Plaintiffs' proposed search also would be unreasonably burdensome. Based on preliminary estimates (because the relevant analysts' documents have not been collected), these searches could include more than 40,000 documents, which would cost at least $200,000 to search and review alone. This significant cost is not proportional to the needs of the case, given Plaintiffs' failure to articulate a specific theory of relevance of any analyst's reports or other documents.[20] And, even if Plaintiffs had articulated a theory of relevance to Plaintiffs' fraud claims under Sections 10(b) and 20(a) of the Exchange Act (*see supra* §§ I.E–F, at 11–13), those claims are not asserted against the Underwriter Defendants. Given the Underwriter Defendants' effective status as third parties for purposes of the Exchange Act claims, the burden that Plaintiff's request would impose on them should be given substantial weight. *See Am. Elec. Power Co., Inc.* v. *United States*, 191 F.R.D. 132, 136 (S.D. Ohio Dec. 17, 1999) ("[T]he status of a person as a non-party is a factor that weighs

---

[20] To the extent the Court grants Plaintiffs' request and orders discovery into analysts' documents, the Court should allocate the cost of collecting and searching those documents to Plaintiffs. *See* Order at 5, *La.-Pac. Corp.* v. *James Hardie Building Prods., Inc.*, Case No. 3:18-cv-00447, Dkt. No. 367 (M.D. Tenn. Jan. 18, 2019) (allocating the costs of defendant's ESI searches to the plaintiff, in light of plaintiff's "minimal relevancy showing at best" and its failure to "[make] use of the information already produced" from defendant's existing custodians).

against disclosure."); *Royal Surplus Lines Ins. Co.* v. *Sofamor Danek Group, Inc.*, 190 F.R.D. 463, 467 (W.D. Tenn. Aug. 5, 1999) ("Some courts have been inclined to limit the scope of discovery directed to non-parties in order to protect the non-party from harassment, inconvenience, or disclosure of confidential documents.").

Finally, Plaintiffs' request is premature. During the course of meet-and-confers, the Underwriter Defendants offered to entertain requests for targeted searches related to specific topics in specific analyst reports that Plaintiffs contend are relevant. Plaintiffs declined to accept that reasonable compromise, reflecting that this request is just another fishing expedition meant to impose unreasonable costs and burdens on the Underwriter Defendants, rather than to gain any meaningful information relevant to Plaintiffs' claims.

DATED: June 20, 2023

ROBBINS GELLER RUDMAN
 & DOWD LLP
CHRISTOPHER M. WOOD, #032977
HENRY S. BATOR, #040431

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
hbator@rgrdlaw.com

4883-5567-9325.v2
Case 3:19-cv-00962    Document 138    Filed 06/20/23    Page 31 of 36 PageID #: 3450

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
SCOTT H. SAHAM
JEFFREY J. STEIN
ASHLEY M. KELLY
TING H. LIU
STEPHEN JOHNSON
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
scotts@rgrdlaw.com
jstein@rgrdlaw.com
akelly@rgrdlaw.com
tliu@rgrdlaw.com
sjohnson@rgrdlaw.com

Lead Counsel for Lead Plaintiff


DATED:  June 20, 2023          BAKER, DONELSON, BEARMAN,
                                 CALDWELL & BERKOWITZ, PC
                               JOHN S. HICKS (TN# 10478)
                               CHRISTOPHER E. THORSEN (TN# 21049)


                                   s/ Christopher E. Thorsen (w/ permission)
                               ────────────────────────────────────────
                                   CHRISTOPHER E. THORSEN

                               1600 West End Avenue, Suite 2000
                               Nashville, TN  37203
                               Telephone: 615/726-5600
                               615/726-0464 (fax)
                               jhicks@bakerdonelson.com
                               cthorsen@bakerdonelson.com

- 32 -

SULLIVAN & CROMWELL LLP
SHARON L. NELLES
ANDREW J. FINN
125 Broad Street
New York, NY 10004
Telephone: 212/558-4000
212/558-3588 (fax)
nelless@sullcrom.com
finna@sullcrom.com

Counsel for Defendants J.P. Morgan Securities
LLC, Citigroup Global Markets Inc., BofA
Securities, Inc., Jefferies LLC, UBS Securities
LLC, Credit Suisse Securities (USA) LLC,
Guggenheim Securities, LLC, Stifel, Nicolaus &
Company, Incorporated, William Blair &
Company, LLC and Loop Capital Markets LLC

4883-5567-9325.v2

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 20, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood.
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)


Email: cwood@rgrdlaw.com

# Mailing Information for a Case 3:19-cv-00962 Franchi v. SmileDirectClub, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Michael Albert**
  malbert@rgrdlaw.com

- **Henry Scattergood Bator**
  hbator@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Wade B. Cowan**
  wcowan@dhhrplc.com

- **James M. Ficaro**
  jmf@weiserlawfirm.com

- **Andrew J. Finn**
  finna@sullcrom.com

- **Andrew Fiorella**
  afiorella@beneschlaw.com

- **Elizabeth O. Gonser**
  egonser@rjfirm.com,sfordice@rjfirm.com

- **Michael C. Griffin**
  michael.griffin@skadden.com

- **John S. Hicks**
  jhicks@bakerdonelson.com,lkroll@bakerdonelson.com,jcalouette@bakerdonelson.com,mbarrass@bakerdonelson.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Stephen Johnson**
  sjohnson@rgrdlaw.com

- **Lewis S. Kahn**
  Lewis.Kahn@ksfcounsel.com

- **Jay B. Kasner**
  jay.kasner@skadden.com

- **Ashley M. Kelly**
  akelly@rgrdlaw.com

- **Phillip Kim**
  pkim@rosenlegal.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Ting H. Liu**
  tliu@rgrdlaw.com

- **MICHAEL J MORSE**
  PKNASHLAW@AOL.COM

- **Richard A. Maniskas**
  rmaniskas@sbtklaw.com

- **E. Powell Miller**
  epm@millerlawpc.com

- **Scott D. Musoff**
  scott.musoff@skadden.com

- **Danielle S. Myers**
  danim@rgrdlaw.com,dmyers@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

- **Sharon L. Nelles**
  nelless@sullcrom.com

- **Christopher Nelson**
  cln@weiserlawfirm.com

Case 3:19-cv-00962   Document 138   Filed 06/20/23   Page 35 of 36 PageID #: 3454

- **Melinda A. Nicholson**
  Melinda.Nicholson@ksfcounsel.com

- **Michael J. Palestina**
  Michael.Palestina@ksfcounsel.com

- **Ira M. Press**
  ipress@kmllp.com

- **Steven Allen Riley**
  sriley@rjfirm.com,dgibby@rjfirm.com

- **Darren J. Robbins**
  darrenr@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Laurence M. Rosen**
  lrosen@rosenlegal.com

- **Scott H. Saham**
  scotts@rgrdlaw.com,ScottS@ecf.courtdrive.com,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com

- **John Tate Spragens**
  john@spragenslaw.com,stacia@spragenslaw.com,spragenslaw@ecf.courtdrive.com

- **Jeffrey J. Stein**
  jstein@rgrdlaw.com,JStein@ecf.courtdrive.com

- **Hannah Stowe**
  hstowe@beneschlaw.com,docket2@beneschlaw.com

- **Tara L. Swafford**
  tara@swaffordlawfirm.com

- **Christopher E. Thorsen**
  cthorsen@bakerdonelson.com,nkhan@bakerdonelson.com,faltaie@bakerdonelson.com,mbarrass@bakerdonelson.com,joboyle@bakerdonelson.com,jcalender@bakerc

- **Christopher M. Wood**
  cwood@rgrdlaw.com,agonzales@ecf.courtdrive.com,CWood@ecf.courtdrive.com,agonzales@rgrdlaw.coom,e_file_sd@rgrdlaw.com,creis@rgrdlaw.com,AKellyRGRI

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)