# Exhibit 1

Videotaped Deposition of

# Neil Dalal

July 18, 2023

Franchi

vs.

SmileDirectClub

**Confidential**



www.aptusCR.com | 866.999.8310

**Page 9**

I N D E X

MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 33 | Email, JPM Smile_114481-82 | 351 |
| Exhibit 34 | JPM Smile_00189165 and attachment 189166 | 358 |
| Exhibit 35 | JPM Smile_00148515 and attachment 148519-36 | 364 |
| Exhibit 36 | Email, JPMC Smile_00115096-9 | 368 |
| Exhibit 37 | Document | 372 |
| Exhibit 38 | Recordkeeping order | 421 |
| Exhibit 39 | Email JPMC Smile 94950 | 430 |
| Exhibit 40 | Emails | 431 |

**Page 11**

I N D E X

MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 48 | Email and Attachment, SDC CSL_0398164-0398173 | 498 |
| Exhibit 49 | JPMC Smile_00049997 | 508 |
| Exhibit 49 | Emails, JPM Smile_00027862-65 | 514 |
| Exhibit 50 | EMAIL, SDC CSL_0382016 | 523 |
| Exhibit 51 | Email, SDC CSL_0401327-28 | 526 |
| Exhibit 52 | Email, SDC CSL_0442714-15 | 528 |
| Exhibit 53 | Email, SDC CSL_365622-24 | 530 |

**Page 10**

I N D E X

MARKED FOR IDENTIFICATION

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 41 | JPMC Smile_00005157-60 | 436 |
| Exhibit 42 | Emails, JMPC Smile_00019122-25 | 444 |
| Exhibit 43 | JPMC Smile_00020851-54 and attachment 19126-34 | 453 |
| Exhibit 44 | JPMC Smile_00120301-02 | 466 |
| Exhibit 45 | Emails, JPMC Smile_00039041-46 | 470 |
| Exhibit 46 | Emails, JPMC Smile_00097400-01 | 476 |
| Exhibit 47 | Email, SDC CSL_0401181 | 482 |

**Page 12**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN-PERSON HYBRID REALTIME VIDEO-RECORDED DEPOSITION of NEIL DALAL, held on July 18, 2023, at 8:30 a.m., at Scott + Scott, 230 Park Avenue, 17th Floor, New York, New York 10169, was reported by AMBRIA IANAZZI, a Registered Professional Reporter, Certified Realtime Reporter, and Certified Shorthand Reporter.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Page 13**

A P P E A R A N C E S:

SULLIVAN & CROMWELL
       Attorneys for Defendant:  JP MORGAN
       125 Broad Street
       New York, New York 10004

BY:  ANDREW J. FINN, ESQ.
       finna@sullcrom.com

       SHARON NELLES, ESQ.
       nelless@sullcrom.com
       NAVRAH S. DHILLON, ESQ.
       dhillonn@sullcrom.com

BENESCH LAW
       Attorneys for Defendants: SMILE DIRECT CLUB
       127 Public Square, Suite 4900
       Cleveland, Ohio 44114

BY:  ANDREW G. FIORELLA,ESQ.
       afiorella@beneschlaw.com
       EMILY DILLINGHAM, ESQ.
       edillingham@beneschlaw.com

SCOTT + SCOTT
       Attorneys for Plaintiffs:
       230 Park Avenue, 17th Floor
       New York, New York 10169

BY:  MAX SCHWARTZ, ESQ.
       mschwartz@scott-scott.com
       EMILIE KOKMANIAN, ESQ.
       ekokmanian@scott-scott.com

**Page 14**

A P P E A R A N C E S:

ROBINS GELLER RUDMAN & DOWD, LLP
       Attorneys for Plaintiffs:
       655 West Broadway, Suite 1900
       San Diego, California 92101

BY:  TING LIU, ESQ.
       tliu@rgrdlaw.com
       STEPHEN JOHNSON, ESQ.
       sjohnson@rgrdlaw.com

ALSO PRESENT:

MICHAEL O'CONNOR, ESQ. -
In-house counsel for JP Morgan

       KEVIN    GONZALEZ    -    Videographer
jkevin.glez@icloud.com

**Page 15**

THE VIDEOGRAPHER:  Stand by everyone.

This begins Media Number 1 in the video-recorded deposition of Neil Dalal in the -- stand by -- United States District Court Middle District of Tennessee Nashville Division.  The civil action number is 319-CV-00962.  Today's date is July 18th, 2023, and the current time on the video is three -- oh, excuse me, 8:38 a.m.

MR. SCHWARTZ:  Excuse me, sir, this is going to go under two cases.  Do you have the second caption, too?

THE VIDEOGRAPHER:  I do, Counsel.

MR. SCHWARTZ:  Okay.  Thank you.

THE VIDEOGRAPHER:  I only received this one, Counsel, I apologize.

MR. SCHWARTZ:  So in the interest of time, is it okay if we just go, and I'll give the reporter the second caption at a break?  Okay.  So we can put that on the record.

THE VIDEOGRAPHER:  Understood, Counsel.

The videographer today is Kevin

**Page 16**

Gonzalez representing Aptus Court Reporting. The video is being taken at Scott and Scott, 230 Park Avenue, 17th Floor, New York, New York 10169.

Would counsel please voice identify themselves and state whom they represent, beginning with the noticing attorney.

MR. SCHWARTZ:  Good morning, this is Max Schwartz with Scott and Scott.  I represent the plaintiff in the action proceeding in the court in Tennessee.

MS. KOKMANIAN:  This is Emily Kokmanian, for Scott and Scott, and I'm also representing -- acting in the same case for the plaintiff.

MR. JOHNSON:  Stephen Johnson for the federal plaintiffs.

MS. LIU:  Ting Liu also on behalf of the federal plaintiffs.

MR. FINN:  Andrew Finn from Sullivan and Cromwell on behalf of JP Morgan, the underwriter defendants in both cases and the witness.  And with me is Sharon Nellis and Nav Dhillon, also from Sullivan and Cromwell, and from JP Morgan,

Michael O'Connor.

THE VIDEOGRAPHER: Thank you, Counsel.

MR. FINN: We have one more.

MR. FIORELLA: Andrew Fiorella for the Smile Direct Defendants.

MS. DILLINGHAM: Emily Dillingham, also on behalf of the Smile Direct Defendants.

THE VIDEOGRAPHER: Thank you, Counsel.

The court reporter today is Ambria Ianazzi, representing Aptus Court Reporting, who may now swear in the witness.

- o 0 o -

N E I L   D A L A L,

NEIL DALAL, having been first duly sworn by a Notary Public of the State of New York was

examined and

testified herein:

- o 0 o -

EXAMINATION BY
MR. SCHWARTZ:

Q. Good morning, Mr. Dalal.

A. Good morning.

Q. I'm Max Schwartz as you probably heard. So thank you for joining us this morning. I'm just going to go over a couple ground rules --

A. Sure.

Q. -- to get started.

A. Okay.

Q. Have you been deposed before?

A. No.

Q. Okay. Welcome to the business.

A. Yes.

Q. Hopefully this will be your last deposition.

The basic rules are: I'm going to ask a question, you have to answer it. If you don't understand a question, you can ask me and I'll try to clarify, let me know. But if you don't seek clarification, I'm going to assume you understand it, okay?

A. Okay.

Q. Also, to help the court reporter

here, we should try not to talk over each other. So, I'll let you finish, and please do the same for me; likewise, your counsel has probably told you that he may object from time to time. So you could just give him a chance to do that if he wants to.

Is there any reason why you can't testify today?

A. No.

Q. No problems with memory?

A. No.

Q. You're not sick or anything like that?

A. No.

Q. Okay. Perfect.

I also want to go over one other point that you heard us discuss briefly. So, there are two cases pending against Smile Direct right now where JP Morgan is a defendant. As you probably heard, one is in the State Court in Tennessee, and there's another case in the Federal Court in Tennessee.

In the interest of efficiency, we're combining the depositions to try to

make it go as quickly as possible for you and everyone else. So I'm going to start with the questioning, and -- but your answers will be for both cases; do you understand?

A. I do.

Q. And -- And likewise, in addition to being subpoenaed in your individual capacity, you're aware that you're also sitting here in the federal case as a 30(b)(6) corporate witness for JP Morgan, correct?

A. I am.

Q. Okay.

So what we discussed with counsel, for the various parties is that, I'll ask a question and if, you know, if it's a question that is on topics that are -- overlap with the 30(b)(6) subpoena, then we'll assume you're answering for both.

But if you need any clarification about what capacity you're answering in you can ask me. And likewise, your counsel can seek further clarification.

A. Got it.

Page 313

end just to ensure anything we're not asking that we should be asking is the intent of the last two, so we had those.

I think we added that specific sentence on Q3 because of the issue that happened, and we knew there were questions on that, although I'm not sure this actually made it into the final version. This is a draft. Ultimately, our Q3 diligence was done outside of this call.

Q. Okay. But this --

But we already discussed at length what diligence was conducted, right?

A. Correct.

Q. Okay.

A. We did.

Q. With regard to --

(Simultaneous speaking.)

A. I -- I -- What I would say, there was -- we discussed what diligence was conducted. On August 7th and over the course of August, there was a diligence conducted throughout the IPO, meaning in early September as well.

Q. Which we discussed as well,

Page 314

right? Is there anything else that we didn't discuss?

A. We discussed it.

Q. Okay.

MR. SCHWARTZ: Let's mark Bates number JPM Smile_00041342.

(Whereupon, Email, JPM Smile_00041342, was marked as Exhibit 24 for identification, as of July 18th, 2023.)

MR. SCHWARTZ: This is plaintiff's 24.

A. Thank you.

(Perusing.)

Q. And just a quick question because -- is this -- is this email -- well, you --

Tell me when you're ready, but my question is really just: Is this notes from that call that we -- that you described in the previous document?

A. No. This is not notes from the call.

Q. Okay.

A. This is a back and forth amongst team members on the question list related to

Page 315

the call. But I think the call was scheduled for 5:00 p.m., and this email chain was at 4:55 p.m., so it was just before the call.

Q. Okay. So put in questions to put into the call.

A. Correct.

Q. Okay.

A. So each of the like when she says, "My thoughts," those are thoughts around questions to ask and not any notes of the call.

Q. Okay.

MR. SCHWARTZ: Let's go to JPM Smile_00041412 and the attachment at -13?

A. (Perusing.)

This is 25.

(Whereupon, JPM Smile_00041412 and attachment -13, was marked as Exhibit 25 for identification, as of July 18th, 2023.)

Q. Okay.

A. Okay. Got it.

Q. Got it.

So, this is just adding certain other topics to the diligence call?

Page 316

A. It appears to be the case, yes. This is adding additional topics versus the last draft. And this looks like it's the final draft and that it went to Kyle.

Q. Okay.

MR. SCHWARTZ: Let's -- Let's go to JPM Smile_00189373, please. This is going to be Plaintiff's 26.

(Whereupon, Email exchange, JPM Smile_00189373, was marked as Exhibit 26 for identification, as of July 18th, 2023.)

MR. SCHWARTZ: This is plaintiff's 26.

A. (Perusing.)

Q. This is another short email exchange. Just let me know when you're ready.

A. I'm ready.

Q. Okay.

So, could you go the bottom, the first in time email from Anshita to Kyle and yourself, amongst some others, at September 2nd, 2019 at 6:36 p.m.?

A. Yes. I've read it.

Q. Subject is pointer -- "Pointers

Q3 EBIDTA," and Anshita writes: "No, Chris and you earlier connected on Q3, EBIDTA to drill down on what will cause increased burn, including increased Smile shop investments and backup facility in Texas, et cetera." And then she writes, "We wanted to provide a few pointers to Robbie on this topic in particular"; do you see that?

A. I do.

Q. So, was your team communicating with Robbie in his -- to figure out his model?

A. No. So what this indicates is obviously, the model changed over the -- that research analyst saw, what we just discussed. The burn EBIDTA, the negative EBIDTA, was more negative in the revised model than initial model, and so our team proactively thought it would be helpful to give our research analyst a few additional bullets of context around that specific point. During the course of the IPO process, the equity capital markets lead banker, in this case it is Tommy, is allowed to communicate with the research analyst.

And so my recollection is, on one of those calls Robbie said he's trying to understand the reasons for the change in burn. In the two models he saw he, got the change in the top line -- that was discussed in the broader call. And so we got these bullets, and what we had done with these bullets is send them into our control room, and they would be responsible for sending it to Robbie. That's how it works.

Q. Okay. But you -- and you initially -- was it your team's --
Was it your own impetus to provide this color for Robbie? Or did Robbie indicate that he needed -- that he would like some additional color?

A. My recollection is Robbie indicated he would like to understand the drop in EBIDTA more clearly between the two different models. And so we answered this question one-off, just like -- Most research analysts had one-off questions, so this is typical for that process.

Q. Okay.
I'm just going to mark two more

documents really quickly. We're not going to review them in length.

A. Okay.

Q. It's going to be the updated com-com memo from August and the bring down due diligence -- is it called a memo?

A. The burn-down due diligence usually called a list.

Q. List, okay.

A. Bring-down due diligence list.

Q. Okay. Also from August.
What is the bring-down due diligence list?

A. Bring-down due diligence list is a document that records the diligence questions we ask just before a filing of the S-1, either a confidential filing or, I think in this instance, most likely the public filing of the S-1.

Q. And how is it different than the com-com memo?

A. So the com-com memo is an internal record of -- and a document that we present to our internal committee, according to the procedures we have internally.

The bring-down due diligence list is just a list of question we ask the management team that's sent to the management team. The com-com memo is an internal document records diligence and a host of other things you saw earlier.

Q. The bring-down due diligence list is really a document provided for the company?

A. It's an agenda for a conference call.

Q. Got it.

A. It's a list of questions we're going to ask on the call.

Q. Is that after the com-com -- the commitment committee has already approved the new filing?

A. For each deal the sequencing can be a little bit different, depends on schedules.

Q. Okay.

A. They're at a very similar time.

MR. SCHWARTZ: So, let's do JPM Smile-0164599 with an attachment at -714? They're actually two attachments here,

Page 373

Q. Just a few from the back, Schedule A JP Morgans Securities, LLC?

A. Oh, where it says "definitions"?

Q. Yes.

A. Okay, cool.

Q. Do you recognize this as the portion of the document that the delineation the topics that you'll be testifying about today?

A. I do.

Q. And turning three pages later, you see the Roman numeral three and the header "Deposition Subject Matters," correct?

A. I do.

Q. Starting with topic number 1, it lists "the preparation of the offering documents, including the identity of the JP Morgan employees responsible for, or involved with, any due diligence conducted in connection with the same"; I read that correctly?

A. You did.

Q. You are the person most knowledgeable at JP Morgan as to this topic,

Page 374

correct?

A. I am.

Q. You were asked questions about this topic by Mr. Schwartz earlier today; weren't you?

A. I was.

Q. Those answers are truthful?

A. They were truthful, yes.

Q. They can be attributed to JP Morgan in your representative capacity.

A. They can.

Q. What did you do to prepare to be the person most knowledgeable as to topic number 1?

A. I'd say a few things. One, was just my actual experience. I was the person most involved with the topics elaborated on in this document.

And then second, I've participated in two preparatory sessions with Sullivan and Cromwell and our inside counsel which reviewed several hours of discussion of document review to help me recall my memories during the time of the IPO.

Page 375

And I also -- my understanding is Sullivan and Cromwell talked to other folks within the JP Morgan team. I personally did not, but they did. And they relayed the relevant findings from those conversations to me, such that I was aware of things that perhaps I didn't directly participate in but JP Morgan participated in, in my capacity as the witness for this.

Q. You said several hours, about how many?

A. Two sessions, each one was several hours. Each one was more than four hours. I don't recall exactly how long.

Q. More than four, less than eight each?

A. That's fair.

Q. You said also earlier today that you reviewed boxes of documents; how many?

A. There were two or three boxes.

Q. How big were the boxes? Are we talking about bankers boxes?

A. Yes.

Q. You said you didn't review all

Page 376

the documents in those boxes, right?

A. Correct.

Q. About how many did you review?

A. I reviewed a selection of documents in the course of conversation with counsel. So I don't have an exact estimate. Just, we would have a conversation, things that I recalled, things I didn't recall, a document we would produce to help me refresh.

Q. You said a selection of documents; who made those selections?

A. It was in the course of our conversations. So as we were reviewing the chronology of the work on this deal, if things I felt like I didn't really recall, a document was produced to help me recall that.

Q. A person.

A. Yes.

Q. Who made those selections?

A. The Sullivan and Cromwell team.

Q. And did you review any documents of your own accord, separate from those selected by Sullivan Cromwell?

A.    Yes.  In between the prep sessions obviously I still have access to our internal document system, so I reviewed some documents as well there.

Q.    Are you --

(Simultaneous speaking.)

A.    Go ahead, sorry.

Q.    Were you finished with your answer?

A.    Yes.

Q.    Are you aware of whether or not the documents that you reviewed in preparation for this deposition have been produced?

A.    My understanding is, yes they have.

Q.    Did they all have those Bates numbers at the bottom right?

A.    I don't recall if they had Bates numbers.

Q.    Do you recall if any of them had them?

A.    I -- Honestly, I didn't know what a Bates numbers was until I walked in here, so I didn't really know to look for

it.

Q.    You didn't notice it, though?

A.    I did -- I wouldn't have noticed it early either way.  I just don't recall.  They definitely had markings at the bottom, I just don't know if that's a Bates number.  But it was something that looked like a JP Morgan internal document, but then with an appendage on the bottom of different sort of text.

Q.    Letters and numbers, that's what you mean by appendage?

A.    Correct.

Q.    Did you speak with anyone in your preparation, aside from your counsel at Sullivan and Cromwell and your internal counsel JP Morgan, to prepare to testify as to topic number 1?

A.    I did not.

Q.    Moving to topic number 2, it states, "The IPO and any financing provided by the underwriter defendants to facilitate the IPO, including the identity of all JP Morgan employees responsible for, or involved with, the IPO and any financing

provided by the underwriter defendants to facilitate it," correct?

A.    Yes, it does.

Q.    Do you recall any specific documents that refreshed your recollection or prepared you to testify as to this topic?

A.    I think it was the same -- similar documents as topic number 1.

Q.    You didn't speak to anyone to prepare to testify about topic number 2 either?

A.    I did not.

Q.    Moving to topic number 3, "The structure of any treatment or group within JP Morgan responsible for, or involved with, the preparation of the offering documents or involved with the IPO," correct?

A.    Correct.  Yes.

Q.    Do you remember any specific documents that refresh your recollection restriction or prepared you to testify as to that matter?

A.    Similar to topic number 1 and 2, the same set of documents.

Q.    And the same question as to

topic number 1 and 2 and 3, you were asked questions about each of these topics earlier today by Mr. Schwartz, right?

A.    I was, yes.

Q.    Your answers were truthful?

A.    They were truthful.

Q.    They can be attributed to JP Morgan as you're testifying in representative behalf now?

A.    They can.

Q.    You also spoke to no one in regards to topic number 3 to prepare yourself to testify?

A.    That's correct.

MR. FINN:  Objection to the form.

THE WITNESS:

A.    That's correct.  Yes, I did not speak to anyone outside of my counsel -- or Sullivan and Cromwell and internal counsel.

MR. JOHNSON:

Q.    As to topic number 4, "The marketing efforts, including conference or road show, that the underwriter defendants undertook or participated in, in connection with the IPO, as well as any materials

Page 381

prepared, disseminated, or discussed in connection with same," correct?

A. Correct.

Q. Earlier you said you didn't attend the road show. Did you speak with anyone who did attend the road show to prepare to testify as to this topic?

A. During the course of the road show itself, I spoke with folks who attended the road show every day. And we had emails and discussions as to what was going on in the meetings. So although I was not physically present, I feel as though I got a good debrief at that time.

Last week, as I said earlier, I have not spoken to anyone outside of Sullivan Cromwell and our internal counsel about any of these topics, and so that also hold for topic 4.

I did review -- There was an email chain that had notes from the road show meetings that someone had distributed. It was a long email chain, and I reviewed that in preparation for this session.

Q. Are you aware of whether or not

Page 382

email chain has produced in this matter?

A. Yes. It has.

Q. You said that you had other discussions. Your testimony was emails and discussions about the road show; what separate discussions?

A. So, this is back, again, during the deal. We would probably have, typically -- and I think it was the case in this one -- a daily call, just amongst our internal team, talking about how did the meetings go today, how are investors feeling, things of that nature. And so in the course of those calls, I got a good sense as to what was happening during the road show meetings.

Q. Were those calls scheduled over email?

A. It would typically be ad hoc -- maybe over email, maybe just literally calling people -- people -- We were in the office back then, so you would just sit in a room.

Q. If they were -- or to the extent that they were scheduled over email, are you

Page 383

aware of whether or not those emails have been produced in this matter?

A. My understanding is, yes, those emails have been produced.

Q. So I don't have to re-ask you as to every topic, you did not speak to anyone outside of Sullivan and Cromwell to prepare to testify today?

MR. FINN: Objection to the form.

THE WITNESS:

A. Sullivan and Cromwell and internal counsel, correct, those are the only parties I spoke to.

MR. JOHNSON:

Q. No JP Morgan employees that aren't lawyers.

A. Correct.

Q. You are, however, the person most knowledge as to topics 2, 3 and 4.

A. Yes.

Q. Moving to topic number 5, "The due diligence, auditing, and investigation performed by you in connection with the IPO or the preparation of the offering documents, including with respect to (A)

Page 384

SDC's financial metrics and growth, (B) the standard of care provided to SDC's customers, (C) the legislative and regulatory risks facing the company, and (D) known risks, events, or uncertainties that, at the time of the IPO, impacted or were reasonably likely to impact SDC's disclosed financial information or future operating results," correct?

A. Correct.

Q. You are the person most knowledgeable as to this subject matter at JP Morgan?

A. Yes.

Q. Do you recall reviewing any specific documents in those banker's boxes that refreshed your recollection or prepared you to testify as to this matter?

A. The same documents alluded to before.

Q. Nothing specific?

A. Nothing specific.

Q. As to topic number 6, "The information you or any underwriter defendant requested from Smile Direct Club in

Page 385

connection with any due diligence related to the IPO or the preparation of the offering documents," correct?

A. Correct.

Q. You are the person most knowledgeable as to topic number 6 at JP Morgan?

A. I am.

Q. You were asked questions about topics 4, 5 and 6 by Mr. Schwartz earlier today.

A. Correct.

Q. Those answers were truthful?

A. They were truthful.

Q. And they could be imputed to JP Morgan as you're testifying in your representative capacity now?

A. Yes.

Q. Do you recall any specific documents as to topic number 6 that refreshed your recollection?

A. Similar documents to the previous questions.

Q. Nothing specific?

A. Nothing specific.

Page 386

Q. Topic number 7, "The information received from Smile Direct Club in connection with any due diligence related to the IPO or the preparation of the offering documents, including the identity of materials Smile Direct Club previously made available to you but that were not retained," correct?

A. Yes. That's what it says.

Q. You are the person most knowledgeable at JP Morgan as to this subject matter?

A. Yes. I am.

Q. Are you aware of any documents that fall into this category?

A. The former, yes, which is "information received from Smile Direct Club, in connection with any due diligence related to the IPO." I'm aware of a lot of documents in that category. I'm not aware of materials that fall into the "were not retained" clause in the second piece of the sentence.

Q. You're not aware of a single deleted email?

Page 387

A. Well, deleted emails are retained. If I delete them, my inbox at the firm still retains it.

Q. Everything that Smile Direct Club ever gave to JP Morgan, that's still at JP Morgan?

A. Any email they ever sent is here, yes.

Q. Any document that they've ever provided?

A. Correct.

Q. Did you review any documents that indicated there may be missing documents?

A. No. I did not.

Q. As to topic number 8 states, "Your policies and any changes thereto related to any due diligence performed in the course of public offerings, generally, and the IPO, specifically, or related to the preparation of the offering documents," correct?

A. Yes. It does.

Q. You're the person most knowledgeable at JP Morgan as to this topic?

Page 388

A. Yes.

Q. You stated earlier today that there is not a written policy as to due diligence that JP Morgan has, right?

A. Correct.

Q. How do you learn about that?

A. We have training and --

So, we have training related to how you conduct due diligence, not necessarily related to an IPO, but how do you conduct due diligence on a company. That's for IPOs, debt offering, et cetera.

Then for IPO specifically, once you're on an IPO -- everyone has their first one, but the rest of the team is knowledgeable. And there is a -- a learning by doing and learning association with other team members.

Ultimately, when you go to the commitment committee meeting, there's a certain standard they expect. And to the extent that something has not been asked, as you've seen in some of the records and previous discussions, they'll say, That should have been asked. Please follow up on

Page 389

that.

Q. Do you remember going through that training?

A. Yes. I went through it in 2010.

Q. What did it look like? Were you in a room and there was a presenter?

A. Yes, a presenter.

Q. Did that have a PowerPoint slide deck?

A. Yes.

Q. In that way there is a policy written about how do go about due diligence at JP Morgan, right?

A. No. That is a document that is about how to conduct due diligence, not a policy, but more a training.

So for example, there're not things in the document that say, You must do X, Y, Z in an IPO due diligence. Instead it says, Here are some ways, and common ways to evaluate the financial performance of a business. Here are things to look for and ask for.

So it's not a policy, it's a training document.

Page 390

Q. If you go back just a few pages, back to those definitions, Number 12 at the top of that page it defines policies or policies, right?

A. It does, yes.

Q. It defines it as stating, "Policy or policies means any rule, procedure, practice or course of conduct, whether formal or informal, written or unwritten, recorded or unrecorded, whether or not recognized or followed, and whether or not communicated or maintained explicitly or implicitly," right?

A. Yes, it does.

Q. Under that definition, JP Morgan does have a policy as to how it goes about due diligence, correct?

A. I don't believe so. I don't think that the document or this training I'm referring to is a rule, procedure, practice or course of conduct.

Q. But you engage in a course of conduct regularly, right?

A. How do you define course of conduct?

Page 391

Q. "Series of actions," you engage in a series of actions when you go through due diligence, right?

A. Correct. But the training I'm referring to did not tell me what course of conduct to -- or "what series of actions," to use your term, to undergo.

Q. But you said when you bring the commitment committee memo to the commitment committee, they're looking for if anything's missing, right?

A. Correct.

Q. That means that there's, whether it's written down somewhere or not, essentially a checklist, right?

A. I wouldn't characterize it as a checklist. They will -- They assess the overall content of what we are presenting, what's in the memo. And then, based on their judgment, they say, Here's what we think is missing. Here's what we think you should ask about. Every case is different and so it's not really a checklist.

Q. No similarities?

A. Sure. There are similarities,

Page 392

but there's also differences. For example, every, you know -- every IPO has an S-1 so, in theory, that would be in every com-com committee for an IPO.

Q. Well, in every com-com memo you have the due diligence questionnaire, right?

A. We have due diligence questions. There's not a standard questionnaire.

Q. The last question, that's always the same, right?

MR. FINN: Objection to the form.

THE WITNESS:

A. The last question -- no, it can change. It was the same in Smile Direct Club because it's just easy to use the same question when you're doing the documents, but I would not say that it's the same in every IPO.

MR. JOHNSON:

Q. You always ask that question, right?

MR. FINN: Objection to the form, asked and answered.

THE WITNESS:

A. No. I just answered that

Page 409

A. Correct.

Q. You're the person most knowledge at JP Morgan about this subject matter?

A. Yes.

Q. How much did JP Morgan make off of the IPO?

A. I don't recall the exact number. I know it's in the underwriting agreement.

Q. You didn't review any documents that refreshed your recollection as to this in preparation for testifying as to this topic?

A. I did review documents. I didn't memorize numbers.

Q. As an estimate.

A. I think it was around 40 million.

Q. That's not all the money that JP Morgan has made from Smile Direct Club; is it?

A. No. We have done other transactions with Smile Direct Club over time.

Q. You talked earlier a CDNR, private equity placement back in 2018?

Page 410

A. Correct.

Q. Do you recall how much JP Morgan made from that?

A. I do not.

Q. Do you have an estimate?

A. I do not.

Q. More than 10 million?

A. I honestly don't know.

Q. Then you talked about a debt agreement --

A. Yes.

Q. -- that you had.

A. Yes.

Q. Do you know what the interest rate for that was?

A. That we charged them?

Q. Yes.

A. I don't know.

Q. Do you know how large that line of credit was?

A. I believe it was -- It was several hundred million dollars; I don't remember exactly how many hundred million dollars.

Q. Then it's safe to say JP Morgan

Page 411

made millions of dollars off of that transaction as well.

A. I think that is fair, yes.

Q. Then you said JP Morgan now not advises but provides information to Smile Direct Club, right?

A. Correct.

Q. And they do that for free?

A. We do that as a matter of course and a matter of business with all of our clients, so yes.

Q. How long does that go on?

A. In perpetuity.

Q. After you help a company underwrite an IPO, you provide information to that company for free forever?

A. Correct.

Q. That's a policy that JP Morgan has?

A. That's not a policy. It is a client coverage approach, so I think I'm speaking to generally how we cover clients and have relationships with clients is trying to provide them information and add value to them with the hopes that, on a

Page 412

subsequent transaction, whenever one would occur, they would engage us.

Q. There's another motive though, right?

A. I'm not aware of what you're alluding to.

Q. You said that you can't remember how many Smile Direct Club shares JP Morgan might still own, but if they did own shares, helping that business would help your business, right?

MR. FINN: Objection to form. Calls for speculation.

THE WITNESS:

A. How do you define "helping that business"? Oh, helping -- sorry, go ahead. How do you define "helping that business"?

MR. JOHNSON:

Q. It would help you maximize shareholder wealth, right?

A. How so? I don't follow.

Q. You make money when stocks that JP Morgan owns increase in value, right?

A. Not necessarily. So depends on where it's owned within the firm, depends on

what we're actually doing with the shares. We could lose money if it goes up. We could be hedged so we're neutral if it goes up, so there's no -- there's not a direct correlation there.

Q. Are you aware of any hedge position that JP Morgan ever took in Smile Direct?

A. I'm not aware of any position that we have with Smile Direct. And I'm not aware if we've ever hedged our exposure to Smile Direct.

Q. Topic number 20 states, "The creation and maintenance of any documents produced by you in this action," correct?

A. Correct.

Q. You're the person most knowledge as this subject matter?

A. Yes.

Q. Did you review any policies or procedures that JP Morgan has to prepare you to testify to that?

A. I did not.

Q. Are you aware of whether or not JP Morgan has document retention policies?

A. I am.

Q. Would all of the documents that relate to the Smile Direct Club IPO be covered by those policies?

A. They would.

Q. And would those policies require that all of those documents be retained until at least today?

A. They would.

Q. You're also subject to federal recordkeeping requirements, right?

A. We are.

Q. Topic number 21 states, "Your employee's use of personal email, text messaging, chat services, or any other short messaging services, SMS, and multimedia messaging services, MMS, technology for business purposes, including in connection to Smile Direct Club or the IPO"; is that correct?

A. That is what it says.

Q. You're the person most knowledgeable as to this subject matter at JP Morgan?

A. I am.

Q. When you were preparing to testify as to this subject matter, did you review the policies and practices that JP Morgan has regarding these types of communications?

A. I not explicitly review those policies, no.

Q. You didn't implicitly review them either?

A. I'm aware of them.

Q. Are you aware of whether those policies are the same now as they were at the time of the Smile Direct Club IPO?

A. Yes. I'm aware they've changed since then.

Q. When?

A. I believe they changed in late -- in early 2020.

Q. Why?

A. We rolled out -- Well, why? There's an SEC agreement between JP Morgan and the SEC regarding our recordkeeping. In response to that, we rolled out a new service where every -- at least every investment banking employee has a corporate

text messaging functionality on their phone. And so the change was to incorporate that new technology.

Q. Are you aware that we requested that your counsel prepare you to testify as to this subject matter?

A. I am.

Q. And are you aware that we requested that you review the policies and practices regarding these types of communications?

A. I was not aware of that specifically, no.

Q. You weren't made aware that we asked for you to review those policies or practices?

A. Not specifically, no.

Q. Not vaguely either, right?

A. No.

Q. Were you aware that we requested that you contact the members of the SDC IPO team who still work at the company to learn whether each of those individuals used those forms of communication during their work on the SDC IPO?

A.   My understanding is the internal counsel and Sullivan and Cromwell team emailed me that request.

Q.   You didn't help evaluate that request?

A.   I did not in any -- regard -- in relation to any of these topics speak to anyone outside of Sullivan and Cromwell and internal counsel.

Q.   Meaning you didn't talk to anyone on the SDC IPO team?

A.   Correct.  Nobody.

Q.   You didn't ask them if they ever used text messaging services?

A.   I did not.

Q.   You didn't ask them if they ever used WhatsApp?

A.   I did not.

Q.   You didn't ask them what types of communications they used?

A.   I did not.

Q.   You're aware that we requested your counsel ask you to do that?

A.   I am now aware of that, yes.

Q.   You're aware that we requested

your counsel prepare you to testify as to any known topics of a discussion within those forms of communication and whether those communications still exist, right?

A.   I'm now aware of that, yes.

Q.   You weren't before I just said those words?

A.   No.

Q.   Which means you didn't do it?

MR. FINN:  Objection.

THE WITNESS:

A.   I did not speak to anyone on the IPO team or anyone outside of Sullivan and Cromwell or internal counsel on any of these topics, including the one we're on right now.

MR. JOHNSON:

Q.   On what basis do you say that you're the person most knowledgeable to testify as to topic number 21 then?

A.   I'm aware of my own use of these -- of communication channels with relation to Smile Direct Club IPO, and I was educated by Sullivan Cromwell and internal counsel as to what other folks said on the

IPO team.

Q.   Are you aware of what those answers are?

A.   Yes.  Via Sullivan Cromwell and internal counsel, I am.

Q.   What did they say?

A.   So, generally in this matter, the vast majority of communication -- when I say "this matter," I mean Smile Direct Club IPO -- the vast majority of communication was on approved channels, which is generally email for JP Morgan, as well as virtual data rooms that we go back and forth on, as well as phone calls.  There was limited use of text messages, which was largely limited to logistical matters or to affirm or -- yeah, affirm what was already written in the email, which is consistent with my personal use as well.

Q.   When you say "a vast majority of communications are through approved channels, and that is consistent with your use of those channels," that mean sometimes you use text messaging to talk about business, right?

A.   No.  What I was referring to is that for this specific matter, the vast majority of communication was via approved channels.  I said "communication," not business communication, but any communication.  That communication that was not through approved channels was largely logistical or affirming what was already in an approved channel.

Q.   So when you say "a vast majority was through approved channels," not all of it was through approved channels, right?

A.   Not all communication, correct.

Q.   So there were communications through unapproved channels.

A.   As I just said, those communications were generally logistical in nature or affirming what was already in an email.

Q.   You also said they were "largely limited" to logistical text messages in nature.  That means they weren't exclusively limited to that; were they?

A.   Because the other piece was affirming what was in an email.

Page 421

Q. It's your understanding that the only time text messaging or any unapproved channel of communication was ever used in connection with the SDC IPO was one of those two categories, either logistics or confirming something that was already stated in an email?

A. That is my understanding, yes.

MR. JOHNSON: I'm marking as Exhibit 38 a document, handing to the witness through counsel.

Q. You recognize this; right, Mr. Dalal?

A. (Perusing.)

(Whereupon, Recordkeeping order was marked as Exhibit 38 for identification, as of July 18th, 2023.)

A. Yes. I'm familiar with this document.

Q. This is the order you referenced earlier when we were talking why JP Morgan changed its policies on recordkeeping?

A. It is.

Q. It's a cease and desist order from the SEC, right?

Page 422

A. It is.

Q. JP Morgan was ordered to pay over a $100 million in fines as a result of the failures to follow the recordkeeping requirements, right?

MR. FINN: Objection to form.

THE WITNESS:

A. Correct. There was a fine of over $100 million.

MR. JOHNSON:

Q. If you go to Page 11, it's under Roman numeral four, Paragraph C, $125 million, right?

A. That is correct.

Q. Go earlier in that document to Page 1, the very bottom under Roman numeral three, "On the basis of this order and Respondent's offer the commission finds that," and then it lists a summary of its findings, right?

A. It does.

Q. Under number 2, it describes that (as read) "these proceedings arise out of a -- the widespread and longstanding failure of JP Morgan employees throughout

Page 423

the firm, including those at senior levels, to adhere to certain of these essential requirements," correct?

A. It does.

Q. Paragraph 5, the last sentence states (as read), "The failure was firm-wide and involved employees at all levels of authority," right?

A. Yes.

Q. Paragraph 6, the last sentence, states (as read), "In fact, dozens of managing directors across the firm and senior supervisors responsible for implementing JP Morgan's policies and procedures and for overseeing employees' compliance with those policies and procedures, themselves failed to comply with firm policies by communicating using non firm-approved methods on their personal devices about the firm's securities business," correct?

A. Correct.

Q. The SEC didn't find that this was limited to logistical matters; did it?

MR. FINN: Objection to form.

Page 424

THE WITNESS:

A. When you say "this," in your question, what are you referring to?

MR. JOHNSON:

Q. The SEC did not find that the use of unapproved communication channels was limited to confirming emails or logistical matters, right Mr. Dalal?

MR. FINN: Objection, calls for speculation.

THE WITNESS:

A. So the SEC -- So this document and the sentences you called out refer to overall within JP Morgan. It does not refer to the Smile Direct Club IPO in its -- or singularly or exclusively.

MR. JOHNSON:

Q. It doesn't refer to any IPO specifically; does it?

A. It does not.

Q. Rather, it states that the failure was widespread, right?

A. It does say that, yes.

Q. Paragraph 5, it describes that failure as occurring from, quote -- "from at

least January 2018 through at least November 2020," correct?

A.   It does.

Q.   That's -- The entire period that JP Morgan was doing due diligence in the Smile Direct Club is encompassed by the period stated in this SEC order.

A.   It is.

Q.   Do you know anyone that was found to have violated this policy at JP Morgan?

A.   Yes.

Q.   Who?

A.   I was.

Q.   When?

A.   In a similar timeframe, but not in relation to the Smile Direct Club IPO.

Q.   Earlier you stated that it was -- restarting the question.

Earlier you stated that JP Morgan's use of text messaging and unapproved communication channels in connection with the SDC IPO was consistent with your own policy; didn't you?

A.   No.  I didn't say that.  We can

go back to the record.  That's not what I recall saying.  I think what I said was consistent with my own use, but please rephrase your question.

Q.   Then the members of the JP Morgan team that worked on the SDC IPO --

A.   Mh-hm.

Q.   -- their use of these unapproved channels was consistent your use.

A.   Consistent with my use in relation to Smile Direct Club, specifically, not my use in relation to any other clients.

Q.   When you were found to have violated this policy --

A.   Mh-hm.

Q.   -- it was just about one other transaction?

A.   Correct.  One specific other transaction.

Q.   What transaction?

A.   The potential IPO for WeWork.

Q.   With whom were you communicating?

A.   The client, WeWork.

Q.   None of your colleagues?

A.   And alongside my colleagues.

Q.   Were any of the members of the SDC IPO team listed in the commitment committee memo also members of the WeWork team?

A.   Do you mind if I refer to the commitment committee memo?

(Perusing.)

No.  I don't believe any of these individuals, other than myself, worked on WeWork.

Q.   Do you know if any of the individuals listed there on the list you just reviewed, were any of those individuals found to have violated the recordkeeping requirements by messaging through unapproved channels?

MR. FINN:  Objection to form.

THE WITNESS:

A.   Yeah.  I wasn't made aware of who else violated that -- what you're describing.

MR. JOHNSON:

Q.   Do you know how many people were found to have violated it?

A.   I don't know.  All -- what I know is in this document.

Q.   There was no discussion in JP Morgan internally about the cease and desist order?

MR. FINN:  Objection to the form.

THE WITNESS:

A.   Not that I'm aware of.  There may have been, but I wasn't involved in.

MR. JOHNSON:

Q.   You said earlier that they changed their recordkeeping requirements and their policies.  Were there any firm wide meetings about this?

MR. FINN:  Objection to form.

THE WITNESS:

A.   The -- there was a firm wide meeting.  The firm wide meeting was, here is the new technology to use.  Use this.  And that was the meeting.

MR. JOHNSON:

Q.   Was everyone required to attend this meeting?

A.   Yes.

Q.   So when you say you don't know

who was found to have violated this recordkeeping requirement and who wasn't, you can't say definitively if you're the only person on the Smile Direct Club IPO team to have violated this policy.

A.   Correct.  I cannot.

Q.   Then as to topic 21, how can you be sure or how do you know that others on the team weren't using these unapproved channels?

A.   So.  I guess two answers to your question.  I know my use of unapproved channels in relation specifically to Smile Direct Club IPO, which I already described.  And then my understanding is that internal counsel and Sullivan and Cromwell asked the other folks who worked on the Smile Direct Club IPO as to their use, and they relayed to me that their use was consistent to mine as it relates to this specific transaction, so that is how I know.

Q.   By that you mean you're relying exclusively on the representations of your counsel?

A.   Correct.

Q.   You didn't find any documents in your review that suggested text messaging was used as to substantive matters?

A.   I did not.

MR. JOHNSON:  Marking document Exhibit 39, handing it to the witness through counsel.

(Whereupon, Email was marked as Exhibit 39 for identification, as of July 18th, 2023.)

A.   (Perusing.)

Q.   Do you recognize this email?

A.   Yes.  I do.

Q.   All of these emails were sent and received in the course of these individuals' roles at JP Morgan, right?

A.   Yes.

Q.   The bottom email from Anshita to you states, in the second sentence, "I'll be checking email every day, but please WhatsApp or iMessage me if you need me to pay attention to anything in real time," right?

A.   It does state that, yes.

Q.   It states, "I'll be back stateside on the 27th morning," right?

A.   It does.

Q.   This email was sent on the 12th?

A.   Yes, it was.

Q.   That's 15 days that Anshita was suggesting that if you needed her to look at anything to WhatsApp or text message her.

A.   Well, what she was suggesting over those 15 days, in practice, is if you need me to make -- to look at email -- because I won't be proactively reviewing every email -- send me a message which would state, Please look at your email, which is what actually happened in this circumstances.

Q.   Then this is about non-substantive communications, right?

A.   This is logistical.

Q.   It wouldn't be about something like the valuation of the company, right?

A.   No.

MR. JOHNSON:  Marking document Exhibit 40.

(Whereupon, Emails JPMC Smile_00023529, was marked as Exhibit 40 for identification, as of July 18th, 2023.)

MR. SCHWARTZ:  Handing this to the witness through counsel.

A.   (Perusing.)

Q.   Bates JPMC Smile_00023529. Let me know when you're ready, Mr. Dalal.

A.   Okay.  I'm ready.

Q.   You recognize this series of emails, right?

A.   I do.

Q.   The very top one, that's an email from you --

A.   Mh-hm.

Q.   -- to Rob, right?

A.   Yes.

Q.   In this string of emails you're talking about multiples right?

A.   Yes.

Q.   A multiple is something that you use to multiple by a revenue projection, in this context, to get an IPO valuation, right?

A.   Correct.

Q.   Top email you state, "I texted with Chris.  Let's do 6 to 8X 2020, thank

you," right?

A.   Yes.  That's what it says.

Q.   Let's go back to the Deposition Notice, Mr. Dalal.

A.   Okay.

Q.   Topic number 22, on the last page here, states "Your policies concerning the use of personal email, text message, chat services, or any other SMS and MMS technology for business purposes," correct?

A.   Yes.

Q.   Topic number 23 states, "Your affirmative defenses set forth in the answer, including (A) your third defense and the basis for your claim in this action that the underwriter defendants had, after reasonable investigation, reasonable grounds to believe and did believe at the time the registration statement became effective, that the statements therein were true, and that there was no omission of a material fact required to be stated therein or necessary to make the statements therein not misleading.

"And (B) the other defenses

asserted by any of the other defendants that the underwriter defendants have adopted by reference as pled in your 23rd defense and the basis for your claim that you are entitled to such defenses in this action," correct?

A.   It does.

Q.   You're the person most knowledgeable as to this topic --

A.   Yes.

Q.   -- at JP Morgan?

A.   Oh, sorry, yes.

Q.   You said earlier you haven't read the answer, right?

A.   Correct.

Q.   Are you aware of that what that third defense is, that's listed in this topic?

A.   I'm not aware of what the third defense specifically is, no.

Q.   Do you know what the 23rd defense is,  the -- under 23B?

A.   I do not.

Q.   Earlier you were shown a series of diligence questions from January 2019,

right?

A.   Yes.

Q.   You said those weren't related to the IPO, right?

A.   Do you mind just showing me the document you're referring to?  Or I could go back to it.

Q.   Okay.

The January 2019 list of initial diligence questions, right?  You were shown a set of those earlier.  I'm not going to ask you about any of the details in the document, just to confirm that that wasn't about the IPO as you testified to previously?

A.   Yeah.  I just don't recall which list it was.  I have to check?  Is that what I said before?

Q.   Yes.

A.   Are these the ones from the financing team?

Q.   (Nodding.)

A.   Yes.  Those were not related to the IPO.

MR. JOHNSON:  I'm marking a

document as Plaintiff's Exhibit 41 and handing it to counsel through -- handing to the witness through counsel.  For the record, JPMC Smile_00005157.

(Whereupon, JPMC Smile_00005157, was marked as Exhibit 41 for identification, as of July 18th, 2023.)

Q.   Do you recognize this document; document, Mr. Dalal?

A.   I don't recognize this document, specifically.

Q.   You could tell by the Bates number at the bottom, right, it was produced by JPMC in this action right?

A.   I can, yes.

Q.   There's the same style of Bates numbers as all the rest of the documents you've been looking at.

A.   Yes.  It does.

Q.   I'll represent to you that this was produced in this action and with meta data that suggests it was from your custodial file.

A.   Okay.

Q.   Moving to Bates JPMC

**Page 533**

A.   Correct.

**Q.   No answer there either.**

A.   Correct.  Although this is not necessarily a complete document.  I don't know which email in the chain it is.  And I also don't know what internal prep the company did.

**Q.   There's no answer next to that question, right?**

A.   Correct.

MR. JOHNSON:  Could we go off the record for 60 seconds just to confer with my co-counsel.  I believe I'm done.

THE VIDEOGRAPHER:  Going off the record.  The time is 7:48 p.m.

(Whereupon, a short recess was taken.)

THE VIDEOGRAPHER:  The time is 7:52 p.m.  We're back on the record.

MR. JOHNSON:  Thank you for your time, Mr. Dalal, I have nothing further.

MR. FINN:  I have nothing further at this time.  JP Morgan hereby designates this testimony and the transcripts confidential under both protective orders in the federal case and the state case.

**Page 534**

THE COURT REPORTER:  Before we go, who is ordering a rough or a final copy of the transcript?

MR. SCHWARTZ:  Probably everyone.

THE COURT REPORTER:  Everyone is getting both a rough and final copy?

MS. NELLES:  Yup.

MR. FINN:  Yes.

MR. FIORELLA:  Yes.

MR. JOHNSON:  We are.

THE VIDEOGRAPHER:  Off the record.  This concludes the video-recorded deposition of Neil Dalal on July 18th, 2023.  We're off the record at 7:53 p.m.

-o0o-

(Whereupon, the examination of NEIL  DALAL  was concluded at 7:53 p.m.)

**Page 535**

C E R T I F I C A T E

I, AMBRIA IANAZZI, a Registered Professional Reporter, Certified Realtime Reporter, New York Association Certified Reporter, New York Realtime Certified Reporter, Certified Shorthand Reporter and Notary Public in New York do hereby certify:

That NEIL DALAL whose examination is hereinbefore set forth, was duly sworn, and that such examination is a true record of the testimony given by NEIL DALAL.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

In  witness  whereof,  I have hereunto set my hand this 24th day of July, 2023.

_____

AMBRIA IANAZZI, RPR, CRR, CSR

**Page 536**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Franchi vs. SmileDirectClub

Date of Deposition: 07/18/2023

Job No.: 10124062

I, NEIL DALAL, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2023, at _____.

_____

NEIL DALAL

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__,

by_____,    proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Franchi vs. SmileDirectClub

Date of Deposition: 07/18/2023

Job No.: 10124062

I, NEIL DALAL, hereby certify

under penalty of perjury under the laws of the State of

**Tennessee** that the foregoing is true and correct.

Executed this _22_ day of

_August_, 2023, at _9: 54 AM_.

NEIL DALAL

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on

this _____ day of _____, 20__,

by_____, proved to me on the

basis of satisfactory evidence to be the person

who appeared before me.

Signature: _____ (Seal)

## ERRATA SHEET FOR THE DEPOSITION OF
## NEIL DALAL, TAKEN ON JULY 18, 2023

| Page:Line | From | To | Reason |
|---|---|---|---|
| 24:9 | CDNR | CD&R | Transcription error |
| 29:15 | CDNR | CD&R | Transcription error |
| 63:22 | a perk | the purpose | Transcription error |
| 101:25 | perspective | prospectus | Transcription error |
| 140:21 | strategic | strategy | Transcription error |
| 167:3 | a credit investor or not a credit | accredited investor or not accredited | Transcription error |
| 193:17 | my Miya | Miya | Transcription error |
| 200:16 | changes | exchanges | Transcription error |
| 213:1 | Someone who | Some of what | Transcription error |
| 222:9 | outer | out | Transcription error |
| 253:13 | would | wouldn't | Transcription error |
| 255:12 | rights | iteration | Transcription error |
| 272:17 | at | as | Transcription error |
| 280:18 | exchange | change | Transcription error |
| 287:14 | regards | records | Transcription error |
| 298:23 | search | research | Transcription error |
| 299:22 | informed | in form to | Transcription error |
| 319:7 | burn-down | bring-down | Transcription error |
| 340:4 | posed | post | Transcription error |
| 365:11 | happy | unhappy | Transcription error |
| 398:2 | analyst's of | analyst's opinion of | Transcription error |
| 443:5 | is question | is a question | Transcription error |
| 443:9 | When | We | Transcription error |
| 463:12 | that industry | dentistry | Transcription error |
| 519:23 | that | than | Transcription error |
| 525:5 | replied | relied | Transcription error |

Subject to the above changes, I certify that the transcript is true and correct.

Neil Dalal