# Exhibit 2

Videotaped Deposition of

# Jordan Termine

July 28, 2023

Franchi

vs.

SmileDirectClub



www.aptusCR.com | 866.999.8310

**Page 1**

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

----------------------------------------x

ADAM FRANCHI, Individually and on Behalf Of All other Similarly Situated,

Plaintiff,

-against-        Civil Action No:

3:19-cv-00962

SMILEDIRECTCLUB, INC., et al.,

Defendants.

----------------------------------------x

VIDEOTAPED DEPOSITION of JORDAN TERMINE, taken by the Plaintiff, pursuant to Notice, held at the law offices of Sullivan & Cromwell LLP 125 Broad Street 37th Floor, New York, New York 10004, on July 28, 2023, at 9:17 a.m., before a Notary Public of the State of New York.

*********************************************

Job No. 10124065

**Page 2**

A P P E A R A N C E S:

ROBBINS GELLER RUDMAN & DOWD LLP
        Attorneys for Federal Plaintiff
        One Montgomery Street, Suite 1800
        San Francisco, California 94104

BY:     JEFFREY J. STEIN, ESQ.
        jstein@rgrdlaw.com
        STEPHEN JOHNSON, ESQ.

SCOTT & SCOTT
        Attorneys for State Plaintiff
        230 Park Avenue, 17th Floor
        New York, New York 10169

BY:     EMILIE B. KOKMANIAN, ESQ.
        ekokmanian@scott-scott.com

BENESCH, FRIEDLANDER, COPLAN & ARONOFF LLP
        Attorneys for Defendant
        SMILEDIRECTCLUB
        200 Public Square, Suite 2300
        Cleveland, OH 44114-2378
BY:     ANDREW G. FIORELLA, ESQ.
        afiorella@beneschlaw.com

SULLIVAN & CROMWELL LLP
        Attorneys for Defendant
        125 Broad Street
        New York, NY 10004-2498

BY:     ANDREW J. FINN, ESQ.
        finna@sullcrom.com
        SHARON NELLES, ESQ.
        CLARA CRENSHAW, ESQ.
ALSO PRESENT:
JEREMY KOVACS-Videographer
        Aptus Court Reporting
MARYANA SCHWARTZ-Inhouse Counsel for Citibank

**Page 3**

INDEX

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| Jordan Termine | Jeffrey Stein | 6 |
| Jordan Termine | Andrew Finn | 254 |

EXHIBITS

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 37 | Notice of Deposition | 14 |
| Exhibit 54 | FINRA Broker Check Report of Jordan Termine | 8 |
| Exhibit 55 | SDC-CSL-0007036 | 19 |
| Exhibit 56 | Plaintiffs' Notice of Deposition of Citigroup Global Markets Inc. | 39 |
| Exhibit 57 | Citi-Smili00015954-65 | 70 |
| Exhibit 58 | Citi-Smile-00018229-32 | 87 |
| Exhibit 59 | Citi-Smile-00025126-46 | 99 |
| Exhibit 60 | Citi-Smile-00018485-88 | 117 |
| Exhibit 61 | Order Instituting Administrative Cease and Desist Proceedings Pursuant to Section 15(B),21(C)of the Securities and Exchange Act of 1934, Making the Findings and Posing Remedial Sanction and a Cease and Desist Order | 128 |
| Exhibit 62 | Citi-Smile-0007983-92 | 138 |
| Exhibit 63 | Citi-Smile-00021594 | 157 |
| Exhibit 64 | Citi-Smile-00022652-58 | 160 |
| Exhibit 65 | SDC_CSL_0278679-81 | 172 |
| Exhibit 66 | Citi-Smile-00022929-34 | 175 |
| Exhibit 67 | Citi-Smile-00022935-52 | 189 |

**Page 4**

| Exhibit 68 | Citi-Smile-00023539 | 195 |
|---|---|---|
| Exhibit 69 | Citi-Smile-00025953-56 | 201 |
| Exhibit 70 | S-1 For SmileDirectClub | 205 |
| Exhibit 71 | Citi-Smile-00031333 | 218 |
| Exhibit 72 | Citi-Smile-00026694-97 | 226 |
| Exhibit 73 | Citi-Smile-00031490 | 229 |
| Exhibit 74 | Citi-Smile-00017960 | 231 |
| Exhibit 75 | Benzinga Article Entitled Meaningful First-Mover Advantage': Smile Direct Club Analysts Sound Optimistic Note After Rough First Month | 237 |
| Exhibit 76 | Report Entitleed Smile Direct Club Moving Fast and Breaking Things in People's Mouths-85% Downside, Published on October 4, 2019 | 243 |
| Exhibit 77 | A Screenshot of a Bloomberg Report | 245 |
| Exhibit 78 | Citi-Smile-000353931-44 | 249 |

(EXHIBITS RETAINED BY COUNSEL)

Page 5

VIDEOGRAPHER: Good morning, everyone. We are now on the record. Today's date is July 28, 2023, and the time is 9:17 a.m. This is the video deposition of Jordan Termine -- sorry, my apologies -- being taken in the matter of Adam Franchi versus Smile Direct Club. We are at Sullivan and Cromwell LLP, New York, 125 Broad Street, 37th Floor, New York, New York 10004.

My name is Jeremy Kovacs of Aptus Court Reporting, located at 41 West 8th Street, Suite 1680, San Diego, California 92101.

Will counsel please voice identify yourself and state who you represent.

MR. STEIN: Good morning. This is Jeff Stein from Robbins Geller Rudman & Dowd on behalf of the Federal Plaintiffs, and with me is Stephen Johnson from my firm.

MS. KOKMANIAN: Good morning. Emilie Kokmanian from Scott and Scott on behalf of the State plaintiffs.

MR. FIORELLA: Andrew Fiorella for Benesch, Friedlander, Coplan & Arnoff for the Smile Direct Club defendants.

MR. FINN: Andrew Finn from Sullivan

Page 6

and Cromwell on behalf of the underwriter defendants and the witness and with me is Sharon Nelles and Clara Crenshaw from my firm and also Maryana Schwartz from Citi.

THE VIDEOGRAPHER: Will -- the court reporter today is Brooke Perry and she may now swear in the deponent.

J O R D A N   T E R M I N E, the witness herein, having been first duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

THE REPORTER: Please state your name for the record.

THE WITNESS: Jordan Termine.

THE REPORTER: Please state your address for the record.

THE WITNESS: 50 White Street, New York, New York 10013.

THE REPORTER: You can begin.

EXAMINATION BY
MR. STEIN:

Q. Good morning, Mr. Termine. Have you ever had your deposition taken before?

A. First time.

Q. Okay. So let's go through the ground rules here. First, the oath that the court reporter just gave

Page 7

you is the same as an oath you would take in a courtroom, carries with it the same penalty of purge, so it's important to tell the truth.

Do you understand that?

A. I understand that.

Q. The court reporter is taking down everything that we say, so it's important to let me finish when I'm asking a question, and I'll try to let you finish when you're answering that question. It's also important to say yes and no, as opposed to nodding your head or saying uh-huh or uh-uh.

Also if you don't understand one of my questions, then feel free to ask for clarification. But if you proceed with an answer, I'll assume that you understood the question that I asked. Is that fair?

A. Yes.

Q. I usually take breaks every hour and 15 or so, but if you need a break before that, just let me know, we can take a break. I just ask that you answer any pending questions before we proceed to a break.

Is there any reason you can't provide your best testimony today?

A. No.

Q. Let's just -- where did you go to undergrad?

A. Bowdoin College.

Page 8

Q. Where is that?

A. Brunswick, Maine.

Q. Did you have any advance -- what was your degree there?

A. Bachelor in economics and government.

Q. Did you -- when did you graduate?

A. 2010.

Q. Did you get an advanced degree after that?

A. I did not.

MR. STEIN: You can mark that one. We're going to mark an exhibit here. This will be Exhibit 54. It will come up on your screen there. This is a broker check report of Jordan Christopher Termine from FINRA.

(Whereupon, the FINRA Broker Check Report of Jordan Termine was marked as Exhibit 54, for identification, as of this date.)

Q. Let me know when you have it in front of you.

A. Yep.

Q. Great. This -- is this your Broker Check report?

A. Yes.

Q. That's your CRD number?

A. I assume it is. That's my name.

Q. All right. Great. If you scroll down a couple

Page 13

started on the SDC IPO work?

A.    So if I started at Citi in May of 2019, the SDC work would have started shortly thereafter.

Q.    Was that your first assignment?

A.    No.

Q.    How many different projects would you be working on at any given time doing your work?

A.    It varies, multiple.

Q.    And I should state for the record that I'm going to say SDC, by that I mean Smile Direct Club, understand that?

A.    Understood.

Q.    If you had to approximate how many different projects you were working on during the time you were working on the SDC IPO, what would you guess?

A.    It would be hard to say a number, because again it would have varied during the course of the project, but multiple.

Q.    10?

A.    Fewer than 10.

Q.    Okay.  Why did you leave HSBC for UBS?

A.    Well, I was living at Hong Kong at the time, and I just wanted to spend a little bit more time with family based in New York.

Q.    And same question for the transition from UBS

Page 14

to Citi?

A.    You know, I -- I wanted to -- the main reason I left and there were a few, was that I wanted to, you know, have a little bit more deal experience and Citi is a bigger platform than UBS, so we're able to do a little bit more with clients at Citi than UBS.

Q.    Was it a promotion to leave?

A.    No, I was well positioned at UBS, and, you know, when I joined Citi, I was, you know, similarly well positioned.  It was really just in the interest of getting on, you know, more bigger better deals, so to speak.

MR. STEIN:  All right.  Let's take a look at an exhibit that has already been marked.  It's a previously marked exhibit, Plaintiffs' 37.  I have hardcopies of this for people, just because my plan is to kind of divert from this document, so you can have it in front of you while we look at other documents electronically, if that makes sense to everybody.

THE WITNESS:  Okay, sure.

(Whereupon, the Notice of Deposition previously marked Exhibit 37 was referenced, for identification, as of this date.)

Page 15

Q.    Just take one for yourself and pass it down.

All right.  This is previously marked Exhibit 37.  It's entitled Plaintiffs' Notice of Rule 30(b)(6) Deposition of Defendant Citigroup Global Market Inc. and JP Morgan Securities LLC.

Mr. Termine, have you seen this document before?

A.    Yes.

Q.    Okay.  Okay.  You can see on the first page, there's a table first column says "deponent Citigroup Global Markets" is the first deponent listed.  And the deposition date and time shows today's date; is that right?

A.    Yes.

Q.    Do you understand that you are here today to testify on behalf of Citigroup?

A.    Yes.

Q.    Did you prepare for this deposition today?

A.    Yes.

Q.    Did you speak with attorneys?

A.    Yes.

Q.    How many different times did you speak with your attorneys in preparation for today's deposition?

A.    Multiple times.

Q.    Can you give me a specific number?

Page 16

A.    I had two prep sessions with the team here at Sullivan and Cromwell, you know, spoke to them on the phone, so, yeah, at least three.

Q.    Okay.  When was the first meeting, be it in person or telephonically?

A.    Couple of weeks ago.

Q.    How long did that meeting last?

A.    Most of the day, I would say.

Q.    And the second call or meeting, when was that?

A.    Yesterday.

Q.    That was an in-person meeting as well?

A.    It was.

Q.    And how long did that one last?

A.    Most of the day.

Q.    And I think we have left a call that you said you had.  When was that?

A.    Yep and caught up after that meeting.

Q.    Did you look at documents with your attorneys?

A.    I did.

Q.    Both of the in-person meetings?

A.    Yes.

Q.    Did you speak with anyone else other than your attorneys at Sullivan and Cromwell in preparation for the meeting today, deposition today?

A.    I caught up with some of the Citi legal team

Page 17

who's present here today.

Q.     Who specifically did you meet with at Citi?

A.     Maryana.

Q.     Anyone else?

A.     Not to the best of my recollection.  I don't recall if anyone else was on that Zoom.  She was the main point of contact at any rate.

Q.     Did you speak with any non-attorneys in preparation for the deposition today?

A.     Not to the best of my recollection.

Q.     Did you look at documents with Maryana?

A.     I looked at documents with the whole team that's present here, S&C, Sullivan Cromwell and Maryana.

Q.     Okay.  Did you have any meetings with Maryana, but without Sullivan Cromwell?

A.     I believe there was an initial call where I was briefed that this was happening.

Q.     But know substantive preparation for the deposition today with just Maryana?

A.     No, not that I can recall.

Q.     Okay.  So using that hard version you have there, the paper copy, if you can flip back a couple of pages to the first instance where it says Schedule A with a parenthetical under it that says Citigroup?

A.     Yes.

Page 18

Q.     So this is a Schedule A we'll be looking at today and it outlines the topics that we plan to discuss.  Have you seen this Schedule A before?

A.     Yes, I believe I have.

Q.     Okay.  And if you flip a couple of pages back, three more pages, there's Roman numeral 3, deposition subject matters.  Do you see that?

A.     Yes.

Q.     Okay.  So at the very bottom there's Topic Number 1 and Topic Number 1 reads:

       "The preparation of the Offering
       Documents, including the identity of the
       Citigroup employees responsible for or involved
       with any due diligence conducted in connection
       with the same."

       Do you see that?

A.     Yes.

Q.     Are you prepared to discuss this topic today?

A.     Yes.

Q.     Other than the meetings that we've discussed, did you do any preparation for this topic?

A.     Yes.  I reviewed -- you know, Sullivan and Cromwell was kind enough to give me many documents to review, which I did.

Q.     That included the Offering Documents?

Page 19

A.     Yes.

       MR. STEIN:  Okay.  Let's mark -- this one will come up electronically.  This is a document produced by -- the Bates number is SDC-CSL-    36.  The title is Working Group List.

       (Whereupon, SDC-CSL-0007036 was marked as Exhibit 55, for identification, as of this date.)

Q.     Let me know when you have it in front of you?

A.     It's in front.

       MR. STEIN:  Did Citigroup produce this document?  What's the SCL Bates number?  Does that indicate Smile Direct or Citigroup?  I just want to --

       Do you guys know?

       MR. FIORELLA:  This is Andrew Fiorella with Smile Direct.  I believe SDC-CSL should be us.

       MR. STEIN:  Okay.  I just wanted to accurately say who produced it.

       MR. FIORELLA:  And this is Exhibit 55?

       MR. STEIN:  Yes, sorry.  Exhibit 55.

       MR. FIORELLA:  Thank you.

Q.     All right.  So you see on the front page it

Page 20

says:  "Working Group List, Project Pegasus July 2019", right?

A.     Yes.

Q.     And Project Pegasus was an internal terminology that Citigroup used to refer to the SDC IPO, correct?

A.     Yes, I believe so.

Q.     So if you flip back a couple of pages, page 4, at the bottom, and it says, Citi at the top.

A.     Mm-hmm, yes.

Q.     It says "Senior Relationship Coverage, BCMA".

       Do you see that?

A.     I do.

Q.     What's that mean?

A.     So typically on, you know, high-profile transactions, like the Smile Direct IPO, you'll have, you know, very senior members of the team involved to show a client that, you know, they're important, it's being taken seriously, et cetera.  John Chirico was the senior person on this transaction.

Q.     And what was his level of involvement with the client?

A.     Again, he is a higher level management role at Citi.  And so, you know, again, it was a -- I was a vice president at the time, so his involvement with the client wasn't something I was, you know, exposed to on a

Page 21

regular basis. I would say, you know, he's higher on the page for a reason. You know, the core deal team falls under investment banking.

Q. So he wasn't doing any day-to-day work on the SDC IPO?

A. Day-to-day, to the best of my understanding, that's correct.

Q. And the next category is investment banking and you said that this is the team here that handle most of the day-to-day on the IPO, right?

A. That's correct.

Q. Are these individuals listed here in order of seniority with most senior at the top?

A. Yes, for the most part. Kevin and Bob are, you know, peers, but yes.

Q. So neither Kevin nor Bob reported to the other one?

A. That's correct.

Q. And this is you here, Jordan Termine, right below them at vice president, right?

A. Yes.

Q. What was the managing director's role with regard to the IPO?

A. You know, the same as it is in a given transaction, to oversee all elements, help manage client

Page 22

relationship, you know, involved in the day-to-day.

Q. And your role as vice president, I assume is similar to that, but you're just under the oversight of the managing directors?

A. That's correct.

Q. How about Greg Joseph, the senior associate, what was his role?

A. You know, similar, you know, help with anything that the deal demands.

Q. Is the same answer true for Matt Lawrence and William Trapnell as analysts?

A. Yes, it is.

Q. And so, is this kind of the order of progression, if you were to get promoted from analyst, you would become a senior associate?

A. You would become an associate and then you would become a senior associate and then a VP and then a director and then an MD.

Q. What is an analyst analyzing with respect to a IPO?

A. The term analyst is just meant to refer to being the most junior person in the investment bank. It's a utility role. William and Matt would do whatever, you know, the deal demanded, as I mentioned.

Q. What kind of things does an IPO deal demand

Page 23

from the investment banking team?

A. Any number of things, you know, including, you know, presentations, you know, market research, valuation work, you know, there's many things that take place over the course of an analyst working on an IPO.

Q. Okay. Is due diligence part of the work?

A. Absolutely, it's an important part.

Q. What's market research mean?

A. You know, understanding a company, you know, similar companies in the space, et cetera.

Q. And valuation, what's that mean?

A. You know, helping -- helping arrive at, you know, a framework to think about value for a given company.

Q. Why is that important in an IPO?

A. In an IPO, you know, the value of a company needs to be determined by the public markets and so, you know, it's relevant to think about, you know, how the public markets may think about valuation.

Q. Does that help you set the IPO price or give a recommendation about setting the IPO price?

A. Yeah, knowledge of, you know, where companies are trading and the valuation of framework that folks you use helps arrive at a recommendation, you know, for the IPO price, sure.

Page 24

Q. And you mentioned due diligence. Can you just speak in general terms about what due diligence is?

A. Sure. Due diligence is a process by which we, you know, investigate and understand, you know, the business, and, you know, its market, et cetera.

Q. And we can dig deeper into that later. Sorry regarding the analyst, I just want to ask a clarifying question. These are not sell-side analysts, correct?

A. That's correct.

Q. And what's a sell-side analyst?

A. What I understood you to mean by sell-side analyst is research analyst; is that correct?

Q. You tell me what that -- what does sell-side analysts mean to you?

A. So I refer to these analysts as investment banking analysts. Occasionally, in common parlance, people will call research analysts sell-side analysts, and that's what I thought you were referring to.

Q. What's a research analyst or a sell-side analyst?

A. Research analyst sits in a different department. They sit in the equity research department and, you know, they produce research reports on companies that they cover.

Q. So they analyze a company from an outside

Page 25

perspective?

A. From a different perspective, yes.

Q. So how are those two perspectives different?

A. They're, you know, in one group, for instance in investment banking, we have a client that's -- in this case, Smile Direct Club. The research department is independent. Their client is not Smile Direct Club.

Q. So investment banking, the client is Smile Direct so they're researching from a client's perspective. Is that what you're saying?

A. Not quite. So the main distinction in investment banking is our clients are corporate clients. So Smile Direct Club is a company -- we were engaged by Smile Direct Club. The research department, you know, is independent. They are not compensated by Smile Direct Club. So they arrive at their own views.

Q. They arrive at their own views. Is the access to information different between investment analysts -- investment banking analysts and research analysts?

A. Yes.

Q. In what way is it different?

A. Given we spend more time with the company, we have access to a greater level of information.

Q. Are there limits on the amount of information -- are there restrictions on you sharing that

Page 26

information with research analysts at your same firm?

MR. FINN: Objection to the form.

MR. STEIN: You can answer.

A. Can you restate that or rephrase that.

Q. Are there any -- sure.

Are there any rules, either within Citigroup or outside of it that prohibit you sharing any type of information with the research analyst team?

A. Yes, it's regulated -- highly regulated, the separation of research and investment banking. The independence of research is important at Citi as it is at many banks. And so the flow of information is, you know, managed by a group called the control room, typically. And it is not -- you know, we're not allowed to contact research analysts, for example.

Q. Okay.

A. Directly.

Q. So the control room is a separate department that's different from investment banking --

A. Compliance, in essence.

Q. Okay. And so if you want to talk to a research analyst, you need to go through the control room?

A. That's right. And to talk to a research analyst, the call, the communications would need to be overseen by a chaperone who would monitor the nature of

Page 27

that conversation.

Q. And that chaperone is from the control room?

A. It's from compliance.

Q. And is there -- is compliance -- is there a distinction between control room and compliance?

A. There may be. It may be maybe a nomenclature issue. You can just think of them as compliance.

Q. Okay. So is the responsibilities of the compliance team to determine whether or not certain information can go from the investment banking team, for example, to the research analyst team?

A. In some cases.

Q. And you said the independence of investment analysts is -- sorry, of research analysts is important at Citi. Why is it important?

A. You know, in -- so the research analyst needs to determine their views on their own. You know, so that when they publish them, you know, they are independent and it's not influenced by the investment banking team.

Q. And is there a -- withdrawn.

Is the -- okay. Why might an investment banking team -- withdrawn.

An investment banking team could be motivated to influence the analyst -- the research analyst because

Page 28

-- no -- withdrawn.

Let me think about it. Well, I'll ask you.

Why -- why do you need to be careful not to let the investment banking team influence the research analysts?

MR. FINN: Objection to the form.

A. Sorry, can you -- can you rephrase that.

Q. Sure. I'll try it again. You mentioned that the role of the compliance team is to prevent the investment team from influencing the independent evaluation from the research analysts, right?

A. I believe so, yeah.

Q. So my question is, why does that control need to be in place? Why would the investment banking team want to influence the research analyst?

A. So the investment banking team -- so I don't know that I'd agree with the framing of that. The investment banking team, you know, in our case, you know, did not want to influence, you know, the research analysts, of course. You know, the thought is that, you know, you need to protect the independence of the research analyst's views.

That research is being read by institutional investors and so on. So you want those views to be independent and not influenced by a corporate

relationship the investment bank may have with a client.

Q.     So the investment bank has a client in whatever, say, for instance in this case, Smile Direct, right?  And their job is to advocate for that client and provide a service for that I client, right?

A.     In some cases, yeah, we -- so when Smile Direct Club engages us, it's typically to provide a service, yes.

Q.     Okay.  And so the role of -- of this -- of these regulations and the internal policies at Citi to prevent information flow is to prevent any motivation for the investment banking team to kind of get more positive result or more positive analysis from the research analyst covering that same company, right?

MR. FINN:  Objection to the form.

A.     I would say it's in place to safeguard the independence of research.

Q.     Okay.  Looking at this -- at this investment banking team here, who was responsible for -- who was the main point of contact -- let me step back.

There were other underwriters that worked on the Smile Direct IPO, right?

A.     Yes.

Q.     Who was the main point of contact for those other underwriters within the Citi team?

A.     So there were two leads, JP Morgan and Citi. And there were a handful of other book runners and a handful of other co-managers.  I don't recall exactly what conversations took place.  In a typical IPO, the leads will liaise with the more junior members of the syndicate.  I don't recall exactly who.

Q.     Was there a particular person at Citi who was the main point of contact for the other underwriters?

A.     I don't recall.  It could have been any member of the deal team.

Q.     Is it an accurate description to say that there was a free communication among everyone at Citi with everyone at the other underwriters?

A.     I don't know that -- yes, I mean, to the extent anyone at another underwriter needed to speak to anyone at Citi, they could call and speak to anyone at Citi. Sure.

Q.     So there's no prohibition from William Trapnell reaching out to JPM to ask them a question, if he had one?

A.     No, no.

Q.     You said book runner.  What's a book runner?

A.     Book runner is a term used to describe the banks who are leading a given equity offering.

Q.     Okay.  And in this case it was JPMorgan and

Citi, right?

A.     So based on my recollection, there was a distinction here, as is the case on many deals between active and passive.  JP Morgan and Citi were active.  So we were most involved, I would say.

Q.     What does an active book runner do that a nonactive one doesn't do?

A.     Spends more time with the company.

Q.     Do -- so active book runners do market research?

A.     That's one thing an active book runner could do, yes.

Q.     Well, let's understand the universe.  So the things we mentioned that you did in the investment banking team were market research, valuation and due diligence.  Is there anything I'm missing?

A.     We do a lot.  Those are three things we do.

Q.     Are those -- can you think of anything that I haven't mentioned in those three?

A.     I'm sure I can.  I mean, so we spend a lot of time, you know, formatting PowerPoints, for example. You know, working, you know, helping the client with anything they ask.  We try to be very friendly to our client and make their lives easier and so, you know, there could be any number of things.

Q.     But no actual -- beyond market research, valuation and due diligence, I understand you might make PowerPoints as part of that overall process.  Can you think of any other overall project -- I just want to make sure that as you sit here today, I understand the universe of tasks that an investment bank does for a client in an IPO?

A.     In an IPO, so we -- we could, you know, an investment bank could help set up investor meetings, for example.  That's an important part of an IPO.  You know, we'd work with our equity capital market syndicate desk who works with the equity sales force to set up investor meetings.  That's one part.

You know, we could help solicit feedback from those investors and help relay that to management so that they have a good understanding of, you know, what investors are thinking.  You know, those are a couple of the examples.

There are others.  You know, if you can think of any other specific things you'd like to ask, you know, additionally that we do, I'm happy to comment. Sitting here today, I don't know that I could list off everything that an investment banker does.

Q.     Okay.  I'm just trying to get as you understand it sitting here today.  That's fine.  And the reason for

asking that is because my next question is, you mentioned a difference between active book runners and inactive.

Is there such a thing as inactive book runner?

A. It's a question of nomenclature, passive. You know, again, it just means the level, of, you know, the interaction with the client. The level of advice being given is slightly lower.

Q. So for a passive book runner, do they still do market research, valuation, due diligence and investment coordination?

A. They would do everything.

Q. Just to a lesser extent?

A. Yes.

Q. If you flip the page on this -- oh, sorry, was there anyone at the Citibank investment banking team who was the primary contact for Smile Direct?

A. So we had many points of contact, but the main folks who were responsible for managing the relationship are Kevin Gallagher and Bob Jackey.

Q. Equity capital markets is the next team listed for Citi. What's their role?

A. Yeah, so as I mentioned at the outset, so health care investment banking works in partnership with equity capital markets on an IPO. Equity capital

markets specializes in equity offerings. That's their sole focus. And so, you know, when you are doing an IPO, you will work closely with them. They are more focused, as the name implies, on the markets. They spend more time with investors.

So they are a big -- a big part of their role is to understand investors and how investors might think about something like this, contacting investors, et cetera.

Q. And Russell Chong was the leader of that team?

A. Yeah, Russ, was the team head at that point it looks like.

Q. How about equity capital markets syndicate? What did that team do?

A. So there's a distinction between so called origination and syndicate. Origination is a little bit more corporate facing. So we work on investment banking a little bit more with them in servicing our corporate clients. The syndicate's main focus -- and again, they do some of this as well, but in general, is to focus on investors.

Q. Is it Paul Abrahimzadeh?

A. Paul, yes.

Q. And he was the lead of that team?

A. He was at the time, it looks like.

Q. Internal counsel speaks for itself, I think. Those are the lawyers that worked on the deal, internal counsel?

A. Oh, from Citi?

Q. Yeah.

A. Yes, it would appear so, yes.

Q. So there's no research analysts assigned to the Citi team. So are there no research analysts that help with the IPO?

A. So -- and I'm just reviewing this working group list. So, you know, going back to that independence point, there's no research analysts, it appears, on this working group list because again they're not part of the deal team, they're independent. And so that's part of the reason why there are -- you know, there appears that there's no research analyst on this list.

Q. Okay. You mentioned -- going back to your -- your kind of individual experience. Do you have experience -- any experience with health care before you took on that role that -- I think it was --

A. At UBS.

Q. -- at UBS?

A. In 2015. I did, but I wasn't focused specifically on it. So in prior roles, I would work across sectors. And so we may work with health care

clients, but I wasn't specifically focused on them. In 2015 is when I started focusing specifically on health care.

Q. Outside of your work as an investment banker, do have you any health care background?

A. I -- you know, the only degree I have is from Bowdoin College, an undergraduate degree.

Q. And it's not health care related?

A. It is not health care related.

Q. What's the difference between JPMorgan's role in the Smile Direct offering and Citi's role?

A. The roles are very similar. In this case, JPMorgan was lead left, which typically, you know, means that, you know they'll have outside economics on a deal, which, I believe was the case here. And you know, they are, you know, a little bit more senior to Citi. Probably, spending a little bit more time with the client, Smile Direct Club, but, you know, we're both very involved, and so it's nuanced.

Q. Okay. And by outside the economics, you mean they make more money off the deal than Citi does?

A. I believe they had a greater, yeah, percentage of the gross spread.

Q. Gross spread. What's the gross spread?

A. It refers to a percentage, commission, so to

**Page 113**

A.    I would imagine. I'd need to look at the document.

Q.    Do you know if that document was produced in this case?

A.    I do not.

Q.    And it also lays out the compensation that underwriters will receive for their services with respect to the IPO, right?

A.    It typically would.

Q.    Topic Number 20 is: The creation and maintenance of any documents produced by you in this action.

Are you prepared to testify on behalf of Citigroup with respect to Topic Number 20 today?

A.    Yes.

Q.    What -- does Citigroup have a document retention policy bank-wide?

A.    Yeah.

Q.    What is that policy?

A.    I'm sure it varies by the type of information, but, you know, we retain -- you know, and e-mails, information we received from a company on our shared drive. We have -- you know, as you may expect for a large financial institution like Citi, document retention is -- record retention is very important and

**Page 114**

we spend a lot of money on that, I'm sure. So we have all sorts of processes and backup servers, I'm sure, to help with that.

Q.    So are e-mails retained indefinitely at Citi?

A.    Indefinitely? I wouldn't be able to say. I'm sure there are -- I'm sure they're held for the appropriate time as kind of, you know, required by law and required by Citi's internal protocols.

Q.    You're not aware of any cutoff, time period in which e-mails are destroyed?

A.    I am not.

Q.    Was there a litigation hold with respect to the allegations in this case?

A.    I believe I received an e-mail hold related to I Smile Direct Club, yes.

Q.    Do you remember when that happened?

A.    I don't recall exactly when.

Q.    Can you approximate?

A.    I wouldn't want to, but I think it could have been shortly, you know, after the IPO. I forget exactly, though, to be honest.

Q.    What was the scope of that litigation hold?

A.    I'm not aware of the exact scope. You know, I think, in general, just given we have such good record retention policies, I consider anything that -- any

**Page 115**

e-mail that's sent, et cetera, as being preserved. Even if it's not necessarily preserved indefinitely, in my mind, you know, that's how I think about it. I saw the e-mail come across and it just -- I knew everything would be held.

Q.    So you interpret it to mean just don't --

A.    Just hold everything, yeah.

Q.    Does Citi have a policy for retaining information from persona; devices?

A.    Citi has a policy on personal devices, which is, based on my understanding, is not to use them.

Q.    You're not supposed to text about business purposes, right?

A.    No, under no circumstances.

Q.    But --

A.    I shouldn't say that. Under -- you are allowed under certain circumstances if it's kind of, you know, logistical or immaterial, some logistic matter. But otherwise, no.

Q.    So are -- we talked about the document retention policies of e-mails. Does that encompass texts from personal devices? Are those retained in the same way?

A.    Well, what we had discussed the retention of was Citi e-mails and the Citi policy for Citi e-mails.

**Page 116**

Citi doesn't retain information that are held on our personal devices.

Q.    That's -- the same is true for personal e-mails?

A.    Yeah.

Q.    Topic Number 21 is: Your employees use of personal e-mail, text messaging, chat services or any other short messaging services and multimedia messaging services, technology for business purposes including in connection with Smile Direct Club or the IPO.

Are you prepared to testify on behalf of Citigroup with respect to Topic Number 21 today?

A.    Yes.

Q.    We touched on it a bit. So your understanding with respect to text messaging, personal e-mails and other chat services for business purposes is that it's not allowed; is that right?

A.    Yes.

And I should clarify though, that it's not allowed under most circumstances. For logistical and other kind of minor uses it's permitted.

Q.    Okay.

MR. STEIN: I'm going to mark a document as Exhibit 60. This is a document produced by Citi, Bates number

CITI-SMILE-00018485 proceeding to 18488.

(Whereupon, CITI-SMILE-00018485-88 was marked as Exhibit 60, for identification, as of this date.)

Q. Let me know when you have it in front of you?

A. I have it.

Q. And the top e-mail is an e-mail from Kevin Gallagher to Robert Jackey on September 17, 2019, right?

A. Yes, that appears to be the date.

Q. And the subject of the e-mail is Re IPO fees, right?

A. Yes.

Q. And if you look -- just so we have some context for the e-mail. If you look at the bottom of the second page, there's an e-mail from Russell Chong --

A. Let me just see if I can scroll all the way down. I just want to make sure I see the entire thing. Okay.

Q. So if you look at the bottom of the second page, with the e-mail from Russell Chong to Tommy Rueger on September 15, , he says, "Tommy, thanks. Citi is totally supportive of the ask."

Do you see that?

A. Yes.

Q. So the subject -- the date, this is just

following the IPO on September 12, 2019, right?

A. Yeah, it appears to be a few days afterwards.

Q. And the subject is "IPO fees," so that's referring to the fees that Citi gets paid that 22 percent of 4.5 percent we talked about earlier, right?

MR. FINN: Object to the form.

A. Yeah, the subject of the e-mail is the subject of the e-mail. The subject says "IPO fees."

Q. Okay. So he says Citi is totally supportive of the ask. This is Russel talking to Tommy Rueger who is from JP Morgan, right?

A. Tommy is from JP Morgan.

Q. Okay. So is your interpretation of this e-mail that they're discussing to ask about that discretionary portion of the IPO fees from Smile Direct?

A. My interpretation of this e-mail if I scroll down all the way to the bottom, David Katzman states, we do not feel paying the 0.5 percent incentive fee for performance makes sense. And so that's the e-mail that got forwarded. And, you know, Russ says that Citi is supportive of that ask.

Q. Okay. So they're talking about reaching out to the company to discuss this fee, right?

A. "Should I reach out or should you". Yeah, it would appear Russ is asking Bob and Kevin who is best to

reach out to Kyle, the CFO, that's logistics.

Q. And it says "we have stuff to talk about", right?

A. It says "we have stuff to talk about", yes, that says that in the e-mail.

Q. And presumably they're talking about how the IPO -- how the company ended up performing in the IPO?

A. I shouldn't speculate about what Russ means by we have stuff to talk about.

Q. And in the next e-mail it says Kyle is pushing to just do it by phone. Kyle is Kyle Wailes in this case, right?

A. Yes, that would be my interpretation.

Q. He wants to have a meeting by phone, he doesn't want to meet with John Chirico and Russ Chong in person, right?

A. That's what Bob said, yes.

Q. Okay. And so then Kevin Gallagher says "I will text on the side to see if this is convenience to us or just something else."

So Kevin Gallagher is talking about texting Kyle Wailes on the side, right?

A. Yes. He appears to be texting him regarding a logistical matter, which as I mentioned is permitted.

Q. He's saying to see whether there's convenience

to us or something else, you're not on this e-mail, right?

A. No, I am not.

Q. So what leads you to belive this a just a logistical matter?

A. They're talking about logistics for most of the e-mail chain.

Q. Well, they're talking about the IPO fee, right?

A. But subsequent to that.

Q. They're talking about a direct meeting between John Chirico and the CFO of the company, right?

A. Yeah, I would say my interpretation just reading these e-mails today and going through and reading Kevin's most recent response is that Kevin is saying he is going to text him on this logistical matter.

Q. How is a meeting between a head person at Citibank and a head person at SDC a logistical matter?

A. Well, it needs to be scheduled, so time and place, and where that's scheduled, I consider to be logistical. My interpretation of this would be that he's not planning to go through the entire content of the meeting they're looking to set up over text. It appears that over text, he's looking to confirm logistics.

Q.    Well, he's texting Kyle Wailes to see why he doesn't want to meet in person, right?

A.    And again, I don't even know if this text happened, but this is what -- it seems like he's texting on logistical items, that's my own view.

Q.    Okay.  So you said you prepared for this topic, Topic 21.  Did you talk to Kevin Gallagher about whether or not he had texts -- texted about business purposes for the Smile Direct IPO?

A.    I did not speak to Kevin.

Q.    Did you speak to anyone about whether or not they use text to communicate for business purposes with respect to the Smile Direct IPO?

A.    No.

Q.    Does Kevin still work at the company?

A.    Kevin does not work at Citi any longer.

Q.    How about Robert or Bob Jackey?

A.    Bob Jackey also doesn't work at Citi.

Q.    Did you ever contact with Kevin or Bob?

A.    You know, not on a regular basis.  From time to time.

Q.    When is the last time you talked to Kevin?

A.    I think I saw him in January in San Francisco, I walked past him.

Q.    Okay.  Do you have his phone number?

A.    No.

Q.    What about Bob Jackey?

A.    Probably saw Bob around that time.  There's a big healthcare conference in San Francisco, where you walk into a lot of people at that time.  I can't recall if I've spoken to him since, it's possible.

Q.    Where does Kevin work now?

A.    I believe -- this needs to be confirmed.  I believe Kevin is the CFO of a company called MindMaze based in Europe.

Q.    But he still works in the U.S.?

A.    No, I think he -- so at the time he was actually based in London.  Bob was based in New York and they partnered on this.

Q.    Let me ask you this, does anyone from the Citigroup team who worked on the IPO in the working group list still work at Citi?

A.    I'd need to check -- so on the working group list, I would need to see it again.  I think there may be e-mail on the equity capital markets team.  Russ for instance, Paul Abrahimzadeh, they still work here.  There could be members of the legal team that still work here.

Q.    Okay.  Let's look at Exhibit 55 again.  Is it in front of you?

A.    Yes.

Q.    We're going back to page 4 of the document this is the working group list for Citi?

A.    Yep.

Q.    John Chirico does he still work there?

A.    Yes.

Q.    And you didn't talk to him about his use of texts, right?

A.    No, however, I believe I was on an e-mail with John and Russ that -- I forget who sent it.  It might have even been Maryana.  Asking us to confirm whether or not we used texts on this IPO.  If memory serves, I believe everyone replied no, that they had not.  That's my understanding.  But again, I don't speak to John very often.  Yeah.

Q.    When was that e-mail that you received from John?

A.    I don't know months -- I'm not sure.  That's just my memory.  I believe, yeah it was, yeah, maybe a couple of months ago, a few months ago.

Q.    And it was sent to a group of people who worked on the Smile Direct Club club IPO?

A.    So I think it was John, Russ and I.  Yeah.

Q.    But did it include everyone who worked on the IPO?

A.    So as I think you're going to get to, as you go down this list, some folks have left.  So they weren't included on that.

Q.    Okay.  And you think this was a couple of months ago, like two months ago?

A.    I don't know the exact time, I don't want to speculate.

Q.    And even though you were asked to prepare today to talk about Topic 21, which discusses the use of e-mails, you didn't review that e-mail in preparation for your deposition today?

A.    I didn't review what e-mail?

Q.    Did you review the e-mail from John Chirico regarding the team member's use of text messages in preparation for the deposition today?

A.    I recall that you know, no one used, you know, personal devices in connection with this.  That's my recollection.

Q.    How did you arrive at that conclusion?

A.    I recalled.

Q.    Recalled what?

A.    I recalled the e-mail.

Q.    You re -- okay.  So you're talking about just from the e-mail from John Chirico that went out to, you think everyone who was working on the Smile Direct Club

IPO that's still at the company?

A.    Again, this one one e-mail, I didn't send it. I replied, that -- to the affirmative, I had not used text, so --

Q.    Okay.  So you're not sure who that e-mail went to?

A.    My recollection is that it went to John and Russ.  But I don't know if other e-mails were sent to -- that was one e-mail I was copied on.

Q.    So you don't know whether or not John sent that same e-mail to everyone on the team or not?

A.    Well, again, John -- John, I believe replied all to that e-mail.  John wasn't sending the e-mail.  I believe it was someone in legal.

Q.    Someone in legal sent the e-mail to John?

A.    Initially to Russ, myself, and John.

Q.    And those are the only people who were the recipients of that e-mail?

A.    My recollection.

Q.    Those individuals to your recollection, replied that they did not use texts?

A.    That is my recollection.

Q.    But as to the other members on the e-mail that weren't on the team, you don't?

A.    I would say that Citi has a policy whereby we

are not supposed to text, so they should not have been on any material matters, logistical, okay, but that's it.

Q.    Do you still have that e-mail?

A.    I don't delete e-mails.

Q.    So yes?

A.    (Indicating.)

Q.    Does Greg Joseph still work at Citi?

A.    No.

Q.    How about Matt Lawrence?

A.    No.

Q.    How about William Trapnell?

A.    No.

Q.    Sarah Bayer?

A.    Good question.  Maybe.

Q.    Did you ask Sarah Bayer if she texted about business-related purposes in the Smile Direct IPO?

A.    No.

Q.    How about Dean Poniros?

A.    He no longer works at the firm.

Q.    Eric Lang, does he still work there?

A.    I don't know who Eric is.

Q.    But you didn't check to see if he still works there?

A.    I did not.

Q.    What about Roma Romaniv?

A.    I did not.

Q.    Catherine Yeo?

A.    I did not.  She may no longer work at the firm.

Q.    But you didn't check?

A.    I did not.

Q.    Michelle Wang?

A.    Michelle Wang, no, I did not.

Q.    What about Paul Abrahimzadeh?

A.    I did not.

Q.    He still works there.  You know that, right?

A.    Yeah, so does Chris.

Q.    You didn't check with Chris either?

A.    I did not.

Q.    You didn't get any e-mails relating to any of these people either, right?

A.    Based on best of my recollection, no.

Q.    So for everyone but you, Russ and John, you're not sure whether or not they texted about business-related purposes with regard to Smile Direct Club, right?

A.    I did not reach out to them specifically on that topic.  We have a policy at Citi that we take seriously about no texting, about the serious matters, non-logistical.

(Whereupon, Order Instituting Administrative Cease and Desist Proceedings Pursuant to Section 15(b), 21(c) of the Securities and Exchange Act of 1934, making the findings and posing remedial sanction and a cease and desist order was marked as Exhibit 61, for identification, as of this date.)

Q.    Exhibit 61, this is a document from the Securities and Exchange Commission in litigation called In the Matter of Citigroup Global Markets Inc., Respondent.  The title of the document is "Order Instituting Administrative Cease and Desist Proceedings Pursuant to Section 15(b), 21(c) of the Securities and Exchange Act of 1934, making the findings and posing remedial sanction and a cease and desist order."

Do you see the document?

A.    I do.

Q.    And you can see in paragraph 1 that the SEC deems it appropriate and in the public interest that public administrative and cease and desist proceedings be and hereby are instituted pursuant to Sections B and 21(c) of the Securities and Exchange Act of 1934 against Citigroup Global Markets Inc., right?

A.    Yes.

Q.    Were you aware that Citigroup got sanctioned by

Page 157

MR. STEIN: We're going to mark as 63, document produced by Citi CITI-SMILE-00021594.

(Whereupon, CITI-SMILE-00021594 was marked as Exhibit 63, for identification, as of this date.)

Q.    Let me know when it's front of you.

A.    Yes.

Q.    This is an e-mail from you to you on July 31, 2019 with the subject SDC call with Steph notes (7/31/19).

Do you see that?

A.    I do.

Q.    Do you recall sending this e-mail?

A.    I don't.

Q.    Any reason to doubt that you sent it?

A.    No, it looks like it was sent from me to me.

Q.    Is Steph referring to Steph Demko?

A.    I would imagine so.

Q.    And Steph Demko was that research analyst that you had mentioned earlier?

A.    Yes, she was the Citi research analyst on the IPO, yes.

Q.    And this is notes from a call that you had with Steph?

A.    The e-mail -- again, so I don't recall this

Page 158

e-mail, but it states that it was call with Steph notes on 7/31.

Q.    Do you recall having a call with Steph on July 31, 2019?

A.    I don't recall having a call on July 31st. We speak regularly with the research analysts in a chaperoned capacity throughout the course of a transaction.

Q.    What do you mean by "chaperoned capacity"?

A.    So again, to maintain the independence of research, investment bankers are not allowed to directly communicate with the research department unless someone from compliance is chaperoning the call and making sure that the conversation stays focused on diligence and business issues.

Q.    Who from compliance was assigned to this -- to oversee Smile Direct Club transaction?

A.    There's typically a group of people and it could be any, you know any number of kind of five to ten. I don't know the size of the team. But there's multiple people from the compliance team who help us out.

Q.    You don't remember in this case who was chaperoning your calls with Steph?

A.    I don't.

Page 159

Q.    You don't recall this specific call, right?

A.    Again, we had many calls, with Stephanie over the course of the transaction. I remember, you know, at a high level having those calls. I don't remember this specific call.

Q.    And in the notes from the call you say "still no quarterlies". What's that mean?

A.    I would be speculating at this point there's not much to work with there. I'm a bad note taker evidently.

Q.    Does quarterlies refer to financial quarters, is that how you would use that?

A.    It could, there's not a lot of context here.

Q.    The second to last line before the list of companies says forward revenue for evaluation purposes?

A.    What I would assume this means is what we spoke about earlier which is to say that a forward revenue multiple, you know, could be an evaluation framework methodology.

Q.    That's where you take projected revenues from future years and apply them multiple to determine the value of the company?

A.    That's correct. You divide the firm value of that company by the revenue to arrive at a multiple.

Q.    And the last line here says "high single digits

Page 160

revenue multiple"; is that right?

A.    That's what it says.

Q.    It says "rev multiple", but that means revenue multiple?

A.    Yes.

Q.    The multiple apply to future revenues to determine the valuation would be in the high single digits?

A.    Again, I don't know what that's referring to. There's a list of companies above that. Is it referring to those companies? It's hard to say based on these poor notes.

MR. STEIN: Exhibit 64 I'll mark for the record this is a document produced by Citibank Citigroup, CITI-SMILE-00022652 and proceeding on to 658.

(Whereupon, CITI-SMILE-00022652-58 was marked as Exhibit 64, for identification, as of this date.)

Q.    Let me know it's in front of you.

A.    Yes.

Q.    As e-mails typically are, the first e-mail is actually on the last page. So if you scroll to the last page, I'll start there?

A.    Yes.

**Page 257**

C E R T I F I C A T E

STATE OF NEW YORK      )

) ss.:

COUNTY OF QUEENS )

I, BROOKE E. PERRY, a Notary Public within and for the State of New York, do hereby certify:

That JORDAN TERMINE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage; and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 28th day of July 2023.

*Brooke E. Perry*
----------------------
BROOKE E. PERRY

**Page 258**

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Franchi vs. SmileDirectClub

Date of Deposition: 07/28/2023

Job No.:10124065

I, JORDAN TERMINE, hereby certify under penalty of perjury under the laws of the State of _____ that the foregoing is true and correct.

Executed this _____ day of _____, 2023, at _____.

_____
JORDAN TERMINE

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__, by_____,    proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

**Page 259**

DEPOSITION ERRATA SHEET

Case Name: Franchi vs. SmileDirectClub

Name of Witness: Jordan Termine

Date of Deposition: 07/28/2023

Job No.:10124065

Reason Codes:  1. To clarify the record.

2. To conform to the facts.

3. To correct transcription errors.

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

**Page 260**

DEPOSITION ERRATA SHEET

Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____
Page _____ Line _____ Reason _____
From _____ to _____

_____ Subject to the above changes, I certify that the transcript is true and correct

_____ No changes have been made. I certify that the transcript  is true and correct.

_____
JORDAN TERMINE

Case 3:19-cv-00962     Document 151-2     Filed 09/01/23     Page 16 of 19 PageID #: 8257
Page 257..260
www.aptusCR.com

DECLARATION UNDER PENALTY OF PERJURY

Case Name: Franchi vs. SmileDirectClub

Date of Deposition: 07/28/2023

Job No.:10124065

I, JORDAN TERMINE, hereby certify under penalty of perjury under the laws of the State of Tennessee _____ that the foregoing is true and correct. Executed this *31* day of *August* _____, 2023, at *5PM* _____.

_____
JORDAN TERMINE

NOTARIZATION (If Required)

State of _____

County of _____

Subscribed and sworn to (or affirmed) before me on this _____ day of _____, 20__, by_____,   proved to me on the basis of satisfactory evidence to be the person who appeared before me.

Signature: _____ (Seal)

www.aptusCR.com

**ERRATA SHEET FOR THE DEPOSITION OF
JORDAN TERMINE, TAKEN ON JULY 28, 2023**

| Page:Line | From | To | Reason |
|---|---|---|---|
| 23:23-24 | folks you use | folks use | Transcription error |
| 27:6 | May be maybe | May be mainly | Transcription error |
| 36:14 | outside | outsized | Transcription error |
| 42:7 | works | worked | Transcription error |
| 52:5 | sale | sales | Transcription error |
| 60:11 | there | their | Transcription error |
| 65:24 | perspective | prospective | Transcription error |
| 72:19 | is typically is | is typically just | Transcription error |
| 79:3 | training | trainings | Transcription error |
| 103:5 | look revenue | look at revenue | Transcription error |
| 103:6 | the a value | the value | Transcription error |
| 104:5 | with their | with where their | Transcription error |
| 109:21 | number | numbers | Transcription error |
| 110:2-3 | we a lot | we have a lot | Transcription error |
| 111:12 | quite | quiet | Transcription error |
| 113:21 | know, and e-mails | know, e-mails | Transcription error |
| 114:15 | to I Smile Direct | to Smile Direct | Transcription error |
| 120:22 | content | contents | Transcription error |
| 122:20 | be e-mail on | be people on | Transcription error |
| 129:6 | aware of that | aware that | Transcription error |
| 130:22 | off challenge | off channel | Transcription error |
| 132:15 | act canning | contacting | Transcription error |
| 134:10 | too | to | Transcription error |
| 142:10 | any type | any time | Transcription error |
| 143:10 | stated as an | stated was an | Transcription error |
| 144:5 | specific | statistic | Transcription error |
| 145:1 | there's | theirs | Transcription error |
| 145:13 | know, refer referrals | know, referrals | Transcription error |
| 145:24 | would you | you would | Transcription error |
| 159:18 | an evaluation | a valuation | Transcription error |
| 163:19 | thing | things | Transcription error |
| 166:14 | they're are notes | they're notes | Transcription error |
| 167:19 | vesting | vetting | Transcription error |
| 171:20 | projects | projections | Transcription error |
| 177:6 | warrants | wants | Transcription error |
| 179:3 | discreet | discrete | Transcription error |
| 179:14 | effective | effect of | Transcription error |
| 180:18 | discreet | discrete | Transcription error |
| 181:2 | they say see | they've seen | Transcription error |
| 181:14 | discreet | discrete | Transcription error |

1

| Page:Line | From | To | Reason |
|---|---|---|---|
| 183:7 | redigering | rejiggering | Transcription error |
| 183:23 | discreet | discrete | Transcription error |
| 186:25 | relay | relayed | Transcription error |
| 188:18 | discreet | discrete | Transcription error |
| 192:7 | pulls | pulled | Transcription error |
| 197:14 | IPO in | IPO were in | Transcription error |
| 197:18 | discreet | discrete | Transcription error |
| 198:11 | discreet | discrete | Transcription error |
| 207:19 | discreet | discrete | Transcription error |
| 217:15 | hand | had | Transcription error |
| 217:20 | for this important | for this company is important | Transcription error |
| 219:14 | direct | draft | Transcription error |
| 230:21 | include | included | Transcription error |
| 231:4 | w | we | Transcription error |
| 235:7 | financial | financials | Transcription error |
| 239:21-22 | continue to the coverage | continue to coverage, cover | Transcription error |
| 243:24 | over values | overvalued | Transcription error |
| 244:12 | 0012 | 1,200 | Transcription error |
| 244:19 | know, tent tend | know, tend | Transcription error |

Subject to the above changes, I certify that the transcript is true and correct.

_____
Jordan Termine