# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

ADAM FRANCHI, Individually and on )
Behalf of All Others Similarly Situated, )
    Plaintiff, )
           )
v. )        **Case No. 3:19-cv-00962 (Consolidated)**
           )        **Judge Richardson/Frensley**
SMILEDIRECTCLUB, INC., et al., )
    Defendants. )

## ORDER

## I.      INTRODUCTION

In these consolidated securities class actions, Plaintiffs allege that they purchased common stock of Defendant SmileDirectClub, Inc. ("SDC") during the relevant period around the time of SDC's Initial Public Offering ("IPO"). Docket No. 85 (Amended Complaint). They allege that Defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5). *Id.* Defendants include SDC, individual SDC executives, and several financial institutions, termed "the Underwriter Defendants," who are alleged to have "acted as underwriters of the IPO and participated in the drafting and dissemination of the Registration Statement as well as the sale of more than $1.345 billion of SDC common stock to the Class." *Id.* at 14. Defendants have denied the substantive allegations and asserted affirmative defenses. Docket Nos. 117, 118 (Answers).

This matter is now before the Court upon a Joint Discovery Dispute Statement filed by the Parties. Docket No. 138. The Parties have filed numerous supporting documents. Docket Nos. 138-1 through 138-21. Plaintiffs have filed a "Notice of Supplemental Evidence in Support of the Joint Discovery Dispute Statement" and additional supporting documents. Docket Nos. 149, 149-

1 through 149-8.  The Underwriter Defendants have filed a "Response to Plaintiffs' Improper 'Notice of Supplemental Evidence'" and other supporting documents.  Docket Nos. 151, 151-1, 151-2.  For the reasons set forth below, the Court finds that the Underwriter Defendants need not produce sworn declarations regarding their use of unofficial means of communications or their document preservation policies.  Upon being deposed, the Underwriter Defendants must be prepared to testify regarding the use of unofficial means of communications to conduct substantive business related to the SDC IPO.  As the dispute regarding discovery from analysts appears to now be moot, there is nothing for the Court to resolve in that regard.

## II.  LAW AND ANALYSIS

### A.      Discovery in Federal Court

Discovery in federal court is governed by the Federal Rules of Civil Procedure, which provide that a party may request production of documents or other tangible items as long as the information sought is within the scope of discovery.  Fed. R. Civ. P. 34(a); *see also* Fed. R. Civ. P. 26(b)(1).  In general, the scope of discovery extends to nonprivileged information that is relevant to any party's claim or defense, regardless of whether the information sought is admissible, that is "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  The Rules were amended, effective December 1, 2015, in part to address the alleged costs and abuses attendant to discovery.  Under Rule 26, "[t]here is now a specific duty for the court and the parties to consider discovery in the light of its 'proportional[ity] to the needs of the case . . . .'"  *Turner v. Chrysler Grp. LLC*, No. 3:14-1747, 2016 U.S. Dist. LEXIS 11133, at *2, (M.D. Tenn. Jan. 27, 2016), *quoting* Fed. R. Civ. P. 26(b)(1).  The following factors are relevant to a consideration of whether the scope of discovery is proportional:

> (1) the importance of the issues at stake in the action,
> (2) the amount in controversy,

> (3) the parties' relative access to relevant information,
> (4) the parties' resources,
> (5) the importance of the discovery in resolving the issues, and
> (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1) (numbering added). "Nevertheless, the scope of discovery is, of course, within the broad discretion of the trial court." *United States v. Carell*, No. 3:09-0445, 2011 U.S. Dist. LEXIS 57435 at *5 (M.D. Tenn. May 26, 2011), *quoting Lewis v. ACB Bus. Servs., Inc.*, 135 F.3d 389, 402 (6th Cir. 1998) (internal quotation marks omitted).

After making a good faith effort to resolve a dispute, a party may move for an order compelling discovery. Fed. R. Civ. P. 37(a)(1). The moving party "must demonstrate that the requests are relevant to the claims or defenses in the pending action." *Carell*, 2011 U.S. Dist. LEXIS 57435 at *5, *quoting Anderson v. Dillard's, Inc.*, 251 F.R.D. 307, 309-10 (W.D. Tenn. 2008) (internal quotation marks omitted). "Relevance for purposes of discovery is broadly construed and the information sought need not be admissible to be discoverable." *T.C. ex rel S.C. v. Metro Gov't of Nashville & Davidson Cty.*, No. 3:17-01098, 2018 WL 3348728, 2018 U.S. Dist. LEXIS 113517, at *17 (M.D. Tenn. July 9, 2018). "If relevancy is shown, the party resisting discovery bears the burden of demonstrating why the request is unduly burdensome or otherwise not discoverable under the Federal Rules." *Carrell*, 2011 U.S. Dist. LEXIS 57435, at *5 (internal quotation marks and citation omitted).

The Court has the authority under Rule 26(b)(2)(C) to limit the frequency or the extent of discovery otherwise allowed by the rules. The Sixth Circuit has observed that "the desire to allow broad discovery is not without limits and the trial court is given wide discretion in balancing the needs and rights of both plaintiff and defendant." *Surles v. Greyhound Lines, Inc.*, 474 F. 3d 288, 305 (6th Cir. 2007), *quoting Scales v. J. C. Bradford*, 925 F. 2d 901, 906 (6th Cir. 1996). As to

3

the judge's role in discovery disputes, "[t]he revisions in Rule 26(b)(2) are intended to provide the court with broader discretion to impose additional restrictions on the scope and extent of discovery." *Surles,* 474 F. 3d at 305. That sentiment has continued through subsequent revisions to Rule 26 including the most recent ones.

The Court also possesses inherent authority to manage litigation. As noted by the First Circuit, "[a]s lawyers became more adept in utilizing the liberalized rules . . . [t]he bench began to use its inherent powers to take a more active, hands on approach to the management of pending litigation." *In re San Juan DuPont Plaza Hotel Fire Litigation*, 859 F. 2d 1007, 1011 (1st Cir. 1988). "The judiciary is 'free, within reason to exercise this inherent judicial power in flexible pragmatic ways.'" *Id.* at 1011, n.2, *quoting HMG Property Investors, Inc. v. Parque Indus. Rio Canas, Ins.*, 847 F. 2d 908, 916 (1st Cir. 1988).

**B.      The Parties' Discovery Dispute**

**1.      Use of "Unofficial Means of Communications"**

Plaintiffs assert that "[a]t least certain Underwriter Defendants used messaging platforms and unapproved electronic communication methods (such as texts, personal email, internal chat, and external messaging systems like WhatsApp) to communicate about the work they did on the SmileDirectClub, Inc. . . . initial public offering . . . ."[1] Docket No. 138, p. 2. Plaintiffs contend that "[t]hese forms of communications violated at least certain Underwriter Defendants' internal policies, and these Underwriter Defendants very likely failed to preserve such communications despite their relevance."[2] *Id.* at 3. Plaintiffs further contend that "[t]he Underwriter Defendants'

[1] For the purposes of this Order, the Court will collectively refer to all such communication methods as "unofficial means of communications."

[2] Plaintiffs' assertion is based in part on the fact that some of the Underwriter Defendants have entered into settlements with the SEC related to allegations that their employees had used personal devices and unofficial means of communications for business purposes. *See* Docket Nos. 138-14

4

messaging platforms and unapproved electronic communications, as well as the potential spoliation of such evidence, are relevant to the claims and defenses in this case." *Id.* at 5.

By letter, Plaintiffs requested that Defendants provide the following information:

> (1) [W]hether any Underwriter Defendant indicates it used another form of communication (text, personal email, external chat, internal messaging) and what type(s) it used; (2) whether you otherwise determine that such forms of communications were used by any Underwriter Defendant and what type(s) they used; (3) whether such forms of communication were preserved; and (4) whether you intend to search these sources for relevant documents as part of this litigation.

Docket No. 138-20, p. 3-4. According to Plaintiffs, the Underwriter Defendants "have refused to answer these foundational questions." Docket No. 138, p. 6.

Defendants contend that Judge Richardson's Order set the scope of discovery in this matter to cover "only three limited theories about statements made in the offering documents" which "focus exclusively on statements made by SDC, not the Underwriter Defendants:"

> (i) [A]lleged statements about some "positive trend in SDC's revenue, gross profits, and Adjusted EBITDA while omitting the fact that these metrics were actually declining at the time of the IPO"; (ii) alleged misrepresentations about "SDC's standard of care"; and (iii) alleged misrepresentations about "the regulatory and legislative risks faced by SDC." Those claims focus exclusively on statements made by SDC, not the Underwriter Defendants, and the Underwriter Defendants are only parties to some but not all claims asserted in this case by virtue of a statutory provision that renders them jointly and severally liable in certain limited circumstances.

---

through 138-19. Defendants maintain that the SEC settlements "in no way suggest that any information relevant to the claims and defenses *in this case* was not properly retained and produced." Docket No. 138, p. 22 (emphasis in original). Defendants assert that "[h]ere, following the filing of numerous securities class actions in the weeks after SDC's IPO, the Underwriter Defendants promptly placed relevant personnel involved in that transaction on specific legal holds and notified them to retain all documents and communications of any kind related to the IPO . . . all of the current employee custodians that the Underwriter Defendants have access to have now confirmed that they did not use personal text messaging or other channels of communication that have not already been collected for substantive business related to the SDC IPO." *Id.* at 22-23.

5

*Id.* at 17-18, *quoting* Docket No. 106, p. 20, 30, 31 (internal citations omitted).

Defendants argue that in IPO securities cases such as this, "documents produced by underwriting banks are primarily relevant to the underwriters' so-called 'due diligence' and not the plaintiffs' affirmative case." *Id.* at 18. Defendants assert that "[t]he Underwriter Defendants have a limited role in this case" and that Plaintiffs' efforts to gain more information from them (and the "sell-side analysts," as discussed below) "constitute a transparent fishing expedition aimed at imposing unreasonable costs and burdens on the Underwriter Defendants and their current and former employees." *Id.* at 14.

Although Defendants contend that discovery from the Underwriter Defendants is irrelevant, they maintain that they have nevertheless expanded their original document searches "to emails, instant messages, and other relevant communications of 14 individual custodians across all ten Underwriter Defendants," asserting that "[t]hese custodians comprise the individuals that were primarily responsible for work on SDC's IPO." *Id.* at 20. Defendants maintain that they "also largely agreed to Plaintiffs' different search terms, which will require duplicative searches of JPM [the Underwriter Defendant alleged to likely possess the bulk of any relevant documents] custodians' documents" at an estimated cost of "at least $250,000 for lawyer review time and for data processing and hosting fees . . . ."[3] *Id.*

---

[3] Defendants also argue that Plaintiffs should coordinate discovery with the pending Tennessee state court action that relates to the same alleged conduct rather than "ignor[ing] the Underwriter Defendants' earlier productions and demand[ing] that they start from scratch by running a different set of broad search terms for dozens of additional custodians across each of the ten banks involved in the IPO." Docket No. 138, p. 19. While the Court finds that coordination with the discovery process in the state court action is related to considerations of proportionality, the Court agrees with Plaintiffs that there are likely areas of information relevant to the claims and defenses in the federal case that are not identical to those in the state court action.

6

## a) Declarations

Plaintiffs ask the Court to order "each of the 14 current Underwriter Defendant custodians – and any future Underwriter Defendant custodians" to produce a sworn declaration that:

> (a) lists with specificity the types, if any, of messaging platforms and unapproved electronic communication methods the individual used for business purposes at the time of his or her work on the SDC IPO (*e.g.*, WhatsApp, text, personal email, internal messaging applications, etc.);
>
> (b) indicates, for each type of other communication used, whether the communications were: (i) entirely destroyed or otherwise unrecoverable; (ii) partially destroyed or unrecoverable (providing as much information about the quantity destroyed as possible); or (iii) fully recoverable; and
>
> (c) attests that all forms of recoverable communication have been turned over to counsel for collection, review, and production.

*Id.* at 6-7.

Defendants maintain that Plaintiffs have provided no authority for the "extraordinary request" for sworn declarations regarding "unapproved communication methods" from the Underwriter Defendants. *Id.* at 15. Defendants argue that they have no control over former employees and are unable to compel them to give sworn declarations. *Id.* at 16. Particularly as "Plaintiffs have already indicated that they intend to take multiple depositions of witnesses from the Underwriter Defendants," Defendants assert that deposition testimony is the best method for getting information about retention of relevant documents, and that "[t]here is no reasonable basis for any further discovery about discovery." *Id.*

Furthermore, Defendants contend that they have already addressed Plaintiffs' concern about communications on personal devices:

> Plaintiffs raised during a meet-and-confer call in January 2023 the fact that certain Underwriter Defendants had entered into settlements with the SEC regarding historical record-keeping

> practices for communications on employees' personal devices. In response, the Underwriter Defendants informed Plaintiffs that they would confirm with current employee custodians where their relevant and responsive business documents and communications were and collect them. To the extent that any relevant and responsive communications are identified that were not retained, the Underwriter Defendants also agreed to disclose that fact.
> . . .
> The Underwriter Defendants have done just that, and there is no indication that other channels of communications like personal text messaging were used for substantive business relating to the SDC IPO.

*Id.* at 20.

Plaintiffs maintain that recent depositions of Underwriter Defendants JPMorgan and Citi, taken pursuant to Fed. R. Civ. P. 30(b)(6), provided further basis for requesting discovery regarding unofficial means of communications (and from research analysts). Docket No. 149. Plaintiffs argue that the depositions "make clear that the same personnel who worked on the SDC IPO engaged in improper communications during the SDC IPO in violation of applicable policies." *Id.* at 2.

The Court has examined the deposition transcript excerpts provided by Plaintiffs and finds that there is no evidence that personnel from the Underwriter Defendants used unofficial means of communications to conduct substantive business related to the SDC IPO. The documents provided by Plaintiffs reveal only logistical, not substantive, communications. *See* Docket Nos. 138-2 through 138-13.[4] The fact that personnel used such communication methods around the same time period, or even that they used those methods to have non-substantive communications related to SDC, is not sufficient to justify additional discovery into unofficial means of communications.

---

[4] Recent deposition testimony does not change this picture. Instead, the witnesses confirmed that unofficial means of communications were used primarily for logistical matters and occasionally to confirm information that was also sent in an email. *See, e.g.*, Docket No. 149-2, p. 6.

This is particularly true because Defendants have represented to the Court that "the Underwriter Defendants have already confirmed with each of the relevant custodians that are still employed by their respective banks that they did *not* engage in substantive communications relating to their work on the SDC IPO outside of their firms' normal channels (*i.e.*, emails or internal messaging systems that are already being searched." Docket No. 138, p. 16 (emphasis in original). At this point, the likely benefit of additional document discovery is low relative to the burden of producing declarations from both current and former employees (and those who may yet be named in the future) and renders such an exercise disproportionate to the needs of the case.

Nevertheless, Plaintiffs are entitled to ask questions about the use of unofficial means of communications in order to determine whether the benefit of such discovery might be greater than it currently appears. Despite initially refusing to prepare a witness to testify on this topic, at least one of the two Underwriter Defendants that have been deposed appear to have provided relevant testimony. *See* Docket Nos. 149-4, p. 4; 151-1, p. 15. Going forward, when this topic is noticed, the Underwriter Defendants must prepare their Rule 30(b)(6) witnesses to testify accordingly.[5]

**b)      Document Retention Policies**

Plaintiffs also ask the Court to order each Underwriter Defendant to produce:

> (i) all policies and procedures governing its use of messaging platforms and electronic communication methods; (ii) all policies and procedures governing the preservation of such communications in effect from January 1, 2019 to October 31, 2019; and (iii) all documents concerning violations of such policies during that same time frame.

---

[5] This topic, as originally noticed by Plaintiffs, is too broad. *See, e.g.*, Docket No. 149-3, p. 12. The Court finds that Plaintiffs have not established that the information sought by the deposition topic is relevant to the claims and defenses in this case. Therefore, the Court will modify the topic to seek only information regarding the use of unofficial means of communications to conduct substantive work on the SDC IPO.

Docket No. 138, p. 7 (footnote omitted).

Defendants maintain that there is no justification for such a request, arguing that "Plaintiffs have pointed to no evidence that the Underwriter Defendants failed to preserve any relevant information." *Id.* at 27.

The Court agrees that at this time, there is no justification for the production of such policies. If evidence of the destruction of relevant documents surfaces at a later date, the Court will reconsider this question.

### 2. Analysts' Reports

Plaintiffs additionally seek discovery, including "research materials, models, and communications" from seven Defendants whom Plaintiffs term "the Analyst Underwriter Defendants," described as those who "[i]n addition to underwriting the SDC IPO . . . also subsequently followed SDC as financial analysts and submitted reports to the investing public commenting on the Company's financials, explaining the basis for past stock price movements and predicting future financial performance." *Id.* at 11. Plaintiffs maintain that "[t]he Analyst Underwriter Defendants have refused to provide anything other than the reports themselves, which are already publicly available." *Id.* Plaintiffs argue that "such documents will help Plaintiffs and their experts establish the materiality of information disseminated to the investing public and provide insight into what caused SDC's price to drop, resulting in losses to the class. *Id.* at 11-12 (footnote omitted). Plaintiffs also "seek discovery probative of whether the same entities destroyed or failed to preserve communications relevant to this case, including a limited number of declarations, preservation policies, and documents concerning violations of those policies." *Id.* at 8.

Defendants argue that "Plaintiffs fail to provide even a baseline articulation of the

relevance of those documents, let alone explain how costly and time-consuming searches of documents at seven of the Underwriter Defendants would be proportional to the needs of the case." *Id.* at 28-29. Defendants argue that the Analysts' reports are irrelevant to the claims and defenses in this case:

> Plaintiffs' securities claims arise from purported misrepresentations or omissions in SDC's IPO offering documents that were filed with the SEC in 2019. There is no allegation that analysts either did any work on the IPO on behalf of the Underwriter Defendants, or were part of any IPO deal team. Instead, they issued independent research reports *after* the IPO occurred and SDC's stock began to trade publicly.
> . . .
> Plaintiffs fail to identify anything in any analyst's published report related to the materiality of any of the alleged misrepresentations *at issue in this case*, let alone that additional information from that analyst's files are needed.

*Id.* at 29 (emphasis in original).

Defendants contend that searching for the requested information would be unreasonably burdensome: "[b]ased on preliminary estimates (because the relevant analysts' documents have not been collected), these searches could include more than 40,000 documents, which would cost at least $200,000 to search and review alone." *Id.* at 30. Defendants argue that the cost is not proportional to the needs of the case, and that if the Court does order discovery into the analysts' documents, it should allocate the cost of that discovery to Plaintiffs. *Id.*

Based on the recent Rule 30(b)(6) depositions of Underwriter Defendants JPMorgan and Citi, Plaintiffs contend that there is evidence that certain information "regarding SDC's significant financial downturn in the third quarter of 2019" was disclosed to "their in-house research analysts even though it was not disclosed in the Registration Statement." Docket No. 149, p. 5, *citing* Docket No. 149-2, p. 4. Plaintiffs argue that the analysts' reactions to the information suggest that it was material and should have been disclosed to investors. *Id.* at 6.

In their most recent filing, Defendants represent to the Court that "the research analyst issue raised in the Joint Discovery Statement and the Notice is now moot." Docket No. 151, p. 2. Defendants assert that "the Parties have since discussed, and the Underwriter Defendants have now agreed in principle to conduct a tailored search of ten additional document custodians, for a limited time period, using additional search terms. This should resolve Plaintiffs' request for additional discovery from analysts." *Id.* at 9. This being the case, the Court finds that there is currently no dispute related to discovery from analysts that requires the Court's attention.

### III. CONCLUSION

For the foregoing reasons, the Court finds that the Underwriter Defendants need not produce sworn declarations regarding their use of unofficial communications or their document preservation policies. Upon being deposed, the Underwriter Defendants must be prepared to testify regarding the use of unofficial means of communications to conduct substantive business related to the SDC IPO. As the dispute regarding discovery from analysts appears to now be moot, there is nothing for the Court to resolve in that regard.

**IT IS SO ORDERED.**

**JEFFERY S. FRENSLEY**
**United States Magistrate Judge**

12