# EXHIBIT E

| From: | Chris Wood |
|---|---|
| To: | "Wolfshohl, Joshua W."; Allison D. Byman |
| Cc: | Power, Aaron J.; Max Schwartz; Mickey Etkin; rww@bymanlaw.com; Jerry Martin; Jeffrey Stein |
| Subject: | RE: SDC |
| Date: | Thursday, May 9, 2024 11:54:27 AM |
| Attachments: | Improperly Withheld for Privilege Documents Log_Final.xlsx |
| | Improper Redactions Log_Final_4.29.24.xlsx |
| | Ciccio Special master order on privilege log dispute.pdf |
| | SDC - Final Search Terms.docx |

Counsel,

As we mentioned during our last call, at the time of SDC's bankruptcy we believed the Company's document production to be incomplete. In particular, (i) the Company's privilege logs were inadequate; and (ii) we believed several additional custodians should have been searched.

Below and attached are summaries of these issues. We appreciate the scope of the issues raised here, and would like to reach a solution that reduces or eliminates any burden the Trustee and the estate, including potentially through a clawback or quick peek agreement. We'd like to discuss this on a call at your convenience.

**Improperly Withheld/Redacted Documents**

SDC produced less than 250,000 documents in this case, but they withheld or redacted almost 100,000 on the basis of privilege or privacy. We have conducted a detailed analysis of SDC's lengthy privilege logs and identified several categories of documents for which the stated rationale for withholding or redacting the documents is meritless on its face. The attached spreadsheets include lists of the documents with meritless claims of protection. In total, we identified 4,396 docs with improper redactions, and 12,406 documents that SDC improperly withheld. These lists are long, but that is a product of SDC's aggressive and improper claims of privilege/privacy. We tried our best to limit the request to only the most egregious examples of improper claims of protection. You will see that in each spreadsheet, the first tab includes a complete list of the documents requested, the second tab includes a breakdown of documents by category, and the subsequent tabs provide more detail about the documents requested and the reasons the claim of protection is improper. The categories break down as follows:

 - **Improper Redactions**

The list of improperly redacted documents refers to bates numbers of produced documents.

> **ELP Redactions** – In **2,189 documents**, Defendants improperly withheld the identity of SDC-affiliated dentists known as "ELPs" (Endorsed Local Providers), who provided the alleged substandard care to SDC patients. Defendants have failed to provide any legitimate reason for withholding these names, other than to say the dentists "don't want to be involved" with the litigation.

> **Protected Content Redactions** – In **1,081 documents**, Defendants redacted relevant information on the basis of "Protected Content," which is not a legitimate basis for

withholding information.  In many cases, Defendants use this catch-all designation to withhold information they simply do not want to disclose, such as public criticisms on social media, or unfriendly articles.  Tellingly, in *Ciccio v. SmileDirectClub, LLC*, a special master in the Middle District of Tennessee already determined that SDC's "redactions of 'protected content' based on their unilateral determination of relevance is not appropriate." *See* attached *Ciccio* order at 4.

**Redacted-No Basis** – For this category comprising **231 documents**, Defendants failed to provide any basis or justification at all for redacting the information.

**No Attorneys Present** - Defendants redacted content from **370 documents** on the basis of "Privilege" or "Attorney client Privilege" where there are no attorneys present on the email chain and no reference to legal advice.

**Attorney is Passive Recipient** – In this category of **28 documents**, Defendants claimed "Privilege" or "Attorney client Privilege" on communications where in-house counsel was merely copied on the email but did not participate. The law is clear that the mere presence of in-house counsel does not make communications privileged. *United States Postal Serv. v. Phelps Dodge Refin. Corp.*, 852 F. Supp. 156, 163-64 (E.D.N.Y. 1994) ("A corporation cannot be permitted to insulate its files from discovery simply by sending a 'cc' to in-house counsel.").

**Third Parties Present** – In this category of **686 documents**, Defendants have redacted content on the basis of "Privilege" or "Attorney client Privilege" when outside third parties were included on the communications. However, "[a]s a general rule, the attorney-client privilege is waived by voluntary disclosure of private communications by an individual or corporation to third parties."  *In re Columbia/HCA Healthcare Corp. Billing Pracs. Litig.*, 293 F.3d 289, 294 (6th Cir. 2002).

**Redactions Overbroad** – In this category of **206 documents**, the redactions are so excessive that Plaintiffs could not assess the validity of Defendants' claims of privilege. For instance, in many of these documents, entire pages are redacted, including non-privileged information in email fields, such as:  the date, sender, recipient, CC, BCC, and email subject.

**Withheld-Privilege** – In **235 instances**, Defendants withheld attachments and instead produced a coversheet asserting privilege as to the entire document.  This list of documents includes instances where we see no valid basis for withholding the attachment.

**Withheld-Not Responsive** – Similarly, in **16 instances**, Defendants withheld entire attachments from a family of documents, contending only that the attachments were "Not Responsive." This amounts to a relevance redaction, which is patently improper.  *See, e.g., Nieves v. Baptist Mem'l Med. Grp., Inc.*, No. 18-2748-JTF, 2020 WL 3441900, at *2 (W.D. Tenn. June 23, 2020) ("parties 'cannot unilaterally redact portions of documents based on relevancy grounds.'")

- **Improperly Withheld Documents**

The list of improperly withheld documents refers to entries of parent emails in the privilege logs produced by SDC in the state and federal actions.

> **No Attorneys Present** - - Plaintiffs have identified **2,671 entries** on the privilege logs in which no attorneys are present in the "To/Author", "From", "CC", and "BCC" fields. Since attorney-client privilege only applies to information conveyed between clients and their attorneys for the purpose of obtaining legal advice, the documents in these entries should be produced.

> **In-House Counsel as Passive Recipient** - Plaintiffs have also identified **1,067 entries** on the privilege logs where in-house counsel, Susan Greenspon Rammelt, is merely copied on communications between SDC executives and/or employees. Here again, since in-house counsel is not an active participant in these communications, these documents should be produced.

> **Third Parties Present** – Plaintiffs have identified **9,065 entries** on the privilege logs in which the purportedly privileged communication was disclosed to a third party. As mentioned, the attorney-client privilege is waived by the voluntary disclosure to third parties.

> **Joint Defense and Common Interest** – Finally, Plaintiffs have identified **131 entries** on the privilege logs in which Defendants withheld documents based on a joint defense agreement or pursuant to a common interest doctrine. However, to invoke these protections, "Defendants must prove an agreement among its members to share information arising out of a common legal interest in litigation." *John B. v. Goetz*, 879 F. Supp. 2d 787, 898 (M.D. Tenn. 2010) (citing U.S. v. Moss, 9 F.3d 543, 550 (6th Cir. 1993)). Since Defendants have made no effort to invoke a joint defense or common interest privilege, these documents should be produced.

## <u>Additional Custodians</u>

We believe the following custodians should be searched using the agreed-upon parameters (attached).

1. **<u>Kay Oswald:</u>** During the Relevant Time Period, Kay Oswald was SmileDirectClub's President of International. In this role, we understand that Mr. Oswald would have been directly involved with expanding SmileDirectClub's teledentistry model to international markets and according to his LinkedIn profile he "crafted solutions to regulatory issues"; "created capabilities to scale [the] organization and execute against aggressive growth plans," was involved with the preparation of the Company's S-1 filing, and "orchestrate[d] pre-IPO roadshow[s]."

2. **<u>Emily Watson</u>**: During the Relevant Time Period, Emily Watson was a Reputation Specialist and Community Associate Manager. In these roles, we understand that Ms. Watson would have been directly responsible for monitoring reputational threats to the Company, its services, and its

products, which included how the Company would respond to negative customer reviews.

3. **Tim Spivy:** During the Relevant Time Period, Tim Spivy was the Director of Club Member Experience. In this role, we understand that Mr. Spivy would have been directly involved with refund procedures, customer retention, marketing and membership programs to promote the Company's services, quality assurance, sales, and training.

4. **Cheryl DeSantis**: During the Relevant Time Period, Cheryl DeSantis was the Chief People and Diversity Officer. In this role, we understand that Ms. DeSantis was a member of the executive leadership team and would have been responsible for talent acquisition, pay and benefits, employee turnover, team member relations, team engagement, and development of SmileDirectClub's global business.

5. **William Beswick**; During the Relevant Time Period, William Beswick was a Dental Team Captain. In this role, we understand that Mr. Beswick was a call center manager and interacted directly with customers having problems with their dental aligners and requesting refunds.

6. **Doug Incorvati**: During the Relevant Time Period, Doug Incorvati was the Senior Vice President of Stores, Revenue, and Operations. In this role, we understand that Mr. Incorvati had responsibilities concerning sales forecasting, store operations, store expansions, and drove revenue for 386 retail stores and 400 dental offices.

Please let us know when would be a good time for a call to continue our discussions.

Best Regards,

Chris Wood
**Robbins Geller Rudman & Dowd LLP**
200 31st Avenue North
Nashville, TN 37203
Tel. (615) 244-2203

---

**From:** Wolfshohl, Joshua W. <JWolfshohl@porterhedges.com>
**Sent:** Thursday, March 28, 2024 10:19 AM
**To:** Mickey Etkin <metkin@lowenstein.com>
**Cc:** Power, Aaron J. <APower@porterhedges.com>; Chris Wood <CWood@rgrdlaw.com>; Max Schwartz <mschwartz@scott-scott.com>; Allison D. Byman <adb@bymanlaw.com>; rww@bymanlaw.com
**Subject:** RE: SDC

EXTERNAL SENDER
I totally understand and agree. Let's talk Monday.

Josh

**Joshua W. Wolfshohl** | Partner
**Porter Hedges LLP**

1000 Main St, 36th Floor | Houston, TX 77002
**t** 713.226.6695   **e** JWolfshohl@porterhedges.com
**Bio** • **Web** • **V-Card**